# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

NEW YORK JETS LLC and
JETS DEVELOPMENT LLC,

               Plaintiffs,

     v.

CABLEVISION SYSTEMS CORPORATION,
CSC HOLDINGS, INC., and
MADISON SQUARE GARDEN LP,

             Defendants.

----------------------------------------------------------X

**JUDGE BAER**

**05** Case No. **2875**
(ECF)

**JURY TRIAL DEMANDED**

**COMPLAINT**

RECEIVED
MAR 16 2005
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs New York Jets LLC and Jets Development LLC (collectively, "Jets," "New York Jets" or "Plaintiffs"), for their complaint against Defendants Cablevision Systems Corporation, CSC Holdings, Inc., and Madison Square Garden LP (collectively, "Cablevision" or "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

1.    Defendant Cablevision possesses monopoly power in the market for cable services in much of the New York metropolitan area. As the owner and operator of Madison Square Garden and Radio City Music Hall, it also possesses monopoly power over enclosed large-scale spectator events and private spectator suites in Manhattan. As Cablevision proclaims on the video scoreboard screen at its Madison Square Garden: "We Own This Town."

Dockets.Justia.com

Cablevision's monopolies -- its "ownership" of this town -- have enabled Cablevision to overcharge the public for such events and for the rental of private spectator suites. Unlawfully seeking to protect its inflated profits, Cablevision has spent tens of millions of dollars, both itself and through front groups, to maintain its monopolies by preventing the New York Jets from developing a competing facility, the New York Sports and Convention Center (the "Sports and Convention Center"), on Manhattan's west side.

2.      The Sports and Convention Center -- a multi-purpose sports, entertainment and convention facility, to be built over the rail yard owned by the Metropolitan Transportation Authority (the "MTA") on Manhattan's long-neglected far west side -- would bring to New York City thousands of jobs, hundreds of millions of dollars of tax revenues, and hundreds of millions of dollars of economic activity and development. Notwithstanding the enormous public benefits from such a facility, Cablevision has gone to unprecedented lengths to prevent its construction because, as Cablevision's Chief Executive Officer, James Dolan, recently explained, the Sports and Convention Center would "affect the Garden's bottom line" and "[Cablevision] would definitely lose concert business, attraction business. . . . We're going to have to compete on price . . . it is going to be a competition, everybody is going to have to . . . take a cut in order to compete . . . ."

3.      The Jets' willingness to undertake the development of the Sports and Convention Center represents an unprecedented private contribution -- more than one billion dollars -- toward the cost of both an Olympic Stadium and a civic facility that could accommodate large-capacity sports and entertainment events. For ten days a year, the Sports and Convention Center will host the Jets in a 75,000-seat stadium; for the other 355 days a year it will be available to

host such major events as the Super Bowl, the NCAA Final Four and other events. Notably, the Sports and Convention Center is an essential cornerstone of New York City's bid to host the 2012 Olympics.

4.    Shortly after Robert Wood Johnson IV became owner of the Jets in January 2000, the Jets, in conjunction with the City and State of New York, began working towards creating the Sports and Convention Center. Over the past four years, the Jets have spent more than $50 million in pursuit of the Sports and Convention Center and achieved many of the milestones necessary for its completion. On March 25, 2004, the Jets entered into a memorandum of understanding (the "MOU") with the MTA and the Empire State Development Corporation ("ESDC") requiring the parties to work cooperatively and to use their "best efforts" to obtain written agreements and the approvals necessary to develop the Sports and Convention Center and to begin construction on the Sports and Convention Center before July 2005. By February 2005, the Jets and the MTA had agreed to have an independent arbitrator determine the fair market value of the property that the MTA was to lease to the Jets upon which the Sports and Convention Center is to be built.

5.    In the face of this progress, and fearing the competition it would face from the Sports and Convention Center, Cablevision has only intensified its multi-million dollar anticompetitive campaign designed to delay and derail the Sports and Convention Center.

6.    That illegal campaign has included, among other things, funding a multi-million dollar onslaught of false and misleading advertisements -- which the media have described as "outrageous," a "pattern of lies," and a "big lie program;" leveraging its vast New York cable television monopolies and media market power to refuse, and coerce others to refuse, Jets'

advertising in order to prevent the Jets from responding adequately to Cablevision's false campaign; submitting a sham bid on the eve of the Jets' fair market value arbitration with the MTA to acquire the site where the Sports and Convention Center is to be built; and supporting and funding sham litigation in order to kill or delay the development of the Sports and Convention Center.

7.    In an effort to disguise its illegal anticompetitive conduct from the public, Cablevision has funded a front group -- the New York Association for Better Choices -- through which it has disseminated much of its false and misleading advertising. Cablevision has used millions of dollars of commercial airtime on its own cable systems to run false and misleading advertising attacking the Sports and Convention Center, and yet has refused to air any Jets advertising regarding the benefits of the project. Moreover, in an outrageous abuse of its monopoly power over cable television, Cablevision has not only refused to run the Jets' advertising on its networks but has also coerced other television stations not to accept this advertising, thereby preventing the public from hearing the Jets' side of the story. Cablevision even blocked Jets' commercials promoting New York's bid to host the 2012 Olympics during locally-aired news broadcasts, including broadcasts on CNN, FOX News, MSNBC, and Long Island News 12. Thus, Cablevision has deliberately misled millions of New Yorkers throughout the state and denied them access to the facts.

8.    None of these actions by Cablevision have had any legitimate business purpose or justification. Instead, Cablevision has placed in jeopardy New York City's bid to host the 2012 Olympics, the Jets' and Jet fans' rights to have a home field, hundreds of millions of dollars of tax revenue for the City and State of New York and thousands of jobs for New Yorkers -- all to

protect Cablevision's monopolies in Manhattan and its ability to reap unjustifiable and unlawful profits from the consuming public. Indeed, the extraordinary lengths to which Cablevision is going to protect its monopolies is probably the single best indication, among others, that these monopolies are extraordinarily valuable and lucrative for Cablevision.

9.    This suit seeks to enjoin the Defendants' unlawful anticompetitive conduct and to compensate the Jets for the damages they have sustained and will sustain as a result of such unlawful conduct.

## THE PARTIES

10.    Plaintiff New York Jets LLC, a Delaware limited liability company, is a member club of the National Football League ("NFL"), owns and operates the New York Jets professional football team and has its principal place of business in New York, New York.

11.    Plaintiff Jets Development LLC, a Delaware limited liability company with its principal place of business in New York, New York, is an affiliate of the New York Jets LLC and is the development arm of the Jets organization overseeing and implementing the development of the Sports and Convention Center.

12.    Defendants Cablevision Systems Corporation ("Cablevision Systems") and CSC Holdings, Inc. ("CSC Holdings") are Delaware corporations, with their principal places of business in Bethpage, New York. The only asset of Cablevision Systems is all of the outstanding common stock of CSC Holdings.

13.    Defendant CSC Holdings is one of the largest cable operators in the United States based on the number of subscribers. CSC Holdings has investments in cable programming networks, entertainment businesses and telecommunications companies. As of December 31, 2004, Defendant CSC Holdings served more than 3 million cable television subscribers in and around the New York City metropolitan area, including an absolute monopoly over all cable services in Bronx, Nassau, Suffolk, and Westchester counties, nearly 75% of the eighteen community districts in Brooklyn, and much of upstate New York. Defendants wield enormous market power in New York's metropolitan media and entertainment markets through, among other things, their ownership of numerous media and entertainment businesses and the commercial airtime they control as well as the advertising they purchase.

14.    Defendant Madison Square Garden L.P. is a Delaware partnership, indirectly owned and controlled by CSC Holdings. Madison Square Garden is engaged in the sports and entertainment business through its ownership and operation of, among other things, the Madison Square Garden arena (the "Garden"), the adjoining Theatre at Madison Square Garden, Radio City Entertainment (which operates Radio City Music Hall), the New York Knicks professional basketball team, the New York Rangers professional hockey team, the New York Liberty professional women's basketball team, and the Madison Square Garden television network.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, and 1367 and 15 U.S.C. §§ 2, 15, 22 and 26.

6

16.     Venue is proper in this District pursuant to 15 U.S.C. §§ 22 and 26, and 28 U.S.C. § 1391(b).

17.     Defendants transact business in this District, have directly, foreseeably and substantially affected interstate commerce in the United States, and have caused injury to Plaintiffs in this District.

## FACTUAL BACKGROUND

A.     **Injury to Competition in the Relevant Product and Geographic Markets**

18.     As described in more detail below, the Defendants own or control all of the enclosed spectator facilities that seat more than 5,000 spectators and are suitable for staging large-scale sports, entertainment and other major events ("enclosed large-scale spectator events") in Manhattan.  Defendants use these facilities in two ways:  they rent the facilities to promoters and producers who stage enclosed large-scale events; and they promote or produce such events themselves and sell tickets directly to the public.  Defendants' monopoly control of these facilities has enabled them to monopolize the following relevant markets (including relevant sub-markets):

(a)     The market for the rental of enclosed facilities with seating capacity greater than 5,000 for enclosed large-scale spectator events in Manhattan;

(b)     The market for sales of tickets for enclosed large-scale spectator events held in enclosed facilities with seating capacity of greater than 5,000 in Manhattan; and

(c)     The market for the rental of suites ("the suite market") in enclosed

facilities with seating capacity of greater than 5,000 in Manhattan.

19.     Through the anticompetitive conduct described herein, Defendants have willfully

maintained, and, unless restrained by the Court, will continue to willfully maintain, monopoly

power in those markets by anticompetitive and unreasonably exclusionary conduct, in violation

of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Individually and collectively, Defendants'

anticompetitive acts were undertaken for the purpose of preventing the Jets from constructing the

Sports and Convention Center in Manhattan which would compete with Defendants' facilities

and compete with their unlawful monopolies.

20.     Defendants' Madison Square Garden (with a seating capacity of approximately

19,500) and the Theatre at Madison Square Garden (with a seating capacity of approximately

5,600) -- both located at West 33rd Street between Seventh and Eighth Avenues -- and Radio City

Music Hall (with a seating capacity of approximately 6,000) -- located at West 50th Street and

Avenue of the Americas -- are the only enclosed spectator facilities in Manhattan with a seating

capacity of 5,000 or more.  Madison Square Garden hosts professional basketball, hockey,

tennis, boxing and wrestling, college basketball, the circus, ice shows, dog shows, award shows,

and concerts, among other events.  The Theatre at Madison Square Garden hosts concerts, family

and children shows such as Sesame Street Live, Golden Gloves boxing, and awards shows,

among other events.  Radio City Music Hall hosts stage shows, concerts, and special events,

including award shows, and family and children shows, among other events.

8

21.     Enclosed large-scale spectator events can only be staged in facilities with seating capacities in excess of 5,000 because of, among others, such factors as the cost of staging such events, the size of the facility needed to conduct the events, and the number of people necessary to be present at such events to make them economically viable.  There are no other facilities in Manhattan that are reasonable substitutes for events of this nature.  Thus, for example, smaller enclosed facilities such as Broadway theaters generally are not a substitute for enclosed large-scale spectator events because they are too small or are not properly configured to stage the events, and they are too small to accommodate the number of patrons needed to realize sufficient revenues to make the staging of the event practical.

22.     The suite market is a separate product market from the facilities rental and ticket sales markets because no other product is reasonably interchangeable for spectators who want to view major live sports, entertainment and other events with a group of people in a private setting. Suites are particularly highly valued by business customers who wish to entertain guests at major events while permitting conversation and interaction with their guests in ways that are not possible in normal theater-type seating.

23.     The 89 suites at Madison Square Garden are the only suites in an enclosed large-capacity facility in Manhattan.  Those suites, which contain private seating, television sets, computers with high-speed internet access, private bathrooms, a private bar and unobstructed views of the event floor, are an extremely profitable business for Defendants, and are priced much higher than other seats in Madison Square Garden or suites at other more modern venues.

24.    Suite rentals typically are long-term (five-to-ten-year) licenses which entitle the licensees to access the suites for all events for which they also purchase tickets at the facility. Suite licensees are generally large corporations and local businesses, which use access to the suites for networking and entertaining clients, prospective clients, vendors, employees and other business associates. Defendants charge an exorbitant fee in comparison to suites at other venues around the country, the vast majority of which offer superior amenities and closer proximity to the event floor in comparison to the Garden's substandard suites.

25.    Manhattan is the relevant geographic market for the relevant product markets for a number of interrelated reasons. First, Manhattan is an international center of business, art, media, entertainment and culture, with unparalleled dining and lodging accommodations. For businesses seeking to entertain guests, a venue outside of Manhattan is simply not a reasonable substitute both in terms of the convenience and prestige for entertainment purposes. For example, for a large number of businesses who wish to entertain either an out-of-town visitor attending a business meeting or staying at a hotel in Manhattan, or simply someone who lives or works in Manhattan, transporting their guests to Long Island or New Jersey to see a sporting or other entertainment event is not a reasonable substitute to a taking those guests to a convenient Manhattan venue. For this reason, neither suites nor venues outside of Manhattan are a reasonable substitute for suites or venues in Manhattan.

26.    Similarly, because Manhattan is the publishing, media and arts capital of the United States, it is essential that performing artists, such as a popular musical act, on a national tour perform at a venue in Manhattan in order to attract journalists, critics and other national opinion leaders to their performances, and thereby generate publicity and critical notice. Since

10

many musical tours are undertaken primarily for the purpose of publicizing their CDs, it is vitally important for these performers to reach the Manhattan media. Venues outside Manhattan are not reasonable substitutes for such performers. For this reason, acts that generally perform only at stadiums make an exception to play at the smaller Garden in order to gain exposure in the critical Manhattan media market.

27. Also, Manhattan is the geographic and a transportation hub of the greater New York City metropolitan area and Tri-State area. Millions of people live or work in Manhattan. Many of these people do not own automobiles. Manhattan is easily accessible by many different avenues of public transport. While some of these potential patrons would perhaps also attend the same event in New Jersey or Long Island (or one of the outer boroughs), for any given event, demand for tickets will always be highest in Manhattan because it is by far the most convenient location for the greatest number of people, as well as the most desirable location to attend an event due to abundant supply of restaurants, bars, hotels, taxicabs, and other complementary services. For these reasons, consumers who wish to attend an event in Manhattan would not consider a ticket to a performance elsewhere to be a reasonable substitute. Similarly, event promoters who wish to attract the Manhattan audience would not consider a venue elsewhere to be a reasonable substitute.

28. It is for these reasons that performing artists on a national tour often play a Manhattan venue, usually in addition to a venue in Long Island and/or New Jersey. Thus, for performing artists and event promoters, Manhattan constitutes a distinct geographic area for concerts that is separate from other areas.

11

29.    In short:

    (a)    for promoters and organizers in the enclosed large-scale event facility rental market, Manhattan is a unique venue for the presentation and marketing of such events, for which there is no reasonable substitute;

    (b)    for the enclosed large-scale event ticket sales market, Manhattan, as the international center of business, art, entertainment and culture, with unparalleled dining and lodging accommodations, is a unique venue for the presentation and marketing of such events, for which there is no reasonable substitute; and

    (c)    for the suite rental market, Manhattan, as the international center of the financial, banking, legal, publishing, fashion and other major industries, as well as art, entertainment and culture, with unparalleled dining and lodging accommodations, is a unique venue for such suites, for which there is no reasonable substitute.

30.    That Manhattan constitutes the relevant geographic market for the relevant product markets is confirmed by the fact that on November 4, 2004 during a conversation with Mr. Johnson, James Dolan urged Mr. Johnson to move the project to Queens.

31.    The barriers to entry to the markets monopolized by Defendants are very high, thereby allowing Defendants to control pricing and exclude competition within those markets. There is simply no available site of sufficient size in Manhattan for an economically viable

enclosed large-scale sports and entertainment facility, such as this project, including one containing suites, except for the proposed site of the Sports and Convention Center. As further alleged below, Defendants have engaged and continue to engage in an intentional wrongful scheme to maintain their monopolies by blocking the sole potential entrant into Defendants' three monopolized markets from building the only facility on the only site in Manhattan capable of competing with Defendants' facilities.

32.    At the expense of consumers and businesses, Defendants have reaped substantial profits from the monopoly power they wield in these markets in the form of inflated monopoly prices for facility rentals, tickets and suite licenses.

33.    Defendants' illegal maintenance of their monopolies have caused injury to competition in one or more of the following ways:

(a)    Charging excessive ticket prices to the public for enclosed large-scale spectator events, including but not limited to concerts, awards shows and large live family entertainment events, in outdated and substandard facilities;

(b)    Charging excessive license fees to users of suites, in outdated and substandard facilities;

(c)    Charging excessive prices to the public for ancillary services such as concessions, souvenirs, and other amenities;

13

(d)    Charging excessive rents to promoters, performers, entertainers, and conventions, in outdated and substandard facilities;

(e)    Charging excessive fees to advertisers in Madison Square Garden; and

(f)    Restricting output of large scale entertainment events in order to maintain excessive rents and ticket prices.

## B.    Defendants' Wrongful Conduct

34.    For over four years, Plaintiffs have expended considerable effort and more than $50 million dollars in pursuing the development of the Sports and Convention Center over a portion of the west side rail yard. That site is part of the largest contiguous location -- equivalent to seven city blocks or 30 acres -- available for development in midtown Manhattan and is the only site in Manhattan suitable for an enclosed facility that would compete with Defendants' enclosed facilities. Completion of the Sports and Convention Center would introduce competition with Defendants' facilities and thereby end Defendants' monopolies over enclosed large-scale events and suites in Manhattan.

35.    Madison Square Garden has contemplated building an enclosed facility at the site of the west side rail yard on two previous occasions. In 1989, when the MTA built the rail yard to provide a switching area for the Long Island Railroad, Defendants contemplated building a replacement for the aging Garden on the site, but instead decided to perform less expensive rehabilitation to the existing Garden. More recently, in 2002 and early 2003, the Jets and Defendants jointly explored and expended considerable amounts of money on the proposed construction of a state-of-the-art "Trisport" facility on the site that could have housed the Jets,

14

Knicks, and Rangers, and also permitted expanded convention, sports and entertainment business to be attracted to Manhattan. In connection with the Trisport project, Defendant Cablevision itself had acknowledged the benefits and versatility of an enclosed large-capacity facility (such as the Sports and Convention Center) -- including its potential use for large-scale entertainment and other events -- and the benefits that New York City and the community would derive from its development. In early 2003, Defendants abandoned that project.

36.    Defendants have acted to prevent Plaintiffs from constructing a competing enclosed facility in Manhattan, by, among other things:

(a)    Leveraging and abusing their cable advertising monopoly and market power in Long Island, the Bronx, Westchester and parts of Brooklyn and other parts of New York State to maintain their monopoly in facilities and suites in Manhattan to prevent Plaintiffs from reaching consumers with pro-Sports and Convention Center advertising on major media outlets, including outlets owned by Defendants, and outlets not owned by Defendants that broadcast on Defendants' cable systems;

(b)    Engaging in a false, misleading and fraudulent disinformation campaign to disparage the Defendants' plans to construct the Sports and Convention Center, the source of which has been disguised from the public through Cablevision's use of a front group -- the New York Association for Better Choices -- which is funded primarily by Cablevision;

15

(c)    Bringing and financing baseless litigation for the sole purpose of impeding Plaintiffs' plans to construct the Sports and Convention Center; and

(d)    Submitting a sham bid to acquire the planned Sports and Convention Center site for the sole purpose of impeding Plaintiffs' plans to construct the Sports and Convention Center by interfering with the Defendants' prospective business relations with the MTA.

Defendants had no legitimate business rationale for any of this conduct.

### C.    Plaintiffs' Efforts to Construct A Competitive Enclosed Facility

37.    Since their formation in 1959, the New York Jets (and their predecessor, the New York Titans) have never had their own stadium.  Instead, they have played their "home" games at the Polo Grounds in Manhattan, Shea Stadium in Queens, and Giants Stadium in New Jersey (which is named for the Jets' cross-town rivals, the New York Giants of the NFL).  Shortly after Robert Wood Johnson IV became the owner of the New York Jets in early 2000, the Jets began planning to build a home stadium in Manhattan.  By September 2000, Mr. Johnson and other representatives of Plaintiffs had met with New York City representatives to discuss proposals for a new stadium facility on the west side of Manhattan.

38.    On January 15, 2003, after Cablevision withdrew from the Trisport project, during a meeting at Madison Square Garden between Seth Abraham, then President of Madison Square Garden, James Dolan and Jay Cross, President of the Jets, James Dolan stated that Cablevision would not oppose continued efforts by the Jets to construct the Sports and Convention Center.

16

The Jets then continued their own extensive and expensive efforts to develop the Sports and Convention Center on that site. Those efforts included continued, intensive negotiations with the MTA and ESDC and the development of a plan, encompassing, among other things, architectural and environmental considerations, to develop and to construct the facility on that site.

## D.     Defendants' Have Acknowledged The Sports and Convention Center Threatens Their Monopolies

39.     The Sports and Convention Center would provide substantial competition for Cablevision's monopolies in the markets for enclosed spectator facilities for large-scale events and suites in Manhattan. James Dolan has publicly acknowledged that competition from the Sports and Convention Center would impair Defendants' ability to continue to harvest unwarranted profits from its enclosed spectator facility and suite monopolies. On October 29, 2004, during a public radio interview on WFAN-AM, simulcast on MSNBC-TV, James Dolan admitted that the Sports and Convention Center proposed by Plaintiffs would "affect the Garden's bottom line;" and that "[Cablevision] would definitely lose concert business, attraction business. . . . We're going to have to compete on price . . . for getting concerts, rentals . . . in order to keep the place busy they're going to have to go after business that is already in the Garden . . . it is going to be a competition, everybody is going to have to . . . take a cut in order to compete . . . ."

40.     Defendants' view that the Sports and Convention Center is a threat to their monopolies over enclosed large-scale spectator facilities and suites in Manhattan is demonstrated by their public statements indicating their opposition to an enclosed spectator facility in Manhattan. In fact, James Dolan has stated that Defendants would drop their opposition to the

Sports and Convention Center if it is constructed without a retractable roof, and have not publicly objected to the construction of an enclosed arena in Brooklyn (for the Nets of the National Basketball Association) or in Queens, for a simple reason: these alternatives are not competitive threats to their monopolies over enclosed spectator facilities for large-scale events and suites in Manhattan.

### E.     Defendants' Anticompetitive Acts to Maintain Their Monopolies

#### i. Defendants' Public Misrepresentations

41.     Defendants have engaged in and continue to engage in a massive media campaign through their cable monopoly and other outlets designed to malign and denigrate the Sports and Convention Center project and Plaintiffs.  Through advertising and public statements, Defendants have deliberately and wrongfully misrepresented such matters as:

> (a)     the economic benefits of the Sports and Convention Center;
>
> (b)     the financing of the Sports and Convention Center;
>
> (c)     the truthfulness and integrity of Plaintiffs in preparing and submitting regulatory filings for the Sports and Convention Center; and
>
> (d)     the environmental impact of the Sports and Convention Center.

42.     Public officials and media reports have pointed out the false and misleading nature of Defendants' advertisements:

> (a)     *New York Times* (August 12, 2004, p. B7):  A Cablevision-supported advertisement "breathlessly exaggerates findings in the city's recent environmental impact statement on the proposed redevelopment of the West Side by conflating the stadium itself with a surrounding project that involves 28 million square feet of office space and 12,000 apartments."

18

(b)    *Daily News* (September 5, 2004, p. 44): "[T]he stadium would spark critically needed development in a long-fallow Manhattan neighborhood. Now, you wouldn't know any of that from the anti-stadium ads that a group called New York Association for Better Choices has been running on television. The organization's latest commercials assert that the city has chosen to spend $600 million on the Jets stadium rather than pay fair wage hikes to cops and firefighters. The claim, patently false, is part of a pattern of deception foisted on New York by Madison Square Garden owner Cablevision. Company chiefs Charles and James Dolan are terrified because the Jets stadium has been designed with a retractable roof so it can serve as an annex to the Javits Convention Center. Desperate to preserve the Garden's entertainment monopoly -- including an $11 million-a-year city tax break -- the Dolans are bankrolling the TV commercials, complete with multiple falsehoods."

(c)    *Crain's New York Business* (January 31, 2005, p. 11): Cablevision's statements, including the claim that building the Sports and Convention Center facility would mean less money for policemen, teachers and firemen, are false: "Cablevision flunks Finance 101 here. City workers are financed by the operating budget, which is the sum of taxes collected and aid received from Albany and Washington. Projects such as the stadium are financed by the capital budget, which is money borrowed for infrastructure. It is illegal for the city to use capital money to pay for operating expenses. . . . Big lie campaigns like this one sometimes work. This one must fail."

(d)    *Daily News* (March 6, 2005, p. 44): "The naked self-interest of Cablevision bosses Charles and Jim Dolan - and their readiness to work against the best interests of New York - have been breathtaking. They have one aim, and that is to save the Garden, an antiquated frump in need of an extreme makeover, from competition by a stadium that would also serve as an entertainment venue and annex to the Javits Convention Center, as well as be the centerpiece venue of the 2012 Olympic Games . . . The company also has funded all those anti-stadium TV commercials you see - the ones that accuse Mayor Bloomberg of diverting $600 million from schools and firehouses to pay for construction. Such a claim is a lie worthy of prosecution under the laws against false advertising. Here is the truth: The city and state jointly plan to borrow $600 million to pay for improvements that will make the stadium a convention center annex. The money will be repaid, plus profit, out of tax revenue generated by the facility - as every independent analysis has projected. Not one cent of the $600 million will come out of the operating budget that pays for city services."

19

### ii. Defendants' Attempts to Silence Plaintiffs

43.    In response to Defendants' misleading media campaign, Plaintiffs have attempted to balance the record by providing the public with their point of view concerning the Sports and Convention Center project.  The most effective way to do this is to utilize the same media outlets Defendants have advertised on, many of which are carried over Cablevision's cable television system.  In a shocking abuse of its monopoly power over cable television, Cablevision has not only refused to run these advertisements on its networks but also has coerced other television stations not to accept the Jets' advertisements, thereby preventing the public from hearing the Jets side of the story.

44.    In a further illegal attempt to preserve their monopolies, Defendants have wrongfully used their cable franchise monopoly over cable television systems in Long Island, the Bronx, most of Brooklyn and other New York locations to prevent Plaintiffs from responding to Defendants' false and misleading advertisements in those areas.  There is no rational business justification for Defendants' refusal to accept profitable advertising on this subject from Plaintiffs except the desire to maintain their monopolies in the enclosed spectator facility and suite markets.  Defendants are using their cable monopolies both to push their opposition to the Sports and Convention Center and to prevent Plaintiffs from communicating their message in support of that project.  The abuse of Defendants' cable monopoly to preserve their wrongful monopolies in enclosed spectator facilities and suites in Manhattan is anticompetitive conduct in violation of Section 2 of the Sherman Act.

45.     More specifically, by virtue of their cable system ownership, Defendants control all local advertising on non-broadcast networks, such as A&E, USA, CNN, CNBC, and YES, regardless of whether those networks are independently owned. Defendants have used this monopoly to prevent Plaintiffs from purchasing local commercial spots on all non-broadcast networks carried on their cable systems. Defendants have likewise used their cable systems monopoly to prevent Plaintiffs from placing advertisements in favor of the Sports and Convention Center on Long Island News Channel 12 (which is owned by Cablevision and broadcast on its system), on the YES Network and the WLNY-TV network (Channel 55 on the Cablevision network), all of which actually solicited the advertisements from Plaintiffs before rejecting them.

46.     Even though they refused to carry Plaintiffs' advertisements supporting the Sports and Convention Center, some or all of those same media outlets carried Defendants' advertisements opposing the Sports and Convention Center, thereby providing the public in Long Island, the Bronx and most of Brooklyn with a one-sided and false view of the issues. These actions have had a material adverse effect on Plaintiffs, as they have prevented Plaintiffs from communicating their views on the Sports and Convention Center to Jets' season ticket holders and other consumers.

47.     Support for the Sports and Convention Center is lower in the areas where Plaintiffs have been denied media time (because of Defendants' anticompetitive conduct) than in areas where Plaintiffs' advertisements have aired. Defendants had no business rationale to coerce these advertisers into boycotting Plaintiffs' advertising on this subject but for their desire to maintain their monopolies in the enclosed spectator facility and suite markets.

21

48.     Defendants also made unsuccessful attempts to pressure the New York One Network, the 24-hour New York City cable news channel, to refuse to run advertising placed by Plaintiffs concerning the Sports and Convention Center project.  Again, Defendants had no business justification for this conduct except to maintain their monopolies in the enclosed spectator facility and suite markets.

49.     On February 24, 2005, the final day of a visit from the International Olympic Committee, Defendants refused the Jets' request to purchase local commercial airtime on any non-broadcast network carried by Defendants.  In fact, the advertisements blocked by Cablevision, while funded by the Jets, merely featured former US Olympians endorsing New York's bid to host the Olympics in New York.

### iii.  Defendants' Misuse of the Litigation Process

50.     Defendants have funded, supported and promoted baseless litigation designed solely to delay, increase the cost of, and prevent the development of the Sports and Convention Center project.

51.     In September 2004, Defendants and others financed and supported by Defendants, filed sham litigation to prevent the MTA and the New York Planning Commission from even holding scheduled public hearings concerning the development plans for the site and the construction of the Sports and Convention Center based on supposed flaws in a draft environmental impact statement ("DEIS").  This litigation was objectively baseless at the time it was filed:  the Defendants had no reasonable basis to believe that they could prevail on the

22

merits of this lawsuit. On September 21, 2004, the New York State Supreme Court refused to enjoin the hearings and dismissed the case.

52.    In December 2004, Defendants' commenced litigation falsely alleging that Plaintiffs improperly manipulated data submitted in connection with the DEIS and the final environmental impact statement. This litigation was brought as part of their concerted plan to kill the Sports and Convention Center project.

### iv. Defendants' Sham Bid for the West Side Rail Yard

53.    On March 25, 2004, the Jets entered into the MOU with the MTA, which owns the proposed site for the Sports and Convention Center, and the ESDC, New York State's economic development agency. Pursuant to the MOU, the parties agreed to work cooperatively, and to use their "best efforts" to obtain the necessary approvals and reach a comprehensive agreement, for the development of the Sports and Convention Center over the MTA's rail yard. The Jets also agreed in the MOU to pay directly or reimburse on a pay-as-you-go basis all of the MTA's costs for pursuing the Sports and Convention Center project, including fees for consultants and outside counsel, costs for surveys, assessments, environmental review, and other things. By early 2005, the Jets had spent more than $2.6 million on such MTA-related expenses in furtherance of the Sports and Convention Center project.

54.    The MOU contained nine milestones that contemplated commencement of construction of the Sports and Convention Center before July 2005, which was necessary for New York City to win its bid to host the 2012 Olympics.

23

55.    By February 2005, Plaintiffs, the MTA and the ESDC had already accomplished four of the nine milestones contained in the MOU and were on the verge of accomplishing the next three. Defendants realized that soon after the MTA and Plaintiffs determined the fair market value of the site in the arbitration scheduled to commence on February 23, 2005 before former Senator George Mitchell, the parties would complete their comprehensive agreement for the development of the Sports and Convention Center.

56.    On the afternoon of Friday, February 4, 2005 -- after four years of dedicated work by Plaintiffs, the MTA and ESDC to develop the west side rail yard and build the Sports and Convention Center -- Defendants announced an unsolicited "bid" to purchase the site from the MTA for a mixed-use residential real estate development for "$600 Million."

57.    Defendants' "bid" was a sham. Defendants had no intention of building any mixed-use project on this site. Their "bid" had no legitimate business justification and was submitted solely for the purpose of delaying and derailing the Sports and Convention Center. The so-called "bid," a two-page letter, contradicted all the relevant zoning provisions governing the site, had no provisions for financing, was not associated with a professional real estate developer, and lacked specificity for the development itself, despite the fact that Defendants were familiar with the complex zoning and regulatory issues surrounding the development of the site. These obvious deficiencies demonstrate that the "bid" was a sham designed solely to prevent the Plaintiffs from developing the Sports and Convention Center, which would break Defendants' monopolies on enclosed large-scale events and suites in Manhattan.

24

58.     Notably, if Defendants want to erect a multi-use development in that area, they can do so -- with much less difficulty -- on the adjoining plot of land (the eastern portion of the west side rail yard) which the MTA also owns and which is already zoned to accommodate the kind of development purportedly proposed in Defendants' "bid."

59.     That Defendants' "bid" was a sham designed to prevent competition from disrupting their monopolies is confirmed further by the fact that Defendants' proposed multi-use development has nothing to do with any of Defendants' existing lines of business.  In fact, on March 9, 2005, the credit rating agency Standard and Poor's downgraded its rating of Cablevision Systems to "developing," based, in part, on the company's bid for the rail yard site, stating: "Such real estate development is clearly outside Cablevision's purview as a cable TV, media, and entertainment operator, and could represent a substantial change in the company's risk profile."  These concerns and the lack of credibility of Cablevision's "bid" are underscored by the recent significant turmoil on the Cablevision board of directors concerning the company's business plans.

60.     Defendants made their sham "bid" solely for the purpose of delaying and derailing the Sports and Convention Center project.  Defendants intended through their "bid," at a minimum, to delay the commencement of construction past the July 2005 deadline set by the International Olympic Committee for the selection of the 2012 Olympics host city, because Defendants believe that support will then wane for the Sports and Convention Center and that the site will continue to stay in an undeveloped condition for the foreseeable future.

## FIRST CAUSE OF ACTION

## (MONOPOLIZATION, 15 U.S.C. § 2)

61.    Plaintiffs incorporate the allegations in paragraphs 1 through 60 hereof as if fully set forth herein.

62.    Cablevision possesses monopoly power in the markets for facility rental and ticket sales for large-scale events in enclosed spectator facilities and suite rentals in Manhattan. Through the anticompetitive conduct described herein, Cablevision has willfully maintained, and unless restrained by the Court will continue to willfully maintain, that power by anticompetitive and unreasonably exclusionary conduct. Cablevision has acted with an intent to illegally maintain its monopoly power in these markets in Manhattan, and its illegal conduct has allowed it to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

63.    Cablevision's monopoly power coupled with its anticompetitive conduct has had, or is likely to have, among other things, the following effects: (a) actual and potential competition in these markets in Manhattan has been limited, reduced, restrained, suppressed and effectively foreclosed; (b) consumers and businesses who attend events, rent facilities or rent suites in these markets in Manhattan paid or are likely to pay artificially inflated prices; (c) actual and potential competitors of Cablevision in these markets in Manhattan effectively have been foreclosed from competing on the merits with Cablevision and injured in their business and property; (d) consumers have fewer options as to where to attend events and must contend with inferior facilities in which to see those events; and (e) instead of free and open competition in these markets in Manhattan, a monopoly has been established and maintained.

64.     As a result of Cablevision's violations of Section 2, the Jets have been injured in their business and property and are therefore entitled to compensatory damages.

65.     Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  In addition, because Cablevision's anticompetitive conduct is threatening to deprive the Jets access to the sole available property of sufficient size in Manhattan for the construction of an economically-viable Sports and Convention Center, the Jets are threatened with irreparable harm.  The Jets have no adequate remedy at law, and will suffer irreparable harm absent the granting of injunctive relief.

66.     Accordingly, Plaintiffs are entitled to recover treble damages from Defendants in an amount to be proven at trial, and to an injunction enjoining Defendants from continuing to engage in their anticompetitive conduct, together with Plaintiffs' attorneys' fees.

## SECOND CAUSE OF ACTION

### (TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS -- MTA AND ESDC)

67.     Plaintiffs incorporate the allegations in paragraphs 1 through 66 hereof as if fully set forth herein.

68.     Defendants knew of the existence and terms of the MOU and wrongfully and intentionally made their sham "bid," and utilized other wrongful means, in order to injure Plaintiffs and deprive them of an advantageous existing and prospective business relationship. Plaintiffs have been injured as a result of Defendants' conduct.

27

69.     But for Defendants' wrongful and intentional interference with Plaintiffs' negotiations with the MTA, Plaintiffs would have concluded an agreement with the MTA after Senator Mitchell made his determination of fair market value.

70.     Defendants' wrongful conduct was willful and wanton, in conscious disregard of Plaintiffs' rights, without justification, and with full knowledge of the harm it would inflict upon Plaintiffs, which harm has, in fact, occurred.  Accordingly, Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### (TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS -- MEDIA OUTLETS)

71.     Plaintiffs incorporate the allegations in paragraphs 1 through 70 hereof as if fully set forth herein.

72.     At the time of Defendants' wrongful conduct, Plaintiffs had existing and prospective business relationships with WLNY - Channel 55, the YES Network, as well as numerous other networks carried on Defendants' cable system.  Defendants intentionally interfered with these business relationships.

73.     Defendants used wrongful means that were dishonest, unfair and improper in an effort to interfere with the Jets' business relationships with WLNY - Channel 55, the YES Network, and numerous other networks carried on Defendants' cable systems.

28

74.     Defendants' actions injured the Plaintiffs' existing and prospective business relationships with WLNY - Channel 55, the YES Network and numerous other networks.

75.     Defendants' wrongful conduct was willful and wanton, in conscious disregard of Plaintiffs' rights, without justification, and with full knowledge of the harm it would inflict upon Plaintiffs, which harm has, in fact, occurred.  Accordingly, Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
## (DECEPTIVE BUSINESS PRACTICES - N.Y. GEN. BUS. LAW § 349)

76.     Plaintiffs incorporate the allegations in paragraphs 1 through 75 hereof as if fully set forth herein.

77.     Defendants willfully and knowingly engaged in deceptive and misleading conduct, including dissemination of deceptive and materially misleading advertising and preventing dissemination of accurate information, which was undertaken in, disseminated in, and directed toward, New York State and its residents.

78.     Defendants' willful and knowing deceptive and misleading conduct has caused consumer injury and harm to the public interest by depriving, and attempting to deprive, the public of an alternate venue to attend sports, entertainment and other events, by lessening, and attempting to lessen, competition in the markets set forth herein, and by undermining the public's interest in an honest marketplace and honest, non-deceptive public speech.

79.    Defendants' willful and knowing deceptive and misleading conduct has injured Plaintiffs' business relations with the City and State of New York, as well as Plaintiffs' reputation.  Accordingly, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered that:

 a.  Plaintiffs have been injured by Defendants' wrongful and anticompetitive conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and as a result, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial, which are to be trebled in accordance with 15 U.S.C. § 15.

 b.  Plaintiffs have been injured by Defendants' tortious interference with Plaintiffs' existing and prospective business relations with the MTA and with the ESDC, and as a result, Plaintiffs are entitled to compensatory damages and punitive damages in an amount to be determined at trial.

 c.  Plaintiffs have been injured by Defendants' tortious interference with Plaintiffs' prospective business relations with various media outlets, including, but not limited to, the Yes Network and WLNY-TV; and as a result, Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

d. Plaintiffs have been injured by Defendants' willful and knowing deceptive and misleading conduct, and as a result, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

e. Defendants, all persons acting on Defendants behalf or under their direction or control, and all successors thereto, should be preliminarily and permanently enjoined from interfering with Defendants' efforts to place advertising concerning the Sports and Convention Center or Defendants' opposition to that project.

f. Plaintiffs are entitled to recover the costs of this action and their attorneys fees, pursuant to 15 U.S.C. §§ 15 and 26, and NY G.B.L. § 349(h).

g. The Court should enter such additional relief as it may find just and proper, including such other preliminary and permanent relief as is necessary and appropriate to foster competitive conditions in the markets affected by Defendants' unlawful conduct.

31

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by a jury.


Dated: New York, New York
      March 16, 2005


Marc E. Kasowitz (MK-2597)
Daniel R. Benson (DB-6587)
Daniel J. Fetterman (DF-9093)
KASOWITZ, BENSON, TORRES
    & FRIEDMAN LLP
1633 Broadway
New York, New York  10019
212-506-1700

David Boies (DB-4399)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York  10504
914-749-8200

Robert J. Dwyer (RD-6457)
Paul R. Verkuil (PV-5978)
Alanna C. Rutherford (AR-0497)
BOIES, SCHILLER & FLEXNER LLP
570 Lexington Avenue
New York, NY 10022
212-446-2300

*Of Counsel:*
Jonathan D. Schiller
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue NW
Washington, DC  20015
202-237-2727