UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NEW YORK JETS LLC and                   :    Case No. 05-CV-2875 (HB)
JETS DEVELOPMENT LLC,                   :
                                        :
                    Plaintiffs,         :
                                        :
v.                                      :
                                        :
CABLEVISION SYSTEMS CORPORATION,        :
CSC HOLDINGS, INC., and MADISON         :
SQUARE GARDEN L.P.,                     :
                                        :
                    Defendants.         :
                                        :
                                        :

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS**

Jack M. Weiss                    Miguel A. Estrada
Randy M. Mastro                  Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP      Michael L. Denger
200 Park Avenue                  Joshua Lipton
New York, NY 10166-0193          GIBSON, DUNN & CRUTCHER LLP
Tel: (212) 351-4000              1050 Connecticut Avenue, NW
Fax: (212) 351-4035              Washington, DC 20036-5306
                                 Tel: (202) 955-8500
                                 Fax: (202) 467-0539

                                 *Counsel for Defendants Cablevision Systems
                                 Corporation, CSC Holdings, Inc., and Madison
                                 Square Garden L.P.*

Dockets.Justia.com

## TABLE OF CONTENTS

I.    Introduction ..................................................................................................... 1

II.    Argument ......................................................................................................... 3

    A.    Doctrines Of Justiciability And Comity Require Immediate Dismissal Of The Jets' Complaint ................................................................................. 3

        1.    The Jets' claim is not justiciable because they have not alleged any actual or imminent injury .................................................................. 3

        2.    This Court should not interfere in the ongoing political and judicial processes that are the subject of the Jets' Complaint ........................ 5

    B.    The Jets' Antitrust Claim Is Meritless ................................................... 7

        1.    The Jets fail to allege that Cablevision engaged in anticompetitive conduct .......................................................................................... 7

            a.    Cablevision's alleged "public misrepresentations" cannot be the basis for a monopolization claim ........................................ 8

            b.    Cablevision's alleged "attempts to silence" the Jets cannot be the basis for a monopolization claim .................................... 11

            c.    Cablevision's alleged "misuse of the litigation process" cannot be the basis for a monopolization claim ............................. 13

            d.    Cablevision's alleged "sham bid for the West Side Rail Yard" cannot be the basis for a monopolization claim .................... 17

        2.    The Jets fail to allege that Cablevision has monopoly power in a properly defined relevant market ................................................... 18

            a.    Promoters of stadium events have options throughout the New York metropolitan area ......................................................... 20

            b.    Promoters of theater and concert hall events have numerous options in Manhattan other than Cablevision's venues ...................... 20

            c.    Consumers of entertainment have countless options in the New York metropolitan area other than Cablevision's venues ................. 21

    C.    The Jets Have Not Stated A Claim For Tortious Interference ............................ 21

    D.    The Jets Have Not Stated A Claim Under N.Y. General Business Law § 349 ..... 24

III.    Conclusion ..................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967)..................................................................................5

*Atlantic Coast Line R.R. v. Brotherhood of Locomotive Eng'rs,*
    398 U.S. 281 (1970)..................................................................................6

*Belfiore v. New York Times,*
    826 F.2d 177 (2d Cir. 1987)....................................................................19

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993)..................................................................................8

*California Motor Transp. Co. v. Trucking Unlimited,*
    404 U.S. 508 (1972)..............................................................................9, 14

*Caplan v. American Baby, Inc.,*
    582 F. Supp. 869 (S.D.N.Y. 1984) ........................................................15

*Catskill Dev., LLC v. Park Place Entm't Corp.,*
    345 F. Supp. 2d 360 (S.D.N.Y. 2004)................................................22, 23

*Carvel Corp. v. Noonan,*
    818 N.E.2d 1100 (N.Y. 2004)...........................................................22, 23

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002)....................................................................10

*Chick Kam Choo v. Exxon Corp.,*
    486 U.S. 140 (1988)..............................................................................2, 7

*Consolidated Edison Co. v. Public Serv. Comm'n,*
    447 U.S. 530 (1980)..................................................................................6

*Cortec Indus., Inc. v. Sum Holding LP,*
    949 F.2d 42 (2d Cir. 1991)......................................................................10

*Eastern R.R. Presidents Conference v. Noerr Motor Freight,*
    365 U.S. 127 (1961)........................................................................ *passim*

*G.K.A. Beverage Corp. v. Honickman,*
    55 F.3d 762 (2d Cir. 1995).....................................................................23

*Hack v. Yale,*
    237 F.3d 81 (2d Cir. 2000)......................................................................19

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V.*,
    1997 WL 539772 (S.D.N.Y. Aug. 28, 1997) ................................................................23

*Los Angeles Mem'l Coliseum Comm'n v. NFL*,
    726 F.2d 1381 (9th Cir. 1984) ....................................................................................20

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ......................................................................................................4

*Mathias v. Daily News*,
    152 F. Supp. 2d 465 (S.D.N.Y. 2001) ........................................................................19

*Meyer v. Grant*,
    486 U.S. 414 (1988) ......................................................................................................6

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) ......................................................................................................6

*Miracle Mile Assocs. v. City of Rochester*,
    617 F.2d 18 (2d Cir. 1980) ............................................................................................8

*Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation*,
    79 F.3d 1298 (2d Cir. 1996) ..........................................................................................5

*National Ass'n of Pharm. Mfrs. v. Ayerst Labs.*,
    850 F.2d 904 (2d Cir. 1988) ..........................................................................................9

*NBT Bancorp v. Fleet/Norstar Fin. Group*,
    664 N.E.2d 492 (N.Y. 1996) ......................................................................................23

*New York Pub. Interest Research Group v. Insurance Info. Inst.*,
    554 N.Y.S.2d 590 (N.Y. App. Div. 1990) ..................................................................24

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ......................................................................................................6

*New York Times Co. v. United States*,
    403 U.S. 713 (1971) ......................................................................................................2

*Northern Pac. Ry. v. United States*,
    356 U.S. 1 (1958) ........................................................................................................17

*Olympia Equip. Leasing Co. v. Western Union Tel. Co.*,
    797 F.2d 370 (7th Cir. 1986) ........................................................................................8

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993) ................................................................................14, 15, 16, 17

*Purgess v. Sharrock,*
    33 F.3d 134 (2d Cir. 1994)................................................................22

*Shaw v. Rolex Watch, U.S.A.,*
    673 F. Supp. 674 (S.D.N.Y. 1987) ...................................................19

*Spargo v. New York State Comm'n on Judicial Conduct,*
    351 F.3d 65 (2d Cir. 2003)................................................................2

*Spectrum Sports, Inc. v. McQuillan,*
    506 U.S. 447 (1993)........................................................................18

*Stutman v. Chemical Bank,*
    731 N.E.2d 608 (N.Y. 2000)......................................................24, 25

*Theatre Party Assocs. v. The Shubert Org.,*
    695 F. Supp. 150 (S.D.N.Y. 1988) .............................................19, 21

*Thomson Info. Servs. v. Lyons Commercial Data, Inc.,*
    1998 WL 193236 (S.D.N.Y. April 21, 1998) ....................................15

*Turner Broad. Sys. v. FCC,*
    512 U.S. 622 (1994).........................................................................13

*Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag,*
    207 F. Supp. 2d 221 (S.D.N.Y. 2002)..............................................15

*United Mine Workers of Am. v. Illinois State Bar Ass'n,*
    389 U.S. 217 (1967)..........................................................................6

*United States v. Broadcast Music, Inc.,*
    275 F.3d 168 (2d Cir. 2001)...............................................................5

*United States v. Grinnell Corp.,*
    384 U.S. 563 (1966).........................................................................18

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001)........................................................7, 13

*United States v. MMR Corp.,*
    907 F.2d 489 (5th Cir. 1990) ...........................................................17

*USAlliance Fed. Credit Union v. Cumis Ins. Soc'y, Inc.,*
    346 F. Supp. 2d 468 (S.D.N.Y. 2004)..............................................25

*USFL v. NFL,*
    842 F.2d 1335 (2d Cir. 1988).............................................................7

*USFL v. NFL,*
    634 F. Supp. 1155 (S.D.N.Y. 1986)...............................................................9, 11

*Vendo Co. v. Lektro-Vend Corp.,*
    433 U.S. 623 (1977)...............................................................................7

*Verizon Comms. Inc. v. Law Offices of Curtis V. Trinko LLP,*
    540 U.S. 398 (2004)............................................................................7, 13

*West Virginia State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943)...............................................................................6

*Wilmorite, Inc. v. Eagan Real Estate, Inc.,*
    454 F. Supp. 1124 (N.D.N.Y. 1977).................................................................15

*Wooley v. Maynard,*
    430 U.S. 705 (1977)...............................................................................6

*Yellow Page Solutions v. Bell Atl. Yellow Pages Co.,*
    2001 U.S. Dist. LEXIS 18831 (S.D.N.Y. Nov. 19, 2001)................................................22

*Younger v. Harris,*
    401 U.S. 37 (1971)................................................................................2

## **Statutes**

28 U.S.C. § 2283.........................................................................................2, 6, 16

N.Y. Gen. Bus. Law § 349.................................................................................3, 24

Defendants Cablevision Systems Corporation, CSC Holdings, Inc., and Madison Square Garden L.P. ("Defendants" or "Cablevision") hereby move to dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

This lawsuit is a transparent, improper attempt to embroil the federal courts in a heated political dispute over whether the New York Jets should be permitted to build—with enormous public subsidies and grave environmental consequences—a football stadium on land owned by the Metropolitan Transportation Authority ("MTA") on the West Side of Manhattan. Faced with opposition from increasingly large majorities of New Yorkers, environmental challenges to their stadium scheme in the state courts, and Cablevision's superior offer to the MTA, the Jets sought to invoke this court's equitable powers to silence Cablevision's political speech, pre-empt the ongoing state litigation and *prevent* competitive bidding for the MTA's property. It has been obvious from the moment the Jets launched this case to the press that there was never any legal point to this case; the complaint's sole role was to act as an additional lever in the Jets' campaign to obtain the rights to the MTA property without any pretense of competitive bidding. That the Jets sought to enlist this Court in that effort under the guise of the federal antitrust laws—laws that are intended to promote competition and to respect free-speech rights—made their complaint as cynical as it was frivolous. But now that the Jets and the City's political establishment have successfully persuaded the MTA to favor the Jets' inferior bid, the purported grievances that the Jets press in this case—and in particular the notion that Cablevision somehow stifled the Jets' voice in the political debate—can safely be recognized as nothing more than political posturing underneath a legal caption.

In any event, the Jets' complaint always was fatally deficient in numerous respects. Indeed, the allegations of the complaint by themselves—especially when coupled with facts that this Court may properly notice because they are "generally known within [this Court's] territorial jurisdiction," Fed. R. Evid. 201(b)—clearly show that the complaint seeks to flout basic rules of justiciability and federalism, core constitutional protections for free speech, and the most basic

tenets of antitrust law. The Jets' entire theory of "injury" presupposes that Cablevision will succeed, to the Jets' detriment, in the political process or in the state courts. But Cablevision is entitled under our Constitution to express its views in the marketplace of ideas and to protect its rights in litigation. Moreover, even if Cablevision's conduct were deemed (against all precedent) actionable, the harm posited by the Jets as a result of that conduct—that their stadium may not be built—is too speculative to give rise to a ripe case or controversy. Given that the Jets seek intervention from this Court to redress future injuries they may never suffer based on governmental action that has not yet occurred, it is hard to avoid the conclusion that this controversy is simply not justiciable.

The Jets' attempt to use this case to shut down as a "sham" ***ongoing*** state court litigation—litigation that exposes the environmental harms that would result from the Jets' stadium scheme—is also at odds with settled precedent and principles of federalism. As the Supreme Court and the Second Circuit have made clear, the *Younger* abstention doctrine protects the "legitimate activities of the States" by prohibiting federal court interference in "ongoing state proceedings." *Spargo v. New York State Comm'n on Judicial Conduct*, 351 F.3d 65, 75 (2d Cir. 2003) (quoting *Younger v. Harris*, 401 U.S. 37, 44 (1971)). Whether or not Cablevision's claims in the pending state proceeding have merit—an issue central to the "sham" inquiry—is without question a matter for the state court to decide in the first instance. In addition, the *Younger* doctrine requires that this Court abstain from interfering in other ongoing state proceedings, including state judicial review of the MTA's bid approval process. The *Younger* doctrine, and the principles of federalism that it reflects, require dismissal of the Jets' claims as they relate to these proceedings. Moreover, the Anti-Injunction Act, 28 U.S. § 2283, expressly prohibits what the Jets seek here—a federal injunction terminating ongoing state litigation. *See, e.g., Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 149 (1988). The Constitution, of course, equally plainly prohibits prior restraints on Cablevision's political speech. *See, e.g., New York Times Co. v. United States*, 403 U.S. 713, 714 (1971). The Jets must believe that the pro-stadium arguments are weak indeed if they seek—in defiance of these settled legal doctrines—to prevent

the examination of those arguments by the New York courts and the political process.

Moreover, the Jets' allegations of monopolization, tortious interference and violations of N.Y. Gen. Bus. Law § 349 are not even remotely cognizable under governing law. The complaint is bereft of allegations that Cablevision engaged in *anticompetitive* conduct: the facts on which the Jets rely—Cablevision's political speech, its state court litigation, its refusal to give yet another advertising outlet to the Jets, and its submission of a bid for the MTA yards—are not anticompetitive as a matter of law. And even if such actions *were* somehow deemed anticompetitive, the "relevant market" that Cablevision allegedly has "monopolized" is simply a gerrymandered list of three Cablevision properties. That contrived "market" exists exclusively in the Jets' imagination, and it does not come close to passing muster under antitrust law—or common sense. The Jets' tortious interference and consumer-fraud allegations—also predicated on the "harm" that the Jets *may* suffer from Cablevision's competing bid for the MTA property or political activities—are equally untenable.

In short, the complaint was filed at a time when the Jets sought to pull every conceivable lever to convince the MTA to award them the right to build on the West Side Rail Yard on the cheap and to convince the state and municipal governments to hand them a $600 million subsidy. That the Jets have been successful—at least so far—underscores that the purported grievances detailed in the complaint are fanciful and not justiciable. Indeed, from justiciability to the merits, it is readily apparent that the complaint fails every applicable yardstick. The Court should swiftly dismiss it—and return the Jets and their legally-captioned jeremiad to the political process, where (if anywhere) the Jets' grievances properly belong.

## ARGUMENT

**A.     Doctrines Of Justiciability And Comity Require Immediate Dismissal Of The Jets' Complaint.**

**1.     The Jets' claim is not justiciable because they have not alleged any actual or imminent injury.**

Notwithstanding their rhetoric about the sinister intentions of Cablevision, the Jets do not allege that they have suffered any cognizable injury as a result of Cablevision's alleged conduct.

3

The central allegation of the Complaint is that Cablevision is "seeking" to "prevent [the] construction [of]" or "derail" the Jets' proposed stadium. Compl. ¶¶ 1, 2, 5. The Jets, however, do not allege that Cablevision has been *successful* in this plan, nor do they claim that the construction of the stadium has been either prevented or derailed. To the contrary, the Complaint speaks of the Sports and Convention Center as a viable, ongoing project. For example, according to the Complaint, the Center is "a multi-purpose sports, entertainment and convention facility, *to be built* over the rail yard," and "[f]or ten days a year, the Sports and Convention Center *will host* the Jets." Compl. ¶¶ 2, 3 (emphasis added).

The Jets also fail to allege that there is any threat of imminent harm that is likely to befall them or their project. Rather, the Complaint describes the Jets' "progress" in moving the project forward and the Jets' ongoing efforts to secure the approval of the MTA and the Empire State Development Corporation. Compl. ¶¶ 4, 5. *Indeed, on March 31, 2005, the MTA awarded development rights for the West Side Rail Yard to the Jets for their stadium project*—albeit, in Cablevision's view, misguidedly and unlawfully. Because the Jets have not alleged either actual harm or the threat of imminent harm, there is no case or controversy for this Court to adjudicate. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992). That the Jets believe that Cablevision harbors bad intentions toward their stadium plans simply cannot substitute for a justiciable claim.

The only potential future harm to the Jets that is even intimated by the Complaint would be caused by a hypothetical decision adverse to the Jets' project through (a) the various political processes that are underway, or (b) the state court litigation that was initiated by Cablevision against the MTA and others. These governmental processes, however, are not yet complete, and it is uncertain whether the outcomes will be favorable or unfavorable to the Jets' ambitions. Thus, the Jets essentially seek this Court's intervention to redress future injuries that they may never suffer as a result of governmental action that has not yet occurred. The Jets' claims based

4

on these contingent events are not ripe. That is reason enough for this Court to decline the Jets' invitation to intervene in the state and municipal political and judicial processes.[1]

**2.    This Court should not interfere in the ongoing political and judicial processes that are the subject of the Jets' Complaint.**

Even if the potential harm to the Jets from an adverse decision through the state and municipal political and judicial processes were sufficiently ripe to create a justiciable case or controversy, the First Amendment and principles of federalism would preclude the relief that the Jets seek here. It is no secret—and this Court may properly take judicial notice of the fact—that the competing proposals for the MTA yards have generated intense public interest, reams of press coverage, state-court litigation, and many efforts by all participants to gain the upper hand in the political process. The New York Times described this as "one of the city's longest-running, most political dramas in some time." *See* "Deadline Today in Showdown Over Stadium," *The New York Times*, Mar. 21, 2005 (Attachment 1). Indeed, despite their implausible suggestions that Cablevision has "attempt[ed] to silence" the Jets' voice in the political debate, the Jets' project has managed to enlist the support of Governor Pataki, Mayor Bloomberg, former Mayor Giuliani (who is featured in a television advertisement supporting the Jets' project), and a raft of other politicians and civic leaders. In filings with the State Lobbying Commission, the Jets disclosed that they spent more than $6 million in 2004 in lobbying state government for their stadium project. *See* Attachment 2.

Like the Jets, Cablevision's executives have engaged in extensive public discourse with Governor Pataki, Mayor Bloomberg, and other political figures in an attempt to persuade New York leaders and the citizenry to Cablevision's point of view. The Jets, however, want this

---

[1]    *See, e.g., Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967) (ripeness doctrine protects agency actions "from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties"); *United States v. Broadcast Music, Inc.*, 275 F.3d 168, 178 (2d Cir. 2001) (issue not ripe because there was no injury and the threat of an injury was based on "a contingent future event that may not occur at all"); *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation*, 79 F.3d 1298, 1306 (2d Cir. 1996) (plaintiffs' claims were not ripe because they "depend[ed] upon the effects of regulatory choices to be made by New York in the future").

Court to shut down, or at a minimum severely restrain, Cablevision's participation in the ongoing political and legal processes. That is an untenable argument under our system of government. Cablevision's participation in the political process, including the advertisements about which the Jets complain, is clearly aimed at influencing the outcome of a heated public and political debate. This is speech at the very heart of the First Amendment. *See, e.g., Meyer v. Grant*, 486 U.S. 414, 420 (1988); *Consolidated Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 535 (1980). Indeed, the Supreme Court has emphasized that the right to petition the government is "among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers of Am. v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967). Although the Jets may find one-sided political debate more convenient for their stadium aspirations, the First Amendment does not permit this Court to assist them.

The Jets' contention that this Court should go even further and *compel* Cablevision to broadcast the Jets' message—a message that Cablevision finds politically repugnant—is likewise wholly foreclosed by the First Amendment. "A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *see also West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943). Nor can the Jets evade this principle by couching their argument as a "right of access," because a "Government-enforced right of access inescapably 'dampens the vigor and limits the variety of public debate.'" *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 257 (1974) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964)).

Principles of federalism, as well as the constitutionally protected right to petition the courts, make it equally inappropriate for this Court to enjoin Cablevision's pursuit of litigation in state court. The Anti-Injunction Act, 28 U.S.C. § 2283, prohibits federal courts from enjoining state proceedings, either directly *or indirectly by enjoining the parties from proceeding with litigation in the state courts. See, e.g., Atlantic Coast Line R.R. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 287 (1970) ("[i]t is settled that the prohibition of § 2283 cannot be evaded

by addressing the order to the parties"). That is so "even when [it] is unmistakably clear" that the state "proceedings interfere with a protected federal right or invade an area pre-empted by federal law." *Chick Kam Choo*, 486 U.S. at 149.[2] Accordingly, this Court may not enjoin Cablevision from pursuing the pending state court litigation.

**B.     The Jets' Antitrust Claim Is Meritless.**

The Jets contend that Cablevision has violated Section 2 of the Sherman Act by allegedly monopolizing a market for large indoor entertainment venues in Manhattan. To state a claim for monopolization, the Jets must allege ***both*** that (1) Cablevision engaged in anticompetitive conduct, and (2) through this conduct Cablevision acquired or maintained a monopoly in a properly defined relevant market. *See, e.g., Verizon Comms. Inc. v. Law Offices of Curtis V. Trinko LLP ("Trinko")*, 540 U.S. 398, 407 (2004). The Jets meet ***neither*** part of this test.

**1.     The Jets fail to allege that Cablevision engaged in anticompetitive conduct.**

The first element of a Section 2 claim requires the Jets to allege that Cablevision engaged in anticompetitive conduct that contributed significantly to the acquisition or maintenance of a monopoly. *See, e.g., United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). It is not unlawful for a firm to pursue legitimate business objectives aggressively, even if the firm is a monopolist and the conduct disadvantages the monopolist's rivals. *See, e.g., USFL v. NFL*, 842 F.2d 1335, 1361 (2d Cir. 1988) (jury was properly instructed that "a monopolist is encouraged to compete vigorously"). The Jets fail to allege conduct that could satisfy this required element of their monopolization claim.

Although the Jets make much of Cablevision's alleged intent to defeat the Jets' stadium project (*see, e.g.,* Compl. ¶¶ 1, 2, 5, 7), allegations that a defendant desires to defeat competitors—even that he is openly hostile toward competitors—are insufficient, as a matter of

---

[2]     Although an exception to the Act's prohibition exists when such relief is "expressly authorized" by Congress, the Supreme Court has held that injunctions pursuant to the antitrust laws do *not* fall under this exception. *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623 (1977).

law, to make out a violation of the antitrust laws.  *See, e.g., Brooke Group Ltd. v. Brown &
Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993); *Olympia Equip. Leasing Co. v. Western
Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986).  Beyond Cablevision's alleged bad intentions,
the Jets purport to base their monopolization claim on four types of alleged conduct by
Cablevision: (1) "public misrepresentations"; (2) "attempts to silence plaintiffs"; (3) "misuse of
the litigation process"; and (4) a "sham bid for the West Side Rail Yard."  Compl. ¶¶ 41-60.  As
a matter of law, however, *none* of these allegations satisfies the "conduct" element of the Jets'
claim.

> ### a.    Cablevision's alleged "public misrepresentations" cannot be the basis
> ### for a monopolization claim.

The Jets allege that Cablevision has engaged in a "massive media campaign" that is
"designed to malign and denigrate the Sports and Convention Center project and Plaintiffs."
Compl. ¶ 41.  The Jets do not allege how these alleged statements have harmed or might harm
them, but they appear to be concerned that public opinion and political decisions will turn against
them.  It has been clear for over four decades, however, that statements designed to influence
public opinion and governmental action, such as those alleged here, cannot violate the antitrust
laws. *See, e.g., Eastern R.R. Presidents Conference v. Noerr Motor Freight ("Noerr")*, 365 U.S.
127 (1961).

In *Noerr*, the Supreme Court recognized that interpreting the Sherman Act to regulate
"political activity" would "raise important constitutional questions," and it held that Congress
did not intend the Sherman Act to "invade" "the freedoms protected by the Bill of Rights."  365
U.S. at 137-38.  Accordingly, the Court held that the solicitation of legislative action cannot, as a
matter of law, violate the Sherman Act.  *Id.* ("To hold that the government retains the power to
act in [a] representative capacity and yet hold, at the same time, that the people cannot freely
inform the government of their wishes would impute to the Sherman Act a purpose to regulate,
not business activity, but political activity, a purpose which would have no basis whatever in the
legislative history of that Act"); *see also Miracle Mile Assocs. v. City of Rochester*, 617 F.2d 18,

20 (2d Cir. 1980). In cases subsequent to *Noerr*, the Supreme Court has extended this immunity to all types of governmental petitioning activity, including petitioning of administrative agencies and courts. *See California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). *Noerr* immunity also "quite clearly applies to the solicitation of action by state and local officials as well as by federal officials." *USFL v. NFL*, 634 F. Supp. 1155, 1178 (S.D.N.Y. 1986).

The *Noerr* doctrine exempts petitioning activity from antitrust liability even if the goal of the petitioning is purely to harm competitors or competition. For example, in *Noerr* the district court had found that "the railroads' sole purpose in seeking to influence the passage and enforcement of laws was to destroy the truckers as competitors for the long-distance freight business." *Noerr*, 365 U.S. at 138. The Court held that this intent to destroy competition could not turn petitioning activity into a violation of the Sherman Act, because the right to seek governmental action "cannot properly be made to depend upon [a person's] intent in doing so. It is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors." *Id.* at 139. In this case, the Jets allege that Cablevision has made public statements in an effort to stifle competition from the Jets' proposed new stadium. Compl. ¶ 5. Under *Noerr*, however, even if Cablevision's sole motivation were to harm the Jets and exclude competition and even if the governmental action would protect a monopoly position, Cablevision's petitioning activity and political speech cannot violate the Sherman Act. *See Noerr*, 365 U.S. at 139.

Cablevision's speech here is at the heart of the First Amendment and *Noerr*. The statements at issue are political statements designed to influence political decision-making in connection with an issue that has been the subject of extensive public debate.[3] For example,

---

[3] Even if Cablevision's statements were analyzed as commercial speech, such as where a defendant denigrates a competitor's product in order to sell its own product, dismissal would be required. The antitrust laws adopt a "presumption that the effect on competition of [misleading advertising about a competitor's product] was *de minimis*." *National Ass'n of Pharm. Mfrs. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988). To overcome this presumption, a plaintiff relying on misrepresentations must establish that "the representations were (1) clearly false, (2) clearly material, (3) clearly likely to induce

[Footnote continued on next page]

Cablevision has run advertisements with statements such as the following:

- Mayor Bloomberg went to Albany to try and saddle upstate taxpayers with the bill for his West Side Stadium. Today, Upstate New York faces rising property taxes, job losses, and severe budget deficits. Now, more than ever, Upstate taxpayers shouldn't be forced into paying for a football stadium that they won't use, and can't afford. Say <u>no</u> to Mayor Bloomberg's West Side Stadium.

- With six hundred million [dollars], we could improve community health care clinics, and offer more affordable care to New Yorkers. Or step up the rebirth of lower Manhattan. So here's the choice: Invest six hundred million in neighborhoods, or . . . spend it on a West Side stadium for the Jets.

- Today, when New York needs them more than ever, recruitment is down and there are thousands less police than four years ago. Now comes a proposal to spend $600 million for a football stadium in Manhattan. That's the wrong priority. Paying to build a police force is more important than paying to build a football stadium. Say NO to the West Side Stadium.[4]

The Jets cannot negate Cablevision's *Noerr* immunity through allegations of misleading statements or an intention to "malign and denigrate" the Jets and their proposed project. Compl. ¶¶ 41-42. Indeed, *Noerr* itself involved strikingly similar allegations. In *Noerr*, the complaint alleged that the defendants engaged in a "vicious, corrupt, and fraudulent" campaign that was designed to foster the adoption of laws "destructive of the trucking business, to create an atmosphere of distaste for the truckers among the general public, and to impair the relationships existing between the truckers and their customers." 365 U.S. at 129. The Court held that the

---

[Footnote continued from previous page]

reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of neutralization or other offset by rivals." *Id.* In this case, even if this test were applied, and even if the Jets could establish that Cablevision's unidentified statements were "clearly false," the Jets would nonetheless fail this test. For example, the targets of Cablevision's speech, city and state political figures, have ample knowledge of the subject matter and are not likely to be misled by Cablevision's supposed misrepresentations. The Jets' multi-million dollar lobbying campaign also negates any contention that they cannot "offset" Cablevision's speech.

[4]    *See* Attachment 3 (text of several recent advertisements sponsored by Cablevision). The Court may take these advertisements into consideration on this Rule 12 motion, because the statements (a) are part of the public record and available to the Jets, and (b) were relied upon by the Jets in connection with their allegation that Cablevision made misrepresentations in these advertisements. *See, e.g., Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002); *Cortec Indus., Inc. v. Sum Holding LP*, 949 F.2d 42, 47 (2d Cir. 1991).

alleged conduct could not violate the Sherman Act, explaining that:

> [i]t is inevitable, whenever an attempt is made to influence legislation by a campaign of publicity, that an incidental effect of that campaign may be the infliction of some direct injury upon the interests of the party against whom the campaign is directed. . . .  To hold that the knowing infliction of such injury renders the campaign itself illegal would thus be tantamount to outlawing all such campaigns. . . .  [T]his has not been done by anything in the Sherman Act.

*Id.* at 143-44.[5]

Ironically, the Jets themselves were on the other side of this same issue in a previous case in this Court involving an alleged campaign to influence public decisions related to football stadia.  In the *USFL* case, the USFL alleged that the NFL and its co-defendants—which included the Jets—used pressure and threats to convince local governmental authorities to refuse to lease stadium facilities to USFL teams.  *See USFL*, 634 F. Supp. at 1177-78.  In that case, the NFL asserted that the alleged conduct "amounts to an exercise of free speech that cannot possibly give rise to liability under the federal antitrust laws."  *Id.* at 1178.  This Court agreed, holding that the "allegations of stadia interference cannot possibly give rise to liability under the federal antitrust laws."  *Id.* at 1179-80.  There is no reason for this Court to reach a different conclusion here, solely to accommodate the Jets' conveniently elastic view of antitrust principles.

     **b.**     **Cablevision's alleged "attempts to silence" the Jets cannot be the basis for a monopolization claim.**

The Jets' next contention—that Cablevision has refused to run the Jets' pro stadium ads, thus keeping the Jets from "communicating their message in support of [the] project" and "preventing the public from hearing the Jets side of the story" (Compl. ¶¶ 43-44)—has so little connection to reality that it is refuted by the face of the Complaint itself.  The Complaint itself

---

[5]  *Noerr* also disposed of an argument that political speech loses its protection where it is distributed through a "third-party technique," *i.e.*, a technique in "widespread use" that involves "giving propaganda actually circulated by a party in interest the appearance of being spontaneous declarations of independent groups."  *See* 365 U.S. at 140-41.  Thus, the Jets' allegations that Cablevision "disguised" its activities by funding a "front group" and distributing advertising through that group (Compl. ¶ 7) do not undermine Cablevision's *Noerr* immunity for the statements at issue here.

quotes extensively from articles in *The New York Times*, the *Daily News*, and *Crain's New York Business* (*id.* ¶ 42)—not exactly obscure publications—all of them favorable to the Jets' position. The Governor, the Mayor and many other civic and political leaders appear *every day* in numerous media to advocate the Jets' cause. Indeed, according to the Jets' own filings with the New York Lobbying Commission—public records that this Court may judicially notice—the Jets spent over $6 million on lobbying on "Jets Stadium/Funding Issues" in 2004, including millions of dollars on advertising on television, radio, newspapers, billboards, the Internet, telemarketing campaigns, mailings, posters, flyers, banners, signs, luncheons, and other events. *See* Attachment 2. Clearly, the Jets' message has not been suppressed.

For good measure, the Jets acknowledge that Cablevision does not even own cable systems in Manhattan (*id.* ¶ 13), which they allege is the *only* relevant geographic market in this case. Yet the Jets' grievance is that Cablevision has refused to carry the Jets' advertisements *elsewhere*—on local advertising spots on its cable television systems in Long Island, the Bronx, Westchester, and parts of Brooklyn. *Id.* ¶¶ 44-46. And the Jets do not allege that they have been prevented from using any *other* media or advertising outlet—including those in their own proffered "market"—to get their message out to the public. To the contrary, the Jets' filings with the Lobbying Commission disclose that they have made extensive use of all sorts of media outlets.[6]

In any event, the suggestion that Cablevision's cable systems give it a stranglehold on the

---

[6]    The Jets also allege that Cablevision has a "monopoly" over the delivery of cable television to customers in certain areas, but they do not—and cannot—allege that Cablevision has control over all media and advertising in any portion of the New York metropolitan area. Cablevision does not even have a "monopoly" over advertising over its own cable systems. Cablevision controls only a limited number of advertising minutes on certain programmers' channels on its systems (the advertising minutes of those programmers that it owns and the minutes allocated to Cablevision by contract with other programmers). The advertising sold directly by the programmers, which comprises the vast majority of advertisements on Cablevision—including those of all the major networks—is fully available to the Jets for advertisements that will run on Cablevision's systems. Indeed, the Complaint acknowledges this indisputable fact, as it only alleges that Cablevision has used its "monopoly" to prevent the Jets from "purchasing *local* commercial spots on all *non-broadcast* networks carried on [Cablevision's] cable systems." Compl. ¶ 45 (emphasis added).

New York media and advertising market is not only absurd, but it is also ultimately unhelpful to the Jets' case. As a matter of antitrust law, Cablevision has no legal duty to run the Jets' ads or otherwise to use its cable systems to assist the Jets in promoting their stadium project. As the Supreme Court recently explained, "the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Trinko*, 540 U.S. at 408 (holding that phone carrier did not violate Sherman Act by excluding competitors from interconnecting with its network). Moreover, Cablevision cannot, consistent with the Constitution, be compelled to broadcast and disseminate the Jets' political message: "At the heart of the First Amendment lies the principle that each person should decide for him or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 641 (1994). Cablevision's right to choose its message—by controlling the content of the local advertising spots it controls—cannot be trampled upon simply because it is a "cable operator." *See id.* at 636 ("cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment").

Finally, the Jets allege no cognizable antitrust injury from their alleged exclusion from Cablevision's systems. For example, the Jets offer no allegation that their inability to deliver their message on a limited advertising medium has foreclosed public decision-makers from deciding in their favor (or that they have been unable to press their arguments with those decision-makers), and they offer no allegation that their stadium project is any less likely to be approved as a result of their alleged exclusion from local advertising spots on Cablevision's non-broadcast channels. *See, e.g., Microsoft*, 253 F.3d at 58-59 (plaintiff "must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect"). This alleged conduct simply cannot form the basis for a monopolization claim.

**c.     Cablevision's alleged "misuse of the litigation process" cannot be the basis for a monopolization claim.**

The Jets allege that Cablevision has "funded, supported and promoted baseless litigation"

13

that was designed to "delay, increase the cost of, and prevent the development" of the Jets' proposed project.  Compl. ¶ 50.  In particular, the Jets point to two litigation matters:  (1) a lawsuit brought by Cablevision against the MTA, the City of New York, the Department of City Planning, and the City Planning Commission, which was dismissed for lack of ripeness on September 21, 2004; and (2) a lawsuit based on essentially the same allegations brought by Cablevision against the same defendants in December 2004, which is pending in New York state court.  *Id.* ¶¶ 51-52.    Both cases asserted that the environmental impact statement ("EIS") submitted in connection with the Jets' proposed stadium project was inadequate, and Cablevision requested that the court block approval of the Jets' proposed project until a proper EIS is conducted.[7]  This litigation activity is privileged governmental petitioning under the *Noerr* doctrine, which cannot be held to violate the antitrust laws.  *See California Motor*, 404 U.S. at 510 (extending *Noerr* immunity to "the approach of citizens . . . to administrative agencies . . . and to courts").

Litigation activity falls outside *Noerr* immunity only where it is a "sham"—that is, where the activity is "not genuinely aimed at procuring favorable government action," as opposed to "a valid effort to influence government action."  *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc. ("PRE")*, 508 U.S. 49, 58 (1993).  A plaintiff basing an antitrust claim on alleged sham litigation must show **both** an objective and a subjective element.  "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically

---

[7]    In the underlying litigation, Cablevision and the other plaintiffs have alleged—and presented substantial evidence—that the government, with the active assistance of the Jets, intentionally manipulated survey data underlying the EIS, which resulted in a significant understatement of traffic flows, air pollution, and noise impacts from the proposed stadium.  In addition, the evidence demonstrates that the defendants "consciously attempted to minimize or ignore many important environmental issues" and "held back from the public so much crucial information about impacts and mitigation measures at the [EIS] draft stage . . . that the public review process was fundamentally flawed from its inception."  *See, e.g.,* Petitioners' Reply Mem. in Support of Article 78 Petition at 5 (Attachment 4).  Not surprisingly, the Jets avoid any reference to the facts or allegations in the underlying litigation, which by itself dooms their "sham" claim to failure.

expect success on the merits.  If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail." *Id.* at 60.  Second, the plaintiff must show that the subjective motivation of the party bringing the litigation was not to secure a favorable *outcome* in the litigation, but to use the *process* of the lawsuit to harm a competitor. *Id.* at 60-61.

The Jets have to meet a significant burden to survive a motion to dismiss on their claim of sham litigation.  "[I]n cases alleging antitrust activity as to conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the claim will have a chilling effect on the exercise of First Amendment rights requires a greater degree of specificity in the complaint than would otherwise be the case." *Caplan v. American Baby, Inc.*, 582 F. Supp. 869, 871 (S.D.N.Y. 1984); *see also Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag*, 207 F. Supp. 2d 221, 223 (S.D.N.Y. 2002) (sham analysis must be addressed to facts on the "face of the complaint, in order to avoid chilling a litigant's exercise of the right to petition").  The Jets' allegations fail on both the objective and subjective elements of the claim.

With respect to the September 2004 litigation, the Jets allege in conclusory fashion that the lawsuit "was objectively baseless at the time it was filed" (Compl. ¶ 51), but they offer no specific allegations about the *content* of the allegations in the underlying litigation, and they fail to offer any explanation as to *why* the lawsuit was allegedly objectively baseless.  It is not sufficient for the Jets merely to recite the legal conclusion that the litigation was "objectively baseless"; rather, they must allege facts that could support this conclusion. *See, e.g., Twin City Bakery*, 207 F. Supp. 2d at 223; *Thomson Info. Servs. v. Lyons Commercial Data, Inc.*, 1998 WL 193236, at *1 (S.D.N.Y. Apr. 21, 1998) (dismissing claim based on sham alleged "in general terms" but with "no particulars to support the claim"; claims of "sham" should not survive motion to dismiss absent "a threshold showing" of objective baselessness); *Wilmorite, Inc. v. Eagan Real Estate, Inc.*, 454 F. Supp. 1124, 1134 (N.D.N.Y. 1977) (permitting complaint to

circumvent *Noerr* on basis of "conclusory allegations" would risk chilling protected petitioning activity).[8]  Their utter failure to even attempt to do so dooms this claim to failure.

With respect to the December 2004 lawsuit, the Jets offer no allegation at all about objective baselessness.  Nonetheless, they apparently seek to have this Court sit in judgment on that pending litigation despite a *total* absence of factual allegations.  Moreover, even if the Jets had sufficiently alleged that Cablevision's lawsuits were objectively baseless, the Jets have offered no allegations whatsoever with respect to the *subjective* element of a sham claim.  The Jets do not allege that Cablevision is not genuinely seeking relief from the court; nor do they allege that Cablevision is instead using the process of litigation as a weapon.  Significantly, the Jets do not allege that the ***process*** of litigation has harmed them at all.  Instead, they appear concerned with the potential that their project could be enjoined as a ***result*** of the litigation.  By definition, such a ruling from the court in the litigation—and Cablevision's efforts to seek that result—are protected from antitrust liability under *Noerr*.[9]

Similarly, the Jets' failure to allege any harm from the fact that Cablevision initiated litigation in state court (as opposed to a potential *result* adverse to the Jets) requires dismissal of the Jets' claim—even if Cablevision's litigation activities could be deemed to be a sham.  A claim of sham litigation "does not relieve the [Jets] of the obligation to establish all other elements" of their substantive antitrust claim; proof of sham litigation would "merely deprive[] [Cablevision] of immunity" for that petitioning activity.  *See PRE*, 508 U.S. at 61.  The Jets must allege that Cablevision's initiation of litigation ***significantly contributed to the acquisition or***

---

[8]  Of course, the mere fact that a lawsuit was dismissed, standing alone, is not enough to support a conclusion that the lawsuit was objectively baseless.  *See, e.g., PRE*, 508 U.S. at 60 n.5 ("when the antitrust defendant has lost the underlying litigation, a court must resist the understandable temptation to engage in *post hoc* reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation" (internal quotations omitted)).

[9]  As discussed above, the Jets' attempts to shut down political debate by attacking "sham" litigation in this Court raises serious federalism concerns.  Both the *Younger* abstention doctrine and the Anti-Injunction Act require that the Jets' claims be dismissed.

***maintenance of a monopoly***, but they offer no explanation as to how the initiation of litigation has harmed them in any way. Indeed, the Jets are not even a party to the underlying litigation.

### d. Cablevision's alleged "sham bid for the West Side Rail Yard" cannot be the basis for a monopolization claim.

If nothing else, the Jets' "sham bid" allegation is novel—and for good reason. No court has ever held that a party's submission of a competitive bid in a competitive bidding process somehow is an *anti*competitive act. To say the least, this represents a counterintuitive theory of antitrust law. Because the Sherman Act was not designed to insulate the Jets from competition in their effort to secure rights to the MTA's property, this Court should swiftly reject the Jets' Orwellian theory of monopolization.

The Jets apparently recognize that Cablevision's participation in the bidding process set up by the MTA, a municipal authority, cannot be considered an anticompetitive act because of *Noerr* immunity and because of the inherently procompetitive nature of the bidding process. Instead, the Jets allege that bid submitted by Cablevision was a "sham." Compl. ¶ 57. But if Cablevision's bid were so objectively baseless as to constitute a sham—that is, if the bid had no chance for success—then the Jets cannot possibly have been harmed, because their bid would have stood as the clear winner. That alone dooms the Jets' claim of a "sham bid" to failure.

Conversely, if Cablevision's bid had a reasonable chance of success, then it cannot possibly be a "sham." *See PRE*, 508 U.S. at 60. And if Cablevision's bid offered legitimate competition to the Jets' bid, then the bid can only be viewed as a *pro*competitive act. *See, e.g., Northern Pac. Ry. v. United States*, 356 U.S. 1, 4 (1958) ("the policy unequivocally laid down by the [Sherman] Act is competition"); *United States v. MMR Corp.*, 907 F.2d 489, 496-97 (5th Cir. 1990) (agreement to refrain from bidding competitively is *per se* unlawful). The purpose of the MTA's bidding process was to ensure that the MTA secured the best value for the rights to use the West Side property, and the enhanced competition from Cablevision's bid contributed to this end. To be sure, the Jets' project would have been harmed if Cablevision had won the bidding, and the enhanced competition in the bidding process that resulted from Cablevision's bid may

17

have convinced the Jets that they needed to submit a higher bid if they were to win, but there is nothing unfair or anticompetitive about this process. To the contrary, this is the essence of competition. *See, e.g., Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) (purpose of Sherman Act is "not to protect businesses from the working of the market; it is to protect the public from the failure of the market").

Indeed, the Jets' own actions following the submission of Cablevision's bid underscore the procompetitive nature of Cablevision's bid. On March 21, 2005, the Jets submitted a bid of $720 million for the rights to build on the West Side Rail Yard—a dramatic increase over their original bid of $100 million, which was submitted as part of an exclusive negotiation with the MTA. Clearly, the increase in the Jets' bid once the bidding became competitive is inconsistent with the notion that Cablevision's bid was a sham.[10] And the fact that the Jets ended up paying more as a result of the competitive process sheds light on the real motivation behind the Jets' gripe with the process. The competitive bidding process cost the Jets more money to secure the (so-far) winning bid—and, conversely, it allowed the MTA to earn more money for its property. It would turn the Sherman Act on its head to hold that Cablevision's bid, which was a critical part of this competitive process, was anticompetitive.

**2.    The Jets fail to allege that Cablevision has monopoly power in a properly defined relevant market.**

Regardless of the underlying conduct alleged, the Jets must allege that Cablevision possesses a monopoly in a properly defined relevant market. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). The Jets' gerrymandered and patently implausible market

---

[10]  The MTA itself recognized that Cablevision's bid was no sham. While the MTA disqualified the bids of other bidders (two for not submitting the required filing fees, and one because of contingencies in the bid), the MTA found that Cablevision was a qualified bidder. Moreover, the head of MTA's Real Estate and Planning Committee, James Simpson, stated on the public record that "if we look at cash on the table, I'd have to pick the MSG proposal because it is $400 million, which is a lot of cash"—approximately $200 million more than the Jets' proposal. *See* "Albany Is Next Stop for Jets' Bid," *New York Sun*, April 1, 2005 (Attachment 5).

definition defies both precedent and common sense. This Court should reject it.

The Jets propose a relevant market consisting *only* of Cablevision's three entertainment venues in Manhattan—Madison Square Garden, the Theater at Madison Square Garden, and Radio City Music Hall. Compl. ¶ 20. The Jets contend that these three venues face no competition from any other venue. *Id.* ¶ 21. While the question of market definition sometimes involves questions of fact, numerous courts have dismissed antitrust claims where, as here, a claim is based on a proposed market definition that conflicts with the clear realities of the marketplace.[11] In particular, courts have cautioned against defining a market limited to a single firm's products that compete in a marketplace with nonstandardized products. *See, e.g., Mathias*, 152 F. Supp. 2d at 482 (market definition should not be "artificially constricted" based on "differences in product characteristics," but rather should reflect "commercial realities").

The Jets' claim fails because Cablevision's venues clearly face extensive competition. Indeed, New York is the live-entertainment capital of the United States (if not the world), with *dozens* of theaters, concert venues, large entertainment halls, and major-league stadia in addition to Cablevision's venues. The analysis of a proper relevant market requires this Court to assess whether these other venues are reasonably substitutable for Cablevision's three venues, from the perspective of event promoters and consumers. *See Mathias*, 152 F. Supp. 2d at 481-82 (describing rule of "reasonable interchangeability"). The inescapable conclusion from such an analysis is that the relevant market is *not* limited to Cablevision's venues.

---

[11] *See, e.g., Hack v. Yale*, 237 F.3d 81, 86 (2d Cir. 2000) (affirming dismissal of claim based on alleged market limited to Yale, where plaintiff alleged that Yale degree "has unique attributes that make it without substitute or equal"; proposed market conflicted with "the obvious: there are many institutions of higher learning providing superb educational opportunities"); *Belfiore v. New York Times*, 826 F.2d 177, 180 (2d Cir. 1987) (rejecting market limited to the *New York Times* as "implausible"); *Mathias v. Daily News*, 152 F. Supp. 2d 465, 482 (S.D.N.Y. 2001); *Shaw v. Rolex Watch, U.S.A.*, 673 F. Supp. 674, 678-79 (S.D.N.Y. 1987) (dismissing claim based on alleged market limited to Rolex watches); *Theatre Party Assocs. v. The Shubert Org.*, 695 F. Supp. 150 (S.D.N.Y. 1988) (dismissing claim based on alleged market limited to ticket sales to "Phantom of the Opera").

       **a.**     **Promoters of stadium events have options throughout the New York metropolitan area.**

From the perspective of promoters of stadium events, the relevant geographic market is at least as large the New York metropolitan area.  Within the area, there are *five* major-league quality venues other than Madison Square Garden—Yankee Stadium, Shea Stadium, Nassau Coliseum, Continental Arena and Giants Stadium—all of which the Jets urge this Court to ignore.  While the Jets argue that only venues within Manhattan are suitable for promoters seeking to reach the New York marketplace, (Compl. ¶ 26), each of these other stadia clearly competes for events to be held in the New York area.  The Jets themselves acknowledge that they have played all over the New York metropolitan area, including in Giants Stadium in the Meadowlands, Shea Stadium in Queens, and the Polo Grounds in Manhattan.  Compl. ¶ 37.[12]

Large event promoters other than NFL teams enjoy a similar ability to choose from venues throughout the New York area, which creates significant competition between Madison Square Garden and other venues.  For example, large concert tours routinely visit venues throughout the New York area, and the Yankees, Mets, Giants, Jets, Islanders, Devils, and Nets (who recently announced plans to move to a to-be-built 19,000-seat arena in Brooklyn (*see* Compl. ¶ 40)) have all played outside Manhattan for years.  The other stadia in the area are clearly substitutes for Madison Square Garden for a wide range of events, and therefore it would be improper to exclude these other venues from the relevant market analysis.

       **b.**     **Promoters of theater and concert hall events have numerous options in Manhattan other than Cablevision's venues.**

It is equally incorrect for the Jets to contend that Radio City Music Hall and the Theatre at Madison Square Garden face no competition.  The Jets urge this Court to ignore all theaters in

---

[12] The mobility of the Jets and other NFL teams is not limited merely to the New York area, but rather it covers the entire country.  In prior court cases, for example, the NFL has argued that the geographic market for stadia is *nationwide*, because NFL teams can move (or threaten to move) anywhere in the country to secure favorable stadium deals.  *See, e.g., Los Angeles Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1393 (9th Cir. 1984) (the Jets were a co-defendant in that case with the NFL).

Manhattan that have a seating capacity of less than 5,000, but they offer no reasonable justification for this result-driven cutoff. The Complaint identifies the events that are hosted in the Theatre at Madison Square Garden as "concerts, family and children shows . . . Golden Gloves Boxing, and awards shows," and it identifies the events that are hosted in Radio City Music Hall as "stage shows, concerts, and special events, including award shows, and family and children shows, among other events." Compl. ¶ 20. As a purported justification for excluding all other theaters and concert halls in Manhattan from the relevant market, the Jets allege that "[t]here are no other facilities in Manhattan that are reasonable substitutes for events of this nature." *Id.* ¶ 21. Even the newest visitor to Manhattan would recognize the absurdity of this contention. Indeed, Manhattan boasts dozens of Broadway theaters that make up the theater capital of the world, as well as numerous other theaters and concert halls that compete with Cablevision's venues, including Carnegie Hall, the New York State Theater, the Metropolitan Opera House, Roseland Ballroom, the Beacon Theatre, and many others.

      c.      **Consumers of entertainment have countless options in the New York metropolitan area other than Cablevision's venues.**

The Jets also attempt to support a relevant market limited to Cablevision's three venues by arguing that consumers of entertainment in New York have no options other than the events hosted in these venues. This argument is also untenable on its face. Consumers of entertainment in New York have more options than could be counted in these pages, including five other major-league sports stadia (all of which have numerous luxury suites), scores of theaters and concert halls, hundreds of restaurants and nightclubs, and many others. Clearly, Cablevision has no monopoly over consumers' entertainment options. *See Theatre Party*, 695 F. Supp. at 154-55 ("Plaintiff has failed to explain why other forms of entertainment, namely other Broadway shows, the opera, ballet or even sporting events are not adequate substitute products.").

**C.**      **The Jets Have Not Stated A Claim For Tortious Interference.**

The Jets contend that Cablevision's alleged "sham bid" and its alleged actions to prevent the Jets from advertising on certain television networks constitute tortious interference with

prospective business relationships. Compl. ¶¶ 67-75. But, for many of the same reasons that the Jets' antitrust claim fails, they also fail to state a claim for tortious interference. *See, e.g., Yellow Page Solutions v. Bell Atl. Yellow Pages Co.*, 2001 U.S. Dist. LEXIS 18831, at *30 n.7 (S.D.N.Y. Nov. 19, 2001) ("Having failed to state a claim under the antitrust laws, plaintiffs have also failed to aver the commission of a tort.").

To state a claim for tortious interference with a prospective business relationship, the Jets must allege that (1) they had a prospective business relationship with a third party, (2) Cablevision interfered with that relationship, (3) Cablevision's intent was to harm the Jets or it used dishonest, unfair, or improper means, and (4) Cablevision's acts injured the Jets. *See, e.g., Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994). Where, as here, a plaintiff alleges interference with *prospective* contract rights, "plaintiff must show more culpable conduct on the part of the defendant"—"as a general rule, the defendant's conduct must amount to a crime or an independent tort." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004); *see also Catskill Dev., LLC v. Park Place Entm't Corp.*, 345 F. Supp. 2d 360, 363 (S.D.N.Y. 2004) ("a third party's interference with a prospective business relationship that has not yet been reduced to contract is actionable only in limited circumstances").

The Jets first assert that by submitting a competing bid to the MTA, Cablevision "deprive[d] them of an advantageous existing and prospective business relationship" with MTA and ESDC. Compl. ¶ 68. While it may be true that facing competition in the bidding process— as opposed to enjoying an exclusive bargaining position to secure the rights to the MTA's land— was disadvantageous to the Jets, Cablevision's submission of a bid to MTA can hardly be deemed tortious conduct. Indeed, if that were the case, any bidder for a potential contract would have a cause of action in tort because another party was attempting to secure the same contract.

The law of tortious interference simply does not render competitive bidding unlawful. For example, New York law defines the "wrongful means" that can support a claim of tortious interference as conduct "representing physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however,

include persuasion alone although it is knowingly directed at interference with the [prospective] contract." *NBT Bancorp v. Fleet/Norstar Fin. Group*, 664 N.E.2d 492, 497 (N.Y. 1996) (internal citations omitted); *see also Carvel Corp.*, 818 N.E.2d at 1103 ("[c]onduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations"). Submitting a competing bid for rights to a piece of property does not fit within the ambit of this definition and is not remotely akin to "criminal" or "wrongful" conduct. Rather, Cablevision's actions represent legitimate business competition. *See Carvel Corp.*, 818 N.E.2d at 1105-06 (competitive activity was not "wrongful" but "legitimate persuasion"). Nor do the Jets allege that Cablevision submitted its competing bid "out of malice." *See Catskill Dev.*, 345 F. Supp. 2d at 363. To the contrary, the Complaint acknowledges that Cablevision submitted its bid in connection with a planned mixed-use residential development on the site; and the Jets do not allege that, if Cablevision were successful in bidding for this highly valuable Manhattan real estate, the venture would not be profitable.

Moreover, the Jets cannot show that Cablevision's bid has caused them any harm, which is one of the required elements of their claim. As discussed above, if Cablevision's bid were so baseless as to constitute a "sham," then it would have been dismissed easily by the MTA and could not have harmed the Jets. And the fact that the MTA actually has awarded the property rights to the Jets conclusively undermines any claim that Cablevision tortiously interfered with the Jets' attempt to secure those property rights. *See, e.g., G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d Cir. 1995).

The Jets' claim that Cablevision interfered with its "existing and prospective business relationships" with "Media Outlets" is similarly deficient. Compl. ¶ 72. As an initial matter, the Jets' allegations on this count are too vague to support a claim, because they fail to identify with any specificity how Cablevision actually interfered with their prospective relationships. The Jets base their claim on alleged "dishonest, unfair and improper conduct" with respect to two television networks (Compl. ¶ 73); but they have not offered any factual allegations to support

this conclusory assertion, as they have failed to allege what Cablevision actually said or did that could constitute tortious conduct. *See, e.g., Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V.*, 1997 WL 539772, at *8 (S.D.N.Y. Aug. 28, 1997) ("vague allegations are insufficient to show the kind of interference that [a tortious interference] claim requires").

The Jets also fail to allege that they suffered any harm as a result of their alleged exclusion from purchasing advertising on two local television networks. As discussed above, the Jets had numerous alternative avenues to deliver their political messages to the public, which they have employed through over $6 million in advertising expenditures in 2004 alone. The Jets' alleged failure to place advertising on two additional television networks scarcely amounts to a judicially redressable injury. Their tortious interference claim should be dismissed.

**D.    The Jets Have Not Stated A Claim Under N.Y. General Business Law § 349.**

To state a claim under Section 349, the Jets must allege three elements: "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chemical Bank*, 731 N.E.2d 608, 611 (N.Y. 2000). The Jets fail to allege any of these elements.

The Jets fail the first element of the test because they do not allege that Cablevision engaged in any commercial or consumer-oriented conduct; instead, they are complaining that Cablevision made misrepresentations in *political* statements. Section 349 provides that "[d]eceptive acts or practices *in the conduct of any business, trade or commerce or in the furnishing of any service* in this state are hereby declared unlawful." *See* N.Y. Gen. Bus. Law § 349(a) (emphasis added). The statute does not purport to regulate non-commercial speech, such as the political speech at issue here. "As consumer protection laws, sections 349 and 350 prohibit, and have only been applied to, frauds or other deceptive practices arising out of commercial transactions . . . and not to general expressions of opinion about public matters." *New York Pub. Interest Research Group v. Insurance Info. Inst.*, 554 N.Y.S.2d 590, 592 (N.Y. App. Div. 1990). Because Cablevision's purpose was clearly "to influence public officials, voters and citizens in general in order to increase sympathy for" its positions, Cablevision was

24

"engaged in precisely the sort of free debate which the First Amendment was intended to safeguard," and therefore Section 349 does not apply here. *Id.*

The Jets also fail the second element, because they fail to identify any particular statement that was, in fact, misleading. *See Stutman*, 731 N.E.2d at 613 (affirming dismissal because plaintiffs "failed to show that defendant committed a deceptive act"). Indeed, the Jets fail to identify any statements *at all* by Cablevision. Simply alleging that Cablevision engaged in "misleading advertising" (Compl. ¶ 77), but without identifying the allegedly deceptive statements, comes nowhere close to meeting the minimum pleading standard. *See, e.g., USAlliance Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 346 F. Supp. 2d 468, 472 (S.D.N.Y. 2004) ("plaintiffs stating a claim under [Section 349] must allege with some specificity the allegedly deceptive acts or practices that form the basis for the claim"). In addition, for the reasons discussed above, the Jets fail the third element because they have not alleged any injury as a result of any allegedly misleading conduct by Cablevision.

**CONCLUSION**

For the foregoing reasons, Cablevision respectfully requests that the Court dismiss the Complaint for failure to state a claim.

Dated: April 5, 2005                              Respectfully submitted,

*Miguel A. Estrada*

Jack M. Weiss                                     Miguel A. Estrada (ME-4227)
Randy M. Mastro                                   Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP                       Michael L. Denger
200 Park Avenue                                   Joshua Lipton
New York, NY  10166-0193                          GIBSON, DUNN & CRUTCHER LLP
Tel: (212) 351-4000                               1050 Connecticut Avenue, NW
Fax: (212) 351-4035                               Washington, DC  20036-5306
                                                  Tel:  (202) 955-8500
                                                  Fax:  (202) 467-0539

                                                  *Counsel for Defendants Cablevision Systems*
                                                  *Corporation, CSC Holdings, Inc., and Madison*
                                                  *Square Garden L.P.*