**4**

Dockets.Justia.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HELL'S KITCHEN NEIGHBORHOOD
ASSOCIATION, MARTIN TREAT, META
BRUNZEMA, DANA TURNER, DANIEL
GUTMAN, RUDOLF SAMANDAROV, and
MADISON SQUARE GARDEN, L.P.,

              Petitioners,

For Judgment Pursuant to CPLR Article 78

    - against -

NEW YORK CITY DEPARTMENT OF CITY
PLANNING, NEW YORK CITY PLANNING
COMMISSION, THE CITY OF NEW YORK, THE
CITY COUNCIL OF THE CITY OF NEW YORK,
and NEW YORK METROPOLITAN
TRANSPORTATION AUTHORITY,

              Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No. 117957/04

IAS Part 49
Justice Herman Cahn

**PETITIONERS' REPLY
MEMORANDUM
OF LAW IN FURTHER
SUPPORT OF
ARLICLE 78 PETITION**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Attorneys for Petitioners

ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022-4690
Telephone: (212) 715-1000
Attorneys for Petitioner Madison Square Garden, L.P.

ANTONIA LEVINE BRYSON, ESQ.
475 Park Avenue South, 16th Floor
New York, New York 10016
Telephone: (212) 483-9120
Attorney for Petitioners Hell's Kitchen Neighborhood
Association, Martin Treat, Meta Brunzema, Dana Turner,
Daniel Gutman, and Rudolf Samandarov

Dated: New York, New York
     March 9, 2005

**TABLE OF CONTENTS**

<u>Page</u>

PRELIMINARY STATEMENT .................................................................................1

ARGUMENT ............................................................................................................7

I. THE COURT SHOULD GRANT THIS PETITION IN ITS ENTIRETY
   BECAUSE THE CITY AND THE MTA HAVE VIOLATED SEQRA,
   CEQR, AND ULURP.........................................................................................7

   A. THE AGENCIES' RELIANCE ON DISTORTED DATA IS
      INDEFENSIBLE UNDER THE "HARD LOOK" STANDARD.......................7

      1. The "Hard Look" Standard Does Not Sanction An Agency's
         Reliance On False Information ................................................................7

      2. Respondents Are Not Entitled to Rely on Experts Who
         Provided or Used Distorted Data or Unrealistic Analyses .....................11

      3. The Environmental Review Process Was Tainted by City
         Hall's Orchestrated Efforts to Push this Project Through.......................12

   B. THE FEIS IS REPLETE WITH DISTORTIONS AND
      MISREPRESENTATIONS CONCERNING SIGNIFICANT
      ENVIRONMENTAL IMPACTS .................................................................16

      1. The Distortion of Traffic Impacts .......................................................16

         a. The Jets' "Unrealistic" 2002 Survey Using "Push"
            Questions.................................................................................18

         b. The Agencies' 2004 Survey Using "Push" Questions.................20

         c. Respondents' Illusory "Multiple Sources of Data" .....................29

      2. Other Misrepresentations of Traffic Impact Findings in the
         FEIS.....................................................................................................34

      3. Misrepresentations of Air Pollution and Noise Impacts ........................39

      4. Misrepresentation of Sewage Impacts...................................................41

      5. Inadequate Consideration of Secondary Displacement...........................43

      6. The "Sham" Financing of the Proposed Action......................................46

      7. Inadequate Consideration of Comments to the DEIS .............................47

i

**TABLE OF CONTENTS**
[Continued]

Page

C.  RESPONDENTS FAILED TO APPLY FOR ALL NECESSARY
PERMITS............................................................................................48

D.  RESPONDENTS CIRCUMVENTED THE PUBLIC REVIEW
PROCESS IN AUTHORIZING NEW ELECTRICAL
SUBSTATIONS ..................................................................................50

E.  THE DEIS WAS SO INCOMPLETE AND INADEQUATE THAT IT
COULD NOT SERVE AS THE BASIS FOR A LEGAL REVIEW
PROCESS THAT PROTECTED THE PUBLIC'S RIGHT TO
INFORMED COMMENT ...................................................................53

II.  THIS COURT SHOULD ORDER THE CITY PLANNING COMMISSION,
DCP, AND MTA TO PRODUCE PUBLIC RECORDS RESPONSIVE TO
MSG'S FOIL REQUESTS ...............................................................................56

CONCLUSION ......................................................................................................61

ii

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Action for Rational Transit v. West Side Highway Project,*
   536 F. Supp. 1225 (S.D.N.Y. 1982).................................................................5

*Almodovar v. Altschuller,*
   232 A.D.2d 700, 647 N.Y.S.2d 1010 (3d Dep't 1996) ...........................................57

*Bliek v. Town of Webster,*
   104 Misc. 2d 852, 429 N.Y.S.2d 811 (Sup. Ct. Monroe County 1980) ......................54, 56

*Burke v. Yudelson,*
   81 Misc. 2d 870, 368 N.Y.S.2d 779 (Sup. Ct. Monroe County 1975),
   *aff'd,* 51 A.D.2d 673, 378 N.Y.S.2d 165 (4th Dep't 1976)....................................58

*Chatham Towers, Inc. v. Bloomberg,*
   No. 107761/04, 2004 WL 2925896 (Sup. Ct. N.Y. County Oct. 15, 2004).......................7

*Chinese Staff & Workers Ass'n v. City of N.Y.,*
   68 N.Y.2d 359, 509 N.Y.S.2d 499 (1986) ..................................................56

*Cilla v. Mansi,*
   No. 3563-02, 2002 N.Y. Misc. LEXIS 657 (Sup. Ct. Suffolk County May 8, 2002) ..............54

*Duke & Benedict, Inc. v. Town of Southeast,*
   253 A.D.2d 877, 678 N.Y.S.2d 343 (2d Dep't 1998)............................................56

*Farbman & Sons v. N.Y. City Health & Hosps. Corp.,*
   62 N.Y.2d 75, 476 N.Y.S.2d 69 (1984) .....................................................58

*Glen Head--Glenwood Landing Civic Council, Inc. v. Town of Oyster Bay,*
   88 A.D.2d 484, 453 N.Y.S.2d 732 (2d Dep't 1982)........................................7, 8, 10

*H.O.M.E.S. v. N.Y. State Urban Dev. Corp.,*
   69 A.D.2d 222, 418 N.Y.S.2d 827 (4th Dep't 1979).............................................8

*Jackson v. N.Y. State Urban Dev. Corp.,*
   67 N.Y.2d 400, 503 N.Y.S.2d 298 (1986). ..................................................56

*Malerba v. Kelly,*
   211 A.D. 2d 479, 621 N.Y.S.2d 318 (1st Dep't 1995) .........................................58

*Marsh v. Or. Natural Res. Council,*
   490 U.S. 360 (1989).......................................................................7

*Moore v. Santucci,*
    151 A.D.2d 677, 543 N.Y.S.2d 103 (2d Dep't 1989) ............................................................ 59

*Newton v. Police Dep't,*
    183 A.D.2d 621, 585 N.Y.S.2d 5 (1st Dep't 1992) ............................................................ 57

*Purchase Envtl. Protective Ass'n v. Strati,*
    163 A.D.2d 596, 559 N.Y.S.2d 356 (2d Dep't 1990) .................................................... 7, 11

*Munash v. Town Bd.,*
    297 A.D.2d 345, 748 N.Y.S.2d 160 (2d Dep't 2002) ......................................................... 11

*Riverkeeper v. EPA,*
    358 F.3d 174 (2d Cir. 2004) ......................................................................................... 49

*Schenectady Chems., Inc. v. Flacke,*
    83 A.D.2d 460, 446 N.Y.S.2d 418 (3d Dep't 1981) ......................................................... 56

*Sierra Club v. United States Army Corps of Eng'rs,*
    614 F. Supp. 1475 (S.D.N.Y. 1985) ........................................................................... 6, 16

*Sierra Club v. United States Army Corps of Eng'rs,*
    701 F.2d 1011 (2d Cir. 1983) ............................................................................ 1, 8, 9, 10

*Silver v. Dinkins,*
    N.Y.L.J., May 3, 1993, at 28, col. 2 (Sup. Ct. N.Y. County May 3, 1993),
    *aff'd* 602 N.Y.S.2d 540 (1st Dep't 1993) ...................................................................... 50

*Society of the Plastics Industry v. County of Suffolk,*
    77 N.Y.2d 761, 570 N.Y.S.2d 778 (1991) ...................................................................... 56

*Washington County Cease, Inc. v. Persico,*
    99 A.D.2d 321, 473 N.Y.S.2d 610 (3d Dep't 1984),
    *aff'd on other grounds,* 64 N.Y.2d 923, 488 N.Y.S.2d 630 (1985) .................................. 10

*Webster Assocs. v. Town of Webster,*
    112 Misc. 2d 396, 447 N.Y.S.2d 401 (Sup. Ct. Monroe County),
    *aff'd,* 85 A.D.2d 882, 446 N.Y.S.2d 955 (4th Dep't 1981),
    *rev'd,* 59 N.Y.2d 220, 464 N.Y.S.2d 431 (1983) .............................................................. 55

*WEOK Broad. Corp. v. Planning Bd.,*
    79 N.Y.2d 373, 583 N.Y.S.2d 170 (1992) ......................................................................... 7

## State Regulations

6 NYCRR § 617.9..................................................................................47

## Secondary Sources

Neal Orloff, *SEQRA: New York's Reformation of NEPA*,
  46 Alb. L. Rev. 1128 (1982)..........................................................10

## PRELIMINARY STATEMENT

The mountain of paper submitted by the City and MTA cannot bury the truth about the fatal flaws in this environmental review process: the decision-making here was predicated on false data that was distorted to fit a predetermined outcome dictated by City Hall. On that basis alone, Respondents' determinations were arbitrary and capricious. In order to get this project approved, the lead agencies here tried to hide the truth about the devastating traffic impacts—and concomitant air, noise and sewage impacts—that this stadium project (the "Project") would cause on the West Side of Manhattan. Then, after approval, they were forced to reveal the truth, in response to FOIL requests and discovery demands. And now, they try furiously to rewrite the history of their decision-making process to excuse their misconduct.

Respondents now assert that they took the required "hard look" here and that that should end the inquiry. A government official, however, cannot take a "hard look" by looking the other way or by looking at bad data that has been distorted to give a misleading impression about environmental impacts. As Respondents concede, a decision "made in reliance on false information, developed without an effort in objective good faith to obtain accurate information, cannot be accepted as a 'reasoned' decision." *Sierra Club v. United States Army Corps of Eng'rs*, 701 F.2d 1011, 1035 (2d Cir. 1983). That is precisely what happened here.

Disclosures made since the filing of Petitioners' opening brief have confirmed the serious deficiencies in this environmental review. What has also emerged is the extent to which City Hall orchestrated a campaign here to ensure that analysis of environmental impacts necessarily conformed with its predetermined outcome. Deputy Mayor Daniel Doctoroff's "principal project coordinator," Ann Weisbrod, who "worked directly with the Deputy Mayor," personally rode herd on City agencies, the MTA, and their "expert' consultants. (Mastro Supp. Aff. ¶ 2.) She was City Hall's chief "enforcer," pressuring analysts to minimize impacts, disparage critics, and

1

mislead potential supporters.  For example, in one of her many candid e-mails, when the Jets' traffic consultants suggested that the draft environmental impact statement ("DEIS") did not adequately consider weekday use of the new stadium as a multi-use facility ("MUF"), she chastised them for "getting us into trouble."[1]

In other e-mails, Weisbrod wanted to "eviscerate" proposals of stadium opponents "to take the wind out of their sails"; she complained bitterly of "a real problem" when the "MTA insist[ed] that the bus capacity" assumptions in the DEIS be reduced, "thus clogging the street with too many buses making it impossible to mitigate impacts"; she hid "the REAL COSTS of the #7 line" from a prominent civic group whose support City Hall was courting; and she fretted that "the Olympic Committee review" team arriving "in Feb/March 2005 to determine the level of our progress and the promises we've made" would include "15 technical people who will be inspecting and asking all the right technical questions.  *Woe is me and you!!!*"[2]  And lest there be any doubt about this Project's inevitability, Weisbrod wrote on June 7, 2004, that "we are fast approaching D-Day on the DEIS," which "will be completed on June 18th and *we will be certified (we already are)* into ULURP on June 21st"[3]—a legal impossibility in a legitimate process because a project cannot legally be "already" certified before a draft EIS is completed.

---

[1]  *Id.* Ex. 80 (E-mail correspondence among Ann Weisbrod, Marty Taub, and Glen Price, re: new description of MUF on Jets website, March 27 and March 29, 2004).

[2]  *Id.* Ex. 82 (E-mail from Ann Weisbrod to Lois Tendler and Adrienne Taub re: Community Outreach Efforts on Hudson Yards, Dec. 9, 2003); Ex. 83 (E-mail from Ann Weisbrod to Philip McGrade, Lawrence Lennon, and Lawrence Fleischer re: Bus Capacity Issue Crisis, March 30, 2004); Ex. 84 (E-mail from Ann Weisbrod to Bill Wheeler and Lawrence Fleischer re: Links Between Transportation Investment and Economic Development (July 2003), July 23, 2003); Ex. 85 (E-mail from Ann Weisbrod to Lawrence Fleischer, Philip McGrade, James Brown and David Donatelli re:  Timeframe and the Olympics, Oct. 8, 2003) (emphasis added).

[3]  *Id.* Ex. 87 (E-mail from Ann Weisbrod to Adrienne Taub and Lois Tendler re: CB #4 and the HY, June 7, 2004) (emphasis added).

It is undisputed that the environmental review of this Project turned fundamentally on traffic impacts.  Pivotal to the lead agencies' traffic impact analysis was a supposedly "independent" 2004 survey of Jets season ticket holders, in which an unprecedented 70% of respondents were reported to have claimed they would take mass transit to get to Jets games at a new West Side stadium.  At the time of the DEIS's filing, City Planning issued a press release hailing the 2004 poll as an "independent survey" proving that the "Jets move from the Meadowlands to Manhattan will take thousands of cars off the road" and result in "high transit use."[4]  Only after the decision to approve this Project, however, did City Planning finally disclose—in unredacted form—an e-mail from the Jets confirming that this survey was anything but "independent" and, instead, consisted of questions that were designed to "push" respondents into saying they would take mass transit.  Although the lead agencies seek to minimize the Jets' role in this supposedly "independent survey," their documents reveal that Jets representatives participated in drafting the survey and even reordering it to "get the full effect of the push questions."[5]  Thus, that survey proved to be no more reliable than a 2002 survey—unabashedly performed by and for the Jets—which, as discovery has revealed, also utilized questions that "pushed" respondents into saying they would use mass transit.[6]  In short, the FEIS's pivotal assumption that 70% of all persons attending events at the proposed stadium would travel by mass transit was predicated on "push polls" that were therefore unreliable.  That fact is now

---

[4]  *Id.* Ex. 88 (June 2004 DCP Press Release).

[5]  *Id.* Ex. 89 (E-mail from Thad Sheely to Erik Metzger and James Brown re: Revised Jets Travel Mode Survey, April 16, 2004); *see also id.* Ex. 103 (E-mail from Melanie Meyers to Thad Sheely, April 16, 2004).

[6]  *See* Mastro Supp. Aff. Ex. 97 (Final Draft 2002 Survey (McLaughlin & Associates, Inc., New York Jets Season Ticket Holders Survey), August 28, 2002); Luntz Supp. Aff. ¶¶ 17–18.

beyond dispute: Respondents and the Jets admitted it in e-mails they were forced to disclose since this Petition was filed.[7]

Not surprisingly, Respondents are now backing away from both "push polls" on which their FEIS relied. They characterize the 2004 Survey as merely a "final check" on the "multiple sources of data" on which the FEIS purportedly based its analysis minimizing traffic impacts. (Resp. Br. at 40.) These "multiple sources of data," however, offer no support for the aggressive assumptions in Respondents' traffic analysis: "transportation studies" commissioned by the Jets that included that 2002 "push poll" that even the lead agencies here found "unrealistic"; "data from other comparable sports venues" proving only how unreasonable these assumptions were because no other venue in North America approaches anywhere near that high a mass transit usage rate; the "transit ridership in New York City," which bears no relation to the riding habits of those who attend Jets games, the vast majority of whom live outside New York City; and "[d]ata regarding transit ridership for events at the Meadowlands in New Jersey, Shea Stadium in Queens and Madison Square garden in Manhattan," which reach levels of only 4%, 17% and 50%, respectively. This post-hoc rationalization cannot change reality: the lead agencies and the Jets presented decision-makers and the public with a rosy but unsupportable picture that misled them into thinking that traffic impacts (and concomitant air and noise impacts) would be less severe because so few Jets fans would drive to games at a new West Side stadium.

Despite all of the evidence to the contrary—the experience of *all* other sports venues throughout North America, the experience of *all* other sports venues here in New York City, and

---

[7] Contemporaneous e-mails confirm that Respondents and their pollsters were well aware at the time that this 2004 poll could "unduly 'lead' the respondent to answer that he/she would take transit." (*See, e.g., id.* Ex. 91 (E-mail from James Brown to Lawrence Lennon, Erik Metzger, and David Donatelli, April 8, 2004).) Indeed, the pollster herself even quipped at one point in late April 2004 that, "*we are going to do our best to 'push' it through.*" (*Id.* Ex. 92 (E-mail from Mindy Rhindress to Lawrence Fleischer re: modal split survey, April 30, 2004) (emphasis added).)

even the *current* practice of Jets fans—the FEIS presented flawed data to support the unwarranted assumption of an unprecedented "sea change" in travel patterns in order to minimize the Project's reported traffic impacts. Nothing in Respondents' voluminous submissions can erase that fact.

The manipulation of traffic data was part of a pattern that pervaded the entire review process. That manipulation also resulted in the understatement of air pollution and noise impacts because the failure to report thousands more cars clogging Manhattan streets on event days necessarily meant that the FEIS failed to report the far greater air emissions and noise levels as a result. As recent discovery has revealed, Respondents consciously attempted to minimize or ignore many important environmental issues, including the severity of traffic, air, noise and sewage impacts; secondary displacement and financing issues; the failure to apply for necessary environmental permits; and the "eleventh hour" amendments rewriting the approval process for new electrical substations to get the Project through. Finally, Respondents held back from the public so much crucial information about impacts and mitigation measures at the draft stage—and so substantially departed from the scoping document that was legally required to be followed as a "roadmap" for the DEIS—that the public review process was fundamentally flawed from its inception.

If this has a familiar ring to it, it is because a similar scene played out here in much the same way 20 years ago. Just like this Court, the federal court there was told that it should approve a project that was said to be "essential" to "transform" a supposedly "underutilized" part of Manhattan. (Resp. Br. at 1.) Just as here, however, the government engaged in "misleading and . . . rather obvious attempts to avoid the full impact of the facts. . . ." *Action for Rational Transit v. West Side Highway Project*, 536 F. Supp. 1225, 1247 (S.D.N.Y. 1982). The federal

judge there did not hesitate to rule, as the law required, that that project could not go forward on the basis of a flawed FEIS, holding that, "[w]hen an agency decision is based upon conclusions in an EIS which are not arrived at in good faith or in a rational and reasoned manner," that decision is "necessarily arbitrary." *Sierra Club v. United States Army Corps of Eng'rs*, 614 F. Supp. 1475, 1516 (S.D.N.Y. 1985).

This case cries out for the same relief. The environmental impacts understated here will affect not just migrating fish, as in that case, but hundreds of thousands of New Yorkers, who will have to live every day with the traffic, air, noise, and sewage problems that will result from this Project.

The public debate continues to rage about this Project, yet the public was denied meaningful participation in this review process because the government failed to give full, fair and honest consideration to this Project's environmental impacts. Petitioners seek to ensure compliance with the safeguards guaranteed by New York law, so that the public can be assured that decision-makers render their judgments based upon all of the relevant environmental considerations. Because those legal safeguards have been frustrated here, this Court should nullify the FEIS, void the decisions based upon it, and compel the Respondents to comply with the law in any future consideration of this Project.

**ARGUMENT**

**POINT I**

**THE COURT SHOULD GRANT THIS PETITION IN
ITS ENTIRETY BECAUSE THE CITY AND THE
MTA HAVE VIOLATED SEQRA, CEQR, AND ULURP**

**A.    THE AGENCIES' RELIANCE ON DISTORTED DATA IS
INDEFENSIBLE UNDER THE "HARD LOOK" STANDARD**

    **1.    The "Hard Look" Standard Does Not Sanction An Agency's Reliance
On False Information**

Although courts give considerable deference to reasonable agency action under SEQRA,

Respondents cannot claim to have taken the required "hard look" here because, among other

things, they relied on distorted data.  An agency cannot rely on analysis it has reason to know is

inadequate, or on data it has reason to know is false or distorted.  Agencies' SEQRA

determinations are struck down where they rely on analyses that are incomplete, inadequate, or

premised on unreliable, inaccurate, or distorted data.[8]  Courts construing the National

Environmental Policy Act ("NEPA")—the "federal counterpart to SEQRA" (Resp. Br. at 34

(citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989)))—reach the same conclusion:

an agency decision "made in reliance on false information, developed without an effort in

---

[8]  *See, e.g., Purchase Envtl. Protective Ass'n v. Strati*, 163 A.D.2d 596, 596–98, 559 N.Y.S.2d 356, 356–57 (2d Dep't 1990) (annulling agency determinations because the agency, relying on the conclusions of its expert consultants, excluded from consideration in the FEIS the impact on certain wetlands present within the site); *Glen Head--Glenwood Landing Civic Council, Inc. v. Town of Oyster Bay*, 88 A.D.2d 484, 490–94, 453 N.Y.S.2d 732, 737–39 (2d Dep't 1982) (holding that respondent agencies failed to comply with SEQRA because they granted a rezoning application on the basis of a factual finding the agencies knew to be unreliable); *Chatham Towers, Inc. v. Bloomberg*, No. 107761/04, 2004 WL 2925896, at *5 (Sup. Ct. N.Y. County Oct. 15, 2004) (Tolub, J.) (annulling negative declaration because the agency's environmental assessment "failed to adequately address certain issues and, in so doing, failed to meet the 'hard look' requirement"); *see also, e.g., WEOK Broad. Corp. v. Planning Board*, 79 N.Y.2d 373, 383, 583 N.Y.S.2d 170, 175 (1992) (concluding that an agency's action should be annulled under SEQRA "because it is not supported by substantial evidence—substantial evidence being such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact or the kind of evidence on which responsible persons are accustomed to rely in serious affairs." (internal quotations and citation omitted)).

objective good faith to obtain accurate information, cannot be accepted as a 'reasoned' decision."
*Sierra Club v. United States Army Corps of Eng'rs*, 701 F.2d 1011, 1035 (2d Cir. 1983).[9]

In *Glen Head--Glenwood Landing Civic Council, Inc. v. Town of Oyster Bay*, for example, the court invalidated a town board's grant of a re-zoning application in part because the board had relied improperly on the applicant's representation in the EIS that it would be able to provide sewage access for the re-zoned property; prior to the board's grant of the re-zoning, facts had come to light that significantly called into question whether the applicant would, in fact, be able to deliver on that representation. *See* 88 A.D.2d 484, 489–495, 453 N.Y.S.2d 732, 736–39 (2d Dep't 1982). The court concluded that, in light of the significance of the sewage question to the re-zoning proposal at issue, the board should have disclosed in a supplemental EIS the fact that the applicant likely would not be able to provide sewage access for the property as he had earlier represented.

Similarly, the Second Circuit, construing the "hard look" standard under NEPA, struck down an agency determination in the "Westway" case because the agency relied upon an FEIS that contained "false statements" concerning the role of the project site as a habitat for certain local fish species, and "statements regarding aquatic impact[s that] had not been compiled in 'objective good faith.'" *Sierra Club*, 701 F.2d at 1030. The agency in *Sierra Club* had relied on an inadequate and factually incorrect report—a report that was not directly based on any actual testing of the project site—to support its finding that the Project would not have any significant impact on the striped bass population migrating down the Hudson River. *See id.* at 1022–24.

---

[9] Indeed, New York courts applying the "hard look" standard in SEQRA cases have made clear that their construction of the standard is guided by federal precedents under NEPA, the original source from which the New York standard was adopted. *See, e.g., H.O.M.E.S. v. N.Y. State Urban Dev. Corp.*, 69 A.D.2d 222, 231–32, 418 N.Y.S.2d 827, 832 (4th Dep't 1979) (finding that "we look to the cases which have construed [NEPA]" for construction of the "hard look" standard under SEQRA because "the State law was modeled after the Federal law in this respect").

The agency continued to rely on this false report even after other government entities and third-party consultants presented the agency with information indicating that there would in fact be a significant impact on the habitat for fish in the project area. *See id.* The court refused to recognize an obligation of deference to the agency's judgment under these circumstances:

> If the [trial] judge finds that the agency did not make a reasonably adequate compilation of relevant information and that the EIS sets forth statements that are materially false or inaccurate, he may properly find that the EIS does not satisfy the requirements of NEPA, in that it cannot provide the basis for an informed evaluation or a reasoned decision. Further, . . . [w]here comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. There must be good faith, reasoned analysis in response.

*Id.* at 1030 (internal quotation omitted). The Second Circuit concluded that the agency violated NEPA by failing to undertake any independent evaluation of the Project's impacts and by failing to react to outside comments indicating that the impacts from the Project could be significant. *See id.* at 1030–31. Moreover, the court found that the agency's false assumption undermined the very purpose of the EIS:

> This baseless and erroneous factual conclusion . . . became a false premise in the decisionmakers' evaluations of the overall environmental impact of Westway and their balancing of the expected benefits of the proposed action against the risks of harm to the environment. Thus, the January 1977 EIS provided no valid "outward sign that environmental values and consequences [had] been considered" with respect to fisheries issues, and hence furnished no assurance that the Westway approvals had been given on a reasoned basis.

*Id.* at 1034 (citation omitted).

Respondents can no more claim that this Court must defer to their judgment than could the defendants in *Sierra Club* and *Glen Head*. As explained in detail in the Petition, Petitioners' opening brief, and here, the FEIS is rife with inadequate analysis and distorted data.

9

Respondents not only had reason to know of the defective data and analysis, but in some cases, Respondents distorted the data themselves or knowingly relied on data that otherwise had been distorted. Moreover, Respondents' internal correspondence makes clear that they dictated predetermined outcomes and that their staffs and consultants constructed their analyses using a top-down approach to meet those predetermined outcomes. If an agency's knowing but passive reliance on false information violates the "hard look" standard, *see, e.g., Glen Head*, 88 A.D.2d at 490–94, 453 N.Y.S.2d at 737–39; *Sierra Club*, 701 F.2d at 1034–35, *a fortiori*, the intentional distortion of data and analyses to achieve a predetermined result also violates the "hard look" standard. Respondents' effort to distinguish this case from the clear line of State and federal authority preventing such abuses of the environmental review process proves too much. Like *Sierra Club*, this is a paradigmatic case of a "truncated or simply bad faith" environmental review that requires judicial intervention to protect the integrity of the process. (Resp. Br. at 36.)[10]

---

10 Moreover, where, as here, a government agency has played a "dual role" as both applicant and reviewing agency in the SEQRA review process, the level of scrutiny applied to Respondent City Planning's decisionmaking must be heightened to reflect the possibility that the reviewing agency's judgment will be compromised by the agency's lack of impartiality. As one commentator on SEQRA has noted:

> [B]y requiring the agency to make an independent judgment of the adequacy of the [EIS], the statute also protects against bias. Applicants are interested in proceeding with their projects in the manner initially proposed by them. This incentive may produce a distortion of the factual situation, and may result in the omission of certain environmental problems, the exclusion of alternatives attractive to society but not to the applicant, and a skewed perspective on the overall balance of environmental benefits and costs associated with each option. The requirement that agencies make their own independent judgment of the adequacy of an impact statement helps mitigate the effects of this bias.

Neal Orloff, *SEQRA: New York's Reformation of NEPA*, 46 Alb. L. Rev. 1128, 1140 (1982) (footnote omitted). This check against "bias" and "distortion" in the decisionmaking process can easily be compromised when the reviewing agency itself is the applicant "interested in proceeding with [the] project." *Id.* Thus, the independence of the agency's decisionmaking must be jealously guarded to ensure that the SEQRA review process is not perverted. Indeed, under similar circumstances, but outside of the SEQRA context, the court in *Washington County Cease, Inc. v. Persico* concluded that Persico, a member of the Industrial Hazardous Waste Siting Board, could not participate in the Board's deliberations on an application submitted by the Department of Environmental Conservation ("DEC") because he also served as general counsel of DEC. *See* 99 A.D.2d 321, 329, 473 N.Y.S.2d 610, 615–16 (3d Dep't 1984), *aff'd on other grounds*, 64 N.Y.2d 923, 488 N.Y.S.2d 630 (1985). The court found that "the conflict in Persico's dual roles is inherently incompatible with procedural due

[Footnote continued on next page]

2.    **Respondents Are Not Entitled to Rely on Experts Who Provided or Used Distorted Data or Unrealistic Analyses**

Respondents claim that they are entitled to rely upon the opinions of their expert consultants. (*See* Resp. Br. at 36–37.) Reliance on expert consultants, however, cannot shield an agency from judicial scrutiny for its violation of environmental review procedures where, as here, the expert analyses are inadequate, unreliable, or premised on false or distorted data. In *Purchase Environmental*, for example, the Appellate Division invalidated a determination of the town planning board because its FEIS failed to consider certain wetlands within the project site. *See* 163 A.D.2d at 596–98, 559 N.Y.S.2d at 356–57. The court expressly rejected the board's argument that it "properly chose to forego consideration of the additional wetlands based on the expert consultant's own determination." *Id.* at 597, 559 N.Y.S.2d at 357. The court concluded that, notwithstanding the expert's advice, the board's decision not to consider the additional wetlands constituted a failure to "take the requisite 'hard look' at environmental concerns mandated by [SEQRA]." *Id.* Similarly, in *Munash v. Town Board*, the Appellate Division rejected the town board's negative declaration despite the fact that the its expert hydrogeologist submitted a report indicating that the there would not likely be a significant impact from the Project. *See* 297 A.D.2d 345, 346–47, 748 N.Y.S.2d 160, 162–63. The board had received additional reports from outside experts advising that the Project would likely cause a significant impact, and the town's expert "did not perform an on-site study, and indicated that she would further evaluate th[e] issue upon receipt of additional . . . information." *Id.* at 347, 748 N.Y.S.2d

---

[Footnote continued from previous page]

    process," and held that he should have recused himself to preserve the impartiality of the Board's review. *Id.* at 329, 473 N.Y.S.2d at 615.

    Although SEQRA contemplates environmental review of projects in which an agency plays such a dual role, it does not contemplate an agency abrogating its obligation to exercise independent judgment. In light of the inherent tension between City Planning's dual roles, the Court should apply a heightened level of scrutiny in order to insure that its independent judgment has not been compromised—as it has been here.

11

162. Again, rejecting the agency's reliance on its expert, the court concluded that the board failed to take the requisite "hard look," and reversed its determination. *Id.*

### 3.    The Environmental Review Process Was Tainted by City Hall's Orchestrated Efforts to Push this Project Through

It has long been known that Mayor Bloomberg and his Deputy Mayor, Daniel Doctoroff, have advocated for a West Side stadium. Until recent document disclosures, however, the extent of City Hall's direct involvement in the environmental review process has remained hidden. Now, through FOIL and civil discovery, the truth is emerging, and it shows how City Hall sought to manipulate the process to support its predetermined result, and succeeded in doing so.

Ann Weisbrod of the New York City Economic Development Corporation ("EDC") has been described by Respondents as "the principal project coordinator" who reported "directly" to "the Deputy Mayor" on the Project. (Mastro Supp. Aff. ¶ 2.) Weisbrod worked tirelessly to retrofit the co-lead agencies' environmental analysis to achieve a predetermined conclusion. Specifically, Weisbrod oversaw the Project's approval process in order to minimize the adverse information disclosed about the Project's impacts. Documents from Respondents' own files, reluctantly produced in response to FOIL requests, civil discovery, and orders of Special Referee Liebman, show that Weisbrod was remarkably effective at damage control and enforced obedience.

For example, in an e-mail to MTA officials regarding the New York City Partnership's economic impact analysis of nine different transportation models, including the proposed extension of the No. 7 subway line contemplated here, Weisbrod wrote:

> unfortunaely [sic] they have the capital costs wrong and they say
> that there will be residential develoment [sic] there not commercial
> . . . *anyway they want to know the REAL COSTS of the #7 Line
> which I haven't told them.* . . . I'd like to set up a meeting with
> them and city planning and MTA or if not MTA we'll meet

12

without you - *if we could get them to say the right things it could be very helpful obviously.* Please advise.[11]

In another e-mail to MTA officials, entitled "Timeframe and the Olympics," Weisbrod candidly admitted that she feared the scrutiny of Olympics "technical people who will be inspecting and asking all the right technical questions" and thereby exposing the flaws in the City's plan:

> While I loved Larry and Ed's scenario regarding the Olympic committee review of the Hudson Yards project alas and alack it is not to be. The Committee will be sending out an evaluation commission in Feb March 2005 to determine the level of our progress and the promises we've made. The evaluation commission will be comprised of 4-5 members of the IOC and unfortunately for us, 15 technical people who will be inspecting and asking all the right technical questions. *Woe is me and you!!!*[12]

In a February 6, 2003 e-mail to Larry Lennon of NYCT, Weisbrod recommended that Project advocates not empower NYS DOT and the Port Authority by meeting with them together. She urged a "divide and conquer" strategy:

> Larry I spoke to Tom J today and I uderstand [sic] we'll have to meet with the Port but can we all talk about it first with Larry Fleischer et al [Ann Weisbrod] and let's not combine DOT with the Port - divide and conquer - let's discuss next week thanks.[13]

Weisbrod also pressed to undermine proposals from the Project's opponents. Petitioner Hell's Kitchen Neighborhood Association ("HKNA"), for example, submitted comments concerning a number of problematic aspects of the Project and also proposed possible alternative

---

[11]   (*Id.* Ex. 84 (E-mail from Ann Weisbrod to Bill Wheeler and Lawrence Fleischer re: Links Between Transportation Investment and Economic Development, July 23, 2003) (emphasis added).)

[12]   (*Id.* Ex. 85 (E-mail from Ann Weisbrod to Lawrence Fleischer, Phillip McGrade, and James Brown and David Donatellire: Timeframe and the Olympics, Oct. 8, 2003) (emphasis added).)

[13]   (*Id.* Ex. 81 (E-mail from Ann Weisbrod to Lawrence Lennon re: Port Authority Traffic Meeting, Feb. 6, 2003).)

uses of the site. In an e-mail to MTA officials, Weisbrod demanded that they "eviscerate" HKNA's proposal:

> One other issue is the HKNA proposal which I've asked the TA to do a better job on explaining why the east/west shuttle does not work. *It is important to eviscerate that proposal in a nice way but nevertheless to do it to take the wind out of their sails.*[14]

In a related exchange with MTA consultant James Brown, Weisbrod made plain her desire to discredit another HKNA alternative—the shuttle—that did not square with City Hall's predetermined outcome :

> thanks so much it really needs to be put to bed in an easily understandable way isn't it going to be part of the evaluation of the HKNA plan in the alternatives chapter? must be in the EIS.[15]

With City Hall's self-imposed deadline looming, Weisbrod was quick to attack any internal criticism suggesting that the DEIS did not adequately address impacts. In a March 29, 2004 e-mail exchange in which Jets consultants suggested that the draft document did not adequately consider weekday use of the new stadium as a multi-use facility ("MUF"), Weisbrod rebuked them: "You guys are getting us into trouble."[16]

Weisbrod was similarly outraged by the MTA's "insist[ence] that the bus capacity" assumptions in the draft documents be reduced, "thus clogging the street with too many buses making it impossible to mitigate impacts."[17] In a March 30, 2004 e-mail, she complained:

---

[14]  (*Id.* Ex. 82 (E-mail from Ann Weisbrod to Lois Tendler and Adrienne Taub re: Community Outreach Efforts on Hudson Yards, Dec. 9, 2003) (emphasis added).)

[15]  (*Id.* Ex. 93 (E-mail from Ann Weisbrod to James Brown re: AKRF and Brookfield Site, Dec. 4, 2003).)

[16]  (*Id.* Ex. 80 (E-mail correspondence among Ann Weisbrod, Marty Taub, and Glen Price re: new description of MUF on Jets website, March 27 and March 29, 2004).)

[17]  (*Id.* Ex. 83 (E-mail from Ann Weisbrod to Philip McGrade, Lawrence Lennon and Lawrence Fleisher re: Bus Capacity Issue Crisis, March 30, 2004).)

> [W]e have a real problem about this bus capacity issue - MTA
> insists that the bus capacity be kept artificially low thus clogging
> the street with too many buses making it impossible to mitigate
> impacts and get to single digits and creating the need to create
> other bus routes on street [sic] that cannot accommodate which
> could in turn trigger a light rail resurgence or at least give succor
> and support to the light rail advocates. . . We need to increase the
> number of riders on the buses.[18]

That the Project's approval was preordained by City Hall was confirmed in Weisbrod's

June 7, 2004 e-mail about the "fast approaching D-Day on the DEIS."[19] There, she admitted

that, although the DEIS was not eligible to be certified into ULURP until it was actually

completed, "*we will be certified (we already are)* into ULURP on June 21st."[20] Then, when that

legal certification date arrived on June 21, 2004, the "fact sheet" describing the "HUDSON

YARDS REZONING" came not from the lead agencies but from Deputy Mayor Doctoroff's

Senior Policy Adviser to City Planning to release.[21]

This preordained outcome was further confirmed by City Planning Chair Amanda

Burden, who swore under oath even before her Commission voted in November 2004 to approve

this Project that: "In the case of the Hudson Yards Redevelopment Program, it is of course my

hope that the applications will be approved by both the CPC and the City Council." (*Id.* ¶ 3.)

---

[18] (*Id.*) Curiously, while the MTA stood its ground, the FEIS fails to address the additional impacts that would result from the use of lower bus capacity numbers. In addition, although the FEIS states that nine additional standard buses will be added in 2010, with 66 articulated buses and four standard buses to be added in 2025, no analysis of the increased emissions generated by these 75 additional buses is ever presented in the FEIS. (*See id.* Ex. 94 (Relevant excerpts of FEIS Chapter 20 at p. 20-158)).

[19] (*Id.* Ex. 87 (E-mail from Ann Weisbrod to Adrienne Taub and Lois Tendler re: CB #4 and the HY, June 7, 2004) (emphasis added).)

[20] (*Id.* (emphasis added).)

[21] (*Id.* Ex. 86 (E-mail from Marc Ricks to Aron Kirsch, Rachaele Raynoff, Richard Barth, Jim Whelan, and Jennifer Falk re: FINAL fact sheet, June 21, 2004).)

In sum, what has emerged from these newly discovered e-mails is an orchestrated campaign by City Hall to ensure its predetermined outcome. That is the antithesis of the "hard look" that the law requires of agency decisionmakers in arriving at their determination "in good faith or in a rational and reasoned manner." *Sierra Club v. United States Army Corps of Eng'rs,* 614 F. Supp. at 1516. A preordained decisionmaking process is necessarily arbitrary and capricious.

**B. THE FEIS IS REPLETE WITH DISTORTIONS AND MISREPRESENTATIONS CONCERNING SIGNIFICANT ENVIRONMENTAL IMPACTS**

The environmental review here suffered from so many infirmities—in its inadequate disclosures and distorted analyses of traffic, air, noise, and sewage impacts, in its inadequate consideration of other impacts, and in its failure to address many of the public's comments concerning those impacts—that it necessarily must fail. Indeed, this review was the antithesis of the informed public process and reasoned decision-making that the law requires. Hence, it cannot stand.

**1. The Distortion of Traffic Impacts**

As explained in Petitioners' opening brief, information in the FEIS itself reveals that its presentation of the Project's anticipated traffic impacts was not merely inadequate; it was knowingly distorted. Documents grudgingly produced by Respondents have now exposed in greater detail the extent to which Respondents manipulated data to reach a predetermined outcome and leave no doubt that the distortion of traffic impacts was calculated to minimize adverse environmental impacts that would have to be disclosed in the FEIS.

16

The traffic analysis was based on two flawed traffic surveys. The first—a 2002 Jets survey—employed "push" questions and yielded such favorable results that even the Agencies had to admit they were in part "unrealistic."[22] Then, in the guise of taking a conservative step in light of the Jets' "unrealistic" 2002 survey, Respondents—with the aid of the Jets—designed a second survey in 2004 that was also, in fact, structured to use "push" questions to mislead respondents and produce biased results. Based on this skewed polling data, the FEIS projects that at least 68% and as many as 75% of persons attending events at the proposed stadium will use mass transit—a far greater use of mass transit than has ever been achieved at any North American sports venue.[23] These distorted percentages generate the implausible projection that fully 52,500 of the 75,000 fans traveling to the stadium for a Jets game would use mass transit, and only 7,500 cars would be on the road traveling to and from the stadium. *Id.*

These deliberately distorted projections not only infect the traffic analysis but also taint the analysis of other areas of environmental concern, such as air and noise pollution, which require accurate, good faith projections of automobile usage in order to be properly assessed. Simply put, the disingenuous portrayal of traffic impacts tainted the entire FEIS and rendered it useless in predicting many other potential environmental impacts of the Project.

---

[22] (*See* Mastro Aff. Ex. 2 (FEIS, App. S-1, Sept. 28, 2004, Metzger Mem. re Multi-Use Facility Transportation Planning Assumptions) at 3–4.) The FEIS deemed the taxi share numbers in the 2002 survey to be unrealistically low, and it therefore applied the taxi shares from MSG's survey to Jets fans from the five boroughs. However, it did not also do that for Jets fans from New Jersey, Long Island, Westchester/Rockland, and Connecticut. There is no reason to believe that Jets fans from those areas are less likely to hire limousines to take them to games than are Knicks fans from the same areas. When the MSG's taxi numbers are applied to the Jets fans from these locations, this adds 710 taxis/limos. (Greene Aff. Par. 6.e). This translates into about 1400 more vehicle movements, because taxis and limousines enter the area and then leave it during the same peak period.

[23] (Pet. Br. at 18–19.) Respondents understood the importance of comparison to other sports venues, yet they failed to question or explain the unrealistically and disproportionately smaller transit-use projections for MSG as compared to other sports arenas. (Mastro Supp. Aff. Ex. 96 (Redacted Minutes of No. 7 Extension Project May 27, 2003 Travel Forecasting Meeting, dated May 28, 2003) ("W. Woodford said that looking at the travel characteristics to other downtown stadiums would be a good idea; however these should include areas with limited parking (Pittsburgh has a large amount of parking and would not be a good example).").)

17

a.    The Jets' "Unrealistic" 2002 Survey Using "Push" Questions

Pursuant to Court-ordered discovery, Respondents finally produced the surveys underlying their untenable projection that approximately 70% of persons attending events at the new Jets stadium would use mass transit.[24]  The first survey was conducted by the Jets in 2002. In the FEIS, Respondents stated that they relied in part on the 2002 Survey in analyzing the Project's traffic impacts.[25]

The 2002 Survey included "push" questions designed to skew its findings regarding projected automobile/taxi usage at the stadium.[26]  These "push" questions were so successful that, as the FEIS acknowledges, the 2002 Survey predicted such low percentages of automobile/taxi usage that even Respondents' consultants deemed them "unrealistic."[27]

Early on in the 2002 Survey, the following question was asked:

> If you were to attend a Jet Game at a new stadium located in Manhattan, near Madison Square Garden, -between 30th and 34th Streets, between 11th and 12th Avenues-, would you most likely drive, or take mass transit that would leave you only a 7 to 10 minute walk to the new stadium? If you would not attend any Jet games at this new stadium, just say so.[28]

---

[24]  This prediction is ludicrous not only because it is unreasonably high, but also because a survey of season ticket holders is not the same as a survey of event attendees, which even Respondents' expert admits:  "[W]e have no data to demonstrate what share of attendees are season ticketholders."  (Ericksen Aff. ¶ 10.)

[25]  (See Mastro Aff. Ex. 2 (FEIS at 19-18) (citing the 2002 survey, among other things, and representing that "Travel projections for attendees at the proposed Multi-Use Facility during the 19 Special Events per year were primarily/based on the results of three studies, two of which included in-depth surveys of Jets season ticket holders.") (emphasis added).)

[26]  (See Luntz Supp. Aff. ¶¶ 15–18.)  In the parlance of polling, a "push" question is one designed to influence the person to whom the question is posed and to elicit a particular response.  (Luntz Aff. ¶ 5.)

[27]  (See Mastro Aff. Ex. 2 (FEIS, App. S-1, Sept. 28, 2004, Metzger Br. re Multi-Use Facility Transportation Planning Assumptions) at 3–4.)

[28]  (Mastro Supp. Aff. Ex. 97 (Final Draft 2002 Survey).)

The 2002 Survey thus told those being questioned that the stadium is (a) "near Madison Square Garden," and (b) "only a 7 to 10 minute walk" away from mass transit. Both statements are entirely misleading and inaccurate. It is patently untrue that a Jets fan would need only 7 to 10 minutes to walk to the stadium from the nearest mass transit station. A more realistic estimate of that walk—a distance of approximately three quarters of a mile or more (*see* Joseph Aff. ¶¶ 5–10)—is "20 to 30 minutes" in "game day" conditions, with traffic gridlock and dense pedestrian crowds. (Greene Aff. ¶ 6.a.1.) Nor is it accurate to characterize the stadium as "near Madison Square Garden" when, in fact, it will be located more than half a mile away. Hence, "[n]o reliable predictions of car traffic or mass transit usage could be made based on that survey because it conveys such misleading information in the questions themselves."[29]

Documents produced since the Petition was filed reveal that Respondents and the Jets were fully aware that the 2002 Survey "pushed" those being questioned into providing the desired answers. Thad Sheely of the Jets wrote to Ann Weisbrod that only 61.1% responded to the question quoted above that they would take mass transit to the stadium, but, because that number was not sufficiently high, additional "push" questions were employed. Not surprisingly, the 61.1% figure increased (i) by 13.1% when respondents were told that no additional parking would be provided; (ii) by another 3.3% when they were told about certain infrastructure improvements; and (iii) by another 2.6% when they were told about added ferry service.[30]

---

[29] (Luntz Supp. Aff. ¶ 17) (opinion of Dr. Frank Luntz, nationally renowned polling expert).)

[30] (*Id.* Ex. 98 (Letter from Thad Sheely to Ann Weisbrod, October 21, 2002).)

Through this progression of "push" questions, the Jets were able to "push" respondents sufficiently to generate an unrealistic total transit share prediction of 80.2%.[31]

Respondents are now trying to distance themselves from the 2002 Survey. In their opposition papers, Respondents acknowledge that they found parts of the 2002 Survey to be "unrealistic" and now claim that, in any event, "traffic projections for the Multi-Use Facility were in reality based on multiple sources of data." (Resp. Br. at 39.) As explained below, however, those other "multiple sources of data" are illusory.[32]

### b.    The Agencies' 2004 Survey Using "Push" Questions

The Co-Lead Agencies recognized that "the auto and taxi modal splits for Manhattan origins projected by the Jets' 2002 season ticket holder survey" were "unrealistic," and they knew that a survey conducted by the Jets alone would have no public credibility.[33] Therefore, in the Spring of 2004, they rushed to commission a new survey (the "2004 Survey") of these same Jets season ticket holders.

In June 2004, City Planning issued a press release touting the 2004 Survey:

> Highlighting the potential for an extension of the No. 7 line to catalyze sustainable, transit-oriented development, the city released a Draft Generic Environmental Impact Statement (DGEIS) this week on the Hudson Yards/7 Line Extension, that includes an independent survey of New York Jets seasons ticket-holders

---

[31]  (Id.) The Jets' efforts to engineer positive results in the 2002 Survey did not end there. For example, in another internal e-mail that Special Referee Liebman ordered Respondents to produce in unredacted form, the Jets' consultant at the time wrote: "When we met with the Jets late last week, Jay [Cross] mentioned that we should take out those who responded that they would not renew their season tickets if the team moved to the West Side. Good idea." (Id. Ex. 99 (E-mail from Marty Taub to various EWT employees, Sept. 26, 2002).

[32]  It is worthy of note that the MTA, the City, and their consultants never obtained a copy of the 2002 survey results from the Jets. (Mastro Supp. Aff. Ex. 100 (Letter from Stephen L. Kass to Michael B. Gerrard, Feb. 11, 2005 ("First, you note that Defendants did not produce 'the survey report for the 2002 survey.' *We understand that neither the City nor MTA nor its environmental consultants are in possession of such a survey report for the 2002 survey.*") (emphasis added).) Instead, the lead Agencies relied on the Jets' characterization of the results of the 2002 Survey. This hardly qualifies as a "hard look."

[33]  (Id. Ex. 90 (2004 Survey). at 4.)

20

> confirming that the overwhelmingly [sic] majority of fans will use
> mass-transit to travel to the New York Sports and Convention
> Center (NYSCC) on the far west side.[34]

City Planning's press release also boasted that:

> Although the [2004 Survey] results showed higher mass transit
> usage, *to be conservative*, the DGEIS assumes that only 68 percent
> of attendees would use mass transit, including subways, commuter
> rail, ferry and buses.[35]

In reality, the 2004 Survey was another skewed and unreliable "push poll." It was

conducted by a market research consultant ("SRBI") paid by the City and the MTA but working

closely with the Jets, and it used "push" questions designed to elicit favorable responses just like

the Jets' 2002 Survey.[36] It is now beyond dispute that the 2004 Survey was also an unreliable

"push" poll. The modal split projected by the 2004 Survey is unreliable, not only because it is

unreasonably high, but also because a survey of season ticket holders is not the same as a survey

---

[34] (Mastro Supp. Aff. Ex. 88 (June 2004 DCP Press Release).)

[35] (*Id.* Ex. 88 (June 2004 DCP Press Release) (emphasis added).) That 68 percent figure did not take into account the considerable margin of error in that poll. Although the overall accuracy of the survey was said to be within a normal range of +/- 4%, the accuracy ratings for the populations of greatest concern—New York and New Jersey—were pitifully low: +/- 7% for New Jersey and +/- 10% for New York. (Greene Aff. ¶ 6.a.v.; *id.* Ex. 101 (Redacted Minutes of No. 7 Extension Project Travel Forecasting Meeting, June 3, 2003 ).) Thus, because the results of this survey had such excessive margins of error, they should not have formed the basis for the traffic impact analysis of this Project in any event. (Luntz Supp. Aff. ¶ 19.)

[36] (*See* Mastro Supp. Aff. Ex. 102 (E-mail from Lawrence Fleischer to James Brown re: Modal Split Survey Instrument, April 26, 2004) ("The ordering issue involved how to order the questions on would you drive if we extened [sic] the 7 line, provided off stadium tailgating locations, a joint ticket or more service. The Jets want the 7 line question to come [sic] last, I wanted it to come first. John Burke, Mindy Rindress [sic] of Shulman, Tony and Bill all agree with me, so the 7 line will go first."); Luntz Aff. ¶ 13 (opining that the 2004 Survey was based on questions containing "factually inaccurate" statements and that it produced "unbelievable and irrelevant" results); Mastro Supp. Aff. Ex. 91 (E-mail from James Brown to Larry Lennon, Erik Metzger, and David Donatelli re: Draft Traffic Survey, April 8, 2004) (questioning whether the 2004 Survey could "unduly 'lead' the respondent to answer that he/she would take transit.").)

of event attendees, as even Respondents' expert admits: "[W]e have no data to demonstrate what share of attendees are season ticketholders."[37]

Respondents cannot credibly deny that they collaborated with the Jets to conduct a "push" poll here because their own internal e-mail communications with the Jets at the time acknowledge that fact. The April 16, 2004 Jets e-mail quoted in Petitioners' opening brief confirmed that the 2004 Survey was designed to "push" respondents, and, particularly, "inveterate drivers," into responding that they would use mass transit.[38] Moreover, even

---

[37] (Ericksen Aff. ¶ 10.) "It would have been more accurate to survey actual attendees. The wrong population was chosen." (Greene Aff. ¶ 6.a.ii.) Notwithstanding Respondents' denials, it is also now beyond dispute that the Jets played a pivotal role in crafting the 2004 Survey to yield favorable answers, just as the Jets had done themselves in 2002. Respondents' contention that the Jets merely provided "suggestions" (Resp. Br. at 41) is wholly refuted by the contemporaneous correspondence between Respondents and the Jets. *See, e.g.,* Mastro Supp. Aff. Ex. 80 (E-mail correspondence among Ann Weisbrod of the EDC, Marty Taub of EWT, and Glen Price of the New York City Department of City Planning, re: new description of MUF on Jets website, dated March 27 and March 29, 2005); Ex. 89 (E-mail from Thad Sheely, New York Jets, to Erik Metzger and James Brown at PB re: Revised Jets Travel Mode Survey, dated April 16, 2004); Ex. 98 ( Letter from Thad Sheely, New York Jets, to Ann Weisbrod at EDC, dated October 21, 2002); Ex. 99 (e-mail from Marty Taub to EWT, dated September 26, 2002); Ex. 103 (e-mail from Melanie Meyers to Thad Sheely, dated April 16, 2004); Ex. 104 (e-mail from Thad Sheely, New York Jets, to Mindy Rhindress at SRBI, Erik Metzger, James Brown and Lawrence Lennon at PB, and John Burke and Lawrence Fleischer at MTA re: Modal Split Survey – Jets, dated April 30, 2004). When it came to the 2004 Survey itself, not only was Jets official Thad Sheely repeatedly revising the draft survey questions; the Jets' outside counsel, Melanie Meyers, was also revising the survey's questions. (Mastro Supp. Aff. Ex. 103 (E-mail from Melanie Meyers to Thad Sheely, April 16, 2004 (stating, for example, "I would omit Question # 9)).)

[38] When finally produced in *unredacted* form *after* the Project's approval, this April 16, 2004 Jets e-mail to the MTA exposed the truth about the 2004 Survey: it was an unreliable "push" poll. That e-mail read in its entirety:

> From:     "Sheely, Thad" <tsheely@jets.nfl.com>
> To:       "Metzger, Erik" <EMetzger@7SUBWAY.com>, "Brown, James" <JBrown@7SUBWAY.com>
> Date:     Fri, Apr 16, 2004 5:46 PM
> Subject:  RE: Revised Jets Travel Mode Survey
>
> Erik,
> This looks great. I made a few changes in the order of the "push" questions for the inveterate drivers. I think we should ask the 7 line question last because then we can use this study for the MUF only alternative up to that question, thus getting the full effect of the push questions.
> We have the list of season ticket holders by zip code w/ contact information. I will be out of town on MTW, but please contact Andrew Cantor on Monday to arrange delivery. We need to have a non-disclosure agreement w/ the pollster to only use this data for this purpose and to destroy upon completion of the task.
> Thanks
> tse

[Footnote continued on next page]

22

Respondents' pollster quipped at the time that "we are going to do everything to 'push' it through."[39]

The stated purpose of the 2004 Survey, as articulated by Thad Sheely of the Jets, was to use "push" questions and, in particular, to reach "inveterate drivers."[40] Transportation engineers seeking realistic projections do not target "inveterate drivers." Moreover, Respondents admitted in their internal correspondence that the goal of the 2004 Survey was to "push" respondents into saying that they anticipated using mass transit.[41] Again, transit engineers seeking realistic projections would not "push" survey respondents in any particular direction.

The version of the 2004 Survey that ultimately was used retained the obvious "push" questions from prior drafts:[42]

- Question 9 offered mass transit to the stadium, via the No. 7 line, from Grand Central, Times Square and the Port Authority Bus Terminal, notwithstanding that the extension of the No. 7 line is

---

[Footnote continued from previous page]

(Mastro Aff. Ex. 1 (Unredacted Jets E-mail).)

[39] Mastro Supp. Aff. Ex. 92 (E-mail from Mindy Rhindress to Lawrence Fleischer re: modal split survey, April 30, 2004).

[40] (Id. Ex. 89 (E-mail from Thad Sheely to Erik Metzger and James Brown re: Revised Jets Travel Mode Survey, April 16, 2004).) Sheely also highlighted the importance of including questions designed to "push" respondents into saying that they would linger in the City before or after games, so that the overall traffic numbers of people entering or leaving the area immediately before or after the game would decrease. (Id. Ex. 104 (E-mail from Thad Sheely to Mindy Rhindress, Erik Metzger, James Brown, Lawrence Lemon, John Burke, and Lawrence Fleischer re: Modal Split Survey – Jets, April 30, 2004) ("REWRITE OF QUESTION 19: 19. Now think about what happens after a Sunday afternoon game. With the stadium in Manhattan, are you likely to head straight home or remain in the vicinity for some period of time in the stadium, or at a restaurant, bar or store in the City? . . . AND WE NEED THE SAME QUESTION FOR MONDAY NIGHT GAMES, BUT PRIOR TO THE GAME.").)

[41] (Mastro Supp. Aff. Ex. 105 (E-Memorandum from John Burke re: Modal Split Survey Among Jets Season Ticket Holders, May 19, 2004) ("[A]n overall response in the magnitude of the behavior intent indicated here (67% would take mass transit), is highly favorable. . . . While it is not unusual for respondents to overstate positive indicated behavior in a case such as this, the net result has to be considered favorable even if traditional 'reduction' factors are applied.").)

[42] In some instances, the questions drafted for the 2004 Survey were even more egregious. See, e.g., id. Ex. 106 (Draft 2004 Survey) (informing respondents that transit would be available just 7 to 10 minutes from the stadium; emphasizing, if they still stated they would drive, that there would be no stadium parking; and then providing, in case the drivers were still unfazed, that the No. 7 subway, the LIRR, Metro North and the ferry would all be a mere 3 to 5 minute walk away).