not guaranteed and, even if it were, no station is planned for the Port Authority terminal;

- If respondents still plan to drive, Question 11 offers a 5 minute walk to the stadium from the ferry, notwithstanding that ferry service is not guaranteed;

- If undeterred, Question 12 offered respondents areas set aside for tailgating at transit facilities, though Respondents have produced no evidence that necessary authorities, including the MTA, the Fire Department, or the Department of Sanitation, have indicated a willingness to provide or even consider this tailgating space;

- If respondents remained committed to driving, Question 13 promised an increase in transit service, a promise for which Respondents have again failed to provide any indication as to who would pay for such increased service or even whether the MTA was made aware of the possibility;[43]

- If that promise failed to produce the necessary result, drivers were offered financial incentives in the form of discounted transit fares in Question 14;

- Finally, if all else failed, Question 17 conveyed to respondents that all transit services, including the LIRR, Metro North, and other subways would all feed into a limited capacity # 7 subway that would carry them to the stadium. However, the # 7 subway is far from a guaranteed resource. In addition, mass transit users cannot all safely and effectively be funneled into subway stations that the FEIS has admitted have insufficient capacity.

(*Id.* Ex 90 (2004 Survey).)[44]  In addition, the 2004 Survey also double-counted some

respondents, including them in both the "inveterate driver" and the mass transit user categories to

---

[43]  Despite the acknowledgement by EWT that "[a]n important factor in realizing a 70 percent level (or more) of transit use on game day will be the ability of rail transit operators to provide the frequency of service and overall train capacity to accommodate fans leaving the area post-game" and that "Without the provision of needed transit capacity, a shift in the equilibrium back toward increased auto use could occur" (*Id.* Ex. 107 (March 6, 2003 EWT Memorandum: West Midtown Football Stadium – Modal Split)), the FEIS provides no indication that the MTA would commit to expanding its service or how such an expansion would be funded.

[44]  In preparing the final survey, Respondents' traffic expert Larry Lennon recognized that "[Q]uestion 17 should delete the reference to Metro North service to Penn Station. That's a long term improvement at best." (*Id.* Ex. 108 (E-mail from Lawrence Lennon to Jim Brown re: Draft Traffic Survey, April 8, 2004).)  Yet despite recognizing that long term improvements should not be used, Respondents' 2004 Survey lead survey respondents to believe that the LIRR would offer

[Footnote continued on next page]

24

make it appear that a great number of inveterate drivers would switch to transit than would be found in an unbiased survey.[45]

Like the 2002 Survey, the 2004 Survey was highly effective in "pushing" respondents to provide answers that "support the traffic assignments" previously selected by the Agencies.[46] An effective and responsible survey is designed to provide data to *create* "traffic assignments," not to support pre-existing "traffic assignments" that were arbitrarily chosen for their marketability to the public.[47] Another flaw in the methodology behind the survey was the small sample size. As suggested by another survey consulting firm considered but not ultimately retained by Respondents, 800 is a more reasonable sample size for determining likely drivers versus transit users, and would "allow for a better base size when analyzing the data for any

---

[Footnote continued from previous page]
    direct service to Grand Central (which it does not). Even an MTA official, whom one might expect to be a realistic and even vigorous proponent of transit use, expressed skepticism as to the survey results regarding use of the LIRR: "T. Jablonski pointed out that a large percentage of Long Island residents . . . said they would take mass transit, however the LIRR service is rather infrequent on Sundays." (*Id.* Ex. 101 (Redacted Minutes of No. 7 Extension Project Travel Forecasting Meeting, June 3, 2003).) The FEIS nevertheless estimates that 80% of Long Islanders would use mass transit. (Mastro Aff. Ex. 2 (FEIS).) Such an impractically high estimate in the FEIS further casts doubt on the accuracy of the survey results.

[45] Question 18 of the 2004 Survey shows that 401 of 601 people responded that they would take mass transit. (Mastro Supp. Aff. Ex. 109 (SRBI Survey Results for 2004 Survey).) Accordingly, there were only 200 "inveterate drivers" who did not respond "mass transit." Yet Question 19, which should be asked only of those who responded that they would not take mass transit, was asked of 212 people. (*Id.* Ex. 109 (SRBI Survey Results for 2004 Survey).) In other words, at least 12 people who were asked Question 19, or 5.6% of the overall sample group, had already answered that they would take mass transit. Thus, the results of Question 19 improperly appear to have made a greater number of "inveterate drivers" switch to mass transit. (*See also* Greene Aff. ¶ 6.a.iii.)

[46] (*See id.* Ex. 110 (E-mail from Larry Lennon to James Brown re: Draft Traffic Survey, April 8, 2004).)

[47] Indeed, the arbitrariness of Respondents' analysis to fit a predetermined outcome was also apparent from the response they prepared *before* the 2004 Survey was completed just in case the survey's results did not jibe with their arbitrary, predetermined "traffic assignments." In the event the survey yielded higher auto rates than Respondents wanted, the MTA's traffic consultant was ready with this rationalization: "This shift in modal split is believed to be the result of recent improvements to the roadway network, including changes to the Holland and Lincoln Tunnel, as well as Eleventh Avenue." (Mastro Supp. Aff. Ex. 111 (E-mail from David Fields to City Officials re: Alternative Text for Survey Results, May 14, 2004).) The 2004 survey consisted of a series of "side-offers," each more promising than the last, that were designed to entice drivers who would not otherwise use mass transit to state that they would do so. As Respondents' own pollster stated: "Q29 . . . only needs to be asked among those who said mass transit once exposed to an a [sic] 'side-offer' such as sattellite [sic] parking etc." (*Id.* Ex. 112 (E-mail from Mindy Rhindress to survey team re: Modal Split Survey -- Jets, April 29, 2004).) Respondents' pollster further conceded: "We already know that those who said mass transit in Q 9 did so b/c of the subway extension." (*Id.*)

subgroups; e.g. comparing the subset of fans who would prefer to still drive to games vs. taking mass transit."[48]  Yet only 600 surveys were conducted.

Unable to defend this "push" polling, Respondents, instead, now make the facile argument that Question 8 of the 2004 Survey is the "key question" and that the "push" questions in the survey did not really begin until Question 9.  Respondents continue that, because "a later question cannot influence the answers to earlier questions," it is "irrelevant whether the . . . questions [after Question 8] can be called "push" questions."  (Resp. Br. at 42-43; Ericksen Aff. ¶ 12.)  Respondents make the remarkable assertion that the distortions generated by the 2004 Survey only occurred later in the poll and, for that reason, the Court should simply ignore it.[49]  This claim is tantamount to someone admitting an intent to defraud but seeking to be exonerated of the offense because the party defrauded had acted before experiencing the fraud's full effect.  The 2004 Survey was a sham "push poll" tainted from its inception by an intentional design to "push" respondents to give particular answers that would support Respondents' predetermined assumptions.[50]

---

[48]  *Id.* Ex. 113 (E-mail from Thomas Duffy to Erik Metzger, April 19, 2004 ).

[49]  Other questions (such as 9, 19 and 26) also "push" respondents to choose mass transit or provide answers that ignore or minimize traffic congestion.  As Dr. Luntz observes, the " effect of these 'push' questions is to influence the respondent's answer in such a way that would extend the period of time during which respondents say they will be arriving at and departing from the football games, thus minimizing the overall traffic impacts.  Again, a paper or computerized survey of actual game attendees would have provided much more accurate results."  Luntz Supp. Aff. ¶ 11.  Moreover, "Dr. Ericksen made no effort whatsoever to defend the latter 'push' questions.  He simply tried to defend the survey through Question 8.  Yet it begs the question: why accept a result from an earlier question in a poll so fraught with distortions in these later questions and admittedly designed to "push" respondents into particular answers.  The better course obviously is to reject such a skewed survey of such a limited segment of the actual attendee population in its entirety as unreliable and irrelevant."  Luntz Supp. Aff. ¶ 13.

[50]  That intent from the poll's inception was made clear by the pollster herself, who quipped in an internal e-mail to MTA officials on the eve of the 2004 survey that "we are going to do our best to 'push' it through."  *Id.* Ex. 92 (E-mail from Mindy Rhindress to Lawrence Fleischer re: modal split survey, April 30, 2004).

Moreover, Respondents are simply wrong about when the "push" questions began in this poll. In reality, they began before the supposedly "key" Question 8 on which Respondents now purport to rely. For example, Question 6 attempted to minimize the distance from Penn Station to the stadium by claiming that "the stadium would be located an approximate 15-minute walk from Penn Station."[51] As nationally renowned polling expert Dr. Frank Luntz, who has also served as Mayor Bloomberg's pollster, explains in his expert affidavit:

> That statement, while appearing incorrect as an estimate of the time required to walk the more than one-half mile through crowded City streets, traffic lights, and gridlocked traffic to the stadium on game days, also gives respondents the misleading impression that they would have a walk of a short distance to the stadium. It assumes as a fact something that is not, in fact, common to all, and predicated on a disputed proposition. Proper poll questions cannot be predicated on disputed factual assumptions. Thus, this question, which is based on an incorrect and misleading statement of fact, also produces statistically inaccurate and unreliable results that are essentially worthless.[52]

When those questioned were then asked, just two questions later, whether they would "most likely drive," "take a limo or cab, or take mass transit" to a Jets game at a new West Side

---

[51] (Mastro Supp. Aff. Ex. 90 (2004 Survey) at 5.) As a matter of fact, Question 6's factual assumption of an "approximate 15-minute walk from Penn Station" to the West Side Stadium was not only misleading but inaccurate. (Mastro Supp. Aff. Ex. 90 (2004 Survey) at 5.) Indeed, measuring the distances from all ten major exit points for Penn Station, even without counting the considerable distances from underground stop to ground-level exit point, the median distance from Penn Station to the West Side stadium would be at least .75 miles and, at certain exit points, .85 miles. (Joseph Aff. ¶¶ 7, 8, 10.) There is simply no way that people typically could walk more than three quarters of a mile in "game day" winter conditions, with traffic gridlock and pedestrian crowds slowing them the entire way, in 15 minutes.

[52] (Luntz Supp. Aff. ¶ 9.) In addition to this "incorrect and misleading statement of fact," Question 6 contains several pejorative terms to suggest to survey respondents that driving to stadium events was more difficult than using mass transit. Question 6 reads: "The stadium would be located an approximate 15-minute walk from Penn Station and on average, there would be a 15-minute walk from *unreserved private* parking facilities that are *not under Jets control*." (Mastro Supp. Aff. Ex. 90 (2004 Survey) at 5 (emphasis added).) As Greene explains, the "the code words 'unreserved,' (meaning might need to fight for), 'private' (meaning not available at all), and 'not under Jets control' (meaning good luck, don't look to us for help) are added to taint the auto choice." (Greene Aff. ¶ 6(a)(vii).) However, the 2004 Survey did not balance the bias of Question 6 against driving, and in favor of mass transit, as it should have. (*See id.*) For example, the question could have described mass transit with such phrases as "infrequent Sunday service," "crowded," and "not under Jets control." (*Id.*) It did not. Such one-sided use of pejorative terms further confirms that the 2004 survey "pushed" respondents to express a preference for mass transit.

stadium, they had just been given "the misleading impression that they would have an easy walk of a short distance to the stadium" and were therefore less likely to respond that they would drive, rendering the results produced "inaccurate and unreliable."[53] Even the "key" question (Question 8) is "itself a form of 'push' question designed to influence survey respondents to say that they will use mass transit to travel to Jets games. This is the obvious effect of the ordering and structure of Question 8, which is really a series of questions and statements explaining mass transit." (*Id.* ¶ 6.) Then, immediately after the question but before the respondent's answer, the questioner recites a litany of many mass transit options: "By mass transit I mean Long Island Railroad, Metro-North Railroad, New York City transit subways and buses, New Jersey transit

_____

[53] Of note, the analysis of Respondents' proffered polling "expert," Eugene Ericksen, as to whether Question 6 of the 2004 Survey is a "push" question, is incredibly disingenuous and predicated on the erroneous factual assumption that Penn Station is only one-half mile from the main stadium entrance of the proposed stadium. (*Compare* Ericksen Aff. ¶ 14 (incorrectly stating that Petitioners' polling expert, Dr. Frank Luntz, estimated the distance to be "approximately one-half mile"), *with* Luntz Aff. ¶ 8 (estimating that same distance to be "more than one-half mile").) Ericksen purports to have used "an internet map search to locate 150 garages within 1.03 miles of the site" and concludes that more than half of these 150 garages are located "beyond 0.5 miles from the stadium location." (Ericksen Aff. ¶ 16.) From that data he further concludes that a majority of parking facilities within the 1.03-mile area are no closer to the stadium than mass transit a half-mile away would be. The problem with that analysis is that the closest mass transit site -- Penn Station -- is more than a half-mile away from the new stadium. In fact, the median distance between the exits of Penn Station to the main stadium entrance to be located at 32nd Street and 11th Avenue ("Main Stadium Entrance") would be approximately .75 miles and the distance from certain Penn Station exits to the Main Stadium Entrance would be as much as .85 miles, not including the considerable distance to walk from the underground mass transit platform to the ground-level exit for any of those Penn Station exits. (*See* Affidavit of Peter Joseph ¶¶ 5–8, 9, Ex. A.) Indeed, in his subsequent analysis, Ericksen betrays that he was well aware of that fact. However, he predicates his entire sworn analysis on the erroneous assumption that Penn Station is only one-half mile from the Main Stadium Entrance. He claims to have measured "the distance of Penn Station to the stadium site in inches," "created a radius of [parking] facilities that would lie within and outside" the distance from Penn Station, and determined that "about 40 percent of parking facilities (or 60 facilities)" out of 150 are farther away from the new stadium than Penn Station, which he repeatedly refers to as being a "15-minute walk" away from the new stadium. (Ericksen Aff. ¶ 17.) He, thus, clearly must have known from that calculation that the median distance from Penn Station to Main Stadium Entrance was .75 miles or more. Indeed under that latter analysis, he proves too much because the converse of his conclusion there is that about 60% of parking facilities are necessarily closer to the proposed stadium than would be Penn Station precisely because Penn Station is so far away. Moreover, in his skewed analysis, Ericksen failed to take into account that new parking facilities and on-street parking may be added closer to the stadium. In sum, on its face, Ericksen's conclusion about Question 6 is unfounded and unreliable. Dr. Ericksen also goes on at great length about his calculations of distance from unidentified parking facilities, while acknowledging that even using conservative assumptions, "40 percent of the parking facilities (or 60 facilities) require more than a 15-minute walk." (Ericksen Aff. ¶ 17.) However, Question 6 leads survey respondents to believe that "on average, there would be a 15-minute walk from unreserved private parking facilities that are not under Jets control." (*Id.* ¶ 13.) Thus, Dr. Ericksen admits that this question is misleading in this respect as well. Moreover, his entire discourse about parking is irrelevant to the issue of whether respondents have been pushed to assume they will take mass transit to games. His parking calculations ignore the possibility of parking facilities ultimately under the Jets' control (which is what the formulation of Question 6 effectively suggests and what Jets fans are used to at the Meadowlands) or increases in on-street parking near the stadium. (Luntz Supp. Aff. ¶ 10.)

buses, and private ferries."[54]  Indeed, the "respondent hears a list of mass transit options before being permitted to answer the question.  A more accurate assessment of actual travel patters would have been to ask the individual their transportation expectations without any prompting of any specific means of transportation."  (*Id.* ¶ 8.)  As Dr. Luntz explains, such phrasing is an "open ended question.  By listing forms of transportation, you are providing information to the respondent that he or she may not have, making the response less accurate."  (*Id.*)

No matter how hard they try, Respondents cannot salvage their "push" poll as anything other than the sham that it was.  It therefore "should not have been relied on in any way in any responsible assessment of traffic impacts here," (*Id.* ¶ 19), instead of being hailed by the City at the time of the DEIS's release as proof positive of "high mass transit use."[55]

c.    Respondents' Illusory "Multiple Sources of Data"

Unable to continue relying on the 2002 and 2004 polls so central to their traffic analysis, Respondents are now resorting to revisionist history.  In their answering papers, they

---

[54]  Mastro Supp. Aff. Ex. 90 (2004 Survey) at 10; *see also* Luntz Supp. Aff. ¶ 7.

[55]  Mastro Supp. Aff. Ex. 88 (June 2004 DCP Press Release).  Of note, both the 2002 and 2004 Surveys polled exclusively Jets season tickets holders, which was itself a suspect sampling.  Respondents' "independent expert" assumes incorrectly that "the sample of respondents who answered this survey is an accurate reflection of the population of season ticketholders relevant to this research."  Ericksen Aff. ¶ 8.  However, polling of season ticket holders is not an accurate reflection of actual attendees for three reasons:  (1) many companies or individuals purchase season tickets but subsequently give the tickets away; (2) season tickets are often purchased by corporations and held in the name of a particular corporate executive who dispenses tickets to a variety of people, for example, friends, colleagues, and clients; and (3) groups or syndicates containing multiple people will purchase season tickets jointly but only one name is listed as the actual seat holder.  Luntz. Supp. Aff. ¶ 4.  A better, more representative sampling group for purposes of these surveys and the justification for their conclusions would have been actual event attendees.  *Id.*  The best population for purposes of obtaining accurate information that would substantiate the survey conclusion about how people would travel to Jets games would be to contact and poll those individuals who *actually* attend games.  As Dr. Ericksen admits, "intercept surveys are certainly done and often can be very effective."  Ericksen Aff. ¶ 11.  For example, short paper questionnaires to be completed by game attendees during the game and returned before they leave would have diminished Dr. Ericksen's concern about questioning respondents who are in a hurry or who are members of a "captive" population.  Hand-held computer instruments by pollsters can also facilitate on-site questioning of actual attendees.  Another methodology, a web-based questionnaire, would have allowed a more representative sample of actual "fans" and "game attendees" to participate.  Web-based surveys do raise some methodological concerns because of self-selectivity and under-reporting of people over age 65, but it still would have broadened the pool of actual game attendees that could have been sampled.  Finally, a traditional random-digit telephone survey, while somewhat costly, would be the most likely methodology to offer the most actual attendees to participate.  Thus, there are three methodologies that would have produced a more accurate and projectable result of Game Day traffic patterns than the methodology used by the 2002 Survey and the Agencies' 2004 Modal Split Survey.  Luntz Supp. Aff. ¶ 5.

characterize the 2004 Survey as merely a "final check" on the "multiple sources of data" on which the FEIS based its analysis minimizing traffic impacts (and thereby, in turn, minimizing air pollution and noise impacts). (Resp. Br. at 40.) However, none of these newfound "multiple sources of data"—"transportation studies" commissioned by the Jets; "data from comparable sports venues;" "transit ridership in New York City;" and "[d]ata regarding transit percentages for events at the Meadowlands in New Jersey, Shea Stadium in Queens, and Madison Square Garden in Manhattan"—offers any credible support for Respondents' untenable position. (*Id.*)

The first of the "multiple sources of data" cited by Respondents is biased "transportation studies" (*id.*) commissioned by the Jets that included the Jets' 2002 "push" poll. The other of those Jets studies projected significantly lower transit use than either of the two surveys based on the modal splits at other stadiums.[56] It also questioned the entire methodology of basing traffic impact analysis on people's predictions of their future behavior.[57]

In addition, Respondents claim to have relied upon "data from other comparable sports venues." (Resp. Br. at 40.) However, that data actually confirms Petitioners' position that the FEIS's mass transit assumptions are exaggerated and unrealistic. As Respondents acknowledge, the highest transit share associated with any other venue anywhere in North America was only 55–60 percent, which the SkyDome in the heart of downtown Toronto drew only for the brief

---

[56] *See* Mastro Supp. Aff. Ex. 96 (Redacted Minutes of No. 7 Extension Project May 27, 2003 Travel Forecasting Meeting, dated May 28, 2003 at 3 ("W. Woodford said that looking at the travel characteristics to other downtown stadiums would be a good idea; however these should include areas with limited parking (Pittsburgh has a large amount of parking and would not be a good example).").

[57] Mastro Supp. Aff. Ex. 96 (Redacted Minutes of No. 7 Extension Project May 27, 2003 Travel Forecasting Meeting, dated May 28, 2003) ("J. Dean said that it is difficult to ask people to imagine how they would travel in the future, especially if they are unfamiliar with the travel conditions.").

30

period "when it opened."[58]  Other examples considered by Respondents had transit shares of

only 35 percent (Busch Stadium, St. Louis), 34 percent (Fenway Park, Boston) and 30 percent

(Trans World Dome, St. Louis Rams).  (*Id.*)  Each of these stadiums' transit shares is therefore

significantly *lower* than the transit share Respondents predict for the new Jets stadium.  And the

Jets' own experts agreed:  Construing this data as favorably as it possibly could, EWT still ended

up predicting only a 60% transit assumption, which was approximately 10% less than the FEIS's

final assumption.[59]  Indeed, using the five urban NFL stadiums cited in the FEIS, and employing

the method of relating central business district transit share to stadium transit share, the projected

transit usage for the West Side stadium would be only 43.8%.  (Greene Aff. ¶ 6.a.iv.)

Respondents' purported reliance on a "comparison of transit ridership in New York City

with that of other cities in which major sports facilities have been built" simply makes no sense.

(Resp. Br. at 40.)  As previously explained, the Jets' fan base is principally in New Jersey,

Connecticut, Westchester, Long Island, and the outer boroughs of the City, not in Manhattan.

The Jets speculate that their fan base will shift upon the opening of a new stadium.  Accordingly,

no conclusions about the mode of transportation Jets fans will employ can reasonably be drawn

from the experience on a day-to-day basis of transit-riding residents of New York City.

Moreover, that factor, if supportive of Respondents' position, would translate into comparable

mass transit use rates at other New York City sports venues, which, as explained here, is not the

case.

---

[58]  *Id.* Ex. 2 (FEIS App. S-1, Sept. 28, 2004 Metzger Br. re Multi-Use Facility Transportation Planning Assumptions) at 6.

[59]  *Id.* Ex. 114 (January 2001 EWT Report: Feasibility Study – Transportation Study Report, *West Side Sports and Exhibition Center*).

Particularly unavailing is Respondents' reliance on the "transit ridership" for events at other local sports venues in or near New York City: "the Meadowlands in New Jersey, Shea Stadium in Queens, and Madison Square Garden in Manhattan." (*Id.*)  The current transit ridership to Jets games at the Meadowlands is only 4 percent.  In addition, no support for Respondents' position can be drawn by reference to Shea Stadium travel patterns.  Notwithstanding that Shea Stadium has its own direct stop on the No. 7 line, the percentage of those traveling to Shea Stadium who use mass transit is only 17 percent.  Nor does MSG's experience help Respondents here.  Even though MSG sits atop Penn Station, into which more than a dozen rail and subway lines directly feed, MSG's transit share is no higher than 50 percent.[60]

Respondents' post-hoc rationalization supposedly culled from "multiple sources" cannot change reality:  decision-makers and the public were presented with a rosy but false picture that misled them into thinking that traffic impacts (and related air and noise impacts) would be less

---

[60] Respondents argue that the analysis conducted by Petitioner MSG's consultant supports the modal splits reflected in the results of the 2004 Survey.  Specifically, according to Respondents' consultant, the 52 percent transit share for MSG projected by Sam Schwartz LLC for a weekend afternoon game should be aggregated with the 10 percent "walk only" share for a total transit split of 62 percent.  (Resp. Br. at 43-44.)  That convoluted reasoning defies common sense.  To begin with, the Jets fan base does not consist principally of residents from Manhattan but, rather, of people from the outer boroughs of New York City, Westchester, Long Island, New Jersey, and elsewhere who obviously will not walk to Jets games.  The FEIS admits that only 5.7 percent of current Jets season ticket holders are from Manhattan, and it projects that only 7.3 percent of the Jets fan base will be from Manhattan after the move.  (*See* Mastro Supp. Aff. Ex. 115 (Memorandum from Erik Metzger, Sept. 28, 2004 at 3).)  In addition, MSG is located within walking distance of far more workplaces and residences than is the stadium site.

Respondents further argue that the Schwartz modal share for auto and taxi trips to MSG on a weekend afternoon—which they misstate as 36% when it actually was 38%—is not materially different from the 31.1% auto and taxi share in the DEIS, "particularly since the Jets, unlike MSG, are not proposing parking discounts in nearby garages for season ticketholders."  Resp. Br. at 44.  A difference of 7% has very real consequences, raising the number of cars going to and from games by more than 2,000.  Greene Aff. ¶ 6.c; Mastro Aff. Ex. 54 Orth-Rogers Assocs., Inc., October 4, 2004 Report) at 31.  Moreover, if anything, the mass transit use rate to a new Jets stadium would be less than at MSG because of the new stadium's remote West Side location, the Jets' fan base and their current driving patterns to games, and the weekend train schedule, among other reasons.  Indeed, the FEIS itself acknowledged that MSG's transit-usage statistics are related to its location atop Penn Station.  Specifically, the FEIS notes that "the percentage of attendees driving" to a relocated MSG, "as opposed to using transit," is "assumed to increase."  Mastro Aff. Ex. 2 (FEIS at 19-31).  The FEIS also concedes that, "[w]ith more trips and a greater percentage by automobile, relocation of MSG is anticipated to result in more significant adverse impacts to the roadway network than maintaining MSG at its current site."  (*Id.*)

severe because so few Jets fans would drive to games at a new West Side stadium. In short, despite all of the evidence to the contrary—the experience of *all* other sports venues throughout North America, the experience of *all* other sports venues here in New York City, and the *current* practice of Jets fans—this EIS presented flawed data to support the unwarranted assumption that travel patterns will be upended, in a triumph of stadium boosterism over experience.[61]

Significantly, the overstatement of the transit shares results in a severe understatement of the number of cars on the road. The FEIS predicted a mere 7,500 cars going to and from the proposed stadium.[62] But the FEIS assumes that automobiles going to and from stadium events will carry an average of at least 3.0 people, thereby artificially reducing the number of cars on the road.[63] Other such analyses typically use a figure of 2.5 people per car going to sports venues.[64] Using that typical vehicle occupancy rate, the difference in the amount of car traffic grows from the 7,500 assumed in the FEIS to 9,000 cars.[65] Moreover, were the stadium analysis more in line with the 50% automobile ridership numbers for weekend sporting events at MSG, for example, then the projected number of cars traveling to a Jets game would rise to 15,000 cars, or double the 7,500 amount reported in the FEIS.[66] And employing the reasonable assumption

---

[61] Respondents also argue that this understatement is irrelevant because the FEIS admits that the Project will cause numerous traffic and air pollution impacts that they concede cannot be mitigated. However, the fact that the Project's disclosed impacts would have been far worse had Respondents not rigged the traffic analysis only reinforces the importance of having accurate data. That is why Respondents are legally obligated to present the true and complete environmental picture - so that decisionmakers and the public can make informed judgment and comment.

[62] Greene Aff. ¶ 7; *see* Mastro Aff. Ex. 54 (Orth-Rogers Assoc., Inc. October 4, 2004 Report) at 28–31.

[63] Greene Aff. ¶ 7; *see* Mastro Aff. Ex. 54 (Orth-Rogers Assoc., Inc. October 4, 2004 Report) at 28.

[64] Greene Aff. ¶ 7; *see* Mastro Aff. Ex. 54 (Orth-Rogers Assoc., Inc. October 4, 2004 Report) at 28, 31.

[65] Greene Aff. ¶ 7; *see* Mastro Aff. Ex. 54 (Orth-Rogers Assoc., Inc. October 4, 2004 Report) at 31 fig. III.11.

[66] *Id.*

of even lower mass transit usage rates at a far West Side stadium, that vehicle number rises to 17,400 cars for weekend events, which is *almost 10,000 more cars on the road every time there is a major sporting event—an increase of more than 130% over the 7,500 figure reported in the FEIS.*[67]

As a consequence of this distortion, the FEIS grossly understated the Project's traffic impacts, and corresponding air and noise impacts. Accordingly, it cannot stand as the basis for any rational, reasoned decision here.

**2.    Other Misrepresentations of Traffic Impact Findings in the FEIS**

In addition to crafting and relying on traffic surveys designed to elicit misleading and distorted responses, Respondents also understated traffic impacts in the FEIS in the many other ways detailed in Petitioners' opening brief. (*See* Pet. Br. at 27–31.) The documents now produced in discovery reveal even more pervasive understatements of traffic impacts.

One egregious example is detailed in a series of exchanges regarding the FEIS's treatment of bus capacity. In a letter from Keith Horn, Chief of Operations Planning for New York City Transit ("NYCT"), to Robert Kulikowski, director of the NYC Office of Environmental Coordination, Horn complains that the CEQR Manual has incorrect capacity numbers for NYCT buses: "The values which you currently have are 70 passengers for a standard 40-foot bus and 145 passengers for an articulated 60-foot bus. These loading levels would be considered severe overcrowding, and may not even be possible to achieve." (Mastro Supp. Aff. Ex. 116 (Letter from Keith Horn to Robert Kulikowski re: CEQR Manual, Feb. 6, 2004).) The letter goes on to explain that the City should use much lower maximum average

---

[67]  *See id.*

34

loads of 65 passengers for a standard bus and 93 for an articulated bus. (*Id.*) The necessary

consequence of this change, however, meant that there would need to be many more buses and

bus trips to accommodate the demand, thereby exacerbating traffic delays and air and noise

pollution.

In response, Ann Weisbrod sent the following e-mail, entitled "Bus Capacity Issue

Crisis," to several MTA officials:

> [W]e have a real problem about this bus capacity issue - MTA
> insists that the bus capacity be kept artificially low thus clogging
> the street with too many buses making it impossible to mitigate
> impacts and get to single digits and creating the need to create
> other bus routes on street that cannot accommodate [sic] which
> could in turn trigger a light rail resurgence or at least give succor
> and support to the light rail advocates. . . We need to increase the
> number of riders on the buses.

(*Id.* Ex. 83 (E-mail from Ann Weisbrod to Philip McGrade, Lawrence Lennon and Lawrence

Fleischer re: Bus Capacity Issue Crisis, March 30, 2004).)

The numbers ultimately used were the lower numbers recommended by Horn. (*See id.*

Ex. 94 (Relevant excerpts of FEIS Chapter 20 at Tables 20-15, 20-16). Significantly, however,

the FEIS fails to account for how the co-lead agencies intend to deal with the masses of people

Weisbrod had planned to pack into the buses. In addition, although the FEIS states that nine

additional standard buses will be added in 2010, and 66 articulated buses and four standard buses

to be added in 2025 (*see id.* Ex. 94 (Relevant excerpts of FEIS Chapter 20 at p. 20-158)), no

analysis of the increased emissions generated by these 75 additional buses is ever presented.[68]

---

[68] (*See id.* Ex. 117 (E-mail from Stamatia Petsios to Jeff Marshall re: Response to NYSDEC Comments on Use of Mobile6.2 model for Hudson Yards Rezoning & No7 Extension Project, May 24, 2004) ("Since the proposed project will not be adding any new bus service and the majority of the trip generation is automobile and taxi, this increase in bus emissions would not affect the project.")). In short, while the FEIS provides for lower bus capacity when the stadium is first erected and then additional buses in later years, it fails to even address the adverse impacts created by the increased street traffic and emissions from these additional buses—impacts that Weisbrod predicted would be "impossible to mitigate." (Greene Aff.

[Footnote continued on next page]

Respondents similarly cherry-picked the data with respect to taxi usage, vehicle trips, and parking availability. For example, a memorandum from Michael Meola of EDC to Weisbrod concerning parking needs notes that "Preliminary analysis shows that approx. 18,300 spaces exist in the EIS study area and approx. 26,500 spaces required with implementation of the proposed action." (Mastro Supp. Aff. Ex. 118 (Memorandum from Michael Meola to Ann Weisbrod re: Javits Plaza Development – Basements, Dec. 9, 2004).) The FEIS, however, claims that 24,254 parking spaces are currently available during the weekday midday period in the study area, and that 31,015 spaces will be available by 2025. (Mastro Aff. Ex. 2 (FEIS Table 19-62).) Yet the FEIS provides no explanation for the sudden increase in these parking capacity numbers. (*Id.*) Furthermore, in January 2001, Jets consultant Eng-Wong Taub & Associates ("EWT") predicted a parking shortfall of more than 2,000 vehicles within a 20-minute walk of the stadium on a Sunday afternoon if MSG were simultaneously holding an event.

Respondents also ignored unhelpful data about parking availability for charter buses. Tom Phelan of EWT noted that "it looks like the Jets currently get about 40 charter buses per game at the Meadowlands." (Mastro Supp. Aff. Ex. 119 (E-mail from Thomas Phelan to Erik Metzger re: NY Jets Bus Modal Split, April 28, 2003).) Although nearly one-half mile of curb space would be required to accommodate these 40 buses, the FEIS does not so much as mention where they would park. (Greene Aff. ¶ 9.) In addition, although the February 2003 EWT study estimated that 5,100 persons would travel to stadium events by bus, requiring approximately 100 buses, nothing in the FEIS accounts for where those buses would park. (Mastro Supp. Aff. Ex. 120 (February 2003 EWT Report).)

---

[Footnote continued from previous page]

¶¶ 8-10: bus traffic will be so delayed that old riders will be deterred from continuing to use and new riders will be driven to alternate modes of travel.)

Another key issue is pedestrian traffic and safety. The January 2001 EWT report recommended a number of traffic management techniques to mitigate this impact, none of which was included in the FEIS. (*Id.* Ex. 114 (January 2001 EWT Report).) EWT recommended partially closing roadways adjacent to the stadium to provide for additional pedestrian capacity. (*Id.* Ex. 114 (January 2001 EWT Report).) EWT also recommended establishing a pedestrian-only plaza during pre- and post-game hours, widening the sidewalk on the south side of 34th Street, and stopping automobile traffic further back from the stop bars at intersections to increase crosswalk area capacity. (*Id.* Ex. 114 (January 2001 EWT Report).) None of these recommendations was incorporated into the project design or the FEIS. (If they had been, of course, automobile traffic would have been even slower.)

Similarly, Metzger's August 10, 2003 e-mail to City Planning showed that Respondents ran projections for vehicle trips at the stadium using Sam Schwartz's MSG modal split,[69] instead of the EWT results based on the 2002 Survey, and the comparison showed that vehicle trips would increase from 7,049 vehicle trips with the 2002 Survey (an overall average of 28.2% auto/taxi usage) to 13,209 vehicle trips with the MSG modal split (an overall average of 56.3% auto/taxi usage). (*Id.* Ex. 121 (E-mail from Erik Metzger to Glen Price and Mehdi Amjadi re: NY Jets Vehicle Trips Using MSG Modal Splits, Aug. 10, 2003).) Part of the difference, it turns out, results from the incorporation into the EWT model of potential ferry service to suppress the auto and taxi percentages. (*Id.* Ex. 107 (March 6, 2003 EWT Memorandum) at 1.) Were all the

---

[69] Despite dismissing the MSG 2003/2004 modal split results in the FEIS in favor of older data, Respondents conceded that the modal splits are "reasonable": "The MSG Sunday night modal splits seem reasonable (the only major problems that I saw was [sic] a substantial amount of New Jersey Transit usage from regions other than New Jersey—13% from both the Bronx and Queens and 7% from Brooklyn—and no usage of the 7th Avenue subway line from Staten Island; but these inconsistencies were probably tied to transit instead of auto usage." (Mastro Supp. Aff. Ex. 121 (E-mail from Erik Metzger to Glen Price and Mehdi Amjadi re: NY Jets Vehicle Trips Using MSG Modal Splits, Aug. 10, 2003).)

"park and ride" ferry users projected there converted into auto users under the EWT study, the total vehicle trip number would jump to 9,699 (an overall average of 38.8% auto/taxi usage). Thus, the favorable modal split projections Respondents used relied heavily on potential ferry service to a station that does not yet exist.   And Respondents failed to indicate other factors that would inhibit transit use, such as weekend train frequency and traffic conditions at the ferry terminals.[70]

      In instances in which Respondents were unable to cherry-pick the results, they simply provided no information at all.  For example, in a redlined draft of a memorandum from MTA consultant Erik Metzger to the No. 7 Extension Project summarizing the results of the 2004 Survey, the following original text was marked for deletion and did not appear in the FEIS:  "For this reason, it was not possible to determine how weekday evening modal splits would differ with and without the No. 7 Subway Extension" (*Id.* Ex. 122 (Draft memorandum from Erik Metzger to Glen Price and Mehdi Amjadi re: Results of Supplemental New York Jets Season Ticket Holder Survey, June 9, 2004) at p. 4 n.4).)  Moreover, Respondents recently had to disclose the following quote from redacted minutes for the No. 7 Extension Project June 17, 2003 Travel Forecasting Meeting: "L. Lennon suggested that the worst case scenario may involve the boat show coinciding with a Jets game."  (Mastro Supp. Aff. Ex. 125 (Redacted Minutes of Number 7 Extension Project Travel Forecasting Meeting, June 17, 2003 ).)  This is precisely what Petitioners have argued here—that this is the "worst case" scenario that should be reflected in the traffic analysis for the FEIS.  Yet even though the Boat Show *always* coincides

---

[70]  Mastro Supp. Aff. Ex. 96 (Minutes from May 27, 2003 Travel Forecasting Meeting, dated May 28, 2003) ("He [J.Dean] mentioned that in order to get to the ferry parking lots in Weehawken, one must use the local street network (which gets congested).  He also noted that New Jersey Transit ridership would be dependent upon the frequency of Sunday train service. . . .  S. Hornick said that he believes a problem with the modal share assumptions is that it does not reflect the limited frequency of weekend service on commuter rail. . . .").

with the last games of the football season, this "worst case" scenario was not reflected in either the DEIS or the FEIS.[71]

### 3. Misrepresentations of Air Pollution and Noise Impacts

Because of its tainted traffic analysis, the FEIS projects air pollution at far lower levels than actually would be generated by the Project. It necessarily follows from the understated traffic analysis that there was a corresponding understatement of air pollution impacts. Moreover, because expert complaints that the Project would create severe impacts on air quality were not heeded or even disclosed in the FEIS, possible measures to mitigate those impacts were wholly ignored. (Affidavit of Alan Shimada, sworn to Mar. 9, 2005 ("Shimada Aff.") ¶¶ 8, 13.) For example, the Project would involve the construction of one or more residential towers whose upper windows would be in the path of a plume of air pollution from a Consolidated Edison generating plant at 59th Street. The FEIS conducted no analysis of the manner in which this plume could affect the residents of these buildings. Thus, this potential impact was not disclosed, and there was no exploration of possible mitigation measures. (See id. ¶¶ 10-14.)

Documents recently produced by Respondents confirm additional manipulations to understate air pollution impacts. In an October 17, 2003 memorandum, Larry Pesesky, one of the MTA's consultants, summarized a meeting with the New York City Department of Environmental Protection ("DEP") and stated, "There should be further discussion with the DGEIS traffic analysts about anticipated future network speeds and physical limitations of the

---

[71] Equally disingenuous are Respondents' statements about being "conservative" and using "worst-case scenarios" in their analysis. (Resp. Br. 15, 16, 17,19, 21, 39, 43, 47, 48, 49, 50, 52 n.23.)) An obvious example belying these claims relates to the analysis concerning the number of fans who would leave the vicinity of the stadium during the hour immediately following the game. A table attached to the June 3, 2003 No. 7 Extension Project Meeting Minutes shows that 85-90% of fans would leave the area within one hour after the game. (Mastro Supp. Aff. Ex. 101 (Redacted Minutes of Number 7 Extension Project Travel Forecasting Meeting, June 3, 2003).) The FEIS uses the bottom of the range—85%—hardly the "reasonable worst-case scenario." (Id. Ex. (FEIS)).

network so that these items can be adequately reflected in the air quality analysis."[72]  Although Petitioners have long been calling for this kind of review—both in their comments on the DEIS and in their opening brief—it was never part of the environmental review process.

Similarly, Christopher Ward, the Commissioner of the DEP, noted in a memorandum to City Planning Commission Chair Amanda Burden that a massive Corps of Engineers program of harbor dredging and port deepening involving water-borne dredges would create a great deal of air pollution.[73]  Ward therefore advised that, "[g]iven the confluence of a number of major projects, issues (e.g. traffic, mobile source emissions) that may contribute synergistic effects need to be identified."[74]  That identification was never done.  (*See* Shimada Aff. ¶ 8.)

Finally, the Air Quality Working Group, an interagency team working on the EIS, observed in a memorandum to MTA consultant James Brown that "[s]ubstantial site HVAC systems associated with the Proposed Action's larger site developments, such as the Jacob Javits Convention Center Expansion, the multi-use stadium, and the relocated Quill Bus Depot, will be evaluated regardless of incremental changes."[75]  That evaluation was never done.  As explained below, no application has been filed with the New York State Department of Environmental Conservation for the air pollution permits that these HVAC systems will require.  The FEIS projections for noise pollution from mobile sources, such as automobiles and trucks, are based on these same faulty traffic projections and, for that reason, are far too low.  (Pet. Br. at 33–34.)

---

[72]  Mastro Supp. Aff. Ex. 126 (Memorandum from Larry Pesesky re: Summary of Sept. 25, 2003 Meeting with NYCDEP on Air Quality, Oct, 17, 2003) at 3.

[73]  *Id.* Ex. 127 (Memorandum from Chris Ward to Amanda Burden at City Planning Commission, July 8, 2003) at 2.

[74]  *Id.* Ex. 127 at 2.

[75]  *Id.* Ex. 128 (Memorandum from Air Quality Working Group to James Brown, September 18, 2003 at 3).

The misrepresentations in the FEIS's noise-impacts analysis were an intentional byproduct of the FEIS's manipulation of traffic data.

### 4.    Misrepresentation of Sewage Impacts

As described in detail in Petitioners' opening brief, higher sewage flows from the Project will cause more untreated sewage to be released into the Hudson River during wet weather. (*See* Pet. Br. at 34–35.)  Discovery now makes clear that Respondents crafted the FEIS to mask the impact of combined sewer overflow ("CSO") events on the environment.

In a memorandum from DEP Commissioner Christopher Ward to City Planning Chair Amanda Burden discussing the impact of the Project on the North River Pollution Control Plant, Ward noted the following:

> [T]here will be increased flow due to increased development in the entire drainage area (e.g. West Chelsea Rezoning with an increase in residential zoning). Consideration must be given to effects associated with this increased flow that include emissions, truck traffic and increased sludge production. Further, increased flow at North River will cause environmental justice concerns in the local community, particularly because the source of increased flow is not the local neighborhood.[76]

Neither the DEIS nor the FEIS discussed the emissions, truck traffic and increased sludge production that would occur at North River or reported any resulting environmental justice concerns.

As Respondents own expert acknowledges, the assessment of water quality impacts posed by increased CSO discharges that will be created by the Proposed Action did not consider polychlorinated biphenyls (PCBs), arsenic, cadmium, chromium, mercury, nickel, or other toxic substances. (Leo Aff. ¶ 54.)  Failure to consider these toxic substances is an especially

---

[76]  *Id.* Ex. 127 (Memorandum from Chris Ward to Amanda Burden at City Planning Commission, July 8, 2003) at 2.

conspicuous omission, as they "have been found to be present in sewage, storm water, and CSO discharges from other urban centers, [and] it is reasonable to presume that they may also be present in sewage and/or CSO discharges from the Project Area." (Kapuscinski Aff. ¶ 5.)

Similarly, the HydroQual study on which Respondents rely chose to use zinc, lead, and copper in storm water as surrogates for the presence and potential impact of PCBs and all other toxic substances.[77] Yet zinc, lead, and copper tend to have different sources and aquatic toxicity than PCBs, mercury, arsenic, chromium, nickel, and many other toxic substances. (Kapuscinski Aff. ¶ 6.) For instance, the New York State Department of Environmental Conservation's (NYSDEC) ambient water quality criteria for PCBs and mercury are substantially lower than criteria values for zinc, lead, and copper, revealing the NYSDEC's conclusion that PCBs and mercury are inherently more toxic. (*Id.*) "Without taking these factors into account, which the DGEIS and FGEIS did not and Mr. Leo did not in his affidavit, it is not possible to reach and support any conclusions about the potential impact of PCBs, mercury, or other toxic substances in CSO discharges, solely on the basis of modeled concentrations of zinc, lead, and copper." (*Id.*)

Finally, Respondents' water quality experts relied on an inaccurate methodology for estimating water quality impacts from conventional pollutants in CSO and North River Water Pollution Control Plant (NRWPCP) discharges. In calculating conventional pollution impacts, the System Wide Eutrophication Model (SWEM) used by HydroQual failed to consider the unique physical location and dimensions of each and every outfall, other than perhaps which "grid box" a particular outfall is located in. (*Id.* ¶ 7.) No accurate prediction of the extent of

---

[77] Mastro Supp. Aff. Ex. 130 (FEIS Appendix N: HydroQual Report at 3-16, 3-27).

42

pollutants can be gathered under that methodology: "Only if the unique physical location is taken into account should it be possible to predict the maximum effects of CSO discharges in the vicinity of any given outfall." (*Id.*) The maximum effects are of particular interest because they may help in "predicting the aquatic impacts of certain acutely toxic substances, which were not considered in the FGEIS, and for characterizing worst-case concentrations of certain conventional pollutants, such as coliform bacteria." (*Id.* ¶ 4.)

5. **Inadequate Consideration of Secondary Displacement**

Respondents contend that the FEIS properly analyzed the potential for the Project to displace current residential tenants in Hudson Yards, Chelsea and Clinton and correctly found that no such displacement would occur. Their argument is based on the fact that current market rents in Hudson Yards already exceed what low- and moderate-income residents can afford. (Affidavit of Harry Schwartz, sworn to Mar. 9, 2005 ("Schwartz Aff.") ¶ 4.) They thus conclude that any existing tenants in these income ranges are living in rent-regulated or government-subsidized housing, and are protected from displacement. (*Id.* ¶ 4.) They also point to the fact that the Project will provide new affordable housing units. (*Id.* ¶ 23.) Although they concede that existing market pressures are already at work to shrink the pool of government-subsidized housing and remove units from rent regulation, they claim that the Project will do nothing to affect these trends. (*Id.* ¶¶ 5, 20.)

Respondents fail to take account of the size and scale of the Project and its ability to influence existing forces by its very magnitude. It is likely that the dramatic rezoning of this low scale neighborhood, currently a mix of manufacturing and transportation with a modest residential component, to a high-rise office and residential area with twice the population, will increase the pressure on the existing housing stock in all three neighborhoods, and result in the indirect displacement of current residents. (*Id.* ¶ 2.)

43

With its 12,800 apartments, almost all market rate, as well as proximity to Clinton and Chelsea, Hudson Yards will indeed, as the FEIS states, have the ability to "completely transform" the neighborhood (*id.* ¶ 4 (citing FEIS at 5-2, 29-27)) and it will completely transform surrounding neighborhoods by sharply accelerating the "economic trends" that sustain indirect displacement (*id.* ¶ 6). It will attract thousands of prosperous residents, who will in turn draw others, overwhelming the existing population and creating its own set of forces. (*Id.*) An analogy can be drawn with Battery Park City, which further stimulated the rehabilitation of older office buildings in lower Manhattan for housing by drawing many more residents into the area. However, in the case of Hudson Yards, the affluent newcomers will indirectly displace less fortunate families from essential housing rather than moving others into vacant office buildings. (*See id.*)

Among the new residents will be a significant share of the 127,000 workers in Hudson Yards who will prefer to live near their jobs, as has happened in the Battery Park City and Wall Street area. (*Id.* ¶ 7.) The FEIS understates the pressure that workers in Hudson Yards will exert on existing housing, and hence on indirect displacement, by underestimating the share who will want to live in Hudson Yards and in nearby neighborhoods close to their workplaces in west midtown.[78] (*Id.*)

Furthermore, past, current and likely future practices confirm the real potential that the massive Hudson Yards development can displace households protected by rent regulations, rental tenure, or government housing subsidies. (*See id.* ¶ 8.) Moreover, rising land values, the strong private market, and the consequent rejection by developers of government housing

---

[78] The proximity of offices and residences will induce some workers to live nearby, more than likely producing a larger share of workers who walk to work than the three percent overall rate which includes walkers from residential neighborhoods without office buildings.

assistance will severely limit the supply of new affordable housing, magnifying the pressure. (*Id.*)

Finally, respondents give short or no shrift to the impacts of Hudson Yards on the Clinton or Chelsea neighborhoods. The Clinton neighborhood has its own special zoning that is intended to preserve its character, which is dependent upon a mix of income levels in the population. (*See id.* ¶ 14.) That zoning was established in direct response to the anticipated speculative real estate pressures from the building of the Convention Center in 1974, in marked contrast to the response here, where expanding the Center carries no consequence for this beleaguered neighborhood. (*Id.* ¶ 15.) In 1985, when the EIS for the redevelopment of Times Square was completed, that major transformation of a nearby area was indeed recognized to carry potentially negative consequences for Clinton's population, and a mitigation program was devised. (*Id.* ¶ 13.) In the intervening years, illegal harassment of tenants and other measures to pry the housing stock from regulation have only increased, yet the Hudson Yards FEIS incomprehensibly assumes that the creation of a clone of midtown Manhattan to the south of this neighborhood will do nothing to exacerbate these trends. (*See id.* ¶¶ 16–17.)

Evidence of the increased pressure that this rezoning brings was supplied just a few weeks ago as plans for Hudson Yards have unfolded. According to the *New York Times*:

> [T]his gritty industrial neighborhood is suddenly in the sights of many real estate developers hungry for land. Residential builders are pushing into the district from Chelsea. Developers are snapping up properties. Land prices are rising. Developers say it is Manhattan's last big canvas for their construction visions.
>
> . . . .
>
> Much of the current interest in the Far West Side is fueled by the seemingly insatiable thirst for housing at any price and the

45

> Bloomberg administration's rezoning of the 42-block area for large projects.[79]

By denying that Hudson Yards will create significant indirect displacement the FEIS avoids any serious consideration of mitigation measures. (*Id.* ¶ 23.) The single mitigation cited is the creation of affordable housing, which is now intended to comprise 26% of the units to be built. (*Id.*) This seems wildly optimistic in light of a study released by Pratt Institute in December of 2004. The Pratt study found that only about 5% of the housing at Hudson Yards will turn out to be affordable, largely as a consequence of developers withdrawing from the City's housing assistance programs. (*Id.* ¶¶ 21, 23.) The study found that "with the density increases provided by the rezoning, the value of the buildable residential area in Hudson Yards is estimated to increase by more than $1.1 billion," or a gain of more than one thousand percent. Such values make it very difficult for any developer to provide an affordable component. (*See id.* ¶ 23.)

### 6.    The "Sham" Financing of the Proposed Action

Respondents argue that this Court should only review the financing of the proposed action if it is a "sham." (*See* Resp. Br. at 62.) That is precisely the point: the financing plan here is a sham. As previously explained, every fiscal watchdog and Citywide elected official (other than Mayor Bloomberg) has voiced objections to the proposed financing of the Project. Since the Petition was filed, opposition to the financing has grown even stronger. For example, City Comptroller William Thompson, concerned "about the transparency and accountability" of payments in lieu of taxes ("PILOT") that City Hall intends to use to fund the Project—and related mitigation measures—has announced that he will audit that proposed use to determine

---

[79]  Mastro Supp. Aff. Ex. 124 (Charles V. Bagli, *Suddenly, Developers Yearn for Gritty Far West Side*, N.Y. Times, Feb. 14, 2005, at B1.

46

legal compliance.[80]  In addition, City Council Speaker Gifford Miller has introduced "legislation to require a public review of any taxpayer money used for the stadium" because he considers the Mayor's PILOT financing plan to be illegal.[81]  Also, an e-mail produced by Respondents suggests that the City and the MTA, as late as May 17, 2004, were still having a major "problem" reaching an agreement on a "component of the Financing Plan which indicated that the City would receive funds from the sale of the Rights to the Eastern Yards."[82]  Accordingly, even under the "sham" standard proposed by Respondents, this Court should carefully weigh the adequacy of the proposed financing scheme as part of its analysis of the mitigation measures relied upon by the FEIS.

### 7.    Inadequate Consideration of Comments to the DEIS

Respondents were required under SEQRA to respond in the FEIS to all substantive comments submitted in response to the DEIS.  6 NYCRR § 617.9(b)(8).  As set forth in detail in Petitioners' opening brief, however, the FEIS fails to adequately respond to numerous comments submitted in response to the DEIS.  (See Pet. Br. at 39–40, 56–57.)  For example, Respondents failed to respond adequately to comments concerning (i) the effects of increased traffic congestion on emergency-vehicle response time, (ii) the Project's impacts on traffic crossing the Hudson River, and (iii) the plan for heating and cooling the stadium, the air pollution impacts associated with that plan, and the permits required to implement that plan.  (See, e.g., id. at 39.)

---

[80]  Mastro Supp. Aff. Ex. 131 (Frank Lombardi & Michael Saul, *Official Eyes Stadium Funds*, N.Y. Daily News, March 4, 2005, at 38).

[81]  Mastro Supp. Aff. Ex. 132 (Winnie Hu & Charles V. Bagli, *Obstacle Rises for Bloomberg on West Side Stadium Plan*, N.Y. Times, March 3, 2005, at B1) (quoting Miller:  "The bottom line is this is the people's money, not the mayor's money. . . This is not a slush fund that he gets to divide up for favorite pet projects."

[82]  Mastro Supp. Aff. Ex. 133 (E-mail from Ann Weisbrod to Philip McGrade, Bill Wheeler, David Karnovsky, and Anthony Semancik, May 17, 2004; E-mail from Philip McGrade to Ann Weisbrod, Bill Wheeler, David Karnovsky, and Anthony Semancik, May 17, 2004).

Yet in their opposition brief, Respondents do not even attempt to refute Petitioners' claims that they failed to adequately respond to these and other comments on the DEIS.

* * *

For all of the foregoing reasons, the Court should reject the FEIS and nullify the actions based upon it because it systematically distorted data in order to understate the severity of traffic, air, noise, sewage, and other impacts and consequently failed adequately to propose mitigation.[83] The FEIS therefore cannot serve as the basis for any reasoned and rational decision and must be struck down.

## C.    RESPONDENTS FAILED TO APPLY FOR ALL NECESSARY PERMITS

Respondents entirely miss the mark by arguing that Petitioners' third cause of action— asserting that Respondents failed to apply for all necessary permits for the Project—is not yet ripe for review. (*See* Resp. Br. at 72.) City officials have repeatedly said that they want "shovels in the ground" prior to the IOC's July 6, 2005 announcement of the city scheduled to host the 2012 Olympics. (*See* Mastro Aff. Ex. 22 (Craig Horowitz, *Stadium of Dreams*, N.Y. Magazine, June 21, 2004, available at http://www.newyorkmetro.com/nymetro/realestate/urbandev/features/9307 (last visited March 9, 2005)).) However, because they failed to obtain or even apply for proper permitting from the New York State Department of Environmental Conservation ("DEC") for the heating system for the stadium and for the construction of a 950-space parking garage, Respondents are woefully behind the game, and the game clock, as determined by their own schedule, is winding down. (*See* Mastro Aff. Ex. 2 (FEIS at 3-9).) Such permitting is a lengthy process, sometimes lasting

---

[83] Also, as previously explained, Respondents failed to give adequate consideration to the Project's aesthetic and visual impacts and failed to consider reasonable alternatives to the Project. (*See* Pet. Br. at 35-37, 39-40.)

years.  Moreover, Respondents' tardiness in applying for an air permit has already had a definite

impact:  the air quality analysis in the FEIS failed to include the HVAC system emissions.

Decision-makers and the public have been deprived of their opportunity for full information.

It has just come to light that Respondents have not applied for yet another key

environmental permit required for the HVAC system.  On March 2, 2005, Special Referee

Liebman ordered the City and the MTA to remove certain redactions from documents they had

previously supplied in redacted form.  One of these documents – received on March 3, 2005 –

was the minutes of an August 14, 2003 Hudson Yards Coordination Meeting.  This sentence was

newly revealed as a result of Special Referee Liebman's order: "S. Kass indicated that the NY

Jets plans for the Multi-Use Facility include a cooling system that uses Hudson River waters."

As such, this system will require a water pollution discharge permit from DEC. 6 NYCRR § 750-

1.5.  As other applicants have learned to their sorrow, obtaining DEC permits for the discharge

of cooling water into the Hudson River is fraught with difficulty.  *Riverkeeper v. EPA*, 358 F.3d

174 (2d Cir. 2004).  It appears that Respondents have done nothing to apply for this permit; nor

was the need for it revealed in the FEIS.

Furthermore, by asserting that "permits for 'indirect sources of air contamination'" are

not required "because Part 203 is simply not applicable to the Proposed Action," Respondents

ignore relevant, if not binding, precedent that holds just the opposite. (Resp. Br. at 73.)

Respondents erroneously state that, because "the 950-space parking facility will not be owned by

any federal or state agency," "the owner or operator of such parking facility (even if construction

were set to begin) is not required to apply for a Part 203 permit.  (*Id.*)  However, a trial court in

New York County has held that City departments are "required to submit an application . . . prior

to commencement of construction on the proposed facility" even where such facilities are not

State or federally owned. *Silver v. Dinkins*, N.Y.L.J., May 3, 1993, at 28, col. 2 (Sup. Ct. N.Y. County May 3, 1993) (Crane, J.) (Ex. 123), *aff'd*, 602 N.Y.S.2d 540 (1st Dep't 1993) (attached as Exhibit 123 to the Supplemental Affirmation of Randy M. Mastro). Respondents' claim of exemption from Part 203 permitting because the parking facility is City-owned must fail.

**D.    RESPONDENTS CIRCUMVENTED THE PUBLIC REVIEW PROCESS IN AUTHORIZING NEW ELECTRICAL SUBSTATIONS**

As explained in Petitioners' opening brief, Respondents violated SEQRA and CEQR by their "eleventh hour" decision to eliminate the need for special permits in order for Con Edison to construct at least two new electrical substations to serve the re-zoned area. Respondents would have this Court believe that switching the form of approval from a special permit to an authorization resulted is a meaningless change. (Resp. Br. at 58.) To the contrary, there are a number of important differences between the processes, all of which afford the public less opportunity for public review.

First, the City Council is excluded from the authorization process, as they are not empowered to "call up" an authorization, as they are able to do in the case of a special permit. Second, although a special permit has a clear process defined under ULURP, mandating public involvement, there is no standardized procedure for review of authorizations; the Zoning Resolution does not even define the term "authorization." The Zoning Handbook, which is 15 years old and does not have the force of law, states in the glossary that an "authorization is a discretionary action taken by the City Planning Commission usually after a 30-day informal

referral to the affected community board. *Generally, a resolution authorizing the action is adopted by the Commission at a public meeting.*"[84]

. Thus, there is no requirement for a public hearing in the "authorization" process. In fact, the CPC generally does not hold a hearing on an authorization.[85] The only opportunity available for the public to participate is to attend a public session of the CPC at which members of the public can merely observe the CPC vote. *See id.* Moreover, the decision to refer the application for an authorization to the Community Board is in the CPC's discretion. (*See* Karnovsky Aff. ¶ 9.) Although the CPC often does make such referrals, there is no requirement, a clear departure from ULURP. Even if the CPC does refer the application to the Community Boards, the time for review is usually 30 days, instead of the 60 days mandated for a special permit under ULURP. Furthermore, there is nothing in the Zoning Handbook that requires, or even mentions, referral to the Borough President. Indeed, City Planning's practice is to send the application to the Borough President for a 30-day review *simultaneously* with the Community Board's 30 day review. (*See* Karnovsky Aff. ¶ 9.) Under ULURP, by contrast, the Borough President has 30 days for review *after* the Community Board's 60-day review period. Respondents cannot deny that the process for approving an authorization is much shorter and much less thorough than that for a special permit.

Respondents baldly assert that there is "no substance to Petitioners' claim that this change in the land use review mechanism for substations was not considered in the environmental review process." (Resp. Br. at 58.) They claim that this change had no potential

---

[84] Department of City Planning, NYC Zoning Handbook: A Guide to New York City's Zoning Resolution (1990), *available at* http://www.tenant.net/Other_Laws/zoning/zontoc.html (emphasis added).

[85] *See* Department of City Planning, New York City Zoning: About Zoning – Terms and Procedures, *available at* http://www.nyc.gov/html/dcp/html/zone/zonetod.html#authorizations.

to alter the conclusions of the FEIS.  However, such an "eleventh-hour" change from the special permit process to an authorization process is simply outside the scope of the certified ULURP application and should not have been considered.  In the original certification and ensuing public review of the DEIS, the public was, in effect, notified through the text of the proposed zoning amendments accompanying the DEIS that all of the review and comment rights associated with ULURP would be available vis-à-vis the substation special permit.  (Karnovsky Aff. ¶ 8.)  The CPC then approved an authorization that substantially reduced the ULURP assurances of public review and increased the CPC's discretion.   The appropriate way to make a change from special permit to authorization would have been for City Planning to have included it in the modified application filed on August 30, 2004.  Such a step would have afforded the Community Boards, Borough President and the public the opportunity to comment at the September 23, 2004 Planning Commission hearing.  Amendments to applications by the Planning Commission are made for precisely this purpose, that is, to allow time for informed public comment.

In terms of environmental review, the CPC was apparently provided with a technical memorandum that stated that the change from special permit to authorization would not have any adverse environmental affects.  (Resp. Br. at 58; Karnovsky Aff. ¶ 11).  This memo was apparently not publicly available prior to the release of the FEIS—until Petitioners saw it attached to Respondents' answering papers in this lawsuit—and there was therefore no opportunity for public comment.  Similarly unavailing is Respondents' argument that this "change in the review process was made in recognition of the identified and fully disclosed need to add such substations to serve the demand generated by new development resulting from the Proposed Action."  (Resp. Br. at 58; Karnovsky Aff. ¶ 9.)  Respondents have again deprived the

public of the opportunity to which it is legally entitled to comment on such proposals prior to passage.

**E.   THE DEIS WAS SO INCOMPLETE AND INADEQUATE THAT IT COULD NOT SERVE AS THE BASIS FOR A LEGAL REVIEW PROCESS THAT PROTECTED THE PUBLIC'S RIGHT TO INFORMED COMMENT**

The DEIS formed the basis for the public comment during the SEQRA and ULURP processes, and it was accepted and certified as complete by the City Planning in its artificial dual role as Co-Lead Agency and its decision-maker on certification. Yet its failure to include a wide range of essential information required by SEQRA and CEQR, and mandated in the scoping documents, deprived Petitioners and the public of their right to any meaningful participation in the review process. Recently produced documents reveal that this inadequacy was deliberate and was designed to foreclose effective debate and comment on the anticipated adverse environmental impact of the Project.[86]

Nonetheless, Respondents were able to offer what they knew to be an inadequate DEIS for ULURP certification process with no fear that it would be rejected. Two weeks before the certification was official, City officials were already referring to the DEIS as "certified." On June 7, 2004, Deputy Mayor Doctoroff's "principal project coordinator," Ann Weisbrod, wrote to an MTA official: "As you know, we are fast approaching D-Day on the DEIS. It will be completed on June 18th and *we will be certified (we already are)* into ULURP on June 21st." (*Id.* Ex. 87 (June 7, 2004 E-mail from Ann Weisbrod to Adrienne Taub with NYCT) (emphasis

---

[86] This rush to completion left many comments unaddressed in the DEIS. For example, the January 2001 Eng-Wong Taub report suggested that physical improvements to increase capacity at the relevant mass-transit facilities were "not considered to be feasible measures to alleviate congested conditions" of the intermittent sort presented by the proposed stadium, and recommended closing off vehicle traffic on several streets near the stadium before and after games in order to handle the heavy pedestrian loads. (*Id.* Ex. 115 (January 2001 EWT Report) at v.) This suggestion was not followed.

added).) Thus, Respondents had no reason to fear the DEIS would be rejected as inadequate.
They knew that certification did not depend on the adequacy of the DEIS but, rather, on the
interest of City officials in pushing the Project through to its predetermined outcome.[87]

In drafting and certifying an incomplete and misleading DEIS, Respondents set in motion
an environmental review built on a fundamentally flawed foundation that undermined the entire
public review process. In their answering papers, Respondents do not attempt to refute any of
the numerous and lengthy examples from the DEIS of omissions and misrepresentations that
Petitioners highlighted in Petitioners' Opening Brief. (Pet. Br. at 40–41, 57–60.) Instead,
Respondents assert that a DEIS need only be "adequate" and is expected to undergo
"refinement" throughout the review process. *Id.* Through this process of "refinement,"
Respondents would have this Court believe that the DEIS can be the proverbial "sow's ear" yet
still produce a "silk purse" in the form of an adequate FEIS. But no amount of "refinement" can
transform a distortion into the truth; and no amount of uninformed public comment could have
transformed a DEIS as misleading and incomplete as the one certified here into an FEIS that
reflected informed public comment or accurately reported the full environmental impacts of this
Project.

Instead of defending the Hudson Yards DEIS, Respondents effectively admit the
deficiencies of the DEIS but claim that the law required nothing more.[88] They cite a number of

---

[87] Indeed, Respondent City Planning's independent decisionmaking was compromised in the EIS process here because it was acting in the "dual roles" of applicant and reviewing agency. Thus, Respondents had even less reason to fear the rejection of the DEIS. As previously noted, the level of judicial scrutiny applied to agency decisionmaking in cases such as this must be heightened to reflect the possibility that the reviewing agency's judgment will be compromised by its lack of impartiality. *See supra* note 10.

[88] Respondents' attempt to distinguish *Cilla v. Mansi*, No. 3563-02, 2002 N.Y. Misc. LEXIS 657 (Sup. Ct. Suffolk County May 8, 2002), and *Bliek v. Town of Webster*, 104 Misc. 2d 852, 429 N.Y.S.2d 811 (Sup. Ct. Monroe County 1980), completely misses the mark. (*See* Reap. Br. at 66 n.25.) To begin with, Petitioners cite these authorities in support of the

[Footnote continued on next page]

54

cases in which a DEIS was deemed "adequate" despite the failure of the lead agency to include some narrow supporting technical data for assertions made in the DEIS, or to consider every conceivable alternative, no matter how remote. (Resp. Br. at 63–65.)

What Respondents fail to appreciate, however, is that the inadequacy of the DEISs at issue in those cases was limited to certain *missing information*, while the inadequacy here was also due to *misinformation*. Respondents did not just submit an incomplete DEIS; they submitted an erroneous one, the drafting of which consciously excluded specific information that would have contradicted the "rosier" environmental impact picture they sought to paint. Yet

---

[Footnote continued from previous page]

proposition that Respondents' fatally flawed environmental review process constitutes a violation of Petitioners' due process rights. (*See* Pet. Br. at 59 & n.46.) Respondents offer nothing to refute this proposition, and instead merely mischaracterize the basis of Petitioners' argument in an attempt to gloss over an issue they apparently cannot overcome.

Respondents' implication to the contrary notwithstanding, there is simply no subsequent authority reversing *Bliek* on even a single point of law set forth therein. The decisions in *Webster Associates v. Town of Webster*, 112 Misc. 2d 396, 447 N.Y.S.2d 401 (Sup. Ct. Monroe County); *aff'd*, 85 A.D.2d 882, 446 N.Y.S.2d 955 (4th Dep't 1981), *rev'd*, 59 N.Y.2d 220, 464 N.Y.S.2d 431 (1983), have no bearing on the court's holding in *Bliek*, which was a separate, prior case involving many of the same parties but a completely different challenge to a different EIS process.

In *Bliek*, the petitioners brought claims challenging the zoning approval granted to developer Webster Associates, claiming that the town board improperly issued a negative declaration after reviewing Webster Associates' DEIS. *See Bliek*, 104 Misc. 2d at 855–57, 429 N.Y.S.2d at 815–16. The court held that the town board's issuance of a negative declaration in the face of the significant impacts attendant to the project violated both SEQRA *and* petitioners' due process rights. *Id.* at 870, 429 N.Y.S.2d at 824. Months later, the town board approved a *rival developer's* preliminary development plan, and various petitioners, including Webster Associates—the *defendant developer* from the *Bliek* case—commenced a *separate* action to annul the approval of the rival developer's plan, alleging, *inter alia*, that the rival's DEIS and FEIS violated SEQRA. *See, e.g., Webster Assocs.*, 112 Misc. 2d at 398–400, 447 N.Y.S.2d at 403–04. The appellate decisions in *Webster Associates* concerned this second case. *See, e.g., Webster Assocs.*, 59 N.Y.2d at 225–26, 464 N.Y.S.2d at 432–33 ("The town planning board approved the Webster Associates application in November, 1979 . . . . Supreme Court vacated the town board's action . . . [in] *Bliek v. Town of Webster* . . . . [O]n October 23, 1980, the town board approved Expressway Associates' preliminary development plans . . . Webster Associates and various local residents and landowners then brought separate lawsuits . . . which were consolidated. Supreme Court granted summary judgment dismissing the proceeding and action. . . . This court . . . granted plaintiffs leave to appeal."). Thus, the *Webster Associates* cases—which involved challenges on *different grounds* to a *different agency determination* based on a *different EIS* submitted by a *different party*—simply have no bearing on the decision in *Bliek*.

Moreover, although the *Webster Associates* cases rejected petitioners' claim that the town board's approval should be invalidated because the DEIS neglected to consider one particular alternative, the Court of Appeals expressly refused to adopt the Appellate Division's reasoning that "inclusion of the alternate proposal in the FEIS cured its omission in the draft EIS." 59 N.Y.2d at 228, 464 N.Y.S.2d at 433. Indeed, the Court of Appeals concluded that "the omission of a required item from a draft EIS cannot be cured simply by including the item in the final EIS." *Id.*, 464 N.Y.S.2d at 433. Thus, the Court of Appeals recognized that, in a proper case, the deficiencies in a DEIS can render it invalid under SEQRA. As Petitioners have amply demonstrated, this is precisely such a case.

despite the obvious deficiencies in this DEIS, Respondents referred internally to the ULURP

application as assured of being "certified" by date certain even before the draft was complete.

   Although deference may be appropriate to lead agencies unable to present a complete

environmental picture of every impact by the time of the DEIS, no deference is owed to lead

agencies that deliberately manipulate and withhold information in connection with a DEIS, as the

Lead Agencies did here. And any DEIS predicated upon such manipulation is simply not

"sufficient to allow informed consideration and comment on the issues." *Jackson v. N.Y. State

Urban Dev. Corp.*, 67 N.Y.2d 400, 423, 503 N.Y.S.2d 298, 308 (1986). Accordingly, for this

independent reason as well, the Court should grant the Petition.[89]

### POINT II

### THIS COURT SHOULD ORDER THE CITY PLANNING<br>COMMISSION, DCP, AND MTA TO PRODUCE PUBLIC<br><u>RECORDS RESPONSIVE TO MSG'S FOIL REQUESTS</u>

   Just as they distorted the facts to hide and trivialize the significant environmental impacts

that will necessarily result from the Project, Respondents stretch the limits of important FOIL

---

[89] Of note, Respondents also now make the meritless argument that MSG alone lacks standing to sue here. It thereby concedes that all of the many other Petitioners have standing to sue. This throwaway argument has nothing to do with the merits of this case, which this Court will ultimately decide, regardless of one petitioner's standing significant adverse environmental impacts of this Project, so Respondents suggest that MSG's interest is purely economic and too generalized to warrant standing.

To the contrary, the employees and fans who work and attend events at MSG will be unable to escape the adverse effects of the Project—namely, increased traffic congestion, and the resulting increase in air pollution and noise—due to its general proximity to MSG. Thus, MSG and its constituents will suffer a "specific noneconomic environmental injury within the zone of interest protected" by SEQRA. Moreover, as even the case on which Respondents rely cautions, "economic concerns" do "not foreclose [a petitioner's] standing to raise environmental injury." *Society of the Plastics Industry v. County of Suffolk*, 77 N.Y.2d 761, 777, 570 N.Y.S.2d 778, 788 (1991). New York courts have recognized that businesses and not-for-profit entities have standing to bring claims under SEQRA where, as here, the entity has "alleged environmental impacts, such as increased noise and traffic, from the proposed project," *see Bliek v. Town of Webster*, 104 Misc. 2d 852, 858–59, 429 N.Y.S.2d 811, 817 (N.Y. Sup. Monroe County 1980); *Duke & Benedict, Inc. v. Town of Southeast*, 253 A.D.2d 877, 878, 678 N.Y.S.2d 343, 345 (2d Dep't 1998); where, as here, a project would "accelerate the displacement of ... residents and businesses or alter the character of the community," *Chinese Staff & Workers Ass'n v. City of New York*, 68 N.Y.2d 359, 363, 509 N.Y.S.2d 499, 501 (1986), or where, as here, a party's proposed project threatens to obstruct an important conduit to the petitioner's property, *see Schenectady Chems., Inc. v. Flacke*, 83 A.D.2d 460, 446 N.Y.S.2d 418 (3d Dep't 1981). Thus, Respondents' attempts to portray MSG as lacking standing because it is merely a member of the public, unaffected in any distinctive way by the many significant adverse impacts of this Project, is meritless and warrants no further attention.

56

exemptions to cloak documents in a veil of secrecy. To be sure, such exemptions are "intended

to protect the open exchange of opinions between agency decisionmakers" and to shield the

"deliberative process." (Resp. Br. at 67.) However, those exemptions do not protect agency

decisionmakers' attempts to manipulate data. Such manipulation can hardly be characterized as

deliberation. In any event, as the DCP's production of just last week amply demonstrates, the

standard under FOIL still has not been satisfied. Respondents continue to flout their obligation

under FOIL, an obligation separate and distinct from their responsibility to comply with

Petitioners' discovery requests.[90]

   Respondents do not—and, indeed, cannot—distinguish the cases cited by Petitioners in

their opening brief. However, in an attempt to avoid their responsibilities under FOIL,

Respondents assert that a grant of discovery in Petitioners' nuisance action "moots" Petitioners'

FOIL claim. To the contrary, in none of the three cases cited by Respondents for this proposition

was a FOIL request found to be satisfied or "mooted" by production of documents pursuant to a

separate discovery request.[91] Rather, in all three cases, the FOIL claims were found to be moot

---

[90] Defendants seem to have adopted the position that they are relieved of their obligations pursuant to Petitioners' FOIL requests to the extent such materials do not fall into one of the categories set forth in the parties discovery stipulation. The stipulation provides that the production agreed to therein "will satisfy the entirety of Plaintiffs' document demands." In no way does this provision discharge the agencies' FOIL obligations. *See* Gerrard Aff. ¶ 7.

[91] In *Newton v. Police Dep't*, 183 A.D.2d 621, 585 N.Y.S.2d 5 (1st Dep't 1992), petitioner made two separate requests under FOIL for information and documents concerning two separate indictments. With regard to one of the requests (Indictment 2054/84), after petitioner had commenced an Article 78 proceeding, respondents sent petitioner some documents and deemed other documents unacceptable. The respondents failed to respond to the other request (Indictment 2441/84). The court held that the respondent's provision of documents regarding Indictment 2054/84 rendered that part of the petitioner's Article 78 proceeding moot, as "where relief being sought is supplied during the pendency of litigation, the matter becomes moot." *Id. at* 624.

  In *Almodovar v. Altschuller*, 232 A.D.2d 700, 647 N.Y.S.2d 1010 (3d Dep't 1996), subsequent to the commencement of the Article 78 proceeding, respondent complied with petitioner's request by providing him some documents and withholding others under FOIL. This response to petitioner's FOIL requests during the pendency of litigation rendered the matter moot.

[Footnote continued on next page]

because respondents at least partially complied with FOIL requests after the commencement of Article 78 proceedings concerning *those very FOIL requests*. No separate actions or discovery were involved whatsoever. Moreover, Respondents cite no case in which a court has held that compliance with discovery requests is tantamount to compliance with FOIL.

To the contrary, "FOIL does not require that the party requesting records make any showing of need, good faith or legitimate purpose. . . . Full disclosure by public agencies, under FOIL, is a public right, and in the public interest, irrespective of the status or need of the person making the request." *Farbman & Sons v. N.Y. City Health & Hosps. Corp.*, 62 N.Y.2d 75, 80, 476 N.Y.S.2d 69, 71 (1984). This contrasts with CPLR Article 31, which serves different purposes and limits discovery to what is "material and necessary." *Id.* at 80–81. "FOIL's mandate of open disclosure requires that an agency's public records remain as available to its litigation adversary as to any other person." *Id.* at 80.[92]

Despite the fact that Respondents have been forced to produce some documents in an ostensible showing of compliance with the parties' discovery stipulation, Respondents continue to raise baseless objections to Petitioners' FOIL requests, produce documents with impermissible redactions, assert bogus claims of privilege, and wait until the last possible moment to produce anything. (Gerrard Aff. ¶¶ 5–6, 8–10.) Such conduct is a far cry from Respondents' broad obligations under FOIL. Accordingly, Respondents have failed to meet their burden of showing

---

[Footnote continued from previous page]

In *Malerba v. Kelly*, 211 A.D. 479, 621 N.Y.S.2d 318 (1st Dep't 1995), the proceeding was rendered moot insofar as the proceeding sought documents that the respondent produced under FOIL after the commencement of the Article 78 proceeding.

92  *See also Burke v. Yudelson*, 81 Misc. 2d 870, 368 N.Y.S.2d 779 (N.Y. Sup. Ct. Monroe County 1975), *aff'd*, 51 A.D.2d 673, 378 N.Y.S.2d 165 (4th Dep't 1976). "The fact that there have already been Article 31 discovery proceedings in connection with the pending lawsuit does not preclude petitioner from obtaining the relief sought here. However, since the requested information is no doubt sought for the purposes of such litigation, the parties may find it advisable to proceed with further Article 31 proceedings." 81 Misc. 2d at 878.

that Petitioners' outstanding FOIL requests are somehow moot. The "mere fact that disclosure was available to the applicant through some other discovery device, such as under CPLR article 31 . . . does not preclude FOIL relief, if warranted. . . . . [T]he burden of proof rests with the agency to demonstrate that the petitioner's specific requests are moot." *Moore v. Santucci*, 151 A.D.2d 677, 678, 543 N.Y.S.2d 103 (2d Dep't 1989). Respondents have failed to meet their burden here.

In particular, on January 28, 2005, Respondents produced a set of meeting minutes from a series of meetings of various government agencies and their consultants concerning, it appears, the transportation impacts of the Hudson Yards Project. The copies we received had their entire contents redacted except for very brief sections concerning surveys that had been conducted of Jets season ticket holders. The redactions were labeled as being redacted because the redacted portions were "non-responsive." Respondents told counsel for Petitioners that they were withholding these portions of these documents because the Stipulation on Document Production that the parties had entered into on January 19 and 20, 2005 stated that "Defendants will produce all nonprivileged documents concerning the 2002 and/or 2004 Surveys (as such surveys are defined on page 5 of the Notice) by hand delivery to such counsel for receipt no later than 6:00 p.m. on Friday, January 28, 2005." Respondents argued that they were entitled to withhold the nonprivileged portions of those documents that did not concern the Surveys. Petitioners disputed that argument, and Special Referee Liebman has taken the matter under advisement. Petitioners believe that these minutes are responsive to their July 2004 FOIL requests sent to the City Planning Commission and the Metropolitan Transportation Authority. One of these meeting minutes appeared on Respondents' privilege log submitted in connection with the discovery ordered in the consolidated nuisance action; thus, these minutes were reviewed in camera by

Special Referee Liebman, who directed that this document be released in mostly unredacted form.  Several of these newly unredacted portions were in fact responsive to Petitioners' FOIL request.  (*See* Gerrard Aff. ¶¶ 5, 6, 8.)

In addition, on February 25, 2005, David Karnovsky, the Counsel of the New York City Department of City Planning, sent Petitioners a letter that forwarded certain additional documents and stated: "You may recall that in my December 8, 2004 letter to you, I indicated that additional records responsive to your request had been located in our Environmental Assessment and Review Division.  Upon closer examination, it was determined that these particular records were not prepared in connection with the DGEIS.  Because they are not responsive to your request, they are not included herein."  In fact, Petitioners' FOIL requests were not confined to records "prepared in connection with the DGEIS."  They also sought documents concerning "the conformity of the Proposed Action with regional or local commitments under the Clean Air Act" and "any regulatory approval that may be needed for any aspect of the Proposed Action."  The second of these two items, in particular, is an expansive request that goes beyond simply the DEIS, and also encompasses the FEIS, the ULURP process, and other environmental and land use approvals.  To the extent that these documents are responsive to Petitioners' FOIL requests, they should be produced.  (*See* Gerrard Aff. ¶¶ 9–10.)

## CONCLUSION

For all of the foregoing reasons, Petitioners request that this Court issue a judgment and order, pursuant to Article 78 of the CPLR, (*i*) annulling and vacating the FEIS; (*ii*) annulling and vacating the Findings Statement; (*iii*) annulling and vacating the Planning Commission's approval of the subject amendments to the Zoning Resolution; (*iv*) annulling and vacating any other approvals granted to any aspect of the Project by Respondents; (*v*) requiring the MTA, the DCP and the Planning Commission to produce unredacted copies of the documents sought under the Freedom of Information Law; (*vi*) preliminarily and permanently enjoining Respondents the MTA and the City of New York from beginning demolition or construction in connection with the Project; (*vii*) awarding Petitioners the costs and disbursements of this proceeding; and (*viii*) granting such other relief as this Court deems just and proper.

Dated: March 9, 2005
    New York, New York

                    Respectfully submitted,

                    GIBSON, DUNN & CRUTCHER LLP

                    By: _____
                        Randy M. Mastro

                    200 Park Avenue
                    New York, New York 10166-0193
                    Telephone:    (212) 351-4000
                    Facsimile:    (212) 351-4035
                    Attorneys for Petitioners

                    ARNOLD & PORTER LLP
                    Michael B. Gerrard
                    399 Park Avenue
                    New York, New York 10022-4690
                    Telephone:    (212) 715-1000
                    Facsimile:    (212) 715-1399
                    Attorneys for Petitioner Madison Square Garden, L.P.

ANTONIA LEVINE BRYSON, ESQ.
475 Park Avenue South
New York, New York 10016
Telephone:    (212) 483-9120
Facsimile:    (212) 213-5004

Attorney for Petitioners Hell's Kitchen Neighborhood
Association, Martin Treat, Meta Brunzema, Dana
Turner, Daniel Gutman, and Rudolf Samandarov