UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NEW YORK JETS LLC and                    :     Case No. 05-CV-2875 (HB)
JETS DEVELOPMENT LLC,                    :
                                          :
                    Plaintiffs,           :
                                          :
v.                                        :
                                          :
CABLEVISION SYSTEMS CORPORATION,         :
CSC HOLDINGS, INC., and MADISON          :
SQUARE GARDEN L.P.,                       :
                                          :
                    Defendants.           :
                                          :
                                          :

**Appendix of Unpublished Opinions Cited in the
Memorandum of Law in Support of Defendants' Motion to Dismiss**

1.  *Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V.*,
    No. 94 Civ. 4725 CSH, 1997 WL 539227 (S.D.N.Y. Aug. 28, 1997).

2.  *Thomson Info. Servs. v. Lyons Commercial Data, Inc.*,
    No. 97 CIV. 7716(JSR), 1998 WL 193236 (S.D.N.Y. April 21, 1998).

3.  *Yellow Page Solutions v. Bell Atl. Yellow Pages Co.*,
    2001 U.S. Dist. LEXIS 18831 (S.D.N.Y. Nov. 19, 2001).

1

Westlaw.

Not Reported in F.Supp.                                                          Page 1
1997 WL 539772 (S.D.N.Y.)
(Cite as: 1997 WL 539772 (S.D.N.Y.))

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
KIDDER, PEABODY & CO., Incorporated,
Plaintiff -Counterclaim-defendant,
v.
IAG INTERNATIONAL ACCEPTANCE, GROUP
N.V., Defendant-Counterclaim.
No. 94 Civ. 4725 CSH.

Aug. 28, 1997.

**MEMORANDUM OPINION AND ORDER**

HAIGHT, Senior J.

*1 Defendant-Counterclaimant IAG International
Acceptance Group, N.V. ("IAG") seeks leave to
amend its counterclaim, *inter alia,* to add a cause of
action for malicious prosecution, and to allege facts
concerning the conduct of defendant Kidder,
Peabody & Company, Incorporated ("Kidder")
subsequent to the vacatur of an order of attachment
secured by Kidder following initiation of the
present lawsuit. Familiarity with this Court's prior
opinions is assumed, and the recitation of facts
below concerns only those details relevant to the
instant motion.

**Background**
Kidder commenced this action on June 27, 1994,
charging that IAG had breached a contract with
Kidder, in which Kidder had agreed to serve for a
three-year term as IAG's underwriter with respect to
an arrangement in which IAG would finance the
origination of auto and light truck loans by Auto
Marketing Network, Inc. ("AMN"). In its
complaint, Kidder alleged that IAG violated that
agreement by contracting with another underwriting
firm, CS First Boston Corporation ("First Boston"),
to handle the transaction. Upon filing its action,

Kidder also obtained an ex parte order of
attachment pursuant to N.Y.CPLR Article 62 and
Fed.R.Civ.P. 64 on any "interest of [IAG] in
personal property or upon any debt owed to said
defendant, and upon any interest of said defendant
in real property." Amended Counterclaim ¶ 34.
Notice of that attachment was served by Kidder on
First Boston and AMN. In response First Boston
notified Kidder that it held no property of IAG, nor
was it indebted thereto. Kidder then consented to
vacatur of the attachment.

IAG filed an answer and brought counterclaims for
fraudulent misrepresentation, breach of contract,
abuse of process, wrongful attachment, and tortious
interference with contract. The final three claims
derived, at least in part, from the attachment
secured by Kidder. Specifically, the defendant
alleged that it turned to First Boston only when it
became apparent that Kidder would be unable to
obtain the financing necessary for the transaction,
and Kidder brought the instant action and obtained
the concomitant notice of attachment for the
purpose of undermining the business relationship
between IAG, First Boston and AMN. IAG claims
that its transaction with First Boston and AMN was
scheduled to close on June 30, 1994. According to
IAG, the order of attachment was served on June
28, and caused First Boston and AMN to cease
doing business with IAG, and to consummate the
loan sale themselves.

Kidder subsequently sought to amend its complaint
to add a second defendant, the Memorial Bank,
which allegedly entered into an agreement with IAG
and Kidder regarding the securitization and sale of
auto loans. I denied that motion as futile, on statute
of frauds grounds. I later granted a motion by IAG
for summary judgment, and dismissed Kidder's
complaint. As a result, the roles initially played by
the parties in this action have been entirely
reversed: IAG, as counterclaimant, now asserts
claims     which     Kidder     resists     as
counterclaim-defendant.

*2 IAG now seeks to file an amended answer and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1997 WL 539772 (S.D.N.Y.)
(Cite as: 1997 WL 539772 (S.D.N.Y.))

counterclaim. In its memorandum supporting that application, IAG sets forth its argument for adding a malicious prosecution claim, and for delineating events that took place subsequent to the commencement of this litigation. The proposed amended counterclaim also contains new factual allegations, and the claim for fraudulent representation is amended to allege "negligent and fraudulent representation." These changes, however, are not addressed in IAG's memorandum.

Kidder asserts that the addition of a counterclaim for malicious prosecution would be futile, as IAG cannot show the sort of "special damages" required for such a claim under New York law. Additionally, Kidder contends that IAG should not be able to add allegations of Kidder's conduct subsequent to its agreement to vacate its order of attachment. According to Kidder, IAG failed to state a sufficient causal connection between Kidder's maintenance of its lawsuit, once the order of attachment was no longer in place, and any harm suffered by IAG. Rather, Kidder claims, IAG's sole purpose in seeking to allege facts beyond that date is to secure a more expansive waiver of Kidder's attorney-client privilege.

Kidder's portrayal of IAG's purported motivation derives from a dispute regarding Kidder's invocation of the attorney-client privilege in response to IAG's request for discovery concerning Kidder's decision-making process in initiating and conducting this lawsuit. Among the defenses Kidder raised to IAG's initial counterclaims was the assertion that it acted in good faith throughout the present litigation. Since Kidder had placed the purity of its litigation motivation at issue, Magistrate Judge Grubin, to whom pre-trial supervision had been assigned, held that Kidder's privilege had been waived as to materials relating to its decision to bring its initial complaint and to seek an order of attachment. *See Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Group, N.V.*, 1997 WL 272405, at *5 (S.D.N.Y. May 21, 1997) (Grubin, M.J.).

IAG argued before the Magistrate Judge that this waiver should extend to Kidder's subsequent conduct of the litigation, an argument Judge Grubin rejected because IAG's counterclaims, as they were then formulated, did not address Kidder's conduct in

seeking to amend its complaint or in opposing summary judgment. IAG then represented to Judge Grubin that it intended to supplement its pleadings so as to base its counterclaims on these actions as well. Judge Grubin declined to address the impact of such an amendment, but she noted that "although two of the proposed counterclaims--for tortious interference with 'contract and business relations' and malicious prosecution-- attempt vaguely to allege not only that Kidder's filing suit and obtaining an attachment injured IAG but that in seeking to file an amended complaint and in opposing summary judgment Kidder acted improperly, the damage allegedly caused to IAG by such behavior by Kidder, beyond the damage from the June 30 transaction, is hardly apparent from the allegations." *Id.* at *5.

*3 In these circumstances, Kidder characterizes IAG's current attempt to add factual allegations concerning Kidder's pursuit of this action subsequent to the lifting of the attachment order as a "transparent and prejudicial litigation tactic," directed at obtaining an advantage in the privilege dispute. Kidder Mem. at 2.

Finally, Kidder notes that IAG has added claims and assertions of fact to its counterclaims that are not addressed in its briefing, including a claim for negligent misrepresentation. Kidder Mem. at 2 n. 1. Kidder asks, therefore, that this Court allow it to address IAG's justifications for these amendments "if and when they are advanced." *Id.*

## Discussion

Under Fed.R.Civ.P. 15(a), leave to amend a pleading should be "freely given when justice so requires." Such leave may be denied, however, if the amendment has been unduly delayed; is sought for a dilatory purpose or made in bad faith; would cause prejudice to the opposing party; or would be futile. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Kidder argues that IAG's proposed amendments are without legal basis and therefore futile, and would cause undue prejudice to Kidder's conduct of this litigation.

## I. Malicious Prosecution

To state a cause of action for malicious prosecution under New York law, the plaintiff must allege: 1)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1997 WL 539772 (S.D.N.Y.)
(Cite as: 1997 WL 539772 (S.D.N.Y.))

Page 3

that defendant initiated an action against plaintiff; 2) with malice; 3) without probable cause to believe it would succeed; and 4) that ended in failure. *O'Brien v. Alexander,* 101 F.3d 1479, 1484 (2d Cir.1996). When such a claim arises out of a civil action, the plaintiff must show "special damages," that is, "some interference with plaintiffs person or property by the use of such provisional remedies as arrest, attachment, replevin or injunction, or other burden imposed on plaintiff beyond the ordinary burden of defending a law suit." *Id* . (citations omitted). *See also Furgang v. JMK Bldg. Corp., et al* ., 183 A.D.2d 1062, 583 N.Y.S.2d 610, 612 (3d Dep't) (plaintiff must show damages beyond those "normally attendant upon being sued"), *appeal denied,* 80 N.Y.2d 756, 588 N.Y.S.2d 824, 602 N.E.2d 232 (1992). New York courts generally hold that allegations of reputational harm resulting from a law suit are not enough to sustain this cause of action, *See Engel v. CBS, Inc.,* 961 F.Supp. 660, 663 (S.D.N.Y.1997); *Campion Funeral Home, Inc. v. State,* 166 A.D.2d 32, 569 N.Y.S.2d 518, 521 (3d Dep't), *appeal denied,* 78 N.Y.2d 859, 575 N.Y.S.2d 455, 580 N.E.2d 1058 (Ct.App.1991), nor is the claim that financial resources were expended in successfully defending against a prior suit, *Miller v. Jamaica Sav. Bank,* 50 A.D.2d 865, 377 N.Y.S.2d 89, 90 (2d Dep't 1975).

The language in some decisions appears to indicate that a defendant's resort to a provisional remedy is required before a malicious prosecution claim may be brought. *See O'Brien,* 101 F.3d at 1485 ("New York courts have repeatedly stated that interference from a provisional remedy is a prerequisite to a malicious prosecution claim where the action upon which that claim is founded is a civil action."). In certain extraordinary cases, however, courts have found other consequences to be sufficient to sustain such a cause of action. Thus, malicious prosecution claims have been permitted in cases where a public servant was suspended without pay as a result of disciplinary proceedings, *Groat v. Town Bd. of Glenville,* 73 A.D.2d 426, 426 N.Y.S.2d 339 (3d Dep't), *appeal dismissed,* 50 N.Y.2d 928 (1980), and where a paternity proceeding was alleged to have been brought maliciously, *see Watson v. City of New York,* 57 Misc.2d 542, 293 N.Y.S.2d 348, 354 (New York County Civ. Court 1968). At least one court has noted that such exceptional circumstances have been found to exist only when

the matter at issue is "quasi-criminal" in nature. *See Engel,* 961 F.Supp. at 664. The instant case cannot be so defined, and does not present circumstances analogous to those in *Groat* or *Watson.* IAG must therefore allege that it was subjected to special damages as a result of Kidder's resort to a provisional remedy to sustain its claim.

**\*4** Kidder maintains that it stipulated to the vacatur of its attachment after being informed by First Boston that it neither held property belonging to IAG nor owed IAG any debt. This is reflected in a letter sent by First Boston to the United States Marshal on July 1, 1994, in which First Boston stated that it was "not in possession or custody of any assets in which [IAG] has an interest", nor was it indebted to IAG. Letter from Miller to Court of Dec. 19, 1996 ex. 3. As a result, Kidder argues, no property was ever attached under the ex parte order it secured, and IAG cannot show that the requisite special damages resulted from Kidder's resort to a provisional remedy.

In response, IAG asserts that, under its contract with First Boston, it was entitled to the proceeds of First Boston's whole loan purchase transaction with AMN, and such profits were therefore subject to the order of attachment. But IAG nowhere contends that any funds were, in fact, attached. On the contrary: its cause of action for malicious prosecution is premised on the quite different assertion that First Boston determined not to carry out the transaction with IAG as the result of Kidder's actions. [FN1]

> FN1. IAG's contention that such profits could have been reached by the order of attachment presents a difficult issue under New York law. An attachment is effective only if the debt or property at issue is within the court's jurisdiction. NY CPLR 6202; *ABKCO Industries, Inc. v. Apple Films, Inc.,* 39 N.Y.2d 670, 385 N.Y.S.2d 511, 512, 350 N.E.2d 899 (Ct.App.1976). This jurisdiction may extend to a debt which is yet to become due "certainly on demand", N.Y. CPLR 5201(a), and to property consisting of a "future right or interest." NY CPLR 5201(b). The New York Court of Appeals has held that "[w]here a duty to pay is conditioned on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4
1997 WL 539772 (S.D.N.Y.)
(Cite as: 1997 WL 539772 (S.D.N.Y.))

the creditor's future performance, or upon contractual contingencies, there is no debt certain to become due." *Glassman v. Hyder*, 23 N.Y.2d 354, 296 N.Y.S.2d 783, 786, 244 N.E.2d 259 (Ct.App.1968). Later, in *ABKCO Industries*, the Court upheld an attachment of a right to funds under a licensing agreement, although that agreement was subject to certain contingencies. Thus, one commentator has concluded that, "[i]f from the judgment creditor's point of view the asset is worth pursuing as a matter of economics, *Abkco* authorizes the pursuit notwithstanding the contingent nature of the asset, and even though nothing may come of the case." David D. Siegel, Supplemental Practice Commentary to SCPA 605, 58A McKinney's Cons.Laws of N.Y. SCPA, Cumulative Annual Pocket Part 1978-79, at 75 (*cited in Streever v. Mazzone*, 97 Misc.2d 465, 411 N.Y.S.2d 843, 847 (Saratoga County Sup.Ct.1978). It would appear, therefore, that IAG is correct in maintaining that, under the facts it has alleged, the proceeds of its agreement with First Boston and AMN would be subject to attachment.

Nevertheless, the fact that the order of attachment might ultimately have led to the attachment of IAG's property is not sufficient to show that IAG did, in fact, sustain the sort of injury required under New York law for a malicious prosecution claim. *See Engel*, 961 F.Supp. at 664 (except for one "aberrational" case, "no other New York court has held that the potential consequences of an action, as opposed to the actual consequences of an action, constitute the interference with person or property required for special injury under New York law").

Kidder advances the proposition that the actual attachment of property must be alleged before a cause of action for malicious prosecution will lie. There is authority that would appear to support that claim. Thus, in *Schulman v. Modern Indus. Bank*, 178 Misc. 847, 36 N.Y.S.2d 591 (N.Y. County Sup.Ct.1942), the court stated explicitly that "if in fact the judgment debtor has no property upon

which a levy can be made the mere mailing of a notice of levy is ineffectual and creates and results in no interference." *Id.* at 593. Similarly, in *Salamanca Trust Co. v. McHugh*, 156 A.D.2d 1007, 550 N.Y.S.2d 764 (4th Dep't 1989), the court rejected the notion that an oral decision to grant an order of attachment, which plaintiff conceded could not actually bind the property at issue, could serve as the basis for a malicious prosecution claim. The court held: "Because no attachment was levied, the alleged wrongful conduct did not amount to an actual interference with [[[defendant's] property." *Id.* at 766. Finally, in *Lincoln First Bank of Rochester v. Siegel*, 60 A.D.2d 270, 400 N.Y.S.2d 627 (4th Dep't 1977) the court granted summary judgment dismissing a counterclaim for malicious prosecution, when the counterclaimant conceded that the plaintiff "would never get any funds at all from the attached contract." *Id.* at 634.

Nonetheless, to read these cases as declaring a bright-line, blanket rule of the sort contended for by Kidder would run contrary to another principle now established in New York law: the malicious filing of a lis pendens alone may give rise to a wrongful prosecution claim. *See Phillips v. Murchison*, 383 F.2d 370, 371 (2d Cir.1967), *cert. denied*, 390 U.S. 958, 88 S.Ct. 1050, 19 L.Ed.2d 1154 (1968); *Chappelle v. Gross*, 26 A.D.2d 340, 274 N.Y.S.2d 555, 557-59 (1st Dep't 1966); *Cf. Chain Locations of Am., Inc. v. T.I.M.E. DC, Inc.*, 99 A.D.2d 111, 472 N.Y.S.2d 462, 464 (3rd Dep't 1984) (filing of lis pendens may result in actionable claim only if malicious). A lis pendens results in no actual encumbrance on property; it "merely provides notice that an action is pending which may affect title to real property." *Schoepp v. State*, 69 A.D.2d 917, 415 N.Y.S.2d 276, 277 (3rd Dep't 1979); *see also Phillips*, 383 F.2d at 371 (2d Cir.1967) ("The lis pendens is a provisional remedy but a very mild one which affords little interference with person or property compared to arrest, attachment, etc....."). *Phillips* and *Chappelle*, therefore, provide at least one exception to the rule urged by Kidder.

*5 I do not believe that the New York holdings outlined above are irreconcilable. Rather, the decisions relied on by Kidder stem from the basic precept that, to constitute "special damages", interference with person or property "must be real and actual, and not imaginary." *Lincoln First*, 400

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1997 WL 539772 (S.D.N.Y.)
(Cite as: 1997 WL 539772 (S.D.N.Y.))

Page 5

N.Y.S.2d at 280-81; *Schulman,* 36 N.Y.S.2d at 593 . In *Lincoln First* and *Salamanca,* it appears that the only damages alleged were those arising directly out of the attachment itself; at least, the opinions reveal no other secondary consequences resulting from the provisional remedy which harmed the claimant. In *Schulman,* the plaintiff made only general assertions of damage to his character, reputation, good name, business, and credit. 36 N.Y.S.2d at 592. Thus, the question of whether property was actually attached was central to the claims raised in these cases; absent such an attachment, there was no alternative basis for showing interference with plaintiff's property.

The instant case presents a different sort of claim: IAG does not allege that it was injured as the result of the actual seizure of its property, but rather that the order of attachment undermined a contractual relationship in which IAG was involved. IAG claims that prior to the ex parte order, it was on the cusp of closing a contract with First Boston and AMN; that Kidder served the notice of attachment on these two parties for the purpose of undermining that agreement; and First Boston and AMN withdrew from the contemplated transaction as a result of the notice they had received of the proposed attachment.

These allegations, while falling outside the paradigmatic malicious prosecution claim, meet all the elements for such a cause of action. IAG has alleged that Kidder employed a provisional remedy in bad faith; that IAG was injured as a direct result of Kidder's resort to that remedy; and that the injury sustained was beyond the mere cost of defending against Kidder's suit. Indeed, if as alleged Kidder's sole purpose in seeking an order of attachment was to disrupt IAG's business dealings, this would seem precisely the sort of wrongful use of a provisional remedy which is actionable under the tort of malicious prosecution. As one New York court noted in regard to a claim arising out of the filing of a lis pendens:

> The effect of a lis pendens is ... to notice the world of an existing claim ... and it was resorted to not from any supposed right in the defendants to assail the plaintiff's ownership, but on mere malice and for an evil purpose. It would be extraordinary indeed if the plaintiff, under such circumstances, had no remedy, and that a

proceeding created for a wise purpose and good ends could be used by a suitor with malice aforethought, without incurring any personal responsibility.

*Smith v. Smith,* 20 Hun. 555, 559 (*cited in Chappelle,* 274 N.Y.S.2d at 558). Likewise, in this case, the allegation that Kidder misused a provisional remedy for the improper goal of giving IAG's contractual partners notice of Kidder's claims is sufficient to give rise to a cause of action for malicious prosecution.

*6 In reaching this conclusion, I acknowledge that IAG is not always clear as to the connection it seeks to draw between the ex parte order and the collapse of IAG's agreement with First Boston and AMN. Indeed, IAG itself cites evidence indicating that it was the lawsuit itself and the "taint" it placed in IAG, not the order of attachment, which deterred first Boston from closing on its contract. IAG Reply Mem. at 13 n. 6. Nonetheless, at this stage of the proceedings, I must consider only the sufficiency of the pleadings. I cannot say, in light of the authorities discussed above and the timetable presented in IAG's amended counterclaim, that IAG has failed to allege a sufficient causal relationship between the issuance of the attachment order and the collapse of its transaction with First Boston and AMN which immediately followed. Moreover, because the facts now at issue therein have been addressed in counterclaims set forth in IAG's prior answer, such as in its abuse of process cause of action, I do not believe that Kidder would be unduly prejudiced if it were now compelled to respond to this additional counterclaim. IAG's application to add a counterclaim for malicious prosecution is therefore granted.

**II. Events Occurring Subsequent to the Attachment's Vacatur**

IAG's proposed amended pleading sets forth facts that occurred after the vacatur of the attachment order. Specifically, its newly asserted malicious prosecution claim, and its previously asserted claim for tortious interference with contract and business relations, are now based in part on Kidder's attempt to amend its complaint and to oppose IAG's summary judgment motion.

In the first instance, IAG contends that such

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 6
1997 WL 539772 (S.D.N.Y.)
(Cite as: 1997 WL 539772 (S.D.N.Y.))

additional facts may properly be pleaded under Fed.R.Civ.P. 15(d). That rule states, in pertinent part:

> Upon a motion of a party the court may, upon reasonable notice and upon such terms as are just, permit him to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. Permission may be granted even though the original pleading is defective in its statement of a claim for relief or defense.....

As is apparent from the text of the rule, the decision as to whether such supplemental pleadings are in order is left within the district court's discretion. *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 66 (2d Cir.1995). Thus, in applying Rule 15(d), I must weigh the same concerns as to delay, futility, bad faith, and prejudice that would be relevant to any application to amend a pleading. *See id.*

IAG notes that the delineation of events subsequent to Kidder's initiation of this litigation is a necessary component of its malicious prosecution claim, as the party advancing such a cause of action must show that the civil action at issue ended in failure. *See* IAG Reply Br. at 10. IAG is correct in this regard, and for this reason, it is permissible for it to allege, in its pleadings, that Kidder's suit was ultimately dismissed. This is hardly the only context, however, in which Kidder's additional factual allegations are presented. As noted *supra,* IAG also contends that Kidder, in continuing its litigation, committed the torts of tortious interference with contract and malicious prosecution. Because I believe the amendment in this regard to be futile, I deny IAG leave to present such facts in support of these claims.

*7 The above discussion of the requirements of a malicious prosecution claim make clear why IAG may not fold Kidder's actions subsequent to the vacatur of the attachment order into its malicious prosecution claim. Such a cause of action must charge that defendant's conduct caused "special damages," generally those which arise out of the use of a provisional remedy. Once Kidder's order of attachment was vacated, IAG had no further basis for alleging the sort of harm which courts have recognized as giving rise to a malicious prosecution claim in civil cases. While IAG does assert that

Kidder's continued pursuit of this litigation prevented it from carrying out its transaction with First Boston and AMN, this does not constitute the sort of exceptional circumstance which, in the absence of a provisional remedy, allows a malicious prosecution claim to lie.

IAG's effort to add these allegations to its claim of tortious interference with contract and business relations presents a closer question. The assertions made by IAG in support of this cause of action are as follows, with emphasis added to those allegations particularly at issue in the present motion:

> as a direct and proximate result of Kidder's actions in suing IAG, *and later filing an amended complaint in an effort to avoid summary judgment on the original complaint,* AMN and First Boston both refused, *and continued to refuse as a result of such amendments and further pleadings by Kidder against IAG,* to do business with IAG, thereby breaching or otherwise rendering performance impossible in accordance with their contractual and business relationships with IAG. There would not have been a breach by either party but for the actions of Kidder.

Amended Counterclaim ¶ 73.

To state a claim for tortious interference with contract under New York law, a plaintiff must show that there existed a valid contract between the plaintiff and a third party, the defendant knew of the contract, and the defendant intentionally and improperly interfered therewith. *Enercomp Inc. v. McCorhill Pub., Inc.,* 873 F.2d 536, 541 (2d Cir.1989). A party's initiation of a civil suit without belief in its merit or for the purpose of harassment can constitute the sort of improper conduct which may give rise to this tort. *See Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 797 F.2d 70, 75 (2d Cir.), *cert. denied,* 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986); *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 428 N.Y.S.2d 628, 632, 406 N.E.2d 445 (Ct.App.1980); *see also* Restatement (Second) of Torts § 767 cmt. a (1979). I have found no New York case in which the process of continuing a suit, seeking to amend a complaint, or defending against summary judgment may themselves constitute tortious interference. Assuming, without deciding, that this may be the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1997 WL 539772 (S.D.N.Y.)
(Cite as: 1997 WL 539772 (S.D.N.Y.))

Page 7

case in certain circumstances, I do not think that the vague and conclusory allegations contained in the proposed amended counterclaim as to a causal connection between Kidder's court filings and the collapse of IAG's business dealings are sufficient to give rise to such a claim.

*8 IAG claims, in its pleadings, that after First Boston and AMN received notice of the order of attachment, they "both refused to perform in accordance with their agreement with IAG, and First Boston insisted instead in consummating a whole loan sale transaction involving solely AMN on June 30, 1994," Amended Answer and Counterclaims ¶ 39. By this action, First Boston and AMN purportedly breached their contract with IAG. It is unclear, once this breach occurred, what remained of the agreement between these parties; according to IAG, First Boston and AMN had already carried out the contemplated transaction on their own. IAG's pleadings are obscure as to what steps First Boston and AMN undertook or refrained from undertaking as a result of Kidder's subsequent motion practice, and the counterclaim does not even indicate if these companies became aware of Kidder's filings. In particular, I see no reason why Kidder's attempt to amend its complaint to add an entirely new defendant, Memorial Bank, would have any impact on First Boston's or AMN's business relationship with IAG, or why Kidder would believe that its motion would have such an effect. In light of these gaps, and the conclusory nature of IAG's allegations, I believe it would be futile to allow IAG to rest its claim for tortious interference with a contract on the motion practice which followed the vacatur of the ex parte order.

These problems are not resolved by reading IAG's claim as one for tortious interference with business relations. To sustain such a claim, IAG must show, *inter alia,* that Kidder interfered with its business relations, and acted with the "sole purpose of harming [IAG] or used dishonest, unfair, or improper means." *Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994). For reasons stated *supra,* IAG's vague allegations are insufficient to show the kind of interference that such a claim requires.

As a result of the foregoing, I deny IAG's motion to amend its counterclaim so as to allege either malicious prosecution or tortious interference on the

basis of Kidder's filings subsequent to the commencement of this action. In making this decision, I need not credit Kidder's description of IAG's motives in seeking the relief now at issue. I leave it for Magistrate Judge Grubin to determine the impact of this ruling on any discovery disputes pending between the parties.

**III. Additional Briefing**

Finally, Kidder requests that it be allowed to respond to other aspects of IAG's proposed amended counterclaim at such time as IAG comes forward with its legal arguments in favor thereof.

There are two aspects to these unbriefed additions. First, IAG provides new factual allegations concerning statements allegedly made by Kidder as to its own commitment to the contract, and the intention of Financial Security Assistance ("FSA") to provide a financial guarantee for the project. [FN2] Amended Counterclaim ¶¶ 12, 52, 53. I do not believe it would be futile to add these allegations to the complaint, as under New York law, a fraud claim may be based on such representations. *See PI, Inc. v. Quality Products, Inc.,* 907 F.Supp. 752, 761 (S.D.N.Y.1995) ("A cause of action for fraud can be maintained on the basis of allegations that a party made a collateral or extraneous misrepresentation that served as an inducement to the contract."). I am also in accord with IAG that no prejudice flows to Kidder from these additions. The burden of showing such prejudice lies with Kidder. *See Sterling v. Interlake Indus.,* 154 F.R.D. 579, 588 (E.D.N.Y.1994) (*citing Panzella v. Skou,* 471 F.Supp. 303, 305 (S.D.N.Y.1979)). Kidder had before it IAG's amended complaint, and could have raised any objections thereto it its memoranda. It chose not to come forward, at this time, to meet its burden. I will not grant it a second opportunity to do so.

> FN2. The role played by FSA is described in my opinion of April 29, 1996.

*9 The second unbriefed aspect of IAG's amendment concerns its attempt to combine its claim of fraudulent misrepresentation with one for negligent misrepresentation. Although these claims are merged together they represent two distinct, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1997 WL 539772 (S.D.N.Y.)
(Cite as: 1997 WL 539772 (S.D.N.Y.))

Page 8

even inimical, causes of action. A claim for fraudulent misrepresentation requires proof that, *inter alia,* the speaker knew the misrepresentation to be untrue. *See Helmsley-Spear v. Westdeutsche Landesbank,* 693 F.Supp. 194, 203 (S.D.N.Y.1988) (*citing Jo Ann Homes at Belmore, Inc. v. Dworetz,* 25 N.Y.2d 112, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214 (Ct.App.1969)). A claim for negligent misrepresentation, in contrast, is actionable under New York law where the defendant has been careless "in imparting words upon which others were expected to rely and upon which they did or failed to act to their damage," and where the author of the statement has "some relationship or duty ... to act with care" vis-a-vis the party at whom the statement is directed. *White v. Guarante,* 43 N.Y.2d 356, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315 (Ct.App.1977). Thus, by adding the word "negligent" to its claim of fraud, Kidder seeks to allege a new claim, albeit without any briefing to support it.

Nonetheless, because such an amendment is not facially meritless, and in light of the liberal standards accorded amended complaints, I will grant IAG's motion to add this claim. A duty sufficient to give rise to a negligent misrepresentation claim may arise where: 1) the defendant makes a statement with the awareness that the statement was to be used for a particular purpose; 2) a known party or parties rely on this statement in furtherance of that purpose; and 3) there is some conduct by the defendant linking it to the party or parties and evincing defendant's understanding of their reliance. *Ossining Union Free School District v. Anderson LaRocca Anderson,* 73 N.Y.2d 417, 541 N.Y.S.2d 335, 339, 539 N.E.2d 91 (Ct.App.1989) (*citing Credit Alliance Corp. v. Arthur Anderson & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (Ct.App.1989)). The allegations in IAG's counterclaim, which assert that Kidder was negotiating a contractual relationship with IAG, and that Kidder made the representations at issue for the purpose of inducing IAG "to do business with it," Amended Counterclaim ¶ 55, are sufficient to allege the requisite relationship.

IAG may therefore amend its counterclaim to allege the negligent misrepresentation claim as presented in its amended counterclaim. That claim,

however, should be stated as a separate cause of action.

IAG is directed to file and serve an amended answer and counterclaim consistent with this opinion within thirty days of the date hereof.

Counsel are directed to attend a status conference in Room 17C, 500 Pearl Street on October 17, 1997 at 2:00 P.M.

It is SO ORDERED.

1997 WL 539772 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

. 1:94CV04725 (Docket)

(Jun. 27, 1994)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**2**

Page 2 of 3



Not Reported in F.Supp.
1998 WL 193236 (S.D.N.Y.)
(Cite as: 1998 WL 193236 (S.D.N.Y.))

Page 1

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
THOMSON INFORMATION SERVICES INC.,
Plaintiff,
v.
LYONS COMMERCIAL DATA, INC., Defendant.
No. 97 CIV. 7716(JSR).

April 21, 1998.

MEMORANDUM ORDER

RAKOFF, D.J.

*1 Plaintiff sues for copyright infringement, breach of contract, unfair competition, and tortious interference with contract. Defendant counterclaims for a declaratory judgment against plaintiff's copyright claim, for violation of the Sherman Act, and for tortious interference with business relations. On February 5, 1998, plaintiff moved to dismiss the antitrust and tortious interference counterclaims. Following briefing and oral argument, the Court telephonically informed counsel on March 6, 1998 that plaintiff's motion would be granted. This Memorandum Order will serve to confirm that ruling and briefly state the reasons therefor.

The relevant facts, either undisputed or taken as alleged by defendant, are as follows. Plaintiff Thomson Information Services Inc. is the official registrar of the American Bankers Association. It publishes RT Access, a "personal computer based compilation of original reference materials on U.S. banking and financial institutions," which Thomson obtains through its position as ABA registrar. Among other things, RT Access provides records of bank locations, including "routing numbers for every head and main branch office, retired routing

numbers," etc. On September 26, 1997, plaintiff filed for copyright registration of RT Access.

Sometime before April, 1997, defendant Lyons Commercial Data, Inc. created a separate computer software program, the Lyons Bank Registry, that also contains banking locations and routing numbers. While Thomson claims the Lyons Bank Registry infringes its RT Access copyright, Lyons, in its First Counterclaim, challenges the validity of Thomson's copyright and seeks a declaratory judgment that Thomson is claiming protection for noncopyrightable factual information. In a Second Counterclaim, Lyons alleges that Thomson has brought the instant action as part of an effort to prevent Lyons from competing against Thomson in the compilation, dissemination, marketing and sale of information concerning banking and financial institutions. Finally, in a Third Counterclaim, Lyons alleges that Thomson made false and disparaging statements about Lyons to prospective and existing customers of Lyons with the purpose and intent of injuring Lyons' existing and prospective business relations with such customers.

In effect, the Second Counterclaim constitutes an allegation that Thomson's copyright action is a sham. One making such an allegation must establish that the challenged claim is objectively baseless. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Ind., Inc.,* 508 U.S. 49, 51, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). While Lyons so alleges in general terms, it offers, in response to plaintiff's instant motion, no particulars to support the claim, notwithstanding that the Second Counterclaim is tantamount to a claim of fraud upon the Copyright Office. *See, e.g., Wolf v. Wagner Spray Tech Corp.,* 715 F.Supp. 504, 507-508 (S.D.N.Y.1989) (dismissing a claim of fraud on the Patent Office for failure to plead with particularity). Even if couched as an antitrust counterclaim, a claim premised on an allegation of "sham" cannot survive the absence of such a threshold showing. *Professional Real Estate Investors,* 508 U.S. at 60-61. Since Lyons has wholly failed to make this showing, its Second

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1998 WL 193236 (S.D.N.Y.)
(Cite as: 1998 WL 193236 (S.D.N.Y.))

Page 2

Counterclaim must be dismissed.

**\*2** While ordinarily such a dismissal would be without prejudice to re-pleading, here Lyons' pleading of other substantive elements of its antitrust claim is so seriously deficient as to make evident that such re-pleading would be futile. For example, Lyons' counterclaim fails to meaningfully identify the relevant market that Thomson allegedly monopolizes. When challenged as to this deficiency, *see* Pl. Mem. at 8-10 and Pl. Reply Mem. at 5-7, Lyons continued at oral argument to define the relevant market in question-begging fashion: "the market...is a market that plaintiff serves." *See* transcript of oral argument of 3/2/98, at 4. This "definition" provides no indication whatsoever of the size of the market in question, Thomson's share of that market, the existence of other competitors besides Lyons, or other relevant parameters that need to be pleaded. *See, e.g., Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,* 614 F.2d 832, 840 (2d Cir.1980); *Shaw v. Rolex Watch, U.S.A., Inc.,* 673 F.Supp. 674, 679 (S.D.N.Y.1987); *Blackwell v. Power Test Corp.,* 540 F.Supp. 802, 807-08 (S.D.N.Y.1981). Accordingly, Lyons' Second Counterclaim must be dismissed with prejudice. *See Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.,* 129 F.3d 240, 246 (2d Cir.1997).

As for defendant's Third Counterclaim, a claim for tortious interference with business relations must allege interference with a specific business relationship. *Korn v. Princz,* 226 A.D.2d 278, 641 N.Y.S.2d 283 (1st Dep't 1996). Lyons makes only vague, generalized allegations of interference; it alleges no interference with a specific relationship. *See* Third Counterclaim at ¶ 22. Consequently, the Third Counterclaim must also be dismissed. At oral argument, however, counsel for Lyons gave the Court some reason to believe that it might be able to cure this deficiency by alleging interference with Lyons' relations with a particular customer. *See* transcript at 7. Accordingly, in the telephone conference of March 6, 1998, the Court granted Lyons leave to replead this counterclaim, provided such amended pleading was filed by March 27, 1998. No such amendment having been filed, defendant's Third Counterclaim is now likewise dismissed with prejudice.

In sum, both the Second Counterclaim and the Third Counterclaim are hereby dismissed with prejudice.

SO ORDERED.

1998 WL 193236 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

. 1:97CV07716 (Docket)

(Oct. 17, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**3**

LEXSEE 2001 US DIST LEXIS 18831

YELLOW PAGE SOLUTIONS, INC.; LAUREL LEONE, d/b/a LEONE
ADVERTISING; MARTINEZ & ASSOCIATES, INC. d/b/a ADS NATIONWIDE;
NATIONAL YELLOW PAGE SERVICE, INC.; LARRY H. KISTENMACHER
d/b/a KEY YELLOW PAGE CONSULTING; TOM A. THOMPSON and DONNA
M. THOMPSON, d/b/a A M NATIONAL ADVERTISING; NATIONAL
TELEPHONE DIRECTORY MARKETING SERVICE, a Partnership; and
PHOENIX YELLOW PAGE GROUP, INC., Plaintiffs, -against- BELL ATLANTIC
YELLOW PAGES COMPANY, BELLSOUTH ADVERTISING & PUBLISHING
CORPORATION, SBC DIRECTORY OPERATIONS, INC., U.S. WEST DEX,
INC., GTE DIRECTORIES CORP., and THE YELLOW PAGES PUBLISHERS
ASSOCIATION, INC., Defendants.

00 Civ. 5663 (MBM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2001 U.S. Dist. LEXIS 18831; 2002-1 Trade Cas. (CCH) P73,556*

November 14, 2001, Decided
November 19, 2001, Filed

**DISPOSITION:** [*1] Defendants' motions to dismiss for lack of personal jurisdiction and failure to state a claim granted, and amended complaint dismissed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, companies that sold advertising in phone directories, sued defendants, publishers of the directories and a trade association, alleging antitrust violations under the Robinson-Patman Act, § § 1 and 2 of the Sherman Act, and state antitrust laws. The defendants moved to dismiss the complaint.

**OVERVIEW:** Several defendants moved to dismiss the action pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(3) for lack of personal jurisdiction and improper venue. All of the publishers moved to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. The court concluded that the companies had failed to establish prima facie facts that supported personal jurisdiction over the moving defendants under New York law. Moreover, having failed to satisfy the "transacting business" test under the long-arm statute, the companies had also failed to satisfy the venue provision

of the Clayton Act, and therefore could not rely on the Act's nationwide service of process provision. The court declined to consider transferring venue, as it was unclear how or where the companies might wish to proceed against the moving defendants. The court also concluded that taking the allegations of the amended complaint as true, it did not appear that there was any set of facts the companies could prove in support of their complaint that would entitle them to relief under the antitrust laws.

**OUTCOME:** The motions to dismiss were granted and the amended complaint was dismissed.

**LexisNexis(R) Headnotes**

**COUNSEL:** CARL E. PERSON, ESQ., New York, NY, for Plaintiffs.

ALAN COHEN, ESQ., ANDREW J. FRACKMAN, ESQ., ROBERT M. STERN, ESQ., O'Melveny & Myers LLP, New York, NY, for Bell Atlantic Yellow Pages Company and GTE Directories Corp., Defendants.

IAN T. SIMMONS, ESQ., WILLIAM J. STUCKWISCH, ESQ., Washington, D.C., for Bell Atlantic Yellow Pages Company and GTE Directories Corp., Defendants.

ALLEN KEZSBOM, ESQ., ALLANA F. STARK, ESQ., Fried Frank Harris Shriver & Jacobson, New York, NY, for BellSouth Advertising & Publishing Company, Defendant.

DAVID A. BARRETT, ESQ., EVAN GLASSMAN, ESQ., Boies Schiller & Flexner LLP, New York, NY, for U.S. West Dex, Inc. and SBC Directory Operations, Inc., Defendants.

KENT A. GARDINER, ESQ., BRIDGET E. CALHOUN, ESQ., Cromwell & Moring LLP, Washington, D.C., for SBC Directory Operations, Inc., Defendant.

MARK A. CONLEY, ESQ., CHARLES STERN, ESQ., Katten Muchin & Zavis, Los Angeles, CA, for Yellow Pages Publishers Association, Inc., Defendant.

**JUDGES:** Michael B. Mukasey, U.S. District Judge.

**OPINIONBY:** Michael B. Mukasey

**OPINION:**

OPINION AND ORDER

MICHAEL B. MUKASEY, U.S.D.J.

Plaintiffs are eight companies that sell advertising in Yellow Pages directories. They sue eight publishers of Yellow Pages directories ("Pubcos") and a trade association, alleging antitrust violations under the Robinson-Patman Act, Sections 1 and 2 of the Sherman Act, and state antitrust laws. Plaintiffs further allege a variety of common-law claims, including unlawful interference with contracts and advantageous economic relationships, breach of contract, breach of the implied covenant of good faith and fair dealing, defamation and trade libel, and unfair competition. Certain defendants move to dismiss the action pursuant to *Fed. R. Civ. P. 12(b)(2)* and *12(b)(3)* for lack of personal jurisdiction and improper venue. All of the defendant Pubcos move to dismiss the amended complaint pursuant to *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim. For the reasons set forth below, defendants' motions to dismiss are granted.

I.

Because a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(2)* based on lack of personal jurisdiction is

"inherently a matter requiring the resolution of factual issues outside of the pleadings [*3] . . . all pertinent documentation submitted by the parties may be considered in deciding the motion." *Pilates, Inc. v. Pilates Inst., Inc., 891 F. Supp. 175, 178 n.2 (S.D.N.Y. 1995).* Therefore, the following facts are drawn from the amended complaint, affidavits, and documentary exhibits submitted by both parties, and on this motion are construed in the light most favorable to plaintiffs. *CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986).* For the purposes of the motion to dismiss pursuant to Rule 12(b)(6), only the facts alleged in the amended complaint may be considered, and such facts are to be accepted as true.

Defendant Pubcos publish printed telephone directories, including Yellow Pages, for cities within their respective geographic regions of the country. (Am. Compl. PP 13-17) Bell Atlantic Yellow Pages Company ("Verizon") n1 is a Delaware corporation with its principal place of business in Massachusetts; it operates in various states in the northeastern United States, including New York. (Id. P 13) BellSouth Advertising and Publishing Corporation ("BAPCO") is a Georgia corporation with its principal place of business in Georgia; [*4] it operates in the southeastern United States. (Id. P 14; Frew Aff. P 3) Southwestern Bell Yellow Pages, Inc. ("SWBYP"), Pacific Bell Directory ("PBD"), Ameritech Publishing, Inc. ("API") and SNET Information Services, Inc. ("SNET") (collectively the "SBC Publishing Companies") n2 are respectively a Missouri, California, Delaware, and Connecticut corporation with their principal places of business in Missouri, California, Delaware, and Connecticut, respectively. (Fobbs Decl. PP 10-13) SWBYP operates in the southern-midwestern and southwestern United States; PBD operates in California and Nevada; API operates in the northern-midwestern United States; SNET operates in Connecticut. (Id.) Qwest Dex, Inc. ("Qwest") n3 is a Colorado corporation with its principal place of business in Colorado; it operates in the midwestern and western United States. (Am. Compl. P 16; Houston Decl. P 2) GTE Directories Corp. ("GTE") is a Delaware corporation with its principal place of business in Texas; it operates in various states throughout the United States. (Am. Compl. P 17) The Yellow Pages Publishers Association, Inc. (the "YPPA") is a Delaware corporation with its principal place of business [*5] in Colorado. (Id. P 20)

n1 Recently, Bell Atlantic changed its name to Verizon.

n2 The four companies that comprise the SBC Publishing Companies have been substituted

Case 1:05-cv-02875-HB-DCF    Document 11    Filed 04/05/2005    Page 17 of 25    Page 3

2001 U.S. Dist. LEXIS 18831, *; 2002-1 Trade Cas. (CCH) P73,556

for defendant SBC Directory Operations, Inc. in this action by stipulation and order.

n3 U.S. West Dex, Inc., changed its name to Qwest Dex, Inc.

Plaintiffs are five Certified Marketing Representatives ("CMRs") and three other companies that have sold Yellow Pages advertising either directly on behalf of a Pubco or on behalf of a CMR. n4 (Id. PP 6-12A) A CMR is an advertising organization or other person that is certified by the YPPA to sell advertising in Yellow Pages directories. (Id. PP 21, 33B) The YPPA is a non-profit trade association comprised of 99 Yellow Pages publishers and 186 CMRs that was created by the Pubcos to facilitate and set standards for the placement of Yellow Pages advertising. (Id. PP 20, 21, 84) None of the plaintiffs are located in New York. (Id. PP 6-12A)

n4 Plaintiffs Yellow Page Solutions, Inc.; Laurel Leone; Martinex & Associates, Inc.; National Yellow Page Service, Inc.; and Tom and Donna Thompson are the CMR plaintiffs. Phoenix Yellow Page Group, Inc. is not a CMR, but to some extent makes claims as a CMR due to its purchase of DRC Advertising, Inc., a former CMR.

[*6]

The advertising that the Pubcos sell in their Yellow Pages directories is either national or local, as defined by non-binding guidelines of the YPPA. (Id. PP 79, 80) Each Pubco has its own internal sales force to solicit local advertisers within the cities for which it publishes directories. (Id. P 74) National advertisers are solicited by CMRs, who then contact a Pubco to submit the advertising order. The CMR acts as an intermediary between the Pubco and the national advertiser, allowing these larger advertisers to place ads for their local outlets in multiple directories without having to deal with each individual publisher. (Id. PP 75, 81)

The Pubcos sell national advertising to the CMRs at a reduced rate, the discount representing the CMRs' sales commission. (Id. P 75) CMRs do not receive a commission for selling local advertising; commissions on local advertising are available only to a Pubco's internal sales force and allegedly to any Pubco that places local advertising in another Pubco's directory pursuant to cross-selling agreements between the Pubcos. (Id. PP 75, 77) The non-CMR plaintiffs earn their compensation either by sharing in a CMR's commission, [*7] or by working out a fee arrangement with their

client-advertisers for local advertising placed directly with a Pubco. (Id. P 76)

Plaintiffs allege that defendants have a monopoly in the market for Yellow Pages publishing and for the advertising published therein for their respective regions, with competing publishers collectively accounting for less than 10% of the market share for Yellow Pages advertising. (Id. PP 34E-F; 67-69) Plaintiffs assert that defendants have engaged in discriminatory practices and have conspired through the YPPA to restrain trade and to further monopolize the industry. (Id. PP 52, 84-86)

Plaintiffs' first claim alleges that defendants have engaged in price discrimination, offering favored CMRs and the internal sales forces of the Pubcos greater discounts on advertising than those offered to plaintiff CMRs. The commission level is based on a CMR's sales history with a Pubco, thereby discouraging a CMR from placing advertising in competing directories regardless of its clients' best interests. (Id. PP 29, 30, 38)

Claim two alleges conspiracy and attempt to monopolize, and monopolization with use of predatory pricing and practices. In addition [*8] to defendants' pricing practices, plaintiffs focus on defendants' manipulation of the definition of "local" and "national" advertising in order to convert national advertisers into uncompensated local advertisers, for whose business the only commission payment goes to in-house sales staff or other Pubcos. Plaintiffs also complain about a host of other allegedly predatory business practices and terms and conditions of doing business. (Id. PP 60, 78, 89A-MM)

The third claim alleges a conspiracy to fix prices and restrain trade, based on the allegation that defendants have conspired to sell plaintiffs local advertising at full list price, without discount, and to redefine national advertising as local advertising. Plaintiffs assert that the collective refusal to sell local advertising at a discount amounts to a group boycott and concerted refusal to deal. (Id. PP 98-100)

Plaintiffs' remaining claims allege an array of state and common law violations.

Plaintiffs allege that the result of these practices is that they are losing their clients to the favored CMRs and the Pubcos, and that non-favored CMRs, and competing publishers of Yellow Pages, are being driven out of business. [*9] (Id. passim)

II.

Jurisdiction is a threshold matter, and must precede a determination on the merits. *Rationis Enter., Inc. v. AEP/Borden Indus., 261 F.3d 264, 267-68 (2d Cir. 2001).* I therefore first consider the motion by BAPCO,

the SBC Publishing Companies, and Qwest to dismiss for lack of personal jurisdiction.

On a Rule 12(b)(2) motion, "the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996).* Prior to the holding of an evidentiary hearing, the plaintiff need only make a prima facie showing that jurisdiction exists. *CutCo, 806 F.2d at 365.* Where, as here, there has been discovery on the issue of jurisdiction, the plaintiff's prima facie showing must include "an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d. Cir. 1990).* The plaintiff cannot rely merely on conclusory statements or allegations, see *Barrett v. United States, 646 F. Supp. 1345, 1350 (S.D.N.Y. 1986)* [*10] (citing *Newmark v. Abeel, 102 F. Supp. 993, 994 (S.D.N.Y. 1952)* (Weinfeld, J.)); rather, the prima facie showing must be "factually supported." *Ball, 902 F.2d at 197.*

In a case arising under federal law which does not provide for service of process, personal jurisdiction is based on the law of the forum state. See *Omni Capital Int'l v. Rudolf Wolff & Co., 484 U.S. 97, 108, 98 L. Ed. 2d 415, 108 S. Ct. 404 (1987).* Although section 12 of the Clayton Act does provide for nationwide service of process for suits under the antitrust laws, *15 U.S.C. § 22* (1994), satisfaction of the venue provision of the Act is a prerequisite to extraterritorial service of process. n5 See *Goldlawr, Inc. v. Heiman, 288 F.2d 579, 581 (2d Cir. 1961),* rev'd on other grounds, *369 U.S. 463, 8 L. Ed. 2d 39, 82 S. Ct. 913 (1962); Grosser v. Commodity Exchange, Inc., 639 F. Supp. 1293, 1312 (S.D.N.Y. 1986),* aff'd *859 F.2d 148 (2d Cir. 1988); GTE New Media Serv. Inc. v. BellSouth Corp., 339 U.S. App. D.C. 332, 199 F.3d 1343, 1351 (D.C. Cir. 2000)* (following Goldlawr). The applicable test [*11] for venue under the Act -- whether the moving defendants transact business in this district -- has been held to be co-extensive with the "transacting business prong" of New York's long-arm statute. *Grosser, 639 F. Supp. at 1313.* If this test is not met, plaintiffs may rely on the other provisions of New York law to establish jurisdiction and on the general venue statute for venue. Thus, New York law determines the issue of personal jurisdiction. If the exercise of personal jurisdiction is found to be proper under state law, the court must then decide whether such exercise is consistent with due process. *Bensusan Restaurant Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997).*

n5  This connection between personal jurisdiction and venue in antitrust cases explains why four of the moving defendants here, BAPCO

and the SBC Publishing Companies, frame their motion as an attack on both jurisdiction and venue. Defendant Qwest, although it makes the same arguments, frames its motion in terms of jurisdiction alone. Personal jurisdiction and venue are necessarily considered together here.

[*12]

In this case, plaintiffs argue that this court has jurisdiction pursuant to *N.Y. C.P.L.R. § 301* (McKinney 2000) and New York's Long Arm Statute, *N.Y. C.P.L.R. § 302* (McKinney 2000).

A. C.P.L.R. § 301

Section 301, as construed by the New York courts, subjects a foreign corporation to personal jurisdiction in New York if the defendant is "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." *McGowan v. Smith, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321 (1981); see also Landoil Res. Corp. v. Alexander & Alexander Servs. Inc., 918 F.2d 1039, 1043 (2d Cir. 1991),* and cases cited therein. The defendant "must be present in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.'" *Landoil, 918 F.2d at 1043* (quoting *Tauza v. Susquehanna Coal Corp., 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917)).*

The traditional indicia of "doing business" here include: 1) the existence of an office in New York; 2) the solicitation of business in the state; 3) the presence of bank accounts and other [*13] property in the state; and 4) the presence of employees of the foreign defendant in the state. See *Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985).* None of these traditional indicia are present for the moving defendants. Rather, the moving defendants do business only in their respective regional territories, where they publish and distribute directories intended only for their local communities. They solicit only local advertisers, and the advertising in these directories is for businesses having local contacts. Although Qwest is licensed to do business in New York and has appointed an agent for service of process, that is not sufficient to subject it to personal jurisdiction absent a showing that it is actually doing business in the state. See *Bellepointe, Inc. v. Kohl's Department Stores, Inc., 975 F. Supp. 562, 564 (S.D.N.Y. 1997)* (citing *Beja v. Jahangiri, 453 F.2d 959, 962 (2d Cir. 1972)); Consolidated Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286, 1293 (11th Cir. 2000)* (collecting cases). n6

n6  Qwest obtained the license only to preserve and protect its trademark. Since its

receipt of that license, Qwest's revenues from New York have been insufficient to require Qwest to pay taxes on that revenue. (Houston Decl. PP 6, 21-22)

[*14]

Plaintiffs first attempt to base § 301 jurisdiction on defendants' contacts with non-plaintiff CMRs in New York, particularly TMP Worldwide, Inc. ("TMP"), allegedly one of the favored CMRs. (Am. Compl. P 2A) Although the Pubcos do accept advertising from these CMRs and derive revenues from New York advertising, it cannot be said that the moving defendants solicit advertising in New York, either directly or indirectly through the CMRs.

First, to the extent that a New York advertiser advertises in defendants' directories, such advertising was solicited by a CMR, which is an unaffiliated intermediary. "[A] foreign supplier of goods or services for whom an independent agency solicits orders from New York purchasers is not present in New York and may not be sued here, however substantial in amount the resulting orders." *Laufer v. Ostrow*, 55 N.Y.2d 305, 311, 449 N.Y.S.2d 456, 459, 434 N.E.2d 692 (1982).

Second, as to the Pubcos' relationship with the CMRs themselves, it should first be noted that "the mere existence of a business relationship with entities within the forum state is insufficient to establish presence." *Insurance Co. of Penn. v. Centaur Ins. Co.*, 590 F. Supp. 1187, 1189 (S.D.N.Y. 1984). [*15] Moreover, in this relationship, it is the CMRs that initiate contact with the Pubcos in order to place advertising in local directories. I thus agree with the District of New Jersey Court that found "it is the CMRs which draw [the Pubcos] into the state, rather than any purposeful injection by [the Pubcos] of their presence." *Database Am., Inc. v. BellSouth Adver. & Publ'g Corp.*, 825 F. Supp. 1195, 1210 (D.N.J. 1993).

Even were I to find that the moving defendants did solicit business from New York CMRs, "mere solicitation" of business or "mere sales" in New York do not constitute a corporate presence in New York. *Roberts-Gordon, LLC v. Superior Radiant Products, Ltd.*, 85 F. Supp. 2d 202, 209 (W.D.N.Y. 2000); *Roper Starch Worldwide, Inc. v. Reymer & Assocs., Inc.*, 2 F. Supp. 2d 470, 473 (S.D.N.Y. 1998) (citing *Landoil*, 918 F.2d at 1043). This is particularly true here, where the amount of revenue derived from New York is less than one percent of annual revenues (Frew Supp. Aff. P 2; Fobbs Decl. P 26; Houston Decl. P 10), far less than the substantial solicitation required. See, e.g., *Beacon Enter., Inc. v. Menzies*, 715 F.2d 757, 763 (2d Cir. 1983); [*16] *Stark Carpet Corp. v. M-Geough*

*Robinson, Inc.*, 481 F. Supp. 499, 505 (S.D.N.Y. 1980); *New England Laminates Co. v. Murphy*, 79 Misc. 2d 1025, 362 N.Y.S.2d 730, 733 (Sup. Ct. Nassau County 1974). Although plaintiffs try to bolster their argument by pointing to the Pubcos' sporadic trips to visit New York CMRs, the occasional sale of directories in New York, and payments made to various New York vendors in the ordinary course of business (Pl. Mem. passim), these are not sufficient to confer § 301 jurisdiction. See cases cited herein; see also *Aquascutum of London, Inc. v. S.S. Am. Champion*, 426 F.2d 205, 211-12 (2d Cir. 1970); *Holness v. Maritime Overseas Corp.*, 251 A.D.2d 220, 222-23, 676 N.Y.S.2d 540, 543 (1st Dep't 1998).

Plaintiffs next rely on alleged cross-selling agreements between the moving Pubcos and Verizon as a basis for general jurisdiction. (Pl. Mem. at 2) Plaintiffs claim that, pursuant to these reciprocal agreements, the moving Pubcos regularly purchase and resell advertising in Verizon's New York directories and receive revenue from New York advertising that Verizon places in the moving defendants' [*17] directories. However, as to all but one of the moving defendants, the facts proffered by plaintiffs themselves directly refute the existence of any such agreements. The sworn depositions of the moving defendants taken by plaintiffs clearly establish that none of the moving defendants, with the sole exception of one of the SBC Publishing Companies, defendant SNET, has such an agreement with Verizon. (Frew Dep. at 26, 33, 35, 36; Gibbons Dep. at 10, 11; Plucker Dep. at 14) Although plaintiffs inexplicably continue to hypothesize the existence of such agreements, "affidavits based on personal knowledge are to be credited over contradictory allegations based merely on information or belief, and facts adduced in opposition to jurisdictional allegations are considered more reliable than mere contentions offered in support of jurisdiction." *Barrett*, 646 F. Supp. at 1350. Plaintiffs have failed to meet their burden here.

As the argument applies to SNET, it is also insufficient to confer jurisdiction. The "Out of Area Agreement" in issue is nothing more than a way for SNET to help its local Connecticut customers, who do not qualify for national representation by a CMR, to [*18] place advertising with Verizon. (Gibbons Decl. P 6) This service, rendered in Connecticut, does not bring SNET into New York for jurisdictional purposes. As to the advertising Verizon places in SNET directories, this is directly analogous to the result of the CMR contacts addressed above, and is insufficient to confer jurisdiction.

## B. C.P.L.R. § 302(a)(1)

Plaintiffs argue also that defendants are subject to personal jurisdiction under § 302(a)(1) of New York's Long Arm Statute. That section permits a court to

exercise jurisdiction over an out-of-state defendant who "transacts any business within the state or contracts anywhere to provide goods or services in the state" where the cause of action arises out of that business activity. C.P.L.R. § 302(a)(1).

Plaintiffs assert that the cross-selling agreements with Verizon are contracts by the moving Pubcos to provide advertising services in New York. (Pl. Mem. P 4) However, as I have noted above, this argument applies only to SNET and, as noted, SNET provides its service in Connecticut, not in New York. I thus turn to whether defendants "transact business" in New York.

To "transact business" in New York, a nondomiciliary must "purposely [*19] avail[] itself of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *McKee Elec. Co. v. Rauland-Borg Corp.*, 20 N.Y.2d 377, 382, 283 N.Y.S.2d 34, 229 N.E.2d 604 (1967) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958)). Courts will consider the "totality of the circumstances" to determine whether a party transacts business in New York; common factors include, but are not limited to: 1) the existence of an ongoing contractual relationship with a New York corporation; 2) whether the contract was negotiated or executed in New York and whether the defendant visited New York regarding the contractual relationship; 3) the choice-of-law clause in the contract; and 4) whether the contract requires supervision by the corporation in the forum state. See *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29-30 (2d Cir. 1996). All factors are relevant, and no one factor is dispositive. Id.

Plaintiffs base their argument in support of jurisdiction primarily on defendants' relationship with CMRs in New York. However, as Judge [*20] Parker has previously determined, these dealings do not constitute transacting business in New York under the meaning of § 302(a)(1). See *National Tel. Directory Consultants, Inc. v. BellSouth Adver. & Publ'g Corp.*, 25 F. Supp. 2d 192 (S.D.N.Y. 1998) [hereinafter NTDC]. The contracts between the moving Pubcos and the CMRs were not drafted in New York, were not negotiated or executed in New York, are explicitly not governed by New York law, and require no supervision in New York. (Frew Aff. PP 18-23; Fobbs Decl. PP 27-28; Houston Decl. PP 20)

Although the contract does generate sporadic contacts between the Pubcos and the New York CMRs by mail, telephone, or otherwise, the Pubcos do not thereby "'project' themselves into New York local commerce in order to 'purposely avail' themselves of the benefits of doing business in New York." *NTDC*, 25 F. Supp. 2d at 196; *see also Roper Starch*, 2 F. Supp. 2d at

474 (holding that phone calls and mailings must serve to project a defendant into New York to assert jurisdiction on that basis); *Premier Lending Services, Inc. v. J.L.J. Assocs.*, 924 F. Supp. 13, 16 (S.D.N.Y. 1996) [*21] (same); *Wilhelmshaven Acquisition Corp. v. Asher*, 810 F. Supp. 108, 112 (S.D.N.Y. 1993) (same). Rather, such contacts "further the CMRs' efforts to place advertising in [the Pubcos' regional directories];" they are thus incidental to a service that is only provided elsewhere. *NTDC*, 25 F. Supp. 2d at 197. The Second Circuit has held that a defendant cannot be sued in New York based solely on incidental contacts associated with performing a service for a New York client where the client solicits the service and the service is performed outside New York. *Mayes v. Leipziger*, 674 F.2d 178, 185 (2d Cir. 1982). In such a relationship, there is "no activity in New York in which defendant sought to participate." Id.; *see also Continental Field Serv. Corp. v. ITEC Int'l Inc.*, 894 F. Supp. 151, 154 (S.D.N.Y. 1995) (declining jurisdiction where defendant had no physical presence in New York and the contract was negotiated and performed in Venezuela).

Moreover, § 302 jurisdiction requires a "substantial relationship" between the in-state contacts and the cause of action sued upon. *Beacon Enter., Inc.*, 715 F.2d at 764 [*22] (citing *McGowan*, 52 N.Y.2d at 272, 437 N.Y.S.2d at 645). To the extent that plaintiffs' claims arise out of the Pubcos' business decisions and practices in connection with their contracts with plaintiff and non-plaintiff CMRs, the claims implicate conduct that took place in the Pubcos' respective regions -- not in New York.

Plaintiffs cite meetings with a favored CMR, TMP, in New York, but plaintiffs adduce no facts to show that these meetings had anything to do with the subject matter of this lawsuit. Plaintiffs offer no more than speculation as to what was discussed at these meetings, and therefore have failed to support § 302(a)(1) jurisdiction. See *Pyramyd Stone Int'l Corp. v. Crosman Corp.*, 1997 U.S. Dist. LEXIS 1610, No. 95 Civ. 6665, 1997 WL 66778, at *10 (S.D.N.Y. Feb. 18, 1997). Further, once again, the discovery record built by plaintiffs often directly refutes the sinister purpose plaintiffs would attach to these meetings. The moving defendants visited CMRs nationwide to discuss such issues as changes in the ordering-processing system, or generally to discuss ways to increase business. (Frew Dep. at 22-23; Gibbons Dep. at 8, 10; Plucker Dep. at 6-7, 24-25) These [*23] visits were not targeted at "favored" CMRs in New York. Indeed, when specifically asked, defendant Qwest refuted the notion that any special deals had been offered to TMP in New York, and some of the defendants, Qwest included, have done no business with TMP in New York during the period for which plaintiffs made

their jurisdictional inquiry. (Plucker Dep. at 14-15; Plucker Decl. P 6; Gibbons Decl. P 4) Thus, the "record is devoid of evidence that defendants' alleged activities in New York gave rise to the causes of action for which long-arm jurisdiction is sought." *Storch v. Vigneau, 162 A.D.2d 241, 242, 556 N.Y.S.2d 342, 342* (1st Dep't 1990). Defendants' other unrelated visits to New York, the occasional sale of a directory in New York, and business payments made to New York vendors similarly lack the requisite "articulable nexus" upon which to base jurisdiction. *McGowan, 52 N.Y.2d at 272, 437 N.Y.S.2d at 645.*

### C. C.P.L.R. § 302(a)(2)

Plaintiffs further rely on § 302(a)(2) of New York's Long Arm Statute, which confers jurisdiction over a defendant who "commits a tortious act within the state." C.P.L.R. § 302(a)(2). Antitrust violations are tortious [*24] acts for jurisdictional purposes. See *Fashion Two Twenty, Inc. v. Steinberg, 339 F. Supp. 836, 841 (E.D.N.Y. 1970); Albert Levine Assocs. v. Bertoni & Cotti, 314 F. Supp. 169, 171 (S.D.N.Y. 1970).* Under § 302(a)(2) a defendant's physical presence in New York is a prerequisite to jurisdiction. See *Bensusan, 126 F.3d at 29* (citing *Feathers v. McLucas, 15 N.Y.2d 443, 458, 261 N.Y.S.2d 8* (1965). Plaintiffs rely on the moving defendants' conspiracy with Verizon and TMP in New York to monopolize, fix prices, and restrain trade, and on the moving defendants' visits to TMP in New York, allegedly in furtherance of that conspiracy. (Pl. Mem. at 18) This argument fails for three reasons. First, as noted above, plaintiffs have failed to show that these meetings involved any such conspiracy. Absent a specific showing that these meetings served an unlawful end, plaintiffs' conclusory allegations are "totally insufficient to create tortious activity in New York." *Lehigh Valley Indus., Inc. v. Birenbaum, 527 F.2d 87, 93 (2d Cir. 1975).*

Second, plaintiffs cannot rely on conspiracy alone to assert jurisdiction. "Under [*25] New York law, conspiracy, per se is not a tort . . . . The damage for which recovery may be had in a civil action is not the conspiracy itself, but the injury to plaintiff produced by specific overt acts." *Grove Press, Inc. v. Angleton, 649 F.2d 121, 123 (2d Cir. 1981).* Plaintiffs have failed to allege specifically any tortious act performed by the moving defendants while in New York.

Finally, to the extent that plaintiffs' papers could be construed to assert a conspiracy theory of jurisdiction based on the alleged in-state activities of Verizon, plaintiffs have failed make a prima facie factual showing of a co-conspiracy. "It is well-established that the acts of a co-conspirator may be attributed to a defendant for the purpose of obtaining personal jurisdiction over the defendant." *Singer v. Bell, 585 F. Supp. 300, 302*

(S.D.N.Y. 1984) (Weinfeld., J.) (citations omitted). However, it is also settled that "the bland assertion of conspiracy . . . is insufficient to establish jurisdiction for the purposes of § 302(a)(2)." *Lehigh Valley Indus. Inc., 527 F.2d 87, 93-94.* Instead, plaintiffs must make a "prima facie case of conspiracy and [*26] allege specific facts warranting the inference that the defendants were members of the conspiracy." *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 26 F. Supp. 2d 593, 601 (S.D.N.Y. 1998)* (citations omitted); see also *Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991).* Plaintiffs then must "come forward with some definite evidentiary facts to connect the defendant with transactions occurring in New York." *Singer, 585 F. Supp. 300, 303* (citations omitted); see also *Levisohn, Lerner, Berger & Langsam v. Medical Taping Sys., Inc., 10 F. Supp. 2d 334, 342 (S.D.N.Y. 1998).*

Plaintiffs have failed to meet their burden. Although a prima facie case of conspiracy can be based on either direct or circumstantial evidence, see *Singer, 585 F. Supp. at 303,* plaintiffs aver no facts to support the inference that the moving defendants were part of any conspiracy, let alone that any tortious acts were committed in New York on their behalf, see *Pyramyd Stone Int'l Corp., 1997 U.S. Dist. LEXIS 1610, 1997 WL 66778,* at *11; see also *Chrysler Capital Corp., 778 F. Supp. at 1268.* [*27] Plaintiffs would apparently have the court infer a conspiracy from defendants' participation in YPPA, a trade association, and from various business practices of the Pubcos, only some of which constitute parallel conduct and all of which are in the defendants' individual self-interest. But far more is required to lay a sufficient factual foundation for an antitrust conspiracy. See, e.g., *AD/SAT, A Division of Skylight, Inc. v. Associated Press, Newspaper Assoc. of Am., 181 F.3d 216, 234-35 (2d Cir. 1999); Apex Oil Co. v. DiMaurio, 822 F.2d 246, 254 (2d Cir. 1987); Levitch v. Columbia Broadcasting System, 495 F. Supp. 649, 674-75 (S.D.N.Y. 1980),* aff'd, *697 F.2d 495 (2d Cir. 1983)* (per curiam). Throughout their complaint and papers, plaintiffs offer nothing more, other than conclusory allegations of a corrupt agreement between the Pubcos and the favored CMRs to violate the antitrust laws. "Mere speculation and conjecture" by the plaintiffs, however, cannot provide a substitute for the averment of jurisdictional facts. *Singer, 585 F. Supp. at 303.*

### D. C.P.L.R. § 302(a)(3)

Finally, plaintiffs would [*28] rely also on § 302(a)(3), which provides for jurisdiction over a defendant who committed a tortious act outside New York that caused injury in New York. C.P.L.R. § 302(a)(3). "Courts determining whether there is injury in New York must generally apply a situs-of-injury test,

which asks them to locate the original event which caused the injury." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 791 (2d Cir. 1999)* (citations omitted). The original event as to a commercial tort is typically the loss of business, which occurs where the customers are located. *American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp., 439 F.2d 428 (2d Cir. 1971); Sales Arm, Inc. v. Automobile Club of S. Cal., 402 F. Supp. 763, 766 (S.D.N.Y. 1975).* Plaintiffs assert that defendants are "causing injury to property of the disfavored CMRs within New York State, and the plaintiff CMRs which purchase from Verizon as to the Verizon yellow-page directories in the SDNY and elsewhere in New York." (Pl. Mem. at 19). However, absent sufficient allegations of a conspiracy with Verizon, see discussion supra pp. 19-21, it is not possible [*29] to connect the moving defendants' activities with any loss of business from Verizon. Plaintiffs do not specifically allege that they, or the disfavored CMRs in New York, have lost business from any client-advertisers in New York as a direct result of the moving defendants' activities. Finally, the mere presence of "disfavored CMRs within New York State," none of whom are parties to this action, does not qualify as injury in New York. See *Mareno v. Rowe, 910 F.2d 1043, 1046 (2d Cir. 1990)* ("An injury . . . does not occur within the state simply because the plaintiff is a resident."); *American Eutectic, 439 F.2d at 433* ("Section 302(a)(3) is not satisfied by remote or consequential injuries which occur in New York only because the plaintiff is domiciled, incorporated or doing business in the state."); *Barricade Books v. Langberg, 2000 U.S. Dist. LEXIS 18279, No. 95 CIV. 8906, 2000 WL 1863764,* at *4 (S.D.N.Y. Dec. 19, 2000) ("New York courts have made one helpful principle clear: the situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff." (citations omitted)). [*30]

Plaintiffs have thus failed to establish prima facie facts that support personal jurisdiction over the moving defendants under New York law. Moreover, having failed to satisfy the "transacting business" test under the Long-Arm Statute, plaintiffs have also failed to satisfy the venue provision of the Clayton Act, and therefore cannot rely on the Act's nationwide service of process provision. I decline to consider transferring venue, as it is unclear how or where plaintiffs might wish to proceed against the moving defendants. The amended complaint is thus dismissed as to defendants BAPCO, the SBC Publishing Companies, and Qwest.

III.

The remaining Pubcos, Verizon and GTE, move to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a claim. Taking the allegations of the amended complaint as true, it does not appear that there is any set of facts plaintiffs could prove in support of their complaint that would entitle them to relief under the antitrust laws. *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).* n7

> n7 Having failed to state a claim under the antitrust laws, plaintiffs have also failed to aver the commission of a tort, thus providing an additional ground for declining jurisdiction under C.P.L.R. § 302(a)(2) and (a)(3).

[*31]

A. The Robinson-Patman Act Claim

The Robinson-Patman Act makes it "unlawful to discriminate in price between different purchasers of commodities of like grade and quality . . . ." *15 U.S.C. § 13(a).* Plaintiffs base their claim on the different level of commissions on the sale of advertising offered to plaintiff CMRs as compared to favored CMRs and the Pubcos' internal sales forces. But as a matter of law, the Robinson-Patman Act does not apply to these allegations. The term "commodities" refers to goods, not services. See *National Tire Wholesale, Inc. v. Washington Post Co., 441 F. Supp. 81, 84 (D.D.C. 1977),* aff'd without opinion, *595 F.2d 888 (D.C. Cir. 1979).* The Second Circuit thus has held that newspaper advertising is not a commodity within the meaning of the Act. *Ambook Enter. v. Time Inc., 612 F.2d 604, 610 (1979).* Contrary to plaintiffs' suggestion, this is not an open question, at least in this Circuit. Nor is advertising "a product . . . because [the directory] occupies a physical space and is physically distributed to the users." (Am. Comp. P 37) Rather, "the printed paper is merely a tangible [*32] vehicle for the conveyance of . . . ideas. It is only incidental to the dominant intangible nature of the transaction." *National Tire Wholesale, 441 F. Supp. at 85* (citations omitted). Plaintiffs' attempts to distinguish Yellow Pages advertising are unpersuasive; rather, like newspaper advertising, it is outside the scope of the Act.

The Robinson-Patman Act claim also fails for two other reasons. First, the commission transactions at issue here are not "sales" with the meaning of the Act. See, e.g., *Metro Communications Co. v. Ameritech Mobile Communications, Inc., 984 F.2d 739, 745-46 (6th Cir. 1993); Kem-Tech, Inc. v. Mobil Corp., 1985 U.S. Dist. LEXIS 15079, No. 84-1421, 1985 WL 3011,* at *4 (E.D. Pa. Oct. 9, 1985) (collecting cases); *Martin Ice Cream Co. v. Chipwich, Inc., 554 F. Supp. 933, 944 (S.D.N.Y. 1983).* CMRs do not buy advertising space from the Pubcos for resale to its clients. Rather, they act as intermediaries, verifying available space and placing orders on behalf of advertisers; they do not hold an

inventory of space. (Am. Compl. PP 75) Based on the foregoing, several other courts have already held that the transactions between [*33] the Pubcos and those selling advertising on their behalf are not "sales." See *American Ad Mgmt., Inc. v. GTE Corp., 92 F.3d 781, 785 (9th Cir. 1996); Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp., 849 F.2d 1336, 1345-48 (11th Cir. 1987)*. Second, to the extent that plaintiffs' claim is premised on alleged differences between their commissions and the commissions paid to the Pubco's own internal sales force, the Robinson-Patman Act does not apply to discrimination based on intra-enterprise transfers. See, e.g., *City of Mount Pleasant v. Associated Elec. Coop., Inc., 838 F.2d 268, 278-79 (8th Cir. 1988)*. For all of the above reasons, plaintiffs' Robinson-Patman Act claim is dismissed.

B. Sherman Act § 2 Claim

Plaintiffs also fail to state a claim for monopolization, attempted monopolization, or conspiracy to monopolize under section 2 of the Sherman Act. Specifically, plaintiffs fail to allege antitrust injury, fail to adequately define the relevant market or plead market power, and fail to properly plead a conspiracy.

In order to prevail on a monopolization claim, "plaintiffs must prove antitrust injury, which [*34] is to say injury of the type the antitrust laws were intended to prevent and that which flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 50 L. Ed. 2d 701, 97 S. Ct. 690 (1977)*. That is, an antitrust plaintiff must prove more than harm to its own business or the loss of a competitor. Rather, it must prove harm to competition as a whole in the relevant market. *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., 996 F.2d 537, 543 (2d Cir. 1993)*. The crux of plaintiffs' complaint is that they are being harmed by the Pubcos' refusal to grant them the same levels of discount on advertising or the same terms as those granted to in-house sales representatives or other CMRs who have a history of selling more advertising than plaintiffs. Plaintiffs complain of having to "lower their markups on resale . . . in order to offer yellow-page advertising to customers at the same price as the favored CMRs and in-house sales departments." (Pl. Opp. at 2) This alleged injury is not antitrust injury.

First, to the extent that plaintiffs are complaining about defendants' pricing conduct as competitors [*35] to the Pubcos' internal sales forces, there is no antitrust injury absent an allegation that defendants' pricing is predatory -- that is, below an appropriate level of defendants' costs. See *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222-24, 125 L.*

*Ed. 2d 168, 113 S. Ct. 2578 (1993); Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 337-39, 109 L. Ed. 2d 333, 110 S. Ct. 1884 (1990)*. Plaintiffs have made no such allegation. Non-predatory pricing furthers competition, and thus is not actionable under the antitrust laws. See *Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1061 (8th Cir. 2000)* ("The decisions of the Supreme Court . . . illustrate the general rule that above cost discounting is not anticompetitive.")

Second, to the extent that plaintiffs are complaining about being disfavored intermediaries between the Pubcos and advertisers, their injury can be likened to that of a non-preferred distributor who is harmed by a supplier's decision to sell its product directly or to give other distributors better terms. In *Cancall PCS v. Omnipoint Corp.*, Judge Schwartz recently dismissed claims [*36] based on just this sort of injury. *2000 U.S. Dist. LEXIS 2830, No. 99 Civ. 3395, 2000 WL 272309 (Mar. 10 2000)*. The Court held that these allegations "fail to allege harm to competition in a manner that the antitrust laws were meant to guard against." *2000 U.S. Dist. LEXIS 2830 at *20, 2000 WL 272309 at *6; see also Re-Alco Indus., Inc. v. National Center for Health Educ., Inc., 812 F. Supp. 387, 392 (S.D.N.Y. 1993)* (holding that even an exclusive distributorship agreement causing harm to another distributor is not, standing alone, sufficient to show antitrust injury).

The Cancall Court explained that such grievances did not constitute harm to competition because plaintiffs made "no allegation that consumers in general were charged higher prices" by the defendant or the other distributors. *Cancall, 2000 U.S. Dist. LEXIS 2830, at *17, 2000 WL 272309, at *6*. Plaintiffs similarly do not allege market-wide harm to competition in the provision of advertising services. They fail to allege specifically that the consumer-advertisers are being charged more because of defendants' conduct, or that advertisers cannot turn to another of the 186 CMRs or to the Pubcos themselves for advantageous terms and prices. Neither plaintiffs' conclusory allegation [*37] that competition has been destroyed in this market, nor their vague allegation of harm to competition in the market for Yellow Pages publishing can cure this defect. Absent sufficient allegations of antitrust injuries, plaintiffs lack standing to bring their antitrust claims.

Even if plaintiffs had alleged antitrust injury, a complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 29, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984)*. Because the relevant market includes all products reasonably interchangeable, determining that market requires consideration of cross-elasticity of demand -- that is, which products can effectively

substitute for the product allegedly being monopolized. See *United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 100 L. Ed. 1264, 76 S. Ct. 994 (1956)*. Plaintiffs assert simply that the relevant market is the market for Yellow Pages directories and Yellow Pages advertising included therein. However, a complaint in an antitrust case must allege a basis for finding that the product alleged to have been [*38] monopolized is in some way unique, that it is a market unto itself. Plaintiffs must explain why the market they allege is in fact the relevant, economically significant market. Here, plaintiffs do not show why other forms of advertising, such as television, radio, or other print media, are not reasonably interchangeable with Yellow Pages advertising. Where a complaint fails to allege facts regarding substitute products, or to allege other pertinent facts relating to cross-elasticity of demand, as the complaint here fails to do, a court may grant a Rule 12(b)(6) motion. See *Re-Alco Indus. Inc., 812 F. Supp. at 391; E&G Gabriel v. Gabriel Bros., Inc., 1994 U.S. Dist. LEXIS 9455, No. 93 Civ. 894, 1994 WL 369147, at *3 (S.D.N.Y. July 13, 1994)* ("Plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal.").

A related defect in plaintiffs' monopolization and attempted monopolization claim is that, absent adequate market definition, it is impossible for the court to determine if the defendants possess "monopoly power in the relevant market" or "a dangerous possibility of achieving monopoly power. [*39] " *United States v. Grinnell Corp., 384 U.S. 563, 570, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966); Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 122 L. Ed. 2d 247, 113 S. Ct. 884 (1993)*. This is compounded by plaintiffs' lack of allegations regarding specific market characteristics, such as barriers to entry, in its purported market. See *International Distrib. Ctrs. v. Walsh Trucking Co., 812 F.2d 786, 791-92 (2d Cir. 1987); Smith & Johnson, Inc. v. Hedaya, 1996 U.S. Dist. LEXIS 19023, No. 96 Civ. 5821, 1996 WL 737194, at *7 (S.D.N.Y. Dec. 26, 1996)*. Plaintiffs' reliance on the entry barriers to providing local telephone service is insufficient; plaintiffs have not shown that defendants' affiliation with the telephone companies endows them with monopoly power in the Yellow Pages advertising market.

Further, these defects in market allegations make it difficult for a court to assess whether the challenged practices are exclusionary conduct in violation of the Sherman Act. Absent a showing that these practices are part of an effort to maintain monopoly power in the relevant market, each defendant is free to decide unilaterally with whom to deal [*40] and on what terms and conditions. See, e.g., *United States v. Colgate &*

*Co., 250 U.S. 300, 307, 63 L. Ed. 992, 39 S. Ct. 465 (1919); Goldwasser v. Ameritech Corp., 222 F.3d 390, 397 (7th Cir. 2000)* ("Even a monopolist is entitled to compete . . . . Part of competing like everyone else is the ability to make decisions about whom and on what terms one will deal."); see also *Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1354 (Fed. Cir. 1999)* ("The Sherman Act does not convert all harsh commercial actions into antitrust violations.").

Finally, plaintiffs fail to properly plead a conspiracy to monopolize. Just as conclusory allegations of concerted action are insufficient to support a conspiracy theory of jurisdiction, so too are they insufficient to state a Sherman Act § 2 claim. "Although the Federal Rules permit statement of ultimate facts, a bare bones statement of conspiracy . . . under the antitrust laws without any supporting facts permits dismissal." *Fort Wayne Telsat v. Entertainment & Sports Programming Network, 753 F. Supp. 109, 113 (S.D.N.Y. 1990)* (quoting *Heart Disease Research Foundation v. General Motors Corp., 463 F.2d 98, 100 (2d Cir. 1972); [*41]* see also *Furlong v. Long Island College Hosp., 710 F.2d 922, 927 (2d Cir. 1983)* ("We think that Conley permits a pleader to enjoy all favorable inferences from facts that have been pleaded, and does not permit conclusory statements to substitute for minimally sufficient factual allegations."); *John's Insulation, Inc. v. Siska Constr. Co., 774 F. Supp. 156, 163 (S.D.N.Y. 1991)* ("Conclusory allegations which merely recite the litany of antitrust will not suffice."). As noted in the discussion of jurisdiction, see supra p. 21, a conspiracy will not be inferred from participation in a trade association. Nor can it be inferred from the non-uniform conduct that necessitates a 75-page complaint where plaintiffs plead "individually" in a "plaintiff-defendant specific" format. (See Am. Compl. at 14 n.1) Plaintiffs' charge of conspiracy is thus not factually based nor intuitively apparent. Accordingly, plaintiffs' Sherman Act § 2 claims are dismissed.

C. Sherman Act § 1 Claim

Plaintiffs' Sherman Act § 1 claim is also without merit. Not surprisingly, it suffers from some of the same pleading deficiencies as plaintiffs' other claims. First, as [*42] noted above, plaintiffs have failed to allege antitrust injury, and thus have failed to satisfy a prerequisite for recovery under the antitrust laws. Second, the amended complaint is devoid of factual support for the existence of any § 1 "contract, combination . . . or conspiracy in restraint of trade." *15 U.S.C. § 1.*

Once again, plaintiffs do not allege when or where any unlawful agreement was made, or by whom, or why the parties would enter this agreement. Furthermore, the court is left to speculate as to its specific terms. For

example, although plaintiffs allege a conspiracy to fix prices, they do not allege that the Pubcos charge the same rates for advertising or even that they have adopted the same discount commission structure. Even where pricing practices or other policies are generally alleged to be uniform, this uniformity does not permit an inference of a conspiracy where the conduct is in each party's individual self-interest. Plaintiffs do not allege, as they must, that this is anything other than independent, parallel conduct meant to maximize each party's own revenues. See *Levitch, 495 F. Supp. at 673-75;* see also *AD/SAT, A Division of Skylight, Inc., 181 F.3d at 235 (2d Cir. 1999);* [*43] *Apex Oil Co., 822 F.2d at 254 (2d Cir. 1987).* There is a similar lack of particulars surrounding the alleged concerted refusal to sell plaintiffs local advertising at a discount. That each Pubco chose to adhere to guidelines set by the YPPA as to the definition of local advertising, and decided to handle "local" accounts internally, is insufficient to state a § 1 claim. See, e.g., *Consol. Metal Prods., Inc. v. Am. Petroleum Inst., 846 F.2d 284, 292-94 (5th Cir. 1988)* (citing *Maple Flooring Mfrs. Ass'n v. United States, 268 U.S. 563, 582-87, 69 L. Ed. 1093, 45 S. Ct. 578 (1925)).*

Finally, although there is no specific mention of a tying claim in the amended complaint, plaintiffs assert an unlawful tying arrangement in their motion papers based on the allegation that defendants have tied current prices for advertising to last year's volume of purchases. (Pl. Opp. at 26) Apart from the question of whether or not the complaint gives notice of such a claim, the claim is deficient as a matter of law. To state a tying claim, there must be two separate products for which there is consumer demand, and the sale of one must be conditioned on [*44] the purchase of the other. See *Jefferson Parish, 466 U.S. at 12, 21-22; Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 462, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992).* Plaintiffs' claim is not based on such a relationship between two separate products as that concept is understood in tying jurisprudence, nor is there any allegation that a CMR is required to have purchased advertising or any other product in order to be able to purchase advertising from defendants.

Plaintiffs' claims will be dismissed without further leave to replead. I told plaintiffs that their amended complaint would be the complaint upon which I would address a motion to dismiss. The letter that defendants sent to plaintiffs under court order put plaintiffs on notice of the deficiencies in their original complaint. Plaintiffs

have failed to correct these deficiencies in their amended complaint, and thus dismissal without leave to replead is proper. See *Rock TV Entm't, Inc. v. Time Warner, Inc., 1998 U.S. Dist. LEXIS 799, No. 97 CIV. 0161, 1998 WL 37498, at *4 (S.D.N.Y. Jan. 30, 1998)* (citing *Posner v. Coopers & Lybrand, 92 F.R.D. 765 (S.D.N.Y. 1981),* [*45] aff'd, *697 F.2d 296 (2d Cir. 1982)).*

D. State and Common Law Claims

Because I have dismissed all of plaintiffs' federal claims on defendants' motion to dismiss, I decline to exercise supplemental jurisdiction over the state and common law claims. They are dismissed. See *28 U.S.C. § 1367(c)(3) (1994); Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 102-03 (2d Cir. 1998)* (holding that when federal claims are dismissed at an early stage of litigation, it is proper to decline to exercise supplemental jurisdiction); *Purgess v. Sharrock, 33 F.3d 134, 138 (2d Cir. 1994)* (stating that if federal claims are dismissed before trial, state claims should be dismissed as well).

E. The YPPA

Although the YPPA did not move to dismiss the complaint, the only role it is alleged to have played was to facilitate the unlawful activities of the defendant publishing companies. Because I have found that plaintiffs fail to allege unlawful conduct by those defendants, there can be no unlawful facilitation by the YPPA, and thus no basis for its continued presence in this lawsuit. Indeed, in their papers, both plaintiffs and [*46] defendants have tacitly acknowledged that the outcome of this motion determines the status of all defendants. Therefore, the amended complaint is dismissed as to all defendants, including the YPPA.

* * *

For the reasons set forth above, defendants' motions to dismiss for lack of personal jurisdiction and failure to state a claim are granted, and the amended complaint is dismissed.

SO ORDERED:

Dated: New York, New York

November 14, 2001

Michael B. Mukasey,

U.S. District Judge