## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                                                           :
NEW YORK JETS LLC and                                      :
JETS DEVELOPMENT LLC,                                      :
                                                           :
                        Plaintiffs,                        :
                                                           :
            v.                                             :     Case No. 05-CV-2875 (HB)
                                                           :
CABLEVISION SYSTEMS CORPORATION,                           :
CSC HOLDINGS, INC., and                                    :
MADISON SQUARE GARDEN LP,                                  :
                                                           :
                        Defendants.                        :
                                                           :
-----------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM IN
## OPPOSITION TO MOTION TO DISMISS

Marc E. Kasowitz (MK-2597)          David Boies (DB-4399)
Daniel R. Benson (DB-6587)          BOIES, SCHILLER & FLEXNER LLP
Daniel J. Fetterman (DF-9093)       333 Main Street
KASOWITZ, BENSON, TORRES            Armonk, New York  10504
   & FRIEDMAN LLP                   914-749-8200
1633 Broadway
New York, New York  10019           David A. Barrett (DB-9626)
212-506-1700                        Robert J. Dwyer (RD-6457)
                                    Paul R. Verkuil (PV-5978)
                                    Alanna C. Rutherford (AR-0497)
                                    BOIES, SCHILLER & FLEXNER LLP
                                    570 Lexington Avenue
                                    New York, NY 10022
                                    212-446-2300

                                    *Of Counsel:*
                                    Jonathan D. Schiller
                                    BOIES, SCHILLER & FLEXNER LLP
                                    5301 Wisconsin Avenue NW
                                    Washington, DC  20015
                                    202-237-2727

Dockets.Justia.com

## TABLE OF CONTENTS

INTRODUCTION ..............................................................................................................1

ARGUMENT ...................................................................................................................3

I.      CABLEVISION IGNORES THE LEGAL STANDARD
        FOR A MOTION TO DISMISS .........................................................................3

II.     THE COMPLAINT STATES A CLAIM FOR MONOPOLIZATION
        IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT .......................................3

        A.    The Complaint Properly Alleges Three Relevant Markets.....................................4

        B.    The Complaint Properly Alleges that
              Cablevision Possesses Monopoly Power.................................................................8

        C.    The Complaint Properly Alleges
              Anticompetitive Conduct in Violation of Section 2 .................................................9

              1.    Cablevision's Refusal to Sell Advertising
                    to the Jets on its Monopoly Cable Systems.............................................11

              2.    Cablevision Coerced Third Parties
                    Not to Deal With the Jets...........................................................................14

              3.    Cablevision's False and
                    Misleading Advertising Campaign.............................................................14

              4.    The Availability Of Other Means To Reach
                    The Public Does Not Excuse
                    Cablevision's Anticompetitive Conduct ....................................................15

              5.    Cablevision's Sham Litigation.................................................................16

              6.    Cablevision's Sham Bid for Development Rights .....................................17

        D.    The Complaint Adequately Alleges Antitrust Injury.............................................18

III.    THE COMPLAINT STATES A CLAIM FOR TORTIOUS
        INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS ...........................20

        A.    Interference with the Jets' Relations with the MTA and ESDC ............................20

              1.    The Complaint Alleges that
                    Defendants Used Wrongful Means ...........................................................20

        2.    The Complaint Alleges Injury
                Caused by Tortious Interference ...............................................................22

    B.    The Complaint States a Claim for Tortious Interference with Media Outlets.......22

IV.    THE COMPLAINT STATES A CLAIM FOR DECEPTIVE BUSINESS
        PRACTICES IN VIOLATION OF NEW YORK LAW....................................................23

V.    THE COMPLAINT CANNOT BE DISMISSED ON
        GROUNDS OF JUSTICIABILITY AND COMITY.........................................................24

CONCLUSION..................................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) ..................................... 17

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ...................... 2, 9, 11-13

*Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102 (2d Cir. 1989) ....................................................... 25

*Brass v. Am. Film Techs., Inc.*, 987 F.2d 142 (2d Cir.1993) ........................................................ 3

*Biovail Corp. Int'l v. Hoechst Aktiengesellschaft*, 49 F. Supp. 2d 750 (D.N.J. 1999) ................ 19

*Brown v. AXA RE*, 2004 U.S. Dist. LEXIS 7624 (S.D.N.Y. May 3, 2004) .................................. 21

*Caplan v. American Baby, Inc.*, 582 F. Supp. 869 (S.D.N.Y. 1984) ........................................... 16

*Caribbean Broad. Sys. Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080
  (D.C. Cir. 1998) ............................................................................................................... 2, 9, 14

*Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 785 N.Y.S.2d 359 (N.Y. 2004) .................................... 20

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ....................................................... 3

*City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373 (9th Cir. 1992) ....................................... 10

*Conmed Corp. v. ERBE Electromedizin GmbH*, 129 F. Supp. 2d 461 (N.D.N.Y. 2001) ............. 21

*Continental Ore Co. v. Union Carbide & Carboon Corp.*, 360 U.S. 690 (1962) ........................ 10

*CVD, Inc. v. Raytheon Corp.*, 769 F.2d 842 (1st Cir. 1985) ........................................................ 19

*Danny Kresky Enters. Corp. v. Magid*, 716 F.2d 206 (3d Cir. 1983) ............................................ 5

*Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174
  (2d Cir. 1990) .................................................................................................................... 3, 13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) .................................... 9, 11

*Eastern Rail. Pres. Conf. v. Noerr Motor Frgt., Inc.*, 365 U.S. 127 (1961) ........................... 16, 17

*Envirosources, Inc. v. Horsehead Res. Dev. Co., Inc.*, 1997 WL 525403 (S.D.N.Y. 1997) ........ 19

*Excellus Health Plan, Inc. v. Tran*, 287 F.Supp.2d 167 (S.D.N.Y. 2003) .................................. 23

*Flip Side Prods., Inc. v. Jam Prods., Ltd.*, 843 F.2d 1024 (7th Cir. 1988) .................................... 5

iii

*George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 424 F.2d 25 (1st Cir. 1970)........... 17

*G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762 (2d Cir. 1995)............................................. 22

*Hecht v. Pro-Football, Inc.,* 444 F.2d 931 (D.C. Cir. 1971) ........................................................ 17

*Hayden Pub. Co. v. Cox Broad. Corp.,* 730 F.2d 64 (2d Cir. 1984)............................................... 4

*High Tech. Careers v. San Jose Mercury News,* 996 F.2d 987 (9th Cir. 1993) ............................ 13

*Home Placement Serv., Inc. v. Providence Journal Co.,* 682 F.2d 274 (1st Cir. 1982) .............. 13

*Houser v. Fox Theatres Mgmt. Corp.,* 845 F.2d 1225 (3d Cir. 1988) ....................................... 5, 8

*Innomed Labs, LLC v. Alza Corp.*, 2002 WL 31521084 (S.D.N.Y. Nov. 13, 2002)................... 21

*Jefferson Parish Hosp. v. Hyde,* 466 U.S. 2 (1984)...................................................................... 8

*Kessler v. Grand Cent. Dist. Mgmt. Ass'n, Inc.,* 158 F.3d 92 (2d Cir. 1998).............................. 25

*Leider v. Ralfe,* 2005 WL 152025 (S.D.N.Y. Jan. 25, 2005)....................................................... 23

*LePage's, Inc. v. 3M,* 324 F.3d 141 (3d Cir. 2003) .................................................................... 10

*Levy v. Southbrook Int'l., Ltd.,* 263 F.3d 10 (2d Cir. 2001)......................................................... 3

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) ..........................................2, 11-12, 14

*In re Lower Lake Erie Iron Ore Antitrus Litig.,* 998 F.2d 1144 (3d Cir. 1993) .......................... 19

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,*
175 F.Supp.2d 593 (S.D.N.Y. 2001)........................................................................................... 24

*Multistate Legal Studies, Inc. v. Horcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.,*
63 F.3d 1540 (10th Cir. 1995) .................................................................................................... 9

*New York Citizens Comm. on Cable TV. v. Manhattan Cable TV, Inc.,*
651 F. Supp. 802 (S.D.N.Y. 1986) ............................................................................................. 5

*New York v. Feldman*, 210 F. Supp. 2d 294 (S.D.N.Y. 2002)..................................................... 23

*Nobody in Paticular Presents, Inc. v. Clear Channel Comm., Inc.,*
311 Supp.2d 1048 (D. Colo. 2004)....................................................................................... 12, 13

*Nutronics Imaging, Inc. v. Danan*, 1998 WL 426570 (E.D.N.Y. Jun. 10, 1998) ........................ 21

*Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973) ..................................................... 11

*OSRecovery, Inc. v. One Groupe Int'l., Inc.,* 354 F. Supp. 2d 357 (S.D.N.Y. 2005).................... 3

*Packaged Programs, Inc. v. Westinghouse Broad. Co.*, 255 F.2d 708 (3d Cir. 1958) ............... 13

*Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005)........................................................ 23

*Primetime 24 Joint Venture v. Nat'l Broad. Co., Inc.*, 219 F.3d 92
(2d Cir. 2000)................................................................................................................. 2, 16

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993)............................................................................................................ 16

*Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211 (2d Cir. 2003) ........................... 20

*Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256 (2d Cir. 1995)...................................... 24

*Six Twenty-nine Prods., Inc. v. Rollins Telecasting, Inc.*, 365 F.2d 478 (5th Cir. 1966) ............. 13

*Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
2000 WL 264295 (S.D.N.Y. Mar. 9, 2000) ............................................................................ 21

*Source of Pennsylvania, L.P. v. Philadelphia Newspapers, Inc.*,
1999 WL 191649 (E.D. Pa. 1999) ........................................................................................ 13

*Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892 (2000)......................................... 23

*Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961)..................................................... 4

*Tic-X-Press, Inc. v. Omni Promotions Co.*, 815 F.2d 1407 (11th Cir. 1987) .................................. 6

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ............................................................ 4, 7, 19

*Tripe M. Roofing Corp. v. Tremco, Inc.*, 753 F.2d 242 (2d Cir. 1985)......................................... 17

*Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119 (S.D.N.Y. 1996).......................... 21, 22

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)................................................................... 3

*United States v E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) ....................................... 4, 8

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ......................................... 9-10, 15

*United States v. Siemens Corp.*, 621 F.2d 499 (2d Cir. 1980) ..................................................... 18

*Universal City Studios, Inc. v. Nintendo Co. Ltd.*, 797 F.2d 70 (2d Cir. 1986)...................... 21-22

*USFL v. NFL*, 634 F. Supp. 1155 (S.D.N.Y. 1985)..................................................................... 17

*Vaughn v. Consumer Home Mortg., Inc.*, 2003 WL 21241669 (E.D.N.Y. Mar. 23, 2003).......... 24

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko LLP,*
    540 U.S. 398 (2004) ............................................................................................... 4, 13

*Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375 (2d Cir. 1995) ................................. 3

*Volvo North Am. Corp. v. Men's Int'l Prof'l Tennis Council,*
    857 F.2d 55 (2d Cir. 1988) ............................................................................ 20-22, 24

*World Wrestling Fed'n Entm't, Inc. v. Bozell,* 142 F.Supp.2d 514 (S.D.N.Y. 2001) ................... 23

*Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.,*
    224 F. Supp. 2d 657 (S.D.N.Y. 2002) .......................................................... 2, 13, 14

## **Statutes**

15 U.S.C. § 15 ............................................................................................................... 19

15 U.S.C. § 18 ............................................................................................................... 18

15 U.S.C. § 26 ............................................................................................................... 19

28 U.S.C. § 2283 ........................................................................................................... 25

Fed.R.Civ.P. 8(a) .................................................................................................... 20, 23

N.Y. Gen'l Business Law § 349 ............................................................................... 23-24

## **Other Authorities**

1984 DOJ/FTC Merger Guidelines ............................................................................... 18

Phillip E. Areeda, *et al., Antitrust Law* (2d ed. 2002) .................................................... 8

P. Areeda & D. Turner, *Antitrust Law* (1978) .......................................................... 9, 17

13A C. Wright, *et al., Federal Practice and Procedure* ............................................... 20

Restatement (Second) of Torts (1979) .......................................................................... 20

## INTRODUCTION

The Jets' Complaint against Cablevision alleges violations of Section 2 of the Sherman Antitrust Act and New York law.[1]  For years, Cablevision has controlled all three of the large indoor facilities for spectator events in Manhattan.  To the detriment of consumers, this monopoly has enabled Cablevision to charge inflated prices for tickets and excessive rents to event promoters; to provide an inferior level of service and amenities to spectators; and to limit the availability and variety of entertainment, sporting and other events that can only be profitably presented in such large, indoor facilities.  Because the New York Sports & Convention Center – a world-class, large-scale enclosed facility that the Jets have spent several years and many millions of dollars trying to create – would compete with Cablevision's monopoly facilities, Cablevision has launched a sophisticated, multi-pronged campaign to maintain its monopoly by stopping the Jets' project.

Cablevision's motion to dismiss begins with a series of irrelevant arguments – ripeness, justiciability, abstention and the Anti-Injunction Act.  The first two arguments fail because the Complaint alleges that the Jets already are suffering injury due to delay and increased costs, and that immeasurably greater harm will occur if Cablevision's illegal, anticompetitive campaign were to succeed in delaying the Jets' project for so long that it can no longer be built.  The abstention/injunction arguments are meritless because they focus exclusively on a single allegation relating to ongoing litigation in state court (as to which no injunction is sought), and ignore all the other anticompetitive conduct and harm alleged.

As to the antitrust issues, Cablevision ignores the factual allegations in the Complaint which explain in detail the commercial realities underlying the Complaint's market definitions, allegations that must be accepted as true on a motion to dismiss.  Similarly, Cablevision disregards

---

[1]  For convenience, all plaintiffs are referred to in this brief as the "Jets" and all defendants as "Cablevision."  Defendants' Memorandum of Law in Support of Motion to Dismiss is cited as "Def. Br."

long-established legal principles controlling the conduct of monopolists. It wraps itself in the First Amendment, but ignores that established antitrust principles already balance free speech values. Indeed, the Supreme Court decided decades ago that media owners have no First Amendment exemption from the antitrust laws when they abuse monopoly power over communication channels. *See Lorain Journal Co. v. United States*, 342 U.S. 143, 155-56 (1951).

A monopolist may not – as Cablevision is specifically alleged to have done: (1) make false and misleading statements to consumers, *see, e.g, Caribbean Broad. Sys. Ltd. v. Cable & Wireless P.L.C.,* 148 F.3d 1080, 1087 (D.C. Cir. 1998); (2) refuse to deal with competitors without legitimate business justification, *see, e.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 610-11 (1985); (3) coerce third parties not to deal with competitors, *see, e.g., Lorain Journal*, 342 U.S. at 149-50; (4) file sham lawsuits and make sham bids to obstruct potential competition, *see, e.g., Primetime 24 Joint Venture v. Nat'l Broad. Co., Inc*., 219 F.3d 92, 101-02 (2d Cir. 2000); or (5) abuse its monopoly power in one market to maintain its monopolies in other markets, *see, e.g., Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 671-2 (S.D.N.Y. 2002).

The Jets welcome competition on the merits in the marketplace and in the political arena, just as they endorse it on the football field. But Cablevision is not playing by the rules. As Cablevision's president James Dolan has admitted (p. 5 below), Cablevision fears the Sports & Convention Center because it would "have to compete on price" with it. Besides opening Cablevision's monopoly to competition, the Sports & Convention Center will create thousands of new jobs and, as the MTA's Board determined, will foster billions of dollars in economic benefits to the MTA and the transit-riding public. The Complaint alleges that Cablevision is using illegal, anticompetitive means to prevent the great benefits that such competition will bring. The motion to dismiss must be denied because those allegations state claims for relief.

2

## ARGUMENT

### I.    CABLEVISION IGNORES THE LEGAL STANDARD FOR A MOTION TO DISMISS

The legal principles applicable to a motion to dismiss bear repeating because Cablevision has ignored them. On a Rule 12(b)(6) motion, the Court must accept as true the factual allegations in the complaint and must draw all reasonable inferences in the plaintiff's favor. *See Levy v. Southbrook Int'l., Ltd.,* 263 F.3d 10, 14 (2d Cir. 2001). The issue is not whether the plaintiff ultimately will prevail, but whether the plaintiff is entitled to offer evidence to support its claims. *See OSRecovery, Inc. v. One Groupe Int'l., Inc.,* 354 F. Supp. 2d 357, 364 (S.D.N.Y. 2005) (citing *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[C]onsideration is limited to the factual allegations in plaintiffs' . . . complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents . . . which plaintiffs . . . relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). Under these established standards, Cablevision's motion must be denied.

### II.    THE COMPLAINT STATES A CLAIM FOR MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

Taking the allegations of the Complaint as true, the Jets have stated a claim for monopolization by alleging "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). The acts that constitute "willful acquisition or maintenance" of monopoly power are often described as "anticompetitive" conduct. *See, e.g.,*

3

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko LLP,* 540 U.S. 398, 407 (2004)
("*Trinko*").

A.    **The Complaint Properly Alleges Three Relevant Markets**

Cablevision argues that the defined markets are too narrow.  Def. Br. at 18-21.    Its
arguments fail because they (1) rely on purported facts not found in the Complaint, and (2) ignore
both the Complaint's presumptively true facts and the common-sense economic realities that the
Complaint reflects.

To define a relevant product market, one looks to "products that have reasonable
interchangeability for the purposes for which they are produced – price, use and qualities
considered."  *United States v E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956).  A
relevant geographic market is "the area of effective competition . . . in which the seller operates,
and to which the purchaser can practicably turn . . . ."  *Tampa Electric Co. v. Nashville Coal Co.*,
365 U.S. 320, 327 (1961).  Moreover, market definition is a "deeply fact-intensive inquiry" that is
specific to the nature of the plaintiff's claims, and only the rarest cases are dismissed for failure to
adequately plead a relevant market.  *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001); *see
also Hayden Pub. Co. v. Cox Broad. Corp.,* 730 F.2d 64, 70 n. 8 (2d Cir. 1984) ("[a]
pronouncement as to market definition is not one of law, but of fact") (citations omitted).

Here, Plaintiffs have alleged in detail three relevant markets:

(a) the market for the rental of enclosed facilities with seating capacity greater than 5,000
    for enclosed large-scale spectator events in Manhattan (the "facilities market");

(b) the market for sales of tickets for enclosed large-scale spectator events held in enclosed
    facilities with seating capacity of greater than 5,000 in Manhattan (the "ticket market");
    and

(c) the market for the rental of suites in enclosed facilities with seating capacity of greater
    than 5,000 in Manhattan (the "suites market").

4

Compl. ¶ 18. The Complaint makes specific and objective factual allegations why other venues, including smaller venues with fewer than 5,000 seats and venues outside Manhattan, are not reasonably interchangeable for customers of the defined markets. Compl. ¶¶ 20-30. [2]

The alleged relevant markets are evidenced by televised admissions of Cablevision's President, James Dolan, that competition from the Sports & Convention Center would force Cablevision to compete and lower its prices. As alleged in the Complaint (and tellingly ignored in Cablevision's brief), Mr. Dolan admitted that the new stadium would "affect the Garden's bottom line." Compl. ¶ 39. Cablevision "would *definitely lose . . . business. . . . We're going to have to compete on price* . . . for getting concerts, rentals . . . in order to keep the place busy they're going to have to go after business that is already in the Garden . . . *it is going to be a competition* . . . ." Compl. ¶ 39 (emphasis added). Cablevision's admissions that it has opposed the project precisely because of its combined attributes of being in Manhattan and having a retractable roof further endorse the Jets' market definitions. *See Compl.* ¶ 40. If the relevant markets were as broad as Defendants assert in their motion, then Cablevision would not fear having to cut prices to compete with the Sports & Convention Center because competition from other venues in the larger markets that Cablevision proposes would already be forcing it to charge lower, competitive prices. *See, e.g., New York Citizens*, 651 F. Supp. at 807 ("a distinct market exists if sellers within the area are making price decisions protected from the need to take account of sellers outside the area").

---

[2]  In arguing (inappropriately in a motion to dismiss) that the market definitions are gerrymandered (Def. Br. at 18-19), Cablevision ignores both the facts alleged and the ample precedent that narrowly-drawn markets, including geographic markets limited to individual municipalities and portions of cities, are appropriate when the commercial realities so dictate. *See, e.g., Flip Side Prods., Inc. v. Jam Prods., Ltd.,* 843 F.2d 1024, 1033 (7th Cir. 1988) (relevant market was "the promotion of arena-level concerts in the Chicago metropolitan area"); *Danny Kresky Enters. Corp. v. Magid,* 716 F.2d 206, 208 (3d Cir. 1983) ("promotion of 'black oriented' concerts" in Pittsburgh was proper market); *Houser v. Fox Theatres Mgmt. Corp.,* 845 F.2d 1225, 1230 n.10 (3d Cir. 1988) (Lebanon, Pennsylvania was relevant geographic market for first-run films); *New York Citizens Comm. on Cable TV v. Manhattan Cable TV, Inc.,* 651 F. Supp. 802, 808 (S.D.N.Y. 1986) (relevant geographic market is a part of lower Manhattan).

Cablevision responds to the Jets' straightforward allegations regarding market definition with four arguments. *First*, Cablevision says that "stadium events" can be held in five stadiums or arenas in metropolitan New York. Def. Br. at 20. This argument ignores that the Complaint does not allege a market limited to "stadium events." Rather, the market allegations encompass large-scale *enclosed* facilities suitable for a variety of attractions, such as circuses, family and awards shows, and basketball, hockey and wrestling. Such attractions cannot practically be held in open-air stadiums. Compl. ¶ 21.

*Second*, Cablevision argues that promoters of events have other venue options besides enclosed facilities with over 5,000 seats, *i.e.*, smaller facilities such as concert halls and Broadway theaters. Def. Br. at 20-21. This contention ignores the express allegations that "smaller facilities such as Broadway theaters generally are not a substitute for enclosed large-scale spectator events because they . . . are not properly configured to stage the events, and they are too small to accommodate the number of patrons needed to realize sufficient revenues to make the staging of the event practical." Compl. ¶ 21. Obviously, Broadway theaters and concert halls cannot stage events such as a circus, an ice show, an athletic competition or conventions and trade shows, for which a large enclosed facility is best setting. In addition, staging multiple shows at smaller venues imposes higher costs compared to a single show at a larger venue. *See Tic-X-Press, Inc. v. Omni Promotions Co.,* 815 F.2d 1407, 1420 (11th Cir. 1987) (affirming finding that "[t]he Omni is the only [enclosed] arena in the Atlanta area with the capacity to seat more than 4,000" and "the Omni's size and configuration make it a unique facility with substantial economic advantages").[3]

---

[3] Although Cablevision's factual arguments are improper in a motion to dismiss, it is worth noting that the largest alternative Manhattan venues mentioned (Def. Br. at 20-21) contain little more than half the seating capacity of Cablevision's smaller venues and less than one-seventh of the seating of Madison Square Garden: The Beacon Theatre (2,800 seats); Carnegie Hall (2,800 seats); Avery Fisher Hall (2,738 seats). *See* http://www.citidex.com/240.htm#C1420; http://www.lincolncenter.org/pdfs/averyfisher.pdf. These figures confirm the commercial reality that there "are no other facilities in Manhattan that are reasonable substitutes for events of this nature." Compl. ¶ 21.

Ultimately, Cablevision's arguments concerning other venues confirm that market definition is a fact-intensive analysis that cannot be resolved on a motion to dismiss.

*Third*, Cablevision argues that its facilities compete with all other entertainment activities in the Tri-State area. Def. Br. at 20-21. On its face, this argument addresses only the ticket market, and is inapplicable to the facilities and suites markets. But even as to the ticket market, the degree to which large-scale indoor spectator events compete with entertainment options such as night clubs, Broadway shows, opera or ballet, is a quintessential factual issue. The Complaint alleges that such entertainment options at other facilities are not reasonable substitutes, and do not constrain Cablevision's ticket prices. Compl. ¶¶ 21, 32-33. At an appropriate time, the finder of fact may hear evidence on the substitutability or cross-elasticity of demand between these various entertainment options, but, in light of the specific allegations in the Complaint, such issues cannot be decided on a motion to dismiss. *See, e.g., Todd*, 275 F.3d at 204.

*Fourth*, Cablevision argues that the relevant geographic market is broader than Manhattan because (i) concert tours visit venues throughout the New York area, and (ii) various Tri-State professional sports teams play outside of Manhattan. These arguments again ignore the allegations of the Complaint and improperly raise extraneous facts, which in any event largely support the Jets' position. [4] The Complaint sets forth numerous reasons, grounded in economic realities, why Manhattan constitutes a distinct geographic market for performing artists and promoters seeking to stage large-scale events, for patrons of such events, and for suite rental customers. For example, Manhattan is:

---

[4]  Cablevision's point that the professional hockey Devils and Islanders play in New Jersey and Long Island while the Rangers play in Manhattan, actually suggests that these are separate geographic markets, each capable of supporting its own team. Similarly, Cablevision's contention that large pop-music tours regularly play several New York area venues is consistent with the Complaint's allegation that "performing artists on a national tour often play a Manhattan venue, usually in addition to a venue in Long Island and/or New Jersey" (Compl. ¶ 28), and further supports the conclusion that Manhattan is a separate market.

- The publishing and media capital of the United States, and has an essential, independent value to performers in terms of publicity and critical attention. Compl. ¶ 26.

- The hub of the greater New York area, and thus is the most convenient location for the greatest number of potential customers for large-scale, indoor events, and provides the best access to complementary services (restaurants, bars, hotels, etc.). Compl. ¶ 27. *See* 2A Phillip E. Areeda, *et al.*, *Antitrust Law* ¶ 533, at 279 (2d ed. 2002) (customer preferences depend "not only on the objective cost of round-trip transportation (whether by car, taxi, or bus), but also on their subjective values of time and inconvenience of traveling to the suburb").

- "[A]n international center of business, art, media, entertainment and culture." Compl. ¶ 25. Thus, venues outside of Manhattan are not reasonable substitutes for purposes of business entertainment, even though patrons might attend events elsewhere. *See Houser,* 845 F.2d at 1230 n.10 (that residents might travel to surrounding cities to see a film unavailable in their city does not mean that the relevant geographic market is broader than the city).

### B.    The Complaint Properly Alleges that Cablevision Possesses Monopoly Power

Monopoly power is the "power to control price or exclude competition" in the relevant market. *E.I. du Pont de Nemours & Co.*, 351 U.S. at 391. It exists whenever prices can be raised above competitive market levels. *See Jefferson Parish Hosp. v. Hyde,* 466 U.S. 2, 27 n.46 (1984).

The Complaint properly alleges that Cablevision possesses monopoly power in each of the three markets alleged in the Complaint. Compl. ¶ 18. There is no other facility that an event promoter could use to stage a large enclosed event (Compl. ¶ 21), and there are no suites in any other large-scale venue in Manhattan. Compl. ¶ 23. "The barriers to entry in the markets monopolized by Defendant are very high, thereby allowing Defendants to control pricing and exclude competition within those markets." Compl. ¶ 31. The barriers include the absence of suitable sites for the construction of a competing facility in Manhattan – other than the Westside Rail Yards, none exists. Compl. ¶ 31. Finally, the Complaint describes the excessive ticket prices and rents for suites that Cablevision is able to charge as a result of its monopolies, and the admissions of Cablevision's President to the same effect. Compl. ¶¶ 33, 39.

8

C.    **The Complaint Properly Alleges Anticompetitive Conduct in Violation of Section 2**

Cablevision's arguments relating to anticompetitive conduct (Def. Br. at 7-17) improperly attempt to segregate each conduct element from the totality of wrongful behavior alleged in the Complaint, and then make a series of unpersuasive points as to the separate elements.  As demonstrated below, each aspect of Cablevision's anticompetitive conduct standing alone would be sufficient to withstand a motion to dismiss.  Taken together, as they must be, the Complaint allegations easily state a monopolization claim.

Most fundamentally, Cablevision ignores the principle that because it holds monopolies in the relevant markets, it must conform its conduct to the requirements of Section 2.  "Where a defendant maintains substantial market power, his activities are examined through a special lens: Behavior that might otherwise not be of concern to the antitrust laws – or that might even be viewed as procompetitive – can take on exclusionary connotations when practiced by a monopolist." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 488 (1992) (Scalia, J., dissenting) (citing 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 813 at 300-02 (1978)).

In evaluating Cablevision's conduct, several principles are clear: "Predatory practices are illegal if they impair opportunities of rivals and are not competition on the merits or are more restrictive than reasonably necessary for such competition . . . ." *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 63 F.3d 1540, 1550 (10th Cir. 1995). Put another way, "[i]f a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory." *Aspen Skiing*, 472 U.S. at 605. Moreover, "'[a]nticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Caribbean Broad. Sys.*, 148 F.3d at 1087; *see also United States v. Microsoft Corp.*, 253 F.3d 34,

58 (D.C. Cir. 2001) ("the means of illicit exclusion, like the means of legitimate competition, are myriad").

The allegations in the Complaint detail a sophisticated, multi-faceted scheme of predatory conduct by Cablevision – conduct serving no legitimate, procompetitive purpose, but intended only to exclude competition. For example:

- Cablevision – whose business is selling television advertising – abused its monopoly power in cable television by refusing to sell the Jets local advertising time to support the Sports & Convention Center on any cable channels on its monopoly cable systems (Compl. ¶ 43);

- Cablevision coerced third parties not to accept Jets' advertising (Compl. ¶ 45);

- Cablevision spent millions of dollars on its own false and misleading publicity campaign (Compl. ¶¶ 41-42), including ads run on the very monopoly cable systems from which it excluded the Jets. Compl. ¶ 43. Cablevision misrepresented the economic benefits of the Sports & Convention Center, its financing and environmental impact and the truthfulness of the Jets. (Compl. ¶¶ 5-8, 36, 41-42); and

- Cablevision filed sham litigation (Compl. ¶¶ 50-52) and submitted a sham bid for the Sports & Convention Center site (Compl. ¶¶ 53-60), both for the sole purpose of delaying implementation of the Jets' agreement to build the stadium, and thereby preventing the emergence of competition with Madison Square Garden and Cablevision's other venues. Compl. ¶¶ 36, 39-40.

These allegations must be evaluated "taken as a whole rather than considering each aspect in isolation." *LePage's, Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. *2003*); *see also Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (Sherman Act plaintiffs "should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each"). Contrary to Cablevision's treatment of the Complaint, "[t]he relevant inquiry is the anticompetitive effect of [defendants'] exclusionary practices considered together," *LePage's,* 324 F.3d at 162, including the "synergistic effect" of Cablevision's "mixture" of predatory conduct on the commercial reality of the marketplace. *See City of Anaheim v. S. Cal. Edison Co.,* 955 F.2d 1373, 1376 (9th Cir. 1992) ("it

would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect").

In sum, the "Sherman Act . . . assumes that an enterprise will protect itself against loss by operating with superior service, lower costs, and improved efficiency." *Otter Tail Power Co. v. United States*, 410 U.S. 366, 380 (1973). But when faced with potential competition, Cablevision has not tried to improve its "efficiency" by preparing to compete, for example, by improving its facilities, rolling back its monopoly pricing, or reducing costs. Instead, it has sought to prevent competition – the very definition of anticompetitive conduct.

> 1.    **Cablevision's Refusal to Sell Advertising to the Jets on its Monopoly Cable Systems**

Ignoring more than a half-century of Supreme Court decisions, Cablevision argues that it has an absolute right to refuse to do business with whomever it chooses. Def. Br. at 11-13. While "as a general matter a firm can refuse to deal with its competitors . . . such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal." *Eastman Kodak Co.*, 504 U.S. at 483 n.32. Cablevision has no legitimate business justification for its conduct. It sacrificed profits from one of its regular businesses, selling advertising, for the sole purpose of thwarting competition from the Sports & Convention Center in order to maintain its monopolies. Such conduct has always been illegal. *See, e.g., Aspen Skiing*, 472 U.S. at 610-11.

Cases rejecting Cablevision's constricted view of the standards governing a monopolist's conduct under Section 2 are legion. For example, in *Lorain Journal*, the Supreme Court upheld an antitrust judgment against a newspaper publisher that refused to sell advertising to anyone who dealt with a new, competitive radio station. 342 U.S. at 143. The defendant attempted to defend its refusal to deal with the same "freedom of contract" argument that Cablevision now resurrects. The Supreme Court soundly rejected that position: "The right claimed by the publisher is neither absolute nor exempt from regulation. Its exercise as a purposeful means of monopolizing

interstate commerce is prohibited by the Sherman Act." *Id.* at 155.  The Court also went on to

dismiss the argument, repeated here by Cablevision (Def. Br. at 6), that the First Amendment

gives an unfettered right to refuse to sell advertising:

> The publisher suggests that the injunction [ordering it to accept
> advertisements] amounts to a prior restraint upon what it may publish.
> *We find in it no restriction upon any guaranteed freedom of the press.*
> *The injunction applies to a publisher what the law applies to others.*
> The publisher may not accept or deny advertisements in an attempt to
> monopolize.

*Id.* at 155-56 (emphasis added).  Similarly, in *Aspen Skiing* the Supreme Court reaffirmed that a

monopolist may be held liable for a refusal to deal absent a valid business justification:  "If a firm

has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize

its behavior as predatory."  472 U.S. at 605.[5]

These principles have been repeatedly applied to find Section 2 violations in the refusal of

a monopolist, such as Cablevision, to sell advertising on ordinary commercial terms to a

competitor in order to maintain monopoly power, either in the same or a separate market.  For

example, in *Nobody in Particular Presents, Inc. v. Clear Channel Comm., Inc.*, 311 F. Supp. 2d

1048 (D. Colo. 2004), the defendant owned both several Denver-area rock radio stations and a

concert promotion business.  The plaintiffs, rival rock promoters, alleged that the radio stations'

refusal to accept advertising from competing promoters violated Section 2.  Like Cablevision, the

defendant argued it had no duty to accept ads from competitors in the concert business.  The

defense was rejected on a summary judgment motion because "Clear Channel's refusal to accept

---

[5] Cablevision's unsuccessful attempt to invoke the First Amendment highlights its failure – despite
proffering extensive extra-record "facts" elsewhere – to provide any valid business justification for
rejecting the Jets' advertising.  There was nothing inappropriate or misleading in the Jets' proposed ads.
Indeed, they would not have been associated with Cablevision, because the Jets also sought to buy time on
independent cable channels such as CNN and A&E, but were thwarted by Cablevision. Compl. ¶¶ 7, 45.
This fact makes Cablevision's "forced speech" argument (Def. Br. at 13) irrelevant.

paid advertising is founded upon an intention to create monopoly power for itself in the rock concert promotions market." *Nobody in Particular,* 311 F.Supp.2d at 1106-08.[6]

Ignoring this authority, Cablevision offers a misleading and incomplete quote from the Supreme Court's decision in *Trinko*. Def. Br. at 13. But *Trinko* reaffirmed that the principles of *Aspen Skiing* apply where there is (a) unilateral termination of voluntary dealing by defendant, (b) a refusal to sell at an established retail price, or (c) a refusal to deal on an existing, open market. *Trinko,* 540 U.S. at 409-10 (citing *Aspen Skiing,* 472 U.S. at 610-11). All three factors are present here.[7]

In addition to being anticompetitive conduct in itself, Cablevision's refusal to deal violates the prohibition against monopoly leveraging. Monopoly leveraging in violation of Section 2 occurs when a defendant with monopoly power in one market uses that power anticompetitively to maintain a monopoly in a second market. *See Yankees Entm't,* 224 F.Supp.2d at 671-2; *Trinko,* 540 U.S. at 415 n.4. By anticompetitively refusing to accept Jets' advertising for local slots on either its own channels or on the national cable channels carried on its systems (Compl. ¶ 44),

---

[6] *See also High Tech. Careers v. San Jose Mercury News,* 996 F.2d 987 (9th Cir. 1993) (denying summary judgment to newspaper that refused to distribute rival plaintiff's advertising circular); *The Apartment Source of Pennsylvania, L.P. v. Philadelphia Newspapers, Inc.,* 1999 WL 191649 (E.D. Pa. 1999) (newspaper's refusal to accept ads from competing "apartment locator" service); *Home Placement Serv., Inc. v. Providence Journal Co.,* 682 F.2d 274 (1st Cir. 1982) (newspaper's rejection of competitor's rental information ads may be anticompetitive even where similar prior ads were deceptive); *Six Twenty-Nine Prods., Inc. v. Rollins Telecasting, Inc.,* 365 F.2d 478, 483 (5th Cir. 1966) ("the complaint is sufficient if the refusal of defendant to accept advertising from plaintiff . . . is for the purpose of destroying plaintiff as an agency and thereby furthering a course toward monopolization"); *Packaged Programs, Inc. v. Westinghouse Broad. Co.,* 255 F.2d 708, 710 (3d Cir. 1958) (upholding complaint for refusal to televise ads produced by rival advertising producer). The *Nobody in Particular* court also denied summary judgment under the "essential facilities" doctrine, 311 F.Supp.2d at 1114, is an independent basis of liability applicable to Cablevision's conduct as well. *See also Delaware & Westside Rail Ry. Co. v. Consol. Rail Corp.,* 902 F.2d 174 (2d Cir. 1990); *The Apartment Source,* 1999 WL 191649 at *10.

[7] Moreover, unlike *Trinko* where the FCC was compelling access to Verizon's network, "no government agency is compelling [defendant] to allow access to its airwaves . . . . Antitrust law is the only mechanism by which [defendant's] behavior may be policed." *Nobody in Particular,* 311 F.Supp.2d at 1114. That logic applies with equal force here.

Cablevision abused its monopoly in the cable television market to maintain its monopoly power in the large-scale facilities, ticket and suites markets.

### 2.    Cablevision Coerced Third Parties Not to Deal With the Jets

Cablevision's motion to dismiss fails to address allegations that Cablevision not only refused to sell advertising itself, but it also coerced third parties not to deal with the Jets. Compl. ¶ 45. A monopolist's coercion of third parties not to deal with competitors in order to maintain monopoly power is blatant anticompetitive conduct without any conceivable legal justification. *See, e.g., Lorain Journal,* 342 U.S. at 149-50. Because Cablevision used its monopoly power in cable television as a means of coercion (Compl. ¶ 45), this conduct also constitutes illegal monopoly leveraging. *See Yankees Entm't & Sports Network,* 224 F.Supp.2d at 671-2.

### 3.    Cablevision's False and Misleading Advertising Campaign

Cablevision does not dispute the sufficiency of the allegations concerning its false and misleading ad campaign against the Sports & Convention Center. [8] Instead, Cablevision attempts to cloak its anticompetive conduct in the First Amendment. Yet the First Amendment does not immunize false statements to consumers, which can constitute anticompetitive conduct violative of the Sherman Act. *See Caribbean Broad. Sys.,* 148 F.3d at 1087 (false statements to purchasers of radio advertising about the extent of defendant's radio coverage stated antitrust claim). As the court in *Caribbean Broadcasting* explained, "the allegations made here – namely, that the defendants made fraudulent misrepresentations to advertisers and sham objections to a government licensing agency in order to protect their monopoly – bring the defendants' conduct well within that concept." *Id.*

---

[8]  These alleged falsehoods include misrepresentations as to the economic benefits of the project, its financing, and the Jets' truthfulness in submitting regulatory filings and environmental impact statements. Compl. ¶¶ 5-8, 36, 41-42.

### 4.    The Availability Of Other Means To Reach The Public Does Not Excuse Cablevision's Anticompetitive Conduct

Cablevision contends that its conduct was not anticompetitive because there were other available means by which the Jets could reach consumers, citing various asserted facts outside the Complaint. Def. Br. at 11-13. The argument is meritless. A monopolist's predatory preclusion of a competitor's efforts to reach consumers efficiently violates Section 2, even if other, less effective means remain available. *See Microsoft*, 253 F.3d at 64 (alternative distribution channels available to competitor were "insufficient to shield Microsoft from liability for [anticompetitive] restrictions because, although Microsoft did not bar its rivals from all means of distribution, it did bar them from the cost-efficient ones").

As in *Microsoft*, the Complaint here alleges that the Jets were excluded from the cost-efficient means of reaching consumers.[9] Compl. ¶¶ 43-47. In particular, Cablevision prevented the Jets from cost-effectively addressing Cablevision's captive audience in its monopoly cable areas – the very consumers who were subjected most intensively to Cablevision's misleading campaign against the Sports & Convention Center. *Id.* Cablevision's claim that outlets such as newspapers or other media enable the Jets effectively to reach these particular consumers – who were specifically targeted by Cablevision's anticompetitive campaign – presents a factual question that cannot be decided on a motion to dismiss. In short, the Complaint properly alleges that Cablevision foreclosed the Jets from reaching substantial numbers of consumers who were affected by Cablevision's misleading advertising through the most efficient and effective means (and for some consumers the only means), in violation of Section 2.

---

[9] Cablevision asserts that the Jets could have purchased national advertising time on the cable networks (Def. Br. at 12 & n.6), but the cost of advertising carried nationwide would be prohibitively expensive when its purpose is to reach only New York consumers.

15

### 5.    Cablevision's Sham Litigation

In asserting that the Jets' claim of misuse of the litigation process is insufficient (Def. Br. at 17), Cablevision again ignores clear and specific factual allegations in the Complaint.

Sham litigation is not protected by the *Noerr-Pennington* doctrine and is actionable under Section 2.  Litigation is a sham when it (1) is "objectively baseless," and (2) "conceals an attempt to interfere directly with the business relationships of a competitor" through the process of litigation. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60 (1993) (citing *Noerr*, 365 U.S. at 144).

With respect to sham litigation, the Complaint sets out specific factual allegations:

- Defendants brought and financed "baseless litigation for the sole purpose of impeding Plaintiffs' plans to construct the Sports and Convention Center" and "had no legitimate business rationale" for doing so.  Compl. ¶¶ 36 and 36(c).

- "Defendants have funded, supported and promoted baseless litigation designed solely to delay, increase the cost of, and prevent the development of the Sports and Convention Center project."  Compl. ¶ 50.

- Defendants filed an "objectively baseless" lawsuit, for which they "had no reasonable basis to believe that they could prevail on the merits," and that lawsuit was dismissed soon after it was filed.  Compl. ¶ 51.

- After dismissal of that lawsuit, "as part of their concerted plan to kill the Sports and Convention Center project," Defendants commenced another lawsuit "falsely alleging that Plaintiffs improperly manipulated data submitted in connection with the DEIS and the final environmental impact statement."  Compl. ¶ 52.

These factual allegations properly plead that Cablevision's "litigation" conduct was (1) baseless, *i.e.*, a "sham," and (2) intended to misuse the litigation process solely for the purpose of delay to injure the Jets' business, and is therefore subject to scrutiny under the antitrust laws. Cablevision's request to dismiss this claim without discovery is meritless. *See, e.g., Primetime 24,* 219 F.3d at 101-02 (reversing grant of dismissal motion because complaint stated a valid sham claim); *Caplan v. American Baby, Inc.*, 582 F. Supp. 869, 871 (S.D.N.Y. 1984) (postponing decision on motion to dismiss sham litigation claim to allow discovery to proceed).

### 6.    Cablevision's Sham Bid for Development Rights

As a threshold matter, Cablevision's argument that its sham bid is immunized under the *Noerr* doctrine (Def. Br. at 8-11), fails because the *Noerr* doctrine does not apply to immunize a defendant's predatory attempts to influence a government agency in a commercial transaction.[10] But even if the *Noerr* immunity doctrine were applied to Cablevision's bid, the Complaint's allegations state a claim under the sham exception to *Noerr*:

- Cablevision "submit[ed] a sham bid to acquire the planned Sports and Convention Center site for the sole purpose of impeding Plaintiffs' plans to construct the Sports and Convention Center" and "had no legitimate business rationale" for doing so. Compl. ¶¶ 36 and 36(d).

- Cablevision "had no intention" of building the project described in its "bid," which "was submitted solely for the purpose of delaying and derailing the Sports and Convention Center." Compl. ¶ 57; *see also* Compl. ¶ 60.

- The bid: (1) "contradicted all the relevant zoning provisions governing the site"; (2) "had no provisions for financing"; (3) reflected no association with a professional real estate developer; and (4) lack specificity for the development itself. Compl. ¶ 57. Cablevision's supposed plan also has "nothing to do with any of Defendants' existing lines of business," and making the bid caused downgrading of Cablevision's credit rating. Compl. ¶ 59.

Cablevision does not appear to dispute that a sham bid is alleged. Instead, they speculate about the effects the sham bid may have in influencing who ultimately develops the site. Def. Br. at 17. This conjecture inappropriately asks the Court to look beyond the Complaint at this stage of the case. Cablevision also misleadingly conflates its original sham "bid," which is alleged in the Complaint (¶¶ 56-60), with a submission that it later made to the MTA after the Complaint was filed. *See* Def. Br. at 18 & n.10. The only facts relevant to this motion are those alleged concerning the original "bid." While evidence will show that the second submission was a sham

---

[10] A number of cases recognize a "commercial exception" to the *Noerr* doctrine, which denies immunity when the government is acting in a commercial capacity. *See, e.g., George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 424 F.2d 25, 33 (1st Cir. 1970); *Hecht v. Pro-Football, Inc.*, 444 F.2d 931, 942-43 (D.C. Cir. 1971); *but see USFL v. NFL*, 634 F. Supp. 1155 (S.D.N.Y. 1985). The Second Circuit has recognized but not decided the issue, *see, e.g., Tripe M. Roofing Corp. v. Tremco, Inc.*, 753 F.2d 242, 248 n.4 (2d Cir. 1985), as has the Supreme Court. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 502 n.7 (1988) (citing Areeda & Turner discussion of "extent to which *Noerr* immunity should apply to commercial transactions involving the government").

(*e.g.*, Compl. ¶ 59, alleging Cablevision's lack of business acumen and financial ability to undertake major real estate development), addressing that submission is improper on a motion to dismiss.

The illusory nature of Cablevision's "bid" (and its post-Complaint submission) is further demonstrated by the express statutory restrictions on acquisitions that promote monopoly power – restrictions that would make a successful bid by Cablevision illegal. Section 7 of the Clayton Antitrust Act prohibits the acquisition of any "assets" where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." *See* 15 U.S.C. § 18. The development rights at issue here cover the only suitable site for a large-scale, enclosed facility for the performance of spectator events in Manhattan (Compl. ¶ 34) that would compete with Cablevision's monopolies in the facilities, ticket and suites markets (Compl. ¶¶ 18-20). Because Cablevision's acquisition of these assets would permanently foreclose competition, the acquisition would "substantially . . . lessen competition" in violation of Section 7. [11] The illegality of Cablevision's bid under Section 7 is further evidence that any bid was not legitimate one, but was submitted solely for the predatory goal of keeping the assets out of the Jets' hands.

### D.    The Complaint Adequately Alleges Antitrust Injury

Cablevision is simply wrong in contending that the Complaint does not allege injury resulting from its anticompetitive conduct. *See* Def. Br. at 3-5, 11-13. The Complaint is replete with allegations of actual and imminent harm entitling Plaintiffs to damages as well as injunctive relief. *See, e.g.,* Compl. ¶¶ 50, 56-60, 64, 68, 69, 74, 79, pp. 30-31 (prayer for relief). Not only does Cablevision benefit (and consumers suffer) with each day Defendants artificially extend their monopoly, but each day brings Cablevision closer to its objective of delaying the process long

---

[11] *See United States v. Siemens Corp.*, 621 F.2d 499, 504-05 (2d Cir. 1980); 1984 DOJ/FTC Merger Guidelines, Section 4.1, available at http://www.usdoj.gov/atr/public/guidelines/2614.htm (Section 7 violated by foreclosure of "actual potential competition" in a monopoly market where proposed acquisition would eliminate entry into that market by a likely competitor in the near future).

18

enough to destroy the project entirely.[12]  If Cablevision's conduct ultimately results in the Jets

being unable to develop the site, the Jets will have suffered an enormous injury and significant

damages.  Even if the Sports & Convention Center is ultimately built, the Jets will have suffered

millions of dollars of economic loss, including increased costs caused by delay and damaged

business relationships.[13]

        These allegations sufficiently state a claim.  *See Todd,* 275 F.3d at 198 ("[n]o heightened

pleading requirements apply in antitrust cases"); *Envirosources, Inc. v. Horsehead Res. Dev. Co.,*

*Inc.,* 1997 WL 525403 at *4 (S.D.N.Y. 1997) (upholding sufficiency of "bare allegations" of harm

to competition).  Cablevision's completed and ongoing anticompetitive conduct entitles the Jets

both to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and to injunctive relief

against "threatened loss or damage" pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

        Finally, Cablevision is wrong in arguing that the Jets' claims are not ripe because the Jets

eventually may overcome Cablevision's state-court challenge to the MTA's bid award.  Def. Br. at

4.  In *Biovail,* for example, the court held that even the *threat* of litigation can cause antitrust

injury.  *Biovail,* 49 F. Supp. 2d at 770; *see also CVD, Inc. v. Raytheon Corp.,* 769 F.2d 842, 851

(1st Cir. 1985) (threat of baseless litigation, even if never filed, can cause antitrust injury absent

delay of competing product).  The Jets are not required to sit idly by until Cablevision's

anticompetitive conduct eliminates any chance of building their project.  "[T]he prospect or fear of

future events may have a real impact on present affairs such that a preemptive challenge is ripe."

---

[12]  *See, e.g.,* Compl. ¶ 60 (sole purpose of sham bid was "to delay the commencement of construction past
the July 2005 deadline set by the International Olympic Committee for the selection of the 2012 Olympics
host city, because Defendants believe that support will then wane for the Sports and Convention Center and
that the site will continue to stay in an undeveloped condition for the foreseeable future").

[13]  Delay caused by anticompetitive conduct that forestalls competition, even if only temporarily, is readily
cognizable as antitrust injury.  *See, e.g., Biovail Corp. Int'l v. Hoechst Aktiengesellschaft,* 49 F. Supp. 2d
750, 757, 768-70 (D.N.J. 1999) (upholding Section 2 claims for delay caused by defendant's interference
with government eventual approval of plaintiff's drug); *In re Lower Lake Erie Iron Ore Antitrust Litig.,*
998 F.2d 1144, 1167-68 (3d Cir. 1993) (finding antitrust standing to recover damages relating to delay
caused by defendants' anticompetitive conduct).

*Volvo North Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988) (quoting 13A C. Wright, *et al.*, *Federal Practice and Procedure* § 3532.2 at 143).

## III.   THE COMPLAINT STATES A CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

Contrary to Cablevision's contentions (Def. Br. at 21-24), the Complaint properly pleads all elements of tortious interference with prospective business relations: "(i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003) (Rule 8(a)(2) applies to tort claim).

### A.    Interference with the Jets' Relations with the MTA and ESDC

Cablevision does not challenge the existence of the Jets' long-term, on-going business relationship with the MTA and the ESDC, as evidenced by the Memorandum of Understanding ("MOU") to develop the Westside Rail Yards site (Compl. ¶¶ 34-35, 37-38), nor does it challenge the allegations of interference. Cablevision contends only that the Jets have failed to plead (1) wrongful means and (2) injury. These arguments are meritless.

#### 1.    The Complaint Alleges that Cablevision Used Wrongful Means

Cablevision's contention (Def. Br. at 22) that the Jets are required, and have failed, to allege that Cablevision's wrongful conduct rose to the level of a crime or independent tort is misplaced. The Complaint details Cablevision's antitrust violations and other unlawful and wrongful conduct, clearly rising to the level of the requisite "culpable conduct." *See Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 785 N.Y.S.2d 359 (N.Y. 2004). At a minimum, Cablevision employed "'wrongful means in interfering with the Jets' business relations,'" which can include "fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure," *Scutti Enters*, 322 F.3d at 216;   Restatement (Second) of Torts § 768 cmt. E (1979), as well as

"[d]ishonesty and unfair means." *Brown v. AXA RE,* 2004 U.S. Dist. LEXIS 7624 at \*19 (S.D.N.Y. May 3, 2004) (citation omitted).

As this Court has held, an antitrust violation alone can satisfy the "wrongful means" requirement. *Innomed Labs, LLC v. Alza Corp.*, 2002 WL 31521084 at \*7 (S.D.N.Y. Nov. 13, 2002) (Baer, J.) ("alleged price discrimination may stand as a 'wrongful act'" in tortious interference claim); *see also Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 2000 WL 264295 at \*32 (S.D.N.Y. Mar. 9, 2000) (unreasonable restraint of trade and attempt to monopolize); *Union Carbide Corp. v. Montell N.V.,* 944 F. Supp. 1119, 1144 (S.D.N.Y. 1996) (antitrust violations).

Cablevision's anticompetitive conduct – including false and deceptive advertising, blocking the Jets' television commercials, bringing sham litigation, and submitting a sham bid (Compl. ¶¶ 5-8, 34-36, 41-60) – stands, in itself, as wrongful means. Additionally, Cablevision's repeated false statements relating to the project (Compl. ¶¶ 5-8, 36, 41-42) are sufficient to meet this element. *See, e.g., Nutronics Imaging, Inc. v. Danan*, 1998 WL 426570 at \*11 (E.D.N.Y. Jun. 10, 1998). Similarly, Cablevision's abuse of monopoly power over cable television to prevent the Jets from purchasing local commercial airtime on Cablevision's cable systems, and to pressure other media outlets not to carry Jets' advertising, to correct Defendants' misrepresentations (Compl. ¶¶ 6, 36, 43-49, 72-75) constitutes wrongful means. *See, e.g., Volvo*, 857 F.2d at 74 (tortious interference claim stated by defendants' alleged efforts to intimidate television networks to interfere with plaintiff's promotional efforts). Wrongful conduct also includes Cablevision's baseless litigation designed solely to delay, increase the cost of, and prevent the development of the Sports & Convention Center. Compl. ¶¶ 6, 36, 50-52. *See, e.g., Conmed Corp. v. ERBE Electromedizin GmbH*, 129 F. Supp. 2d 461, 470 (N.D.N.Y. 2001) ("interfering through the threat of litigation constitutes 'improper means'") (quoting *Universal City Studios, Inc. v. Nintendo Co.*

21

*Ltd.*, 797 F.2d 70, 75 (2d Cir. 1986)). Finally, the Complaint alleges that Cablevision's "bid" was a sham, submitted solely to interfere with the Jets' business relations by causing the MTA to reject the MOU and desist from mutual efforts with the Jets to develop the Sports & Convention Center. Compl. ¶¶ 57-60.

Taken separately or together, the foregoing allegations properly plead the required wrongful conduct to state a claim for tortuous interference.

### 2.    The Complaint Alleges Injury Caused by Tortious Interference

Contrary to Cablevision's argument (Def. Br. at 23), the Complaint properly alleges that interference with the Jets' business relations with the MTA and ESDC caused the Jets significant harm. For example, but for Cablevision's wrongful conduct, the Jets would have concluded an agreement with the MTA following the arbitration process to determine the fair market value of the Rail Yards development rights. Additionally, Cablevision's interference caused the MTA to act contrary to the MOU, in reliance upon which the Jets had spent millions of dollars. Compl. ¶¶ 34, 53-55, 67-70. *See Volvo*, 857 F.2d at 75 (upholding tortious interference claim absent allegation of any lost contract); *Union Carbide Corp. v. Montell N.V.*, 1998 WL 574207 at *2 (S.D.N.Y. Aug. 12, 1998) (allegation of lost benefit sufficient).[14]

### B.    The Complaint States a Claim for Tortious Interference with Media Outlets

The Complaint also states a claim for tortious interference with the Jets' prospective business relations with YES Network and WLNY-TV, with which the Jets had ongoing relationships. As a result of Cablevision's coercion, these networks rejected the very Jets commercials they had earlier solicited and then ran Cablevision ads opposing the Sports & Convention Center. Compl. ¶¶ 36, 43-48. The Complaint thus adequately pleads wrongful means,

[14] Defendants' contention that consummation of a contract negates the element of harm (Def. Mem. at 23, citing *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d Cir. 1995)), is wrong. *G.K.A.* merely says a plaintiff must allege conduct that actually interfered with plaintiff's relations with a third party, as is alleged here.

*see* Section III.A.1 above; *World Wrestling Fed'n Entm't, Inc. v. Bozell*, 142 F.Supp.2d 514, 532 (S.D.N.Y. 2001), as well as injury, because Defendants' conduct obstructed the Jets' ability to communicate with consumers, including season ticket holders. Compl. ¶¶ 46-47.

## IV.    THE COMPLAINT STATES A CLAIM FOR DECEPTIVE BUSINESS PRACTICES IN VIOLATION OF NEW YORK LAW

Section 349(a) of the New York General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." Notwithstanding Cablevision's claims to the contrary (Def. Br. at 24), the Complaint adequately alleges all required elements: (a) the challenged acts or practices were consumer-oriented; (b) they were misleading in a material way; and (c) the plaintiff suffered injury as a result. *See Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892 (2000). [15]

The Complaint alleges deceptive acts or practices – particular false advertisements (¶ 42), coercion to prevent airing of honest ads by the Jets (¶¶ 43-47), and sham litigation and bidding (¶¶ 50-60); and describes the resulting consumer harm – deprivation of fair competition and "of an alternate venue to attend sports, entertainment and other events . . . and undermining the public's interest in an honest marketplace" (¶ 78). This is consumer-oriented conduct. *See, e.g., Leider v. Ralfe*, 2005 WL 152025 at *9 (S.D.N.Y. Jan. 25, 2005) (Baer, J.) (antitrust violation involving consumer deception would support Section 349 claim); *Excellus Health Plan, Inc. v. Tran*, 287 F.Supp.2d 167, 180 (S.D.N.Y. 2003) ("allegations that [party] has caused harm to the public at large by engaging in deceptive conduct designed to limit consumers' health care choices" held sufficient); *New York v. Feldman*, 210 F. Supp. 2d 294, 301-02 (S.D.N.Y. 2002) (consumer-oriented element is "liberally construed"; allegation that defendant undermined state's interest in an "honest marketplace in which economic activity is conducted in a competitive manner" held

---

[15] "An action under [Section] 349 is not subject to the pleading-with-particularity requirements of Rule 9(b) . . . , but need only meet the bare-bones notice-pleading requirements of Rule 8(a)." *Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005).

sufficient).

This pattern of alleged deceptive and misleading conduct is also more than sufficient to meet the materiality element of a Section 349 claim. *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264-65 (2d Cir. 1995) (pattern of deceptive conduct); *Vaughn v. Consumer Home Mortg., Inc.*, 2003 WL 21241669 at *5-6 (E.D.N.Y. Mar. 23, 2003) (deceptive practices comprise a course of conduct under Section 349).

As shown above (pp. 18-20), the Jets have adequately alleged injury. The Complaint also alleges (¶ 79) that this conduct "has injured Plaintiffs' business relations with the City and State of New York, as well as Plaintiffs' reputation." Nothing more is required. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175 F.Supp.2d 593, 631 (S.D.N.Y. 2001) ("plaintiffs need only allege that the defendants' material deceptive acts caused the injury"); *Securitron*, 65 F.3d at 265 (upholding Section 349 claim for injury to reputation).[16]

## V.    THE COMPLAINT CANNOT BE DISMISSED ON GROUNDS OF JUSTICIABILITY AND COMITY

Cablevision attempts to evade judicial scrutiny of its predatory and anticompetitive conduct under the antitrust laws by invoking inapposite legal concepts, including ripeness, failure to exhaust administrative remedies, the *Younger* doctrine and the Anti-Injunction Act. *See* Def. Br. at 1-7. As with Cablevision's substantive response to the Complaint, this attempt fails because it turns on mischaracterizing or ignoring the actual allegations of the Complaint.

The Jets' allegations of injury have been discussed above (pp.18-20), and are plainly sufficient to establish that a ripe case or controversy presently exists. *See, e.g., Volvo*, 857 F.2d at 70 (plaintiff's standing established by allegations that anticompetitive conduct threatened to

---

[16]  Cablevision's attempt to use the First Amendment to defend its violations of state law fails for the same reasons it fails with regard to the Sherman Act violation. *See* Section II above. The claim is based on Cablevision's course of conduct, not solely deceptive advertising. Compl. ¶¶ 76-79. In addition, false statements to public officials can violate the statute. *See Securitron*, 65 F.3d at 264 (misrepresentations to city agency).

discourage participation in its promotional events).  Since Cablevision is continuing to challenge the Jets' ability to develop the Sports & Convention Center, the parties' antitrust dispute is not moot.  *See, e.g., Bigelow, Inc. v. Unilever N.V.,* 867 F.2d 102, 106 (2d Cir. 1989) (challenged conduct not "irrevocably abandoned"); *Kessler v. Grand Cent. Dist. Mgmt. Ass'n, Inc.,* 158 F.3d 92, 99 (2d Cir. 1998) (lawsuit not mooted by contract expiration because, *inter alia,* "negotiations are ongoing for a new contract").  Similarly, cases pertaining to exhaustion of administrative remedies (Def. Br. at 5 n.1) are not relevant because there is no administrative process capable of resolving the Jets' claims arising from Cablevision's anticompetitive conduct.

Cablevision stretches credulity by invoking the abstention doctrine and the Anti-Injunction Act, 28 U.S.C. § 2283.  (Def. Br. at 6-7).  The Complaint describes a multifaceted campaign of anticompetitive conduct designed to thwart competition.  One allegation involves a pending state court action; everything else relates to non-litigation conduct or to a case that was dismissed months ago.  Nor is there any request to enjoin state court proceedings.  *See* Compl. at pp.30-31. Neither abstention nor the Anti-Injunction Act is applicable merely because some aspects of the anticompetitive conduct occurred in state court proceedings, particularly where damages are also sought.  The only injunctive relief requested addresses Cablevision's interference with the Jets' efforts to place television advertising, leaving this Court with broad discretion to craft appropriate relief sufficient to address Cablevision's wide-ranging unlawful scheme.  Compl. at pp. 30-31.[17]

## CONCLUSION

For the foregoing reasons Cablevision's motion to dismiss should be denied and discovery should commence in this case forthwith.

---

[17]  Moreover, abstention is appropriate only if the state forum affords an adequate opportunity for review of the federal plaintiff's claims. *See Cullen v. Fliegner,* 18 F.3d 96, 103 n. 4 (2d Cir. 1994). Here, the Jets cannot raise federal antitrust claims in state court, which lacks jurisdiction to hear them. *Freeman v. Bee Mach. Co., Inc.,* 319 U.S. 448, 451 (1943).

25

Dated: April 19, 2005

Respectfully submitted,

Marc E. Kasowitz (MK-2597)
Daniel R. Benson (DB-6587)
Daniel J. Fetterman (DF-9093)
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, New York 10019
212-506-1700

David Boies (DB-4399)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
914-749-8200

David A. Barrett (DB-9626)
Robert J. Dwyer (RD-6457)
Paul R. Verkuil (PV-5978)
Alanna C. Rutherford (AR-0497)
BOIES, SCHILLER & FLEXNER LLP
570 Lexington Avenue
New York, NY 10022
212-446-2300

*Of Counsel:*
Jonathan D. Schiller
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue NW
Washington, DC 20015
202-237-2727