UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NEW YORK JETS LLC and<br>JETS DEVELOPMENT LLC,<br><br>        Plaintiffs,<br><br>v.<br><br>CABLEVISION SYSTEMS CORPORATION,<br>CSC HOLDINGS, INC., and MADISON<br>SQUARE GARDEN L.P.,<br><br>        Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Case No. 05-CV-2875 (HB) |

### REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

| | |
|---|---|
| Jack M. Weiss<br>Randy M. Mastro<br>GIBSON, DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, NY 10166-0193<br>Tel: (212) 351-4000<br>Fax: (212) 351-4035 | Miguel A. Estrada<br>Theodore B. Olson<br>Michael L. Denger<br>Joshua Lipton<br>GIBSON, DUNN & CRUTCHER LLP<br>1050 Connecticut Avenue, NW<br>Washington, DC 20036-5306<br>Tel: (202) 955-8500<br>Fax: (202) 467-0539<br><br>*Counsel for Defendants Cablevision Systems Corporation, CSC Holdings, Inc., and Madison Square Garden L.P.* |

Dockets.Justia.com

# TABLE OF CONTENTS

I. Argument .................................................................................................................. 1

    A. Noerr's Protection Of Political Petitioning Dooms The Jets' Claims ...................... 1

    B. The Jets Do Not Allege A Cognizable Injury ........................................................ 3

    C. The Jets Have Not Alleged Any Anticompetitive Conduct ................................... 4

        1. Cablevision's political advertising campaign is not anticompetitive conduct ........................................................................................... 4

        2. Cablevision's alleged refusal to air the Jets' advertisements is not anticompetitive conduct ........................................................................................... 5

        3. Cablevision's state court litigation is not anticompetitive conduct ............. 7

        4. Cablevision's bid for the MTA's property is not anticompetitive conduct ........................................................................................... 8

    D. The Jets Have Not Alleged That Cablevision Has Monopoly Power In A Properly Defined Relevant Market .................................................................. 8

    E. The Jets Have Not Stated A Claim For Tortious Interference .............................. 10

    F. The Jets Have Not Stated A Claim Under N.Y. General Business Law § 349 .................................................................................................................. 10

II. Conclusion ............................................................................................................... 10

i

## TABLE OF AUTHORITIES

**Cases**

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ..........................................................................................5, 6

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ..............................................................................................4

*Caribbean Broad. Sys. Ltd. v. Cable & Wireless P.L.C.*,
    148 F.3d 1080 (D.C. Cir. 1998) ............................................................................2

*Cine 42nd St. Theater Corp. v. The Nederlander Org.*,
    790 F.2d 1032 (2d Cir. 1986) ................................................................................8

*Conley v. Gibson*,
    355 U.S. 41 (1957) ................................................................................................1

*Cortec Indus., Inc. v. Sum Holding LP*,
    949 F.2d 42 (2d Cir. 1991) ....................................................................................9

*Eastern R.R. Presidents Conference v. Noerr Motor Freight*,
    365 U.S. 127 (1961) ..................................................................................... *passim*

*Flip Side Prods., Inc. v. Jam Prods., Inc.*,
    843 F.2d 1024 (7th Cir. 1988) ..............................................................................9

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951) ..............................................................................................2

*Home Placement Serv. Inc. v. Providence Journal Co.*,
    682 F.2d 274 (1st Cir. 1982) .................................................................................2

*Meyer v. Grant*,
    486 U.S. 414 (1988) ..............................................................................................4

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) ..............................................................................................1

*New York v. Feldman*,
    210 F. Supp. 2d 294 (S.D.N.Y. 2002) .................................................................10

*New York Pub. Interest Research Group v. Insurance Info. Inst.*,
    554 N.Y.S.2d 590 (N.Y. App. Div. 1990) ...........................................................10

*Nobody in Particular Presents, Inc. v. Clear Channel Comm., Inc.*,
    311 F. Supp. 2d 1048 (D. Colo. 2004) ..............................................................2, 5

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993) ................................................................................................3, 7, 8

*TEC Cogeneration Inc. v. Florida Power & Light Co.*,
    76 F.3d 1560 (11th Cir. 1996) ..............................................................................................8

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994) .........................................................................................................1, 5

*USFL v. NFL*,
    634 F. Supp. 1155 (S.D.N.Y. 1986) .....................................................................................8

*Verizon Comms. Inc. v. Law Offices of Curtis V. Trinko LLP*,
    540 U.S. 398 (2004) ..................................................................................................4, 5, 6

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*,
    425 U.S. 748 (1976) .............................................................................................................2

**Statutes**

N.Y. Gen. Bus. Law § 349 ..............................................................................................................10

The Jets do not dispute that they have based their claims on Cablevision's governmental petitioning activity, nor do they dispute that they are attempting to use this lawsuit to shut down that activity. Under *Noerr*, Cablevision's solicitation of government action cannot support the Jets' claims. Rather than address *Noerr*, the Jets attempt to divert attention by relying on cases involving commercial conduct, but those cases are inapposite because this case is about political conduct, not commercial conduct. Similarly, the Jets devote only the most cursory attention to the grave justiciability problems that doom their case at the outset, perhaps because they are forced to concede that this Court may not enjoin Cablevison's state court litigation, and because they cannot cogently explain how this Court might, consistent with the First Amendment, silence Cablevision's speech or compel Cablevision to carry the Jets' contrary message. Opp. Br. 24-25. In the end, the Jets are left to argue that "[t]he issue is not whether the plaintiff ultimately will prevail." Opp. Br. 3. But that is precisely the issue where, as here, a plaintiff bases a claim on conduct that, even if assumed true, does not violate the law. *See, e.g., Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Because Cablevision's political conduct could not support the Jets' claims under *any* set of facts, the Jets' complaint should be dismissed now.

## ARGUMENT

### A.  *Noerr*'s Protection Of Political Petitioning Dooms The Jets' Claims.

The Jets' professed concern underlying their claims is that "Cablevision is continuing to challenge the Jets' ability to develop the Sports & Convention Center." Opp. Br. 25. The Jets are correct in this regard—Cablevision has petitioned various state and municipal governmental bodies and the state courts in an effort to have those bodies disapprove or block the Jets' proposed stadium project. This governmental petitioning activity, however, is protected by the First Amendment, and the Jets cannot use the antitrust laws to shut down Cablevision's efforts. *See Eastern R.R. Presidents Conf. v. Noerr Motor Freight ("Noerr")*, 365 U.S. 127 (1961); *see also Turner Broad. Sys. v. FCC*, 512 U.S. 622, 641 (1994) (First Amendment protects broadcaster's right to control its political messages without government interference); *Miami Herald Pub'g Co. v. Tornillo*, 418 U.S. 241, 257 (1974).

The Jets do not cite a single case in which a defendant's attempts to influence the political process—such as Cablevision's alleged conduct here—were held to provide the basis for an antitrust claim. There are no such cases. The Supreme Court conclusively resolved this issue in *Noerr*, holding that it is "clear that the Sherman Act does not apply to the . . . solicitation of governmental action with respect to the passage and enforcement of laws." 365 U.S. at 138. It matters not whether Cablevision's political efforts are "vicious, corrupt, and fraudulent" (as the district court held in *Noerr*) or whether they are designed solely to harm the Jets' business or maintain a monopoly; those efforts are protected. *Id.* at 129, 138-39, 143-44.

The Jets do not even bother to discuss, much less distinguish, *Noerr*, which is fatal to their case. Instead, the Jets rely on cases in which antitrust defendants were alleged to have engaged in **commercial** conduct, such as refusals to carry competitors' **product advertisements**. Opp. Br. 12-13; *Lorain Journal Co. v. United States*, 342 U.S. 143, 155 (1951) (newspaper's rejection of "advertisements of goods or services"); *Home Placement Serv. Inc. v. Providence Journal Co.*, 682 F.2d 274 (1st Cir. 1982); *Nobody in Particular Presents, Inc. v. Clear Channel Comm., Inc.*, 311 F. Supp. 2d 1048 (D. Colo. 2004).[1] Commercial speech, however, receives a "different degree of protection" under the First Amendment than political petitioning. *See Virginia Pharmacy*, 425 U.S. at 772. The Jets' cases do not undermine Cablevision's *Noerr* immunity to seek political action without incurring antitrust liability; nor do those cases undermine the Supreme Court's holding in *Turner* and *Tornillo* (Opening Br. 6, 13) that a broadcaster may not be compelled to disseminate political speech.

The Jets do not allege that Cablevision made negative statements about the Jets' team or

---

[1] The Jets' argument that Cablevision's allegedly "misleading" political speech violated the antitrust laws is similarly flawed. Like the Jets' other authority, the case that the Jets cite in this context deals only with misleading *commercial* speech. *Caribbean Broad. Sys. Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1082, 1087 (D.C. Cir. 1998). The Supreme Court has explained that the regulation of purportedly "misleading" political speech would chill protected speech in a way that regulation of misleading commercial speech does not. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 772 (1976). Indeed, the Jets' claims, which are bereft of any explanation as to how Cablevision's statements were misleading, are clearly designed to chill Cablevision's political speech.

products, refused to allow the Jets to air commercial advertisements, or engaged in some other commercial conduct. Instead, they base their claims on Cablevision's alleged conduct as part of the political process—such as statements questioning the policies of Governor Pataki and Mayor Bloomberg. The Jets have utterly failed to explain how their claims survive *Noerr*.

**B.     The Jets Do Not Allege A Cognizable Injury.**

Cablevision explained in its opening brief that the Jets have not suffered any injury that could form the basis for an antitrust claim against Cablevision, because the only potential harm to the Jets and their stadium plan would be the result of governmental or judicial decisions. *See* Opening Br. 3-7. The Jets offer nothing to the contrary.

The only "injury" the Jets claim to have suffered to date is the alleged delay in the approval of their stadium project caused by the MTA's decision to put the development rights for the West Side property up for bid, rather than awarding the rights to the Jets through an exclusive negotiation. *See* Opp. Br. 19, 22. But the Jets have already been awarded the development rights—a fact that they curiously fail to mention—and their Complaint contains no allegation of harm from any brief delay in receiving this award. Moreover, as the Jets freely admit, any delay resulted from ***the MTA's action*** in putting its property up for bid. Opp. Br. 22. This governmental action cannot support an antitrust claim against Cablevision, even if it was, in fact, undertaken at Cablevision's prompting. *Noerr*, 365 U.S. at 138.[2]

The only other harm to which the Jets point is potential future harm that may befall their project as a result of ***governmental*** processes based on Cablevision's "continuing" challenge. Opp. Br. 25. This is a telling acknowledgement that the real issue here is the potential that Cablevision will be successful in convincing the state or municipal government that the Jets'

---

[2]    The Jets' attempt to show an injury also undermines their contention that Cablevision's bid for the MTA's property was a "sham." If, as the Jets now argue, Cablevision's bid for the West Side property was sufficiently attractive to convince the MTA to back away from its exclusive negotiation with the Jets and open up the bidding, then Cablevision's bid could not have been so objectively baseless as to constitute a sham. *See Professional Real Estate Inv. Inc. v. Columbia Pictures Indus., Inc. ("PRE")*, 508 U.S. 49, 60 (1993).

project should not be permitted to proceed. This potential future injury, however, is not actionable, both because it is not yet ripe and because injuries that result from the decisions of governmental bodies cannot form the basis for the Jets' claims. Opening Br. 4-5, 8-9.[3]

C.  **The Jets Have Not Alleged Any Anticompetitive Conduct.**

To state a claim for monopolization, the Jets must allege that Cablevision engaged in anticompetitive conduct that meaningfully contributed to the acquisition or maintenance of a monopoly. *Verizon Comms. Inc. v. Law Offices of Curtis V. Trinko ("Trinko")*, 540 U.S. 398, 407 (2004). The Jets' brief confirms their failure to satisfy this required element of their claim.

1.  **Cablevision's political advertising campaign is not anticompetitive conduct.**

As discussed above, Cablevision's efforts to secure government action cannot form the basis for an antitrust claim. The Jets assert that Cablevision has engaged in a "false and misleading ad campaign" and that "the First Amendment does not immunize false statements to consumers." Opp. Br. 14. The Jets, however, have not based their claim on commercial speech to consumers, but rather on speech aimed at influencing decisionmakers in the political process. This is core political speech that is entitled to the strongest First Amendment protection, *see, e.g., Meyer v. Grant*, 486 U.S. 414, 420 (1988), and immunized from antitrust liability under *Noerr*. The Jets utterly fail to distinguish this clear authority in any remotely persuasive way.

The Jets also fail to show that Cablevision's statements would be actionable even if they could properly be characterized as commercial speech. There is a presumption under the antitrust laws that misleading advertisements have a *de minimis* effect and are not actionable. Opening Br. 9 n.3. The Jets cannot satisfy the requirements to overcome this presumption (*id.*),

---

[3] The Jets argue that Cablevision is attempting to "compartmentalize" their injury, and that their claim instead should be evaluated as a "mixture." Opp. Br. 10. But there is nothing here to "mix"—zero plus zero will never add up to a positive number. Alleged injuries that are not of a type that the antitrust laws are designed to prevent—such as injuries suffered as a result of government action—cannot form the basis for an antitrust claim, no matter how they are mixed together. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).

and they do not even attempt to do so.[4]

### 2. Cablevision's alleged refusal to air the Jets' advertisements is not anticompetitive conduct.

Cablevision's alleged refusal to air the Jets' political advertisements also does not give rise to an antitrust claim. First, the cases cited by the Jets regarding refusals to assist competitors involve *commercial* conduct, such as a refusal to accept commercial advertisements from a competitor. *See, e.g., Nobody in Particular*, 311 F. Supp. 2d at 1106. The Jets point to no case in which a court has held that a defendant's refusal to air *political* advertisements could form the basis for an antitrust claim. Just as Cablevision's affirmative political advertisements are protected speech, Cablevision's alleged attempts to influence the political process and secure its political ends by allegedly refusing to air the Jets' political message constitute political conduct that is similarly protected. *Noerr* immunity is not dependent on the precise form of allegedly anticompetitive conduct; rather, the Sherman Act simply does not regulate attempts to influence government action. *Noerr*, 365 U.S. at 137-38; *see also Turner*, 512 U.S. at 641 (First Amendment protects cable operator from being compelled to broadcast political message).

Second, the antitrust laws impose no duty on Cablevision to assist the Jets. *See Trinko*, 540 U.S. at 408. The Jets argue that, under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), a monopolist has a duty in certain circumstances to assist competitors. Opp. Br. 11-12. But *Aspen Skiing* is both inapposite and no longer controlling law after *Trinko*.

To begin with, Cablevision is not a monopolist with respect to the alleged *conduct at issue here*, and therefore the duty that *Aspen Skiing* placed on certain monopolists simply does not apply. The Jets allege that Cablevision refused to air their advertisements and convinced two

---

[4] The Jets incorrectly assert that "Cablevision does not dispute the sufficiency of the allegations" concerning allegedly misleading statements. Opp. Br. 14. To the contrary, Cablevision has argued that the Jets' conclusory allegations were insufficient because they failed to identify "the allegedly deceptive statements, [which] comes nowhere close to meeting the minimum pleading standard." Opening Br. 25, 9 n.3. The Jets still have not identified any allegedly false statements. In any event, the Jets' claims fail as a matter of law under *Noerr* even if Cablevision had actually issued misleading advertisements.

television networks to refuse the Jets' advertisements. But the Jets do not allege that Cablevision is a monopolist with respect to *advertising*. They allege only that Cablevision controls a limited number of advertising spots—"local commercial spots on all non-broadcast networks carried on [its] cable systems" (Compl. ¶ 45). The mere fact that the Jets claim to have preferred advertising through Cablevision neither makes Cablevision a monopolist nor entitles the Jets to a right of access to Cablevision's advertising spots. As the Jets have demonstrated with their extensive, multi-media advertising campaign (featuring Mayor Giuliani, among others), Cablevision is far from the only avenue for the Jets to advertise their message.[5]

Moreover, even if Cablevision could be deemed to be a monopolist with respect to advertising spots, *Trinko* made clear that even a monopolist generally has no duty to deal with or assist its competitors. *See Trinko*, 540 U.S. at 408-09. The Jets rely heavily on *Aspen Skiing* to argue that Cablevision had a duty to assist them, but the *Trinko* Court emphasized that *Aspen Skiing* is "at or near the outer boundary of § 2 liability" and that it constituted only a "limited exception" to the general rule that a business may choose freely with whom it will deal. *Id.* at 409. *Trinko* explained that there was "significance in the [*Aspen Skiing*] defendant's decision to cease participation in a cooperative venture," and because there was no similar prior cooperative venture in *Trinko*, the Court held that the case "does not fit within the limited exception recognized in *Aspen Skiing*." *Id.* Similarly, in this case the Jets allege no prior "cooperative venture" with Cablevision with respect to the Jets' political advertising, and therefore the "limited exception" of *Aspen Skiing* does not apply.[6]

Finally, the Jets point to no harm from their alleged inability to advertise on

---

[5] The Jets argue that "the availability of other means to reach the public does not excuse Cablevision's anticompetitive conduct" (Opp. Br. 15), but they miss the point. The availability of numerous other advertising vehicles means that Cablevision is not a monopolist with respect to advertising, and therefore that its alleged denial of advertising spots to the Jets is not anticompetitive conduct at all.

[6] The Jets rely on *Aspen Skiing* and criticize Cablevision for "[i]gnoring this authority," and relying instead on *Trinko*. Opp. Br. 13. It is hardly improper for Cablevision to have relied on the Supreme Court's latest word on the subject matter (*Trinko*), rather than a sharply limited two-decade-old decision (*Aspen Skiing*) that does not apply to the allegations in this case.

6

Cablevision's local spots or the spots on two other television networks. The Jets have taken advantage of the numerous advertising channels available to them, and they cannot allege that they have been unable to get their message either to the public or to political decisionmakers. Opening Br. 12-13. This is fatal to their claim.

### 3. Cablevision's state court litigation is not anticompetitive conduct.

The Jets have not alleged the elements of a claim of "sham" litigation. The Jets' conclusory allegation that Cablevision's litigation is "objectively baseless" is insufficient to carry their pleading burden; instead, they must offer *factual* allegations to support the conclusion that "no reasonable litigant could realistically expect success on the merits." Opening Br. 14-15 (quoting *PRE*, 508 U.S. at 60). The Jets point to no such allegations (nor allegations as to the subjective element of their sham claim). Their opposition simply repeats the conclusion that Cablevision's litigation was "baseless." Opp. Br. 16. Merely repeating a conclusory allegation is not a substitute for minimum factual allegations. The sham claim fails on this ground alone.

Even if the Jets had carried their pleading burden (and they have not), facts as to which this Court may take judicial notice demonstrate that the underlying litigation is not objectively baseless. Several independent parties have asserted claims in state court that are substantively identical to Cablevision's supposed "sham" claim, including the Tri-State Transportation Campaign (a non-profit corporation formed in 1992 by the Environmental Defense Fund other environmental groups) and the New York Public Interest Research Group. *See* Exh. 2 (¶¶ 2-6, 14).[7] These complaints were filed by independent parties represented by counsel who were satisfied that their allegations had sufficient merit to meet their obligations as officers of the

---

[7] A number of independent parties also have advocated positions similar to Cablevision's claim regarding the MTA's award of the West Side development rights to the Jets, including Public Advocate Betsy Gotbaum, Common Cause, the Transit Workers Union, NYPIRG/Straphangers, and the TSTC, who have filed lawsuits against the MTA; and the Speaker of the New York City Council, nine other members of the City Council, and two State Senators, who filed an amicus brief in the NYPIRG/Straphangers case against the MTA. *See* Exhs. 3-5. Clearly, Cablevision is not the only party that has seen fit to file a legal challenge on these issues.

court. That these other litigants have asserted these claims clearly shows that a "reasonable litigant could realistically expect success on the merits," which requires dismissal.

Moreover, even if the underlying claim could be deemed a sham, the Jets have made no effort to show how Cablevision's initiation of litigation supports the elements of an antitrust claim. *See* Opening Br. 16-17. In particular, the Jets have pointed to no harm from the process of litigation. The only threat to which the Jets point is an adverse decision on the merits. As a matter of law, however, such an outcome would not support an antitrust claim. *See PRE*, 508 U.S. at 60.

4. **Cablevision's bid for the MTA's property is not anticompetitive conduct.**

As noted above, the Jets have effectively conceded that Cablevision's bid was not a sham, because they argue that the MTA considered the bid to be serious enough to establish a bidding process.[8] Opp. Br. 22. The Jets also ask this Court to ignore the Jets' own actions following the submission of Cablevision's bid, of which this Court may properly take judicial notice. That the Jets viewed Cablevision's bid as sufficiently meritorious to warrant raising their own bid by hundreds of millions of dollars belies their claim that Cablevision's bid was a sham.

D. **The Jets Have Not Alleged That Cablevision Has Monopoly Power In A Properly Defined Relevant Market.**

The Jets pay lip-service to the proper standard for defining a relevant market—the test of "reasonable interchangeability" (Opp. Br. 4)—but they attempt to support their narrow market definition by applying a different, and incorrect, test. The Jets argue that Cablevision is a

---

[8] The Jets try to salvage their novel "sham bid" argument by contending that it might have violated Section 7 of the Clayton Act if the MTA had awarded the West Side development rights to Cablevision. Opp. Br. 18. The possibility of such a violation was nowhere alleged in the Complaint. Moreover, it does not violate the antitrust laws (including Section 7) when a governmental authority grants development rights pursuant to a clearly articulated state policy, even where those rights create anticompetitive effects. *See, e.g., Cine 42nd St. Theater Corp. v. The Nederlander Org.*, 790 F.2d 1032, 1046-47 (2d Cir. 1986). And while the Jets offer a half-hearted argument that the antitrust laws apply to government action taken in a commercial capacity (Opp. Br. 17 n.10), this so-called "commercial exception" to *Noerr* has long been disfavored, and it was expressly rejected by this Court in a case in which the Jets were a defendant. *See USFL v. NFL*, 634 F. Supp. 1155, 1178-79 (S.D.N.Y. 1986); *see also TEC Cogeneration Inc. v. Florida Power & Light Co.*, 76 F.3d 1560, 1572-73 (11th Cir. 1996).

8

monopolist because it supposedly "fear[s]" facing additional competition. Opp. Br. 5. But the simple fact, even if assumed to be true, that a company does not want to face additional competitors does not make it a monopolist. A street-corner hot dog vendor will not want another hot dog vendor to open for business on its corner, but that does not make the hot dog vendor a monopolist or hot dog sales on a particular corner a relevant market. Not surprisingly, the Jets offer no authority to support their argument that a defendant's alleged desire not to face additional competition means that the defendant is a monopolist.

In any event, the premise of the Jets' claim that Cablevision "fear[s]" competition is an utter fabrication. The Jets base their contention on a supposed quotation from Cablevision's president, James Dolan, (see Opp. Br. 5, Compl. ¶¶ 2, 39), but the actual transcript of Mr. Dolan's statements—which this Court may properly consider at this juncture because it is expressly referenced in the complaint as the basis for the Jets' claim, see, e.g., Cortec Indus., Inc. v. Sum Holding LP, 949 F.2d 42, 47 (2d Cir. 1991)—reveals that the Jets' version of Mr. Dolan's statements is an outrageous distortion. Mr. Dolan actually stated that "I don't mind competing" with the Jets' stadium. See Exh. 1 at 15-16. He further stated that his concern was not with competition, but with the fact that the Jets will be "compet[ing] on price with the subsidy of the government" while Cablevision "will be compet[ing] on price with a subsidy from nobody." Id.

Under the proper standard for defining the relevant market, dismissal is also required. For example, as the Jets acknowledge, the relevant geographic market is the area "to which the purchaser can practically turn." Opp. Br. 4. That the Jets themselves have turned to venues in Queens and the Meadowlands (Compl. ¶ 37) conclusively demonstrates that the geographic market for promoters of large-venue events encompasses at least the New York metropolitan area, and not just Manhattan.[9] The Jets try to hide behind the argument that market definition

---

[9] This market definition is also consistent with a case that the Jets cite (Opp. Br. 5 n.2), *Flip Side Prods., Inc. v. Jam Prods., Inc.*, 843 F.2d 1024, 1033 (7th Cir. 1988), in which the court concluded that the geographic market for "arena-level concerts" was the entire Chicago metropolitan area, including venues in downtown Chicago as well as suburbs such as Rosemont.

often involves questions of fact (Opp. Br. 4, 7), but they do not dispute that numerous courts have dismissed cases where, as here, a plaintiff asserted a purported market that was implausible. *See* Opening Br. 19 & n.11 (citing cases). There is no need to conduct discovery here to confirm the obvious: event promoters and consumers of entertainment have numerous options in the New York metropolitan area and in Manhattan other than Cablevision's three venues.

E.   **The Jets Have Not Stated A Claim For Tortious Interference.**

The Jets' tortious interference claim fails because, among other reasons, they have not alleged any tortious conduct. Opening Br. 21-24. The Jets' opposition points to nothing other than Cablevision's supposed "anticompetitive conduct." Opp. Br. 21-23. Their tortious interference claim thus falls with their antitrust claim. In addition, the Jets have not shown that Cablevision's alleged anticompetitive acts caused injury—significantly, the Jets were awarded development rights to the West Side property following the bidding that is the subject of their tortious interference claim. For these reasons, as well as for the other reasons that Cablevision identified in its opening brief, the Jets' tortious interference claim fails as a matter of law.

F.   **The Jets Have Not Stated A Claim Under N.Y. General Business Law § 349.**

Section 349 applies only to commercial, or "consumer-oriented," activities, not the political speech alleged here. N.Y. Gen. Bus. Law § 349 (prohibiting "[d]eceptive acts or practices *in the conduct of any business, trade or commerce or in the furnishing of any service*" (emphasis added)); *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002). Section 349 *cannot*—consistent with the Constitution—prohibit Cablevision from freely expressing its "opinion about public matters." *New York Pub. Interest Research Group v. Insurance Info. Inst.*, 554 N.Y.S.2d 590, 592 (N.Y. App. Div. 1990). The Jets offer no explanation as to how Section 349 might reach Cablevision's alleged political conduct, but instead rely on cases addressing commercial conduct. Because those cases are inapposite, this claim should be dismissed.

## CONCLUSION

For the foregoing reasons, Cablevision respectfully requests that the Court dismiss the Complaint for failure to state a claim.

Dated:  April 29, 2005                              Respectfully submitted,

                                                    /s/ Miguel A. Estrada

Jack M. Weiss                                       Miguel A. Estrada (ME-4227)
Randy M. Mastro                                     Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP                         Michael L. Denger
200 Park Avenue                                     Joshua Lipton
New York, NY  10166-0193                            GIBSON, DUNN & CRUTCHER LLP
Tel:  (212) 351-4000                                1050 Connecticut Avenue, NW
Fax:  (212) 351-4035                                Washington, DC  20036-5306
                                                    Tel:  (202) 955-8500
                                                    Fax:  (202) 467-0539

                                                    *Counsel for Defendants Cablevision Systems Corporation, CSC Holdings, Inc., and Madison Square Garden L.P.*