SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------x

In the Matter of the Application of

TRI-STATE TRANSPORTATION
CAMPAIGN, Inc., NEW YORK PUBLIC
INTEREST RESEARCH GROUP, Inc.
JONATHAN ORCUTT, KATHERINE
SLEVIN, TERESA TORO, and MENAKA
MOHAN,

               Petitioners,

For Judgment Pursuant to CPLR Article 78

         – against –

NEW YORK CITY DEPARTMENT OF
CITY PLANNING, NEW YORK CITY
PLANNING COMMISSION, THE CITY
OF NEW YORK, THE CITY COUNCIL OF
THE CITY OF NEW YORK, and NEW
YORK METROPOLITAN
TRANSPORTATION AUTHORITY,

               Respondents.

------------------------------------------------x

Index No. 117947/04

IAS Part 49

Justice Cahn

**VERIFIED
AMENDED PETITION**

      Petitioners, by their undersigned attorney, for their verified petition alleges as
follows:

## NATURE OF THE PROCEEDING

     1.     This proceeding is brought pursuant to Article 78 of the Civil Practice
Law and Rules, seeking declaratory and injunctive relief against the Department of City
Planning of the City of New York ("DCP"), Planning Commission of the City of New

1

Dockets.Justia.com

York (the "Planning Commission"), the City of New York (the "City"), the City Council of the City of New York (the "City Council"), and the New York Metropolitan Transportation Authority ("MTA") (collectively, the "Respondents") in connection with their arbitrary, capricious, and unlawful issuance of approvals for the No. 7 Subway Extension, Hudson Yards Rezoning & Development Program Draft Generic Environmental Impact Statement ("DGEIS") and Final Generic Environmental Impact Statement ("FGEIS").

## PARTIES

2.  The Tri-State Transportation Campaign ("Tri-State" or "TSTC") began as a project of the Environmental Defense Fund in 1992, a New York non-profit corporation. Its mission is to create, advocate and implement an efficient, equitable and environmentally sound transportation plan and planning process for the greater tri-state metropolitan area.

3.  A board of trustees was formed for the project known as the Tri-State Transportation Campaign. The board consisted of fifteen members, including an organization representative from each of the ten founding member-organizations. Among these ten founding organizations were:  Environmental Defense Fund (now Environmental Defense), Natural Resources Defense Council, NY Public Interest Research Group (Straphangers Campaign), Transportation Alternatives, New York City Environmental Justice Alliance, Environmental Advocates of New York, New Jersey Public Interest Research Group Citizen Lobby, and Connecticut Fund for the Environment.

4. In 1994, the trustees of the Tri-State Transportation Campaign determined to separately incorporate, and did so, in New Jersey, immediately filing a certificate and authority to do business in New York. Tri-State is headquartered in New York, and employs its full-time professional staff in New York. Each of the founding organizations of Tri-State agreed to send a representative as a trustee of the Tri-state Transportation Campaign, Inc. to serve as that organization's representative. Each of these member-organizations except for two of the founding organizations were and are membership organizations. Projects, positions and other work, including lawsuits, are voted upon by the member-organizations' representatives to the trustee board of Tri-State Transportation Campaign, Inc. When Tri-State testifies on a project, it represents the interests of the thousands of members of its member-organizations, by consent of those organizations.

5. Tri-State Transportation Campaign also has affiliate members. Affiliates are membership organizations and prominent individuals who have read the Tri-State Transportation Campaign Citizens Action Plan and have agreed, at a board meeting or in writing to support said Plan and Tri-State organization. They may attend all Tri-State meetings, have the privilege of the floor, and call on Tri-State members for expertise and assistance.

6. Tri-State now has seven members of the trustee board who represent their member-organization's interests, including Natural Resources Defense Council, NY Public Interest Research Group (Straphangers Campaign), and Environmental Defense, as well as several individual board members, and over 70 affiliate member organizations.

7.    Tri-State, through its individual trustees, its member-organizations who send a representative trustee to its board, which include and represent thousands of members, and its scores of affiliate members, who speak through the Tri-State voice, have standing to appeal Respondents' decision to approve the Hudson Yards development. Petitioner brings this suit on behalf of all the following: the organization, its employees, its trustees, its trustees' members, its affiliates, and its affiliates' members.

8.    Petitioner's headquarters is located at 350 West 31st Street, between 8th and 9th Avenues, within the study and rezoning areas. TSTC has a 10-year lease for its current property extending from August 2003 to July 2013. In anticipation of occupying the space for the entire lease period, and possibly beyond, TSTC has made extensive improvements to its office. Major construction of the Project is slated to begin as early as 2005, including construction of the Multi-Use Facility ("Stadium") and Eastern Caemmerer Yards, which are located on 31st Street, and end in 2010. (FGEIS, Figure 23-3, Construction Schedule.) Petitioner's office sits directly downwind from these construction sites. (FGEIS, Figure 23-1, Major Construction Activity 2005-2010.)

9.    In addition to enduring years of construction impacts, Petitioners will suffer from the long-term effects of the project. TSTC employees bike to work. This requires them to share the roadways with trucks and cars during the morning and evening rush hours. Employees also commute by subway. They walk to and from the subway and train stations, and frequent businesses throughout the study area. TSTC employees currently have to endure the air and noise impacts of the region's congested traffic. Traffic frequently backs up on 31st Street between 8th and 9th Ave and often takes up the entire block, leaving cars and trucks idling. The FGEIS shows that the Project will only

4

make traffic worse. The FGEIS identifies a number of intersections along 8th and 9th Avenues that will have significant adverse impacts in 2010 with the proposed action. (FGEIS, 19-63, Table 19-23, 2010 Future with the Proposed Action: Intersections with Significant Adverse Impacts – Weekday AM Peak Hour.) Further, traffic, air pollution, noise, and pedestrian and bicyclist safety impacts in the vicinity of Petitioner's office would be worse than projected in the FGEIS if realistic traffic assumptions were used.

10.     Petitioner Jonathan Orcutt is the Executive Director of the Tri-State Transportation Campaign, Inc. He frequently bikes to work, or he takes mass transit, and will be affected by the traffic, noise and air impacts caused by the Project.

11.     Petitioner Katherine Slevin is the Associate Director of the Tri-State Transportation Campaign. She takes mass transit to work and will be affected by the traffic, noise and air impacts caused by the Project.

12.     Petitioner Teresa Toro is the Tri-State Transportation Campaign's New York Coordinator. She takes mass transit to work and will be affected by the traffic, noise and air impacts caused by the Project.

13.     Petitioner Menaka Mohan is the Tri-State Transportation Campaign's Communications Assistant. She takes mass transit to work and will be affected by the traffic, noise and air impacts caused by the Project.

14. ·   The New York Public Interest Research Group, Inc. ("NYPIRG") is a non-profit membership organization dedicated to protecting the environment and public health, supporting consumer rights, and improving government administration. NYPIRG's principal office is located at 9 Murray Street, 3rd Floor, New York, New York.  NYPIRG also maintains twenty offices on

college campuses, a legislative office in Albany, New York, and regional

offices in Buffalo, Huntington and Syracuse. NYPIRG maintains twenty-one chapters at

college campuses across the state. They are suing on behalf of their members who will be

adversely affected by the Project.

15.    Petitioners will suffer in ways that differ from the effects that would be

suffered by the public at large because Petitioners will be subject to increased traffic

congestion, air pollution, and noise associated with the project.

16.    Petitioner TSTC brings this suit on behalf of all the following: the

organization, its employees, its trustees, its trustees' members, its affiliates, and its

affiliates' members.

17.    Respondent New York City Department of City Planning ("DCP") is a

department of the City of New York established pursuant to Chapter 8 of the New York

City Charter ("Charter"). Under ULURP, DCP has the responsibility for certifying that an

application is complete before the Planning Commission reviews it.

18.    Respondent New York City Planning Commission ("Planning

Commission") exists pursuant to Section 192 of Chapter 8 of the Charter. Under ULURP,

the Planning Commission is responsible for performing a substantive review of, holding a

public hearing on, and issuing a report and resolution on most proposed land-use actions

in New York City. It is co-lead agency, with the New York Metropolitan Transportation

Authority, for the environmental review of the project for purposes of SEQRA and

CEQR.

19.    Respondent City of New York (the "City") is a domestic municipal

corporation located within the State of New York.

19a.    Respondent The City Council of the City of New York ("City Council") is a legislative body of the City established by Charter. Pursuant to Justice Cahn's ruling on January 13, 2005, the City Council has been named as a Respondent following its January 20, 2005 action.

20.    Respondent New York Metropolitan Transportation Authority ("MTA") is a public authority of the State of New York established pursuant to N.Y. Public Authorities Law § 1263. It is co-lead agency, with the Planning Commission, for the environmental review of the project for purposed of SEQRA and CEQR.

## JURISDICTION

21.    This Court has subject matter jurisdiction over this matter and may exercise personal jurisdiction over the Respondents.

22.    Pursuant to CPLR § 506(b) venue is proper in the Court because DCP, the Planning Commission, and the MTA have their principal offices in New York County and the determination complained of was made in New York County, and the material events have taken place and will continue to take place in New York County.

## RELEVANT LEGAL PROVISIONS

23.    In 1975, the New York State Legislature enacted SEQRA, N.Y. Environmental Conservation Law ("ECL") Article 8. The purpose of SEQRA is to incorporate the consideration of environmental factors into the planning, review, and decision-making processes of state and local governmental agencies at the earliest possible time. To accomplish this purpose, SEQRA requires that all agencies determine whether the actions they undertake, fund, or approve may have a significant adverse

impact on the environment, and if they may, to prepare an environmental impact statement ("EIS") analyzing such impacts. *See* ECL § 8-0103; 6 New York Codes, Rules & Regulations ("NYCRR") § 617.1(c).

24.    The regulations under SEQRA state: "An EIS provides a means for agencies, project sponsors and the public to systematically consider significant environmental impacts, alternatives and mitigation. An EIS facilitates the weighing of social, economic, and environmental factors early in the planning and decision-making process." 6 NYCRR § 617.2(n).

25.    In 1997, the Mayor of the City of New York signed Executive Order 91, promulgating CEQR requirements as contemplated by SEQRA. Pursuant to section 192(e) of the Charter, the Planning Commission has established additional rules under CEQR. *See* 62 RCNY § 5-01 *et seq.*

26.    Compliance with SEQRA and CEQR is mandatory: "No agency involved in an action may undertake, fund or approve the action until it has complied with the provisions of SEQR" and CEQR. 6 NYCRR § 617.3(a); *see also* 62 RCNY § 6-12(a).

27.    The project may have a significant adverse impact on the human environment and require discretionary approvals of State and City agencies, thus requiring the preparation of an EIS under SEQRA and CEQR.

28.    The SEQRA regulations include a list of items that "all draft EISs must include." 6 NYCRR § 617.9(b)(5). Among these are "a statement and evaluation of the potential significant adverse environmental impacts at a level of detail that reflects the severity of the impacts and reasonable likelihood of their occurrence," *id.* § 617.9(b)(5)(iii), including any "reasonably related short-term and long-term impacts.

cumulative impacts and other associated environmental impacts," *id.* § 617.9(b)(5)(iii)(a), and "a description of the mitigation measures." *Id.* § 617.9(b)(5)(iv).

29.    Similarly, CEQR provides that "[t]he body of all draft and final EIS's shall contain at least the following," 62 RCNY § 6-09(d), including "a statement of the environmental impacts of the project, including its short-term and long-term effects, and typically associated environmental effects," *id.* § 6-09(d)(2), and "a description of mitigation measures proposed to minimize adverse environmental impacts." *Id.* § 6-09(d)(7).

30.    SEQRA provides that every DEIS must be made available to interested members of the public for comment, and that a public hearing may be held on the DEIS. ECL § 8-0109(4)-(5); 6 NYCRR § 617.9(a)(3)-(4). A public hearing is mandatory under CEQR. 62 RCNY § 6-10(c).

31.    The SEQRA and CEQR regulations provide for a process called "scoping." "The primary goals of scoping are to focus the EIS on potentially significant adverse impacts and to eliminate consideration of those impacts that are irrelevant or nonsignificant." 6 NYCRR § 617.8(a)

32.    The SEQRA regulations provide that "[t]he lead agency will use the final written scope, if any … to determine whether to accept the draft EIS as adequate with respect to its scope and content for the purpose of commencing public review." 6 NYCRR § 617.9(a)(2).

33.    Under CEQR, scoping is mandatory. 62 RCNY § 5-07.

34.    The Uniform Land Use Review Procedure ("ULURP"), established by Charter §§ 197-c, 197-d, and 200, is the required procedure for review of certain

9

categories of land-use decisions in New York City. Charter § 197-c provides that "applications by any person or agency for changes, approvals, contracts, consents, permits or authorization thereof, respecting the use, development or improvement of real property subject to city regulation shall be reviewed pursuant to a uniform review procedure" if such matters fall within certain specified categories.

35.     The project involves "applications ... for changes, approvals, contracts, consents, permits or authorizations thereof, respecting the use, development or improvement of real property subject to city regulation" under Charter § 197-c.

36.     Where an action under ULURP is also subject to an EIS, the ULURP application may not be certified as complete until "the satisfactory completion of a DEIS." 62 RCNY § 6-10(a); *see also* 62 RCNY § 2-02 (a)(5)(v)(B).

37.     The regulations of the Planning Commission require that "documents or records intended to define or substantially redefine the overall scope of issues to be addressed in any draft environmental impact statement required by law shall be circulated to all affected community or borough boards." 62 RCNY § 5-06.

38.     SEQRA and CEQR require the lead agency to make available to the public the supporting studies and information relied upon for the factual content, assumptions and conclusions of the Environmental Impact Statement ("EIS").

39. SEQRA provides:

A draft or final EIS may incorporate by reference all or portions of other documents, including EISs that contain information relevant to the statement. The reference documents must be made available for inspection by the public within the time period for public comment in the same places where the agency makes available copies of the EIS. When an EIS incorporates by reference, the referenced documents must be briefly described, its applicable

findings summarized, and the date of its preparation provided. 6
NYCRR § 617.9(b)(7).

40.    Likewise, CEQR requires:

An EIS may incorporate by reference all or portions of other
documents which contain information relevant to the statement.
The referenced documents shall be made available to the public in
the same places where copies of the statement are made available.
When a statement uses incorporation by reference, the reference
document shall be briefly described and its date of preparation
provided. CEQR at § 6-09(e).

## FACTS

41.    The City of New York and the MTA have proposed a set of related actions

that would completely transform the West Side of Manhattan. These include the

construction of a new football stadium for the New York Jets; an expansion of the

Convention Center; an extension of the No. 7 subway line; and a rezoning of a 42-block

area generally bounded by West 43rd Street on the north, Eleventh Avenue on the west,

West 28th and 30th Streets on the south, and Seventh, Eighth, and Tenth Avenues on the

east (the "Project").

42.    On April 21, 2003, the Planning Commission and the MTA, as the joint

lead agencies for the SEQRA/CEQR review of the project, announced that they would

prepare a DEIS considering the project.

43.    In April 2003, the Planning Commission and the MTA announced that

they would be conducting a scoping process to determine the scope of the DEIS. They

released a draft scoping document on April 30, 2003. They held a public scoping hearing

on June 5, 2003, and they accepted written comments until June 16, 2003. A large

number of comments were submitted. Petitioner submitted comments at this hearing.

11

44.    On May 28, 2004, after considering the oral and written comments on the draft scope, the Planning Commission and the MTA issued the Final Scope for the DEIS.

45.    On or about June 21, 2004, the Planning Commission and the MTA accepted the DEIS as adequate and issued it for public comment.

46.    The "Notice of Acceptance of Draft Generic EIS" issued by the Planning Commission and the MTA stated that the DEIS was "prepared in accordance with the Final Scoping Document issued on May 28, 2004."

47.    On June 21, 2004, DCP certified the ULURP application for the proposed rezoning as complete and authorized it to undergo the ULURP review process. This action initiated the referral of the application to Community Boards 4 and 5, to the Manhattan Borough Board, and to the Manhattan Borough President.

48.    On September 23, 2004, the Planning Commission and the MTA held a public hearing on the DGEIS (FGEIS at 3-4). TSTC's New York Coordinator testified at this hearing. (FGEIS at Appendix AA: Transcript of DGEIS Public Hearing at 177).

49.    On November 22, 2004, the Planning Commission approved the ULURP applications and issued a "Co-Lead Agencies Findings Statement" under SEQRA and CEQR.

## UNSUPPORTED TRAFFIC ANALYSIS

50.    Both the DGEIS and the FGEIS assume that approximately 70% of stadium users will travel by mass transit. Traffic, noise, and air quality assumptions in the DGEIS and FGEIS are all built upon this figure. Experience at other facilities throughout the City and comparable facilities throughout the United States demonstrate that this figure is unrealistic, unreliable, unsupported, and unsupportable.

12

**Unreliable Survey Results**

51.     The mode split used in the DGEIS and FGEIS is based entirely on two telephone surveys of Jets season ticket holders. Neither the DGEIS nor the FGEIS contain the actual surveys. "Mode split" is a term of art that describes how many people use alternative forms of transportation. It is frequently used to describe the percentage of people who use private automobiles, as opposed to the percentage who use public transportation.

52.     According to the FGEIS, the first telephone survey, taken between August 29 and September 5, 2002, took a random sample of 600 Jets season ticket holders and found that "approximately 70% of the season ticket holders said they would maintain their ticket subscriptions and take mass transit service." (FGEIS, App. S. 1, Mem. From E. Metzger to G. Price, M. Amjadi, Sept. 28, 2004 ("Sept. 28, 2004 Metzger Mem.") at 1-2.

53.     In 2004, Respondents conducted a "supplemental survey" of New York Jets season ticket holders. The new survey was conducted by telephone from May 5-10, 2004 by Schulman, Ronca & Bucuvalas, Inc. and asked 600 season ticket holders approximately 20 questions pertaining to their expected travel patterns to the proposed Stadium. The survey is reported to have a margin of error of about plus or minus 4 percent. (FGEIS, App. S. 1, Mem. From E. Metzger to G. Price, M. Amjadi, June 9, 2004 ("June 9, 2004 Metzger Mem.") at 1.

54.     On or about November 17, 2004, Petitioner's attorney contacted DCP to request a copy of the survey instruments used, noting that according to the FGEIS, a copy was provided to another commenter. FGEIS, Comment N-14, at 29-78 ("After this

comment was received, copies of McLaughlin & Associates, Inc.and Schulman, Ronca & Bucuvalas Inc. ("SRBI") survey instruments were provided to the commenter. Cross tabulations from the SRBI survey, which was sponsored by the co-lead agencies, were also provided.") A representative for DCP told Petitioner's attorney that she would have to file a New York State Freedom of Information request with the DCP or MTA in order to view a copy of the survey questions. Petitioner's attorney received a copy of the SRBI survey from another source and included comments on the instrument in her November 19, 2004, Comments on FGEIS for Hudson Yards Project. ("Comments on FGEIS for Hudson Yards Project," Tri-State Transportation Campaign, November 19, 2004 ("TSTC"), Ex. A).

55.    According to the SRBI survey instrument, 67 percent of respondents stated that they would take transit to a Jets game at the new stadium. With the proposed #7 Subway extension, 75 percent of respondents revealed an intention to take transit to a game. A series of additional questions, asked just of remaining drivers, adds additional transit amenities and services. With the entire package of transit services and amenities in place, the survey finds that 88 percent of respondents intend to use transit to get to a Jets game at the new stadium. (SRBI Survey, Ex. B).

56.    No other comparable venue in New York City enjoys transit usage rates as high as forecasted for the Jets stadium. (TSTC, p. 5-6, Ex. A). The SRBI stadium survey from which these figures were derived has produced results that greatly overstate what actual transit usage rates would be if the proposed stadium were built.

57.    Modal split figures are the keystone of transportation planning, providing the basic numbers needed to develop transit ridership estimations, traffic volume

projections, and pedestrian impact assessments. (TSTC, p. 4). The misleading results derived from the Jets stadium survey undermine the entire FGEIS traffic analysis, resulting in highly underestimated traffic congestion and associated impacts, and infect the air quality and noise analysis (TSTC, p 7.).

58.     Over the last several decades, transportation experts have developed several tools for forecasting modal choice, transit usage, high-occupancy vehicle lane usage, and participation in travel demand management programs. One method is the "stated preference" survey or model. Under this method, respondents are asked to consider several different options, based on well-developed contextual factors, including the total cost of each alternative, the total time of travel, time spent waiting for a bus or train, total walking distance, etc. This method gives the respondent as much information as possible, so that they can make a relatively informed prediction about how they might travel. (TSTC, p. 2).

59.     Despite the fact that a true "stated preference" survey or model is based on well-developed contextual factors, "major shortcomings of stated preference and discrete choice models limit their utility however. These models typically overstate actual usage of new or improved transit services, often by large amounts." (Schaller, B. "Enhancing Transit's Competitiveness: A survey methodology." Presented at the Transportation Research Board Annual Meeting, Washington, DC, January 1999, Ex. C).

60.     One flaw with "stated preference" surveys is that "when individuals are confronted with situations that they have not experienced, they can find it difficult to gauge accurately the consequences of the choices that they are asked to make." (D'Arcier, Bruno Faivre. "Hypothetical Situations: The attempt to find new behavioral

hypotheses," *TRB Trasnportation Research Circular E-C008: Transport Surveys: Raising the Standard*. August 2000, Ex. D).

61. The SRBI survey, however, does not even qualify as a stated preference survey, because it fails to provide the contextual information that would be needed to make an informed prediction of travel mode. Respondents were not told how much the transit trip would cost, nor how long it would take. They were not told how much they could expect to pay in tolls or parking, or how long a driving trip would take. Survey respondents were not given information about how far they would have to walk from various transit options to get to the proposed stadium, and were not asked about access to existing transit service from their residence. (SRBI Survey, Ex. B).

62. At best, the SRBI survey could be described as a concept test. Studies have shown concept tests to be particularly unreliable. (Couture, M.R., Dooley, T. "Analyzing Traveler Attitudes to Resolve Intended and Actual Use of a New Transit Service," *Transportation Research Record* v. 794 (1981), pp 27-33, Ex. E). Studies of concept tests have shown that less than half of those who initially indicated that they would take a new subway line actually did once the subway line was open. (TSTC Comments, p 2, Ex. A, Couture, M.R., Dooley, T. "Analyzing Traveler Attitudes to Resolve Intended and Actual Use of a New Transit Service," *Transportation Research Record* v. 794 (1981), pp 27-33, Ex. E, Chatterjee, A., Wegmann, F.J., and McAdams, M.A. "Non-Commitment Bias in Public Opinion on Transit Usage," *Transportation* v. 11 (1983), pp 347-360, Ex. F).

63. Another flaw with concept tests is that they suffer from a "non-commitment bias," which has been identified as the primary cause of overstated transit

use intentions. Respondents feel free to indicate that they will use a new transit service because they are under no obligation to actually do so. (Chatterjee, A., Wegmann, F.J., and McAdams, M.A. "Non-Commitment Bias in Public Opinion on Transit Usage," *Transportation* v. 11 (1983), pp 347-360, Ex. F; Garling, T., Gillholm, R., and Garling, A. "Reintroducing Attitude Theory in Travel Behavior Research: The Validity of an Interactive Interview Procedure to Predict Car Use," Transportation, v. 25 (1998), pp 129-146, Ex. G; Garling, T., Loukopoulos, P., and Lee-Gosselin, M. "Public Attitudes," in K. Button and D. Hensher (eds.), *Handbook of Transport and the Environment*. Elsevier Science, 2003, Ex. H). Studies have in fact used a "noncommitment bias correction" to discount results from transit use concept tests. (Ithaca-Tompkins County Transportation Council. *NESTS Transit Planning Project: Task 2 Deliverable: Service and Facility Strategies*. August 2002 at 21-22, Ex. I).

64.    In summary, despite allegations in the DGEIS and the FGEIS that using a prospective survey to predict transit use is the most accurate way to devise mode share, much literature demonstrates otherwise.

## FLAWED SRBI SURVEY

65.    In addition to doubts about whether or not surveys in general are a realistic way to estimate mode share, the SRBI survey is seriously flawed. One significant defect with the SRBI Jets season ticket holders survey is that the questions on modal split are prospective, rather than reflective of actual demonstrated behavior. (TSTC, Ex. A).

66.    Respondents to the stadium travel survey were asked a series of questions that appeared to lead respondents about their expected choice of transportation to a Jets game at the new stadium location. The first question asked all respondents whether they

would drive, take a taxi or limousine, or use mass transit. Subsequent questions, asked only of those who responded that they would drive, added more transit options such as the Number 7 Subway extension, satellite parking for ferry service, and satellite tailgating facilities. Statistics experts fault these types of survey questions for introducing error because of the social desirability effect – by the end of questioning, the respondent is well aware that the interviewer would prefer her to state she would take mass transit (TSTC at 2-3, Ex. A).

66a.    According to the SRBI Survey, survey respondents were told that they would be able to transfer to the Number 7 Subway line from the Long Island Rail Road. However, the Long Island Rail Road does not currently offer direct service to Grand Central Station, which is connected to the No. 7 Subway line. The East Side Access Project would connect the Long Island Rail Road to Grand Central Station, but the completion of that project any time in the near future is doubtful. On January 18, 2005, Gov. George Pataki proposed a state budget that did not provide full funding for the project, leaving many to doubt whether the project will ever be completed. On January 24, 2005, Mayor Michael R. Bloomberg testified that the governor's decision put the project's future in "jeopardy." (SRBI Survey at 12, Ex. B.; Al Baker and Sewell Chan, "Transit Projects Are Put In Doubt by Pataki Budget/A $105 Billion Blueprint/ Higher Fees Don't Cover 2nd Ave. Subway and L.I.R.R. Connection," N.Y. Times, Jan. 18, 2005, at A1, Ex. O; New York City, Press Release, PR-031-05, "Mayor Michael R. Bloomberg Testifies Before the New York State Joint Fiscal Committees on the 2005-2006 Executive Budget," Jan. 24, 2005, Ex. P.)

67.     The Petitioners are aware of no similar venue in New York City that has a mode split similar to the FGEIS's mode split for the proposed Jets stadium. (TSTC, pp 5-6). A 2003-2004 survey of actual sports game attendees done by Madison Square Garden found the average percentage of people who took mass transit to sports events was 49-52%, and this arena is much closer to mass transit stations – both commuter rail and subway services – than the proposed Jets stadium. The FGEIS, however, claims that "highly conservative estimates of events and vehicular trip assumptions were factored into the analysis methodology to ensure that the analysis determined potential impacts of the reasonable worst case scenarios." (FGEIS at ES-40.)

## Defective Survey Instrument Resulted in Defective Mode Split

68.     Modal split figures are the keystone of transportation planning, providing the basic numbers needed to develop transit ridership estimations, traffic volume projections, and pedestrian impact assessments. (TSTC, p 4). The FGEIS traffic analysis uses modal split figures derived from survey use. The SRBI survey found an implausibly high transit mode share – 68 percent transit usage without the No. 7 Subway extension and 75 percent transit usage with the extension – which is well above transit usage for every other comparable venue in New York City. (TSTC, p 5-6). These misleading results undermine the entire FGEIS traffic analysis, producing highly underestimated traffic congestion and parking impacts, air pollution, and noise concerns. (TSTC, p 7).

69.     The defective mode split analysis has affected and infected significant environmental analysis for traffic, air quality, and noise.

## Traffic

70.     The FGEIS underestimates the amount of traffic congestion. Because of the defective mode split, traffic congestion impacts have been seriously underestimated. Clearly, if the FGEIS modal split findings exaggerate the numbers of stadium patrons using mass transit, more auto and taxi traffic than the FGEIS predicts will enter the study area during stadium events, and this traffic would have to be assigned to the highway and street network in the FGEIS traffic analysis. Traffic congestion impacts will also be greater even under the 68% transit ridership scenario because the traffic congestion mitigation analysis studies each intersection in isolation and does not provide for any dynamic effects, interaction or cumulative effects from intersection to intersection across the street network. (Comments of Jeffrey Zupan, Regional Plan Association, FGEIS, Appendix BB at 46).

71.     In addition, traffic impacts will be worse than predicted if the No. 7 line extension is not completed by 2010 as the FGEIS assumes because more people will take cars and taxis.

72.     In addition, even though traffic impacts of the proposed action have been greatly underestimated, the DGEIS and FGEIS still predict that the Project will result in massive, unprecedented levels of congestion. (DGEIS at 19-165 to 19-168, Tables 19-68, 19-70, FGEIS 19-62 to 19-81).

## Air Pollution

73.     Air pollution impacts of the proposed action will be greater than the FGEIS finds if more car and taxi traffic than the FGEIS allows for is generated by the proposed stadium.

74.    The FGEIS presents a direct relationship between traffic volume and air pollutants: "CO is a colorless and odorless gas that is generated in the urban environment primarily by the incomplete combustion of fossil fuels in motor vehicles. In New York City, more than 80% of CO emissions are from motor vehicles."(FGEIS, 21-4) "Hydrocarbons (including nitrogen oxides and photochemical oxidants) include a wide variety of volatile organic compounds, emitted principally from storage, handling, and use of fossil fuels." Other pollutants that result from burning fossil fuels in automobiles and trucks include particulate matter, and other non-criteria pollutants, such as benzene (FGEIS 21-4 to 21-5).

75.    The DGEIS and FGEIS project air pollution levels resulting from the development. If traffic levels generated by the proposed action exceed those allowed for in the DGEIS, air pollution levels could well violate the National Ambient Air Quality Standards for carbon monoxide and fine particulate matter, leading to adverse health impacts. (ENVIRON Comments, FGEIS, Appendix BB, at 521 to 524).

76.    The FGEIS underestimates air pollution levels by ignoring the considerable increases in emissions that will result from the projected expansion of ferry traffic across the Hudson River. Ferries have higher emissions per passenger mile than do automobiles. (Comments of Riverkeeper, FGEIS, Appendix BB at 225).

77.    If traffic levels exceed those allowed for in the DGEIS and FGEIS, congestion will be worse and pollution impacts will be higher than the DGEIS and FGEIS admit.

78.    Emission rates for many pollutants follow a U–shaped curve, with emission rates declining as speed increases up to a certain level, and then climbing again.

(Surface Transportation Policy Project, "Clearing the Air: Public Health Threats from Cars and Heavy Duty Vehicles- Why We Need to Protect Federal Clean Air Laws." Washington, DC: August 2003, Ex. J). Vehicles in congestion stemming from the proposed stadium will clearly be at the upper end of the "U" curve – idling or traveling very slowly, and thus emitting maximum levels of pollutants. Similarly, transportation studies find that "emissions [from carbon monoxide and volatile organize compounds] are generally highest in low-speed, congested driving conditions." ("Expanding Metropolitan Highways: Implications for Air Quality and Energy Use." Special Report 245, Transportation Research Board, National Research Council, pg. 49, Ex. K).

79.     Slower vehicle speeds produce more volatile organic compounds and carbon monoxide, along with toxic air pollutants, such as benzene. (Tang, T, Claggett, M., Byun, J., Roberts, M., et al. MOBILE 6.2, Air Toxic Emission Factor Modeling: A Trend and Sensitivity Analysis, submitted to the US EPA's 13th International Emission Inventory Conference, June 2004, Ex. L; US EPA, Sensitivity Analysis of MOBILE 6.0, December 2002, Ex. M).

### Noise Impacts

80.     Noise impacts of the proposed action will be much greater than the FGEIS predicts if the Project generates more car and taxi traffic than the FGEIS predicts.

81.     As the FGEIS states, "Traffic related noise levels in New York City streets are directly affected by vehicle types (i.e. automobiles, medium trucks, and heavy trucks), vehicle speed and traffic volume" (FGEIS, at 22-1). "When traffic volumes are doubled (or halved) the noise level generally increases (or decreases) by approximately 3 dBA."(FGEIS at 22-2).

82.    The FGEIS also finds that noise levels are directly related to traffic volumes estimates stemming from the proposed action: "The Proposed Action would result in perceptible changes in noise levels at 6 of the 19 analysis locations in 2010 and 8 of the 19 analysis locations in 2025 during at least one of the five periods for which estimates for noise levels were completed. This is due to increases in traffic volumes and intersection delays" (FGEIS at 22-3).

83.    If traffic levels will be greater than anticipated in the FGEIS, noise levels would also be higher than those predicted in the FGEIS.

## UNDERESTIMATED PARKING IMPACTS

84.    Despite the fact that FGEIS acknowledges that the Project will result in a major increase in parking, it has grossly underestimated parking impacts.

85.    Even assuming an implausibly high transit share, the FGEIS posits a major increase in parking demand caused by the proposed action. In particular, construction of the new stadium will produce far greater utilization of available off-street parking within the study area in 2010 and 2025 (FGEIS at 19-79, Table 19-32; FGEIS at 19-162, Table 19-62). The FGEIS makes only one set of development assumptions about likely land uses in its study area, and does not consider whether intense demand for event parking will generate a market response that attempts to supply some of that demand through the construction of more off-street parking within walking radius of the stadium than the FGEIS anticipates. (FGEIS at 2-19 to 2-22.) Urban experts contend that the traffic, visual, pedestrian circulation and other impacts of the stadium may have a repellent effect on nearby residential and office development, an effect that would make development of additional commercial parking aimed at stadium patrons more likely. (Written Comments

of Jeremy Soffin, Regional Plan Association, FGEIS, Appendix BB at 188; Regional Plan Association, "Urban Development Alternatives for the Hudson Yards," December 2004, at 17, Ex. N). The Hudson Yards zoning proposal would create more parking capacity than the DGEIS accounts for and it is likely some of this capacity would be available to stadium patrons. (Comments of Daniel Gutman, FGEIS, Appendix BB at 325).

86.    Parking availability is an important factor in transportation modal choice and any such parking development or additional capacity would be likely to attract a higher driving share to stadium events than the estimates in the FGEIS. The FGEIS, in fact, indicates that the proposed action seeks to create a more parking-intensive district in the Far West Side than exists elsewhere in Manhattan south of 60th Street. (Responses to Comments O-25 and O-26, FGEIS at 29-111).

## UNMITIGATED IMPACTS

87.    Traffic congestion mitigation measures identified in the DGEIS and FGEIS have not been demonstrated to work as an inter-related system – it is unclear from the FGEIS what the effects of mitigation at one intersection will be at other nearby intersections (Comments of Jeffrey Zupan, Regional Plan Association, FGEIS, Appendix BB at 46). The intersection-level mitigation measures should be situated within a dynamic district-wide approach to traffic congestion that can account for the interaction of various traffic flow and control measures throughout the street network.

88.    Traffic congestion mitigation measures have not been designed for traffic levels greater than those that will result from the modal split of at least 68% of stadium patrons using mass transit to reach stadium sporting events.

89.    The DGEIS and FGEIS treatment of mass transit is insufficient because it assumes the realization of a "best case" mass transit network scenario (FGEIS Chapter 20), including some hugely expensive projects and a variety of spending decisions that are outside of New York City's control. (TSTC at 10 to 12, Ex. A). For instance, the FGEIS says the 2010 stairway-crowding problem it identifies for Grand Central Terminal's subway station will be solved in 2025 by the existence of the Second Avenue subway and LIRR East Side Access. The existence of these and other projects and services underlies the basic long-term transportation analysis for the Proposed Action, but funding and completion of such projects is a highly questionable proposition. The FGEIS does not provide any mitigation measures in case these assumptions are not realized.

89a.    On January 18, 2005, Gov. George Pataki proposed a state budget that did not provide full funding for the Second Avenue subway and the LIRR East Side Access project, further decreasing the likelihood that these projects will be completed on time. In fact, on January 24, 2005, Mayor Michael R. Bloomberg testified that the governor's decision put the projects' futures in "jeopardy." (SRBI Survey at 12, Ex. B.; Al Baker and Sewell Chan, "Transit Projects Are Put In Doubt by Pataki Budget/A $105 Billion Blueprint/ Higher Fees Don't Cover 2nd Ave. Subway and L.I.R.R. Connection," N.Y. Times, Jan. 18, 2005, at A1, Ex. O; New York City, Press Release, PR-031-05, "Mayor Michael R. Bloomberg Testifies Before the New York State Joint Fiscal Committees on the 2005-2006 Executive Budget," Jan. 24, 2005, Ex. P.)

89b.    The FGEIS identifies significant adverse conditions (intolerable and possibly unsafe subway station crowding and degradation of pedestrian circulation within parts of stations such as platforms, stairways and corridors) arising from the proposed

action in 2010 at nine subway station elements for the AM peak hour, four subway station elements for the PM peak hour and one for the weeknight and Sunday Special Event peak hours. (FGEIS at 20-1, 20-2.)  The FGEIS asserts that all but one of these conditions can be mitigated via measures such as new station stairways, stairway widenings, new escalators, retro-fit of existing escalators to higher speeds and additional automated subway station entrance/exit facilities. These measures would need to be implemented at the Times Square, 42nd Street-Port Authority Bus Terminal, Grand Central-42nd Street, 6th Avenue-42nd Street, Herald Square and other Midtown Manhattan subway stations. (FGEIS at 20-1, 20-2.) Presumably, these mitigation measures would have to be implemented during NYC Transit's 2005-2009 capital program to serve as mitigation in the 2010 design year. But according to the MTA's draft capital program for that period, only Grand Central and Times Square are included in the station rehabilitation program, and the work there is focused on station elements other than on the elements identified as problems in the FGEIS. The MTA 2005-2009 capital budget is facing a multi-billion dollar financing gap. (TSTC at 10, Ex. A). The FGEIS does not acknowledge the strong likelihood that the proposed 2010 mitigation work will not occur, nor does the FGEIS acknowledge that if these mitigation measures are implemented, it will be at the expense of mass transit improvements planned for other parts of the system.

89c.    The FGEIS identifies several NYC Transit bus routes with a capacity would not be sufficient to handle anticipated passenger demand in 2010 if the Proposed Action takes place. Proposed mitigation is frequency-of-service improvements to these routes. (FGEIS at 20-75.)  However, NYC Transit is facing a major operating budget

26

crisis and has raised the possibility of severe New York City bus service cuts. (TSTC at 10, Ex. A). The FGEIS does not address the possibility that there will not be adequate bus capacity to handle the increased demand in 2010.

89d.    The FGEIS also anticipates significant ridership additions to New York Waterway trans-Hudson ferry routes and says 2010 Special Event demand could require the addition of up to eight ferry trips over and above peak hour service, while current service is also inadequate to meet projected AM and PM peak hour demand. The FGEIS posits that NY Waterway's ferry fleet has sufficient capacity to meet this demand in 2010. In 2025, the FGEIS predicts that the existing capacity of current New York Waterway ferry services is not anticipated to be sufficient to accommodate the additional demand caused by the Proposed Action; therefore, one additional run per hour would have to be added. (FGEIS at 20-4, 20-5, 20-80.) Stadium patrons are expected to utilize ferry service. The SRBI survey also shows that 130 respondents, representing 25% of those who said they would take mass transit, would take ferry service from New Jersey. (SRBI survey at 22, Ex. B.) However, ferry ridership has indeed declined since 2001, calling the FGEIS' "background" ferry service data into question. Also, in recent months, New York Waterway has been reported to be on the brink of bankruptcy. (TSTC at 11, Ex. A.) The FGEIS fails to study the possibility that there will not be adequate ferry capacity in 2010 and beyond.

## DGEIS AND FGEIS FAILED TO CONSIDER A RANGE OF ALTERNATIVES AND "WORST-CASE" SCENARIOS

90.    The DGEIS and the FGEIS assumes that many improvements to the transit system will be in place in 2010 and 2025 at a time when the transit system is facing a funding crisis. (TSTC at 10 to 12, Ex. A).

91.    Among the transit systems the DGEIS and FGEIS assume to be in place during the study years: extension of the No. 7 line; construction of the Second Avenue Subway; the East Side Access project connecting the Long Island Rail Road to Grand Central Terminal; construction or widening of many staircases, escalators, and other features of subway stations; and the addition of many new buses. Funding has not been secured for most of these improvements. (TSTC at 10-11).

92.    By failing to consider the likely chance that many of these systems will not be in place during the study years, the DGEIS and FGEIS further underestimated traffic, air pollution, and noise impacts caused by the Project due to the increase in car trips and failed to analyze a reasonable "worst-case" scenario as required by SEQRA and CEQR.

## DGEIS AND FGEIS FAILED TO ADEQUATELY STUDY FUNDING FOR THE PROJECT

93.    Neither the DGEIS nor the FGEIS address the funding of the Project. In fact, the Findings Statement states that "project financing is beyond the scope of the FEIS." (Findings Statement at 8).

93a.    According to the FGEIS, "[a]t present, the collective mitigation costs is between $300 and $400 million based on the key elements of the mitigation program. These include: traffic improvements (signage, striping, signals, traffic enforcement agents for special events at the Multi-Use Facility, removal of corner bulbs on Route 9A); two pedestrian bridges over Route 9A; new MTA buses; subway station improvements (stairway widenings, new stairways, high speed escalators, HEETs, and new mezzanine levels); an enlarged school; a fire station by 2025; two new DSNY collection trucks; and

noise mitigation measures (City's window attenuation program, air conditioning replacement)." (FGEIS at 5-97, 5-98.) The FGEIS does not identify the source of money for these mitigation measures or provide a breakdown of the costs.

## STADIUM REDESIGN HAS NOT BEEN STUDIED

93b.    On February 2, 2005, a new design for the stadium was unveiled, months after the FGEIS was approved by the Respondents. In addition to other changes, the main entrance was moved from the north side of the building to 32nd Street and the sidewalk width along 11th Avenue was doubled from 15 feet to 30. (Michael Saul, "Stadium Plan Slashed," N.Y. Daily News, Feb. 2, 2005, Ex. Q). Any impact these changes may have on pedestrian flow has not been studied, nor was the public was given an opportunity to comment on the impacts of the redesigned stadium.

## FIRST CAUSE OF ACTION
### SEQRA AND CEQR: DEFICIENT DGEIS AND FGEIS

94.    Petitioner repeats and realleges, as if set forth fully herein, the allegations contained in Paragraphs 1 through 93 thereof.

95.    It was arbitrary and capricious, an abuse of lawful procedure, and a violation of SEQRA and CEQR for the Planning Commission and the MTA to approve and FGEIS that relies on an unreliable survey instrument that arbitrarily inflates the percentage of stadium attendees who will take mass transit; uses the mode share derived from the misleading survey instrument to project impacts of traffic, air quality, and noise; and failed to respond to many comments on the DGEIS and FGEIS.

96.    Both the DGEIS and the FGEIS failed to take a hard look at the environmental impacts caused by the Project.

## SECOND CAUSE OF ACTION
## SEQRA AND CEQR: FAILURE TO DISCLOSE RELEVANT DOCUMENTS

97.     Petitioner repeats and realleges, as set forth fully herein, the allegations contained in Paragraphs 1 through 96 hereof.

98.     In both the DGEIS and FGEIS, DCP and MTA rely on two surveys of Jets season ticket holders to generate the modal split for the stadium and reference it throughout the documents. The survey instruments were not included in the DGEIS and FGEIS nor the appendices. Petitioners and other members of the public were not able to review the methodology of the survey nor adequately comment on the use of the survey.

99.     DCP and MTA's failure to include the survey instruments in the DGEIS and the FGEIS, or to make the surveys available at the identified repositories is contrary to the fundamental purposes and goals of SEQRA and CEQR. As a result, DCP and MTA have violated their duty to conduct a fair and impartial comprehensive environmental review. SEQRA and CEQR's fundamental requirements that the public has full and fair access to the reports underlying an EIS's conclusions.

100.     Consequently, following judicial remand and recommencement of the SEQRA/CEQR process, DCP and MTA should release in complete form, all studies referenced and relied upon by the DGEIS and FGEIS and make these available at the public repositories as required by SEQRA and CEQR and provide an extended period for comment upon the newly released information. Subsequently, DCP and MTA should then prepare a supplemental EIS allowing the public for the first time to fully examine and comment upon the underlying studies in their complete form.

## THIRD CAUSE OF ACTION
### SEQRA AND CEQR: FAILURE TO MITIGATE IMPACTS

101.   Petitioners repeat and reallege, as if set forth fully herein, the allegations contain in Paragraphs 1 through 100 hereof.

102.   SEQRA requires every environmental impact statement to contain "a description of the mitigation measures." 6 NYCRR § 617.9(b)(5)(iv).

103.   SEQRA requires every SEQRA findings statement to "incorporat[e] as conditions to the decision those mitigative measures that were identified as practicable." 6 NYCRR § 617.11(d)(5).

104.   According to the DGEIS, FGEIS and Findings Statement for the Project, a number of significant impacts for the Project will not be mitigated, including but limited to and a number of the mitigation measures have no identified funding.

## FOURTH CAUSE OF ACTION
### SEQRA AND CEQR: DEFICIENT DGEIS

105.   Petitioners repeat and reallege, as if set forth fully herein, the allegations contain in Paragraphs 1 through 104 hereof.

106.   It was arbitrary and capricious, an abuse of lawful procedure, and a violation of SEQRA and CEQR for the Planning Commission and the MTA to approve an DGEIS that relies on a misleading survey instrument that inflates the percentage of stadium attendees who will take mass transit; uses the mode share derived from the misleading survey instrument to project impacts of traffic, air quality, and noise; and failed to respond to many comments on the DGEIS in the FGEIS.

## SIXTH CAUSE OF ACTION
## ULURP: CERTIFICATION OF INCOMPLETE APPLICATIONS

107.    Petitioners repeat and reallege, as if set forth fully herein, the allegations contained in Paragraph 1 through 106 hereof.

108.    The participants in the ULURP process, including the community boards, the Borough President, the Borough Board, and the Planning Commission, were not able to make informed recommendations and decisions regarding the Project in the absence of an adequate DGEIS. Petitioners and the public, who have the right to testify at public hearings to be held by the community boards and the Planning Commission, were not able to participate meaningfully in the ULURP process and make fully informed comments to those public bodies.

109.    It was arbitrary and capricious, a violation of ULURP, a violation of lawful procedure, a violation of due process, and ultra vires for Respondent DCP to certify the ULURP application for the Project as complete, and to begin the ULURP review process, despite the numerous deficiencies in the DEIS.

## NO PRIOR APPLICATIONS

110.    No prior application for this or any similar relief has been made in this Court, except for a Petition filed on August 26, 2004 seeking to enjoin the conduct of the public hearing that was scheduled to take place on September 23, 2004 concerning the DGEIS. The Court denied the injunction and dismissed the Petition on the grounds that it was not ripe and Petitioners, Hell's Kitchen Neighborhood Association, et al., had not exhausted their administrative remedies. Subsequently the matter has become ripe and the Petitioners have exhausted their administrative remedies.

32

## RELIEF

**WHEREFORE,** Petitioners request that this Court issue a judgment:

(1) annulling and vacating the FGEIS;

(2) annulling and vacating the Findings Statement;

(3) annulling and vacating the Zoning Action;

(4) enjoining Respondents MTA and the City from beginning demolition or

construction in connection with the Project;

(5) awarding Petitioners the costs and disbursements of this proceeding; and

granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
       February 14, 2004

By: _____
    Nancy M. Christensen, Esq.
    Tri-State Transportation
    Campaign
    350 West 31st Street
    Suite 802
    New York, NY 10001
    (212) 268-7474
    Attorney for Petitioners

# VERIFICATION

STATE OF NEW YORK         )
                          )
COUNTY OF NEW YORK        )


KATHERINE SLEVIN, being duly sworn deposes and says: I am the Associate

Director of the Tri-State Transportation Campaign, a petitioner in the above-captioned

action and proceeding; I have read the foregoing Verified Amended Article 78 Petition

and know the contents thereof; the same is true to my own knowledge, except as to the

matters therein stated to be alleged on information and belief, and as to those matters, I

believe them to be true.


KATHERINE SLEVIN


Sworn to before me this
*14* day of February 2005

NOTARY PUBLIC