SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------X
In the Matter of

BETSY F. GOTBAUM, as Public
Advocate for the City of New York,

                          Petitioner,

For Judgment pursuant to CPLR Article 78

       -against-

NEW YORK METROPOLITAN
TRANSPORTATION AUTHORITY,

                          Respondent.
--------------------------------------------------------------X

Index No.
IAS Part

**EMERGENCY
AFFIRMATION**

    CHARLES A. STEWART, III, an attorney admitted to practice law in the State of New York, affirms under penalty of perjury, pursuant to CPLR 2106, as follows:

    1.    I am a member of Stewart Occhipinti, LLP, attorneys for Betsy F. Gotbaum, the Public Advocate of the City of New York, the Petitioner in the above captioned action. I respectfully submit this affirmation in support of Petitioner's motion brought by order to show cause which seeks the following relief set forth in her Verified Petition: (a) granting Petitioner intervenor status in the related actions, currently pending before the Honorable Justice Cahn entitled *Madison Square Garden, L.P. v. New York Metropolitan Transportation Authority and Jets Development*, LLC, Index No. 104644/05 (the "MSG Action"); (b) declaring that the New York Metropolitan Transportation Authority ("MTA") acted arbitrarily and capriciously in selecting the Jets' bid; (c) granting a preliminary injunction enjoining the MTA from transferring certain MTA property interests over the John D. Caemmerer West Side Yards on the West Side

of Manhattan (the "Development Rights") to Jets Development, LLC (the "Jets") on the terms agreed to during and following the MTA bidding process during the pendency of this proceeding, and granting a permanent injunction from doing so in the absence of a new and proper bidding process; (4) compelling the MTA to offer the Development Rights in a fair and proper bidding process in compliance with its statutory obligations; and (5) such other and further relief as the Court deems just and proper. A copy of the Verified Petition is attached hereto as Exhibit "A."

2. The Public Advocate has as its public mandate the responsibility of oversight over the executive branch of the New York City government. It is in this capacity that role that the Public Advocate seeks to be heard in connection with the review of the MTA's bidding process pursuant to which the Development Rights were transferred to the Jets.

3. On April 11, 2005, Justice Cahn in the MSG Action established a briefing schedule for parties in certain actions contesting the MTA's transfer of the Development Rights to the Jets. Under this schedule, the parties opposing MSG's motion are required to submit opposition papers on April 22, 2005, reply papers are due on April 27, 2005, and the hearing date on MSG's motion has been set for May 3, 2005.

4. The Public Advocate respectfully requests that Petitioner's order to show cause be signed by the Court so that the matters raised by her Petition be heard at the same time as the parties in the MSG Action.

5. Petitioner has made no prior motion for the relief sought herein.

Dated: New York, New York
April 18, 2005

_____
CHARLES A. STEWART, III

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------X
In the Matter of

BETSY F. GOTBAUM, as Public
Advocate for the City of New York,

               Petitioner,

For Judgment pursuant to CPLR Article 78

      -against-

NEW YORK METROPOLITAN
TRANSPORTATION AUTHORITY,

               Respondent.
-----------------------------------------------------------X

Index No.
IAS Part

**VERIFIED PETITION**

     Petitioner Betsy F. Gotbaum, Public Advocate of the City of New York (the "Public Advocate" or "Petitioner"), by her attorney, Stewart Occhipinti, LLP, as and for her verified petition, alleges as follows:

## NATURE OF PROCEEDING

    1.  Pursuant to Article 78 of the CPLR, the Public Advocate files this petition to prevent the New York Metropolitan Transportation Authority ("MTA") from disposing of certain MTA property interests over the John D. Caemmerer West Side Yards (the "Yards") on the West Side of Manhattan (the "Development Rights").

    2.  As explained in detail below, good cause exists to believe that MTA Board members, which include four City representatives, violated their statutory and fiduciary duties and the public trust and acted arbitrarily and capriciously in connection with the bid process by which the Development Rights to the Yards were awarded to the Jets Development, LLC (the "Jets").

3. The MTA has a fiduciary obligation to dispose of its real property only if it is "in the interest of authority." N.Y. Pub. Auth. Law § 1267. When disposing of property, such as the Development Rights, the MTA is required to obtain terms "most beneficial" to the public, *Square Parking Systems, Inc. v. Metropolitan Transportation Authority*, 92 A.D.2d 782, 785, 459 N.Y.S.2d 774, 777 (1st Dep't 1983), and to utilize a process "that fosters fair and open competition, is conducted under the highest ethical standards, and enjoys the complete confidence of the public." MTA Code of Ethics. With regard to the transfer of the Development Rights, the MTA was obligated to obtain the highest price for the property, but it did not.

4. The MTA desperately needs to receive the highest price possible for the transfer of the Development Rights. Since 1996, annual subway ridership has risen 29% while service has only increased 11%, and bus ridership is up 41% while service has only increased 27%. Thus, New Yorkers are paying more but receiving less from the MTA.

5. New York City MTA riders shoulder a disproportionate share of the MTA's budget. NYC Transit moves 84% of all New York State riders but only receives approximately 63% of state aid (approximately $350 million annually). In contrast, Long Island Railroad and Metro North account for only 5% of state riders but receive 23% of state aid (approximately $275 million annually).

6. Starting in 2006, the MTA has projected significant operating budget deficits. For example, the MTA projects a $607 million deficit in 2006.

7. To combat these deficits, the MTA has announced that it is contemplating additional fare increases, eliminating 33 bus routes that serve 270,000 people, eliminating

three branches of the LIRR serving 10,000 people, suspending service on 95 bus routes serving 60,000 people, and reducing subway service by 10%.

8. The Public Advocate believes that it is vital to the residents of New York City that the MTA achieve the highest possible price in connection with the sale of the Development Rights so that it is able to maximize the funds for the benefit of the riding public, for whom the MTA's network of services is essential.

9. The MTA is desperately in need of funding for a variety of necessary projects. New York City Transit is one of the oldest and largest interconnected route structure transit systems in the world and the arrangement of signal power on the Lexington Avenue Line has been in existence for over seventy years and is of an obsolete design. In addition, the MTA has requested millions of dollars of funding to harden New York City's transit system against the modern threat of terrorism. Against this backdrop, and as transit service disruptions have a major disruption on the lives of the public, it is imperative that the MTA not sell its assets cheaply.

10. Moreover, there are no funds available in the City budget for the stunningly expensive stadium envisioned by the Jets. Nonetheless, the City is planning to finance a $300 million subsidy toward this stadium with an unprecedented aggregation of City revenues derived from payments in lieu of taxes ("PILOTs") that are collected on tax-exempt development projects throughout the City. The City plans to divert these revenues from the City's treasury without City Council authorization in order to cover the debt service on the City's multi-million dollar stadium bond issuance.

11. Also, the City previously announced that millions of dollars of the Jets' contribution would be funded with City revenue bonds. These are tax-exempt bonds that

are supposed to be devoted to projects that further the public good, and there is a ceiling on how many of these bonds can be issued. If the City goes forward with this plan, it is giving up a significant portion of its tax-exempt bonds that could otherwise fund critical public projects such as affordable housing and other economic development.

12. The stadium that the Jets want to build in New York City would be, by far, the world's most expensive sports stadium. Current estimates are that building costs will exceed $1.9 billion, with many of these costs to be borne by New York City taxpayers. According to a New York Building Congress document, construction costs have climbed an average of 3.25% each year since 1995. Thus, the current estimates for the cost of the stadium are likely to increase significantly over time, further increasing the burden that will have to be shouldered by New York City taxpayers.

13. This lawsuit is being brought to assure that the residents of New York City receive maximum value for their property so as to alleviate the burden presently borne by users of the MTA transportation network, most of whom are residents of New York City, and to ensure a transportation system that provides safe and efficient services to New Yorkers. It is also brought to alleviate the burden that will be borne by taxpayers as a result of potential funding shortfalls which are likely to result from the City's proposed financing scheme for the stadium.

## THE PARTIES

14. Petitioner Betsy F. Gotbaum is the duly-elected Public Advocate for the City of New York.

15. Respondent MTA is a public authority of the State of New York established pursuant to N.Y. Public Authorities Law § 1263.

## THE MTA'S LEGAL OBLIGATIONS

16. The MTA's statutory purpose is to benefit the people of the State of New York and, in particular, the riding public that uses its transportation services. *See* N.Y. Pub. Auth. Law §§ 1264(1)-(2); 1267(5)-(6).

17. As set forth in its charter, the MTA's mission is to "develop and improve commuter transportation." N.Y. Pub. Auth. Law § 1264(1)-(2). In furtherance of that mission, the MTA must obtain terms "most beneficial" to the public when it disposes of assets. *Square Parking Systems, Inc. v. Metropolitan Transportation Authority*, 92 A.D.2d 782, 785, 459 N.Y.S.2d 774, 777 (1st Dep't 1983).

18. In the context of the sale of the Development Rights, MTA Board members had a legal responsibility and fiduciary duty to do what was in the best interest of the MTA, i.e., getting the highest price obtainable for the Development Rights so that these funds could be used for transportation purposes.

## FACTUAL BACKGROUND

19. The MTA, through one of its subsidiary agencies, owns the Yards. The property is widely believed to be worth more than $900 million, particularly if the area is re-zoned. Nonetheless, since March, 2004, the MTA Board, which includes four City representatives,[1] repeatedly has taken steps to transfer the Development Rights for millions of dollars less than such rights are actually worth.

---

[1] At the relevant time, the four City representatives on the MTA Board were John Banks, III, Susan Kupferman, Mark Lebow and Mark Page.

## The Memorandum of Understanding

20. On March 25, 2004, New York State Urban Development Corporation d/b/a Empire State Development Corporation (the "ESDC"), the MTA and the Jets entered into a Memorandum of Understanding (the "MOU") with respect to the development of a football stadium for the Jets at the Yard. Among other things, the MOU stated:

> Specifically, and subject to all required approvals, *the goal will be to execute definitive documents by the spring of 2005*, which documents would include: conveyance of air space above the Yards by the MTA; development agreement for the Enclosure; funding agreement for the Enclosure; lease of air space above the Enclosure to ESDC or a subsidiary; sublease of air space to the Jets; development agreement for the Facility and Roof; funding agreement for the Roof; and non-relocation agreement with the New York Jets.

*Id.* ¶ 17 (emphasis added).

21. The MOU was silent with respect to the consideration to be paid to the MTA. Subsequently, however, as explained below, the public learned that the MTA was prepared to sell the Development Rights to the Jets for a mere fraction of the fair market value of the property.

22. Indeed, the MTA took no steps to determine the fair market value of the property until it was pressured to do so by the public. After the execution of the MOU, MTA Chairman Peter Kalikow even publicly stated that it might not be "feasible to do public bidding."

23. However, in April, 2004, bowing to public pressure, the MTA finally agreed that it would hire outside appraisers to estimate the value of the Yards. On November 2, 2004, Jerome Haims Realty, Inc. ("JHR"), a real estate appraiser and consultant that the MTA retained, issued an opinion that the fair market value of the Development Rights

6

was $923,400,000. Furthermore, JHR concluded that "the highest and best use is its development with a mixed-use development that is for the most part residential apartment buildings with ground-level retail use along the site's 11th avenue frontage."

### The Bidding Process

24. On January 30, 2005, the press reported that the Jets had made an offer of $100 million for the Development Rights. The Jets' offer was slightly less than 11% of the MTA's appraisal. At the time, MTA Chairman Kalikow was quoted in the press as saying that he "thought $100 million, frankly, was an insult."

25. Nevertheless, Mr. Kalikow agreed to an "arbitration" process under which the MTA would receive between $100 million to $300 million for the Development Rights. Thus, the highest amount that the MTA would receive in the arbitration was still just a fraction of the MTA's appraisal. However, the only mandate of the arbitrator was "to determine the price to be paid by the Jets for acquisition of the air rights and other real property interests necessary to permit the construction of the proposed stadium." Letter from George Mitchell to Peter Kalikow and Jay Cross, dated Jan. 28, 2005, at 2. Thus, the arbitration was not an attempt to determine whether the MTA was receiving the highest price for the Development Rights.

26. On February 4, 2005, Madison Square Garden L.P. ("MSG") made an unsolicited offer to pay the MTA $600 million for the right to develop on the Yards, including $250 million toward the cost of a platform. Certain City officials publicly stated that MSG's proposal was not serious.

27. On February 8, 2004, the MTA announced its intention to proceed with what was now called a "non-binding" arbitration with the Jets.

7

28. On February 22, 2005, again faced with mounting public criticism of the process by which the Jets were being able to acquire the Development Rights, the MTA issued a formal request for proposals for the sale or lease of the Development Rights (the "RFP"). However, as explained below, the bidding process designed and executed by the MTA appears to have been structured to reach a pre-determined outcome, namely, that the Jets would acquire the Development Rights without regard to whether the MTA was receiving the highest price for its property.

29. First, the MTA set a deadline of March 21, 2005—less than 30 days after the RFP was issued—for the submission of proposals. Given the daunting challenges in formulating a bid for the Development Rights, the MTA's deadline seems designed to deliberately limit, if not preclude, the submission of bids.

30. Second, the RFP required bidders to accept the property (which is currently zoned for low-density manufacturing use) "as is," providing that "[n]o proposal that is contingent upon a change in existing zoning requirements will be considered." RFP at Section IV.C. This requirement appears intended to artificially deflate the value of the property. As one non-partisan planning group, the Regional Plan Association ("RPA"), explained:

> By requiring bidders to assume that the current, low-density zoning remains in place, the process undermines proposals for the site to achieve its 'highest and best' use or for the MTA to receive fair market value for the site. The MTA's own appraisal of the site assumes an override of the low-density manufacturing use to allow for valuable high-density, mixed-used development. By not assuming the necessary zoning override, the [MTA] is artificially deflating the site's value.

RPA Statement, Feb. 23, 2005.

8

31. The RPA concluded that the RFP was so defective "that the so-called open bidding process will make it next to impossible for the MTA to receive the maximum return for its prime asset, the rail yard on the Far West Side." *Id.*

32. The MTA retained Newmark & Co. ("Newmark") to help review bids submitted in response to the RFP despite the fact that, according to press reports, Newmark's chief executive, Barry Gosin, and chairman, Jeffrey Gural, together gave at least $100,000 to NYC 2012, which is a proponent of a stadium at the Yards.

### The Bidding Process

33. News organizations have reported that certain City officials sought to influence the bidding process, including linking New York's bid for the 2012 Olympics to the MTA's selection of the Jets' bid.

34. *The New York Times*, for example, reported on February 17, 2005 that some developers were intimidated by certain City officials and were reluctant to engage in the bidding process, stating:

> Some of the city's most active developers said yesterday that they were reluctant to make an offer on the rights without being assured they could get the zoning that would allow them to build apartment houses and office buildings.
>
> ...
>
> Several other developers coupled their zoning reservations with a fear of retaliation either by Mayor Michael R. Bloomberg or by Deputy Mayor Daniel L. Doctoroff, who controls the housing, planning and economic development agencies that builders must deal with every day.
>
> "If some developer bids a high number and actually buys it and then Doctoroff orders city planning not to rezone the property, what are you going to do with it?" said another prominent residential developer, who spoke on condition of anonymity.

Charles V. Bagli, *Builders Wary of Pursuing Site Sought by Jets for a Stadium*, N.Y. Times, Feb. 17, 2005, at B1.

35. Part of the Jets' proposal included a contingent $440 million payment by six developers for transferable development rights ("TDRs") to be transferred from the Yards to other locations throughout the City. The press reported that this idea was conceived by City officials. Charles V. Bagli, *Jets' Final Bid Needed Help From Group of Developers*, N.Y. Times, Mar. 26, 2005, at B1. The inclusion of the developers' "offer" to purchase TDRs for $440,000,000 resulted in public reports that the Jets' offer had been increased from $210 million to $720 million. In selecting the Jets' bid, the MTA stated that it had not considered the developers' offer to purchase the TDRs. At best, the TDR proposal was highly impractical and would have required massive re-zoning in an area that the City Council just recently has re-zoned.

36. The press also reported that City officials discouraged the involvement of developers in any proposal for the Development Rights by making it apparent that the City would not likely cooperate in securing the necessary re-zoning for any such development project. For example, it was reported that Deputy Mayor Doctoroff stated that it was "'highly unlikely' that the city would rezone the property for any buyer other than the Jets." Editorial, *Bloomberg's Wasteland*, N.Y. Sun, Feb. 24, 2005, at 10 (quoting Deputy Mayor Doctoroff).

37. Certain City officials may also have influenced the MTA bidding process by suggesting that the City's $2 billion contribution to the #7 line subway train was dependent on the construction of the football stadium proposed by the Jets. Indeed, after the bid, the MTA stated that it awarded the Development Rights to the Jets to assure, in

part, "the financing of the number seven train." MTA Board Meeting, derived from NY1 Broadcast, Mar. 31, 2005 ("Transcript") at 39. MTA representatives stated: "Under the Jets' proposal the extension is assured, providing the MTA with a $2 billion asset paid for entirely with non-MTA funds." Statement by New York City Representatives on the Metropolitan Transportation Authority Board, John Banks, III, Susan Kupferman, Mark Lebow and Mark Page, On the Disposition of the Western Rail Yards, dated March 30, 2005.

38. The City Council, however, as part of the comprehensive rezoning plan for the West Side, had approved the financing for the extension of the #7 subway line and provided for City-backed bond financing for this project. The City Council recognized that extending the #7 subway line to the West Side of Manhattan is a crucial aspect of the redevelopment and revitalization of the West Side, regardless of the construction of a football stadium, because there presently is no subway service within a reasonable proximity of the proposed high-density commercial development west of 10th Avenue.

39. Only three entities submitted bids for the Development Rights. On March 31, 2005, just 10 days after receiving these bids, the MTA's 14 voting members, which included the four City representatives, over the objections of all of the MTA's non-voting members, accepted the Jets' proposal despite the fact that it was not the highest bidder.

40. Several MTA Board members admitted that MSG's bid was worth at least $200 million more than that of the Jets.

41. For example, on March 31, 2005, James S. Simpson, Chair of the Board's Real Estate/Planning Committee, acknowledged that "MSG's proposal is worth at least $200 million more than the Jets' proposal" to the Authority, and "if we said, 'OK, let's look at

11

the cash on the table, what is the best deal for us today' . . . the MSG proposal is the correct choice." Transcript at 40.

42. Before voting for the Jets' bid, two other members of the MTA's Board, Vice Chairman David S. Mack and Vice Chairman Edward B. Dunn, also conceded that MSG's proposal was higher. *Id.* at 40.

43. Thus, the bidding process structured by the MTA did not result in the MTA receiving the greatest possible price for the Development Rights.

44. Indeed, public statements by MTA Board members indicate that they considered factors that were not within their fiduciary obligations to achieve the best possible price for the sale of the Development Rights.

45. For example, James Simpson was reported as stating that the MTA had considered the interest of "our stake holders here in the city and state," and further stated: "This is a major economic development project for the region and we can't think of ourselves as a transportation company. We are a part of, we are the most important part of the economic engine that drives the city of New York and this is a tremendous project, tremendous and I can go home at night and sleep soundly knowing that I pushed this forward."

46. In evaluating bids for the sale of the Development Rights, MTA Board members should not have been concerned with currying favor with state and city "stake holders" by initiating "major economic development" projects in New York City. Their fiduciary responsibility is to determine the action that is most beneficial for the MTA and its patrons – the vast majority of which are New York City residents. Regarding the sale

of the Development Rights, the MTA's lone concern should have been assessing whether it had received the highest price.

47. The non-voting MTA Board members virtually conceded that the MTA voting members had violated their duties by selecting the Jets' bid. For example, non-voting MTA Board member James F. Blair, the chairperson of the Permanent Citizens Advisory Committee to the MTA, stated:

> [T]he board has a fiduciary duty to maximize the current value of its assets to better serve the riding public. We're not land developers, we're not sports promoters and we are not out for political gain. We are, however, the stewards of this region's transportation assets, a system that's in trouble, it's in danger of returning to a state of disrepair. And we have, therefore, a duty to protect our customers from avoidable fare increases or service cutbacks. This means that we really have to fearlessly maximize the asset values and select a proposal, which, under reasonable analysis, will yield the highest present value to our customers. . . . Today, a $200 million value gap, as has been stated, appears to exist between these two bids. And this is a gap which frankly, from my perspective, is too wide to bridge. . . .[I]f I had a vote, I would not be able to support the current motion.

Transcript at 44.

## FIRST CLAIM FOR RELIEF
### (N.Y. PUBLIC AUTHORITIES LAW §§ 1264, 1265 AND 1267)

48. Petitioner repeats and realleges the allegations contained in paragraphs 1 through 47 above as if set forth in full herein.

49. Pursuant to Public Authorities Law sections 1264(1) and (2), the MTA, in effectuating its purposes, is required to obtain terms most beneficial to the people of the State of New York.

13

50. Pursuant to Public Authorities Law sections 1265(7) and 1267(5) and (6), the MTA, prior to "acquir[ing], hold[ing or] dispos[ing] of real or personal property in the exercise of its powers," must first determine that any disposition is "in the interest of the authority." N.Y. Pub. Auth. Law §§ 1265(7), 1267(5)-(6).

51. The MTA violated sections 1264, 1265, and 1267 of the Public Authorities Law by accepting the Jets' bid, and conducted a bidding process that discouraged all bidders besides the Jets from making a proposal.

52. The MTA repeatedly violated its own bidding directives, among other things, that require it to adopt a process "that fosters fair and open competition, is conducted under the highest ethical standards, and enjoys the complete confidence of the public." *See* MTA "Vendor Code of Ethics."

53. The MTA, in conjunction with pressure exerted by State and City officials, failed to obtain the most beneficial terms and to act in the interest of the MTA, thereby violating sections 1264, 1265, and 1267 of the Public Authorities Law.

54. The MTA acted arbitrarily and capriciously in its handling of the bidding process by which the Development Rights were awarded to the Jets.

55. These arbitrary and capricious acts have harmed the residents of New York City in numerous ways, including, but not limited to, failing to realize the highest possible price for the sale of the Development Rights to increase monies available to the MTA to invest in the mass transportation system that is critical to the quality of life of New Yorkers.

56. The residents of New York City will be irreparably harmed absent immediate injunctive relief if the MTA is permitted to contract with the Jets to sell the Development

Rights. Therefore, Petitioner requests a preliminary injunction to enjoin the MTA from entering into a contract for the disposition of property with the Jets during the pendency of this proceeding, and a permanent injunction from doing so in the absence of a fair and proper bidding process.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner requests that this Court issue an order:

1) Declaring that the MTA acted arbitrarily and capriciously in selecting the Jets' bid;

2) Granting a preliminary injunction enjoining the MTA from entering into an agreement to transfer the Development Rights to the Jets on the terms agreed to during and following the MTA bidding process during the pendency of this proceeding, and granting a permanent injunction from doing so in the absence of a new and proper bidding process;

3) Compelling the MTA to offer the Development Rights in a fair and proper bidding process in compliance with its statutory obligations;

4) Awarding the Petitioner the costs and disbursements of this proceeding, including attorneys' fees, if available; and

5) Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
April 18, 2005

STEWART OCCHIPINTI, LLP

By: _____
Charles A. Stewart, III
1350 Broadway, Suite 2200
New York, New York 10018
(212) 239-5500

*Attorneys for Betsy F. Gotbaum
Public Advocate of the City of New
York*

## VERIFICATION

BETSY F. GOTBAUM, the Public Advocate of the City of New York, verifies that she has read the allegations contained in the attached Petition, that the allegations contained therein are true and accurate to the best of her knowledge, except as to those matters alleged to be on information and belief, and as to those matters, she believes them to be true.

*[signature]*
BETSY F. GOTBAUM

Sworn to before me this
18th day of April, 2005

*[signature]*
Notary Public

State of New York
Public Notary
Ramon Martinez
# 01MA5022998
Qualified in Bx. County
Exp. 11/24/07