SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
In re the application of:
NEW YORK PUBLIC INTEREST RESEARCH
GROUP/STRAPHANGERS CAMPAIGN, Inc.,
GENE RUSSIANOFF, COMMON CAUSE, INC.,
RACHEL LEON, TRI-STATE TRANSPORTATION
CAMPAIGN, INC., JON ORCUTT, LOCAL 100
OF THE TRANSIT WORKERS UNION a/k/a
TWU LOCAL 100, ROGER TOUSSAINT, et al.,
on their own behalf and on behalf of all straphangers
and taxpayers in the City and State of New York
similarly aggrieved,                                       **NOTICE OF PETITION**

                        Petitioners,

For an order pursuant to Article 78 of the C.P.L.R.,

        - against -

NEW YORK METROPOLITAN TRANSPORTATION
AUTHORITY, PETER S. KALIKOW in his capacity of
Chair/Commissioner of the Metropolitan Transportation         Index:.
Authority,

                        Respondents.

-------------------------------------------------------------------X

        PLEASE TAKE NOTICE that upon the attached Verified Petition dated April 15, 2005,

Memorandum of Law dated April 15, 2005, Joint Affirmation of Counsel for Petitioners dated April 15,

2005, Affidavit of Gene Russianoff dated April 15, 2005 and Affidavit of Roger Toussaint dated April 18,

2005 and all Exhibits filed simultaneously herewith and those which have already been filed with the Court

in <u>MSG v. Metropolitan Transportation Authority</u>, Index: 104644/05, which are referenced in support of

this Petition, Petitioners will move this Court, on or before May 2, 2005 or as otherwise instructed by the

Honorable Judge Cahn, at the Courthouse, 60 Centre Street, Motion Support Courtroom 130, 9:30 a.m. or

as soon thereafter as counsel can be heard for a judgment granting the relief sought in the Petition and such

other, further and different relief as the Court deems just, equitable and proper.    This special proceeding

is an Article 78/ State Finance Law §123 proceeding seeking judgment against the named Respondents.

        PLEASE TAKE FURTHER NOTICE that pursuant to CPLR §7804, Respondents' answer and

supporting affidavits, if any, are required to be served upon the undersigned at lease five days before the

date this Petition is noticed to be heard.    Petitioner's reply and supporting affidavits will be served at least

one day before the date this Petition is noticed to be heard.    Pursuant to CPLR §7804(b), this Court has

1

exclusive jurisdiction over this Article 78 petition and pursuant to CPLR §7804(b) and CPLR §506(b),

Petitioner states that New York County is a proper venue for this proceeding.

Dated: New York, New York
April 18, 2005

Thomas D. Shanahan
Shanahan & Associates, P.C.
545 Fifth Avenue, Suite 1205
New York, New York 10017
(212) 867-1100
Fax (212) 972-1787

Hon. Eric Schniederman
Of Counsel, Shanahan & Associates, P.C.
545 Fifth Avenue, Suite 1205
New York, New York 10017
(212) 867-1100
Fax (212) 972-1787

Daniel R. Bright
Kennedy Schwartz & Cure, P.C.
113 University Place
New York, New York 10003
(212) 358-1500
Fax (212) 358-0207

Thomas Kennedy
Kennedy Schwartz & Cure, P.C.
113 University Place
New York, New York 10003
(212) 358-1500
Fax (212) 358-0207

Nancy Christensen
Tri-State Transportation Campaign
350 West 31st Street, #802
New York, New York 10001
(212) 268-7474
Fax (212) 268-7333

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X
In re the application of:
NEW YORK PUBLIC INTEREST RESEARCH
GROUP/STRAPHANGERS CAMPAIGN, Inc.,
GENE RUSSIANOFF, COMMON CAUSE, INC.,
RACHEL LEON, TRI-STATE TRANSPORTATION
CAMPAIGN, INC., JON ORCUTT, LOCAL 100
OF THE TRANSIT WORKERS UNION a/k/a
TWU LOCAL 100, ROGER TOUSSAINT, et al.,
on their own behalf and on behalf of all straphangers        Index:
and taxpayers in the City and State of New York
similarly aggrieved,

　　　　　　　　　Petitioners,

For an order pursuant to Article 78 of the C.P.L.R.,        **VERIFIED PETITION**

　　　　- against -

NEW YORK METROPOLITAN TRANSPORTATION
AUTHORITY, PETER S. KALIKOW in his capacity of
Chair/Commissioner of the Metropolitan Transportation
Authority,

　　　　　　　　　Respondents.

------------------------------------------------------------------X

　　　Petitioners, by and through their attorneys, do hereby complain of respondents as

follows:

## NATURE OF PROCEEDING

　　　1.  This consolidated Article 78 proceeding and plenary taxpayer action (brought

pursuant to State Finance Law § 123) seeks to prevent the New York Metropolitan

Transportation Authority (the "MTA" or the "Authority") from conveying the

development rights to the John D. Caemmerer West Side Yards (the "Rail Yards") in

violation of its statutory and common law obligations to obtain the terms most beneficial

to the public in any disposition of public property, and to conduct an open public bidding

process that treats all bidders fairly.

1

1

2. Petitioners bring this Article 78 proceeding for declaratory and injunctive relief to: (1) enjoin the MTA from transferring the Rail Yards to Jets Development, LLC ("the Jets"); and (2) require the MTA to issue a new Request for Proposals ("RFP") for the Rail Yards, providing sufficient information to enable all potentially interested parties to submit bids for this extremely valuable asset. Petitioners also seek relief, including declaratory relief, pursuant to State Finance Law § 123-b.

3. Petitioners do not believe that it is necessary for the Court to determine which if any of the proposals submitted in response to the MTA's February 22, 2005 RFP was or is best or most valuable.

4. Petitioners respectfully submit that all of the bids submitted in response to the February 22, 2005 RFP must be rejected, as the MTA's procedure to solicit those bids was both substantively and procedurally defective. The MTA clearly failed to seek the highest value of the Rail Yards, assessed by the MTA itself as worth almost one billion dollars, for the financial benefit of the people of the State of New York, as required by its statutory mandate and by the common law of the state of New York

5. For the reasons set forth herein, and in the accompanying memorandum of law and affidavits, Petitioners urge the Court to require a new, open RFP process consistent with the MTA's statutory and common law duties.

## PARTIES

6. Petitioner New York Public Interest Research Group/Straphangers Campaign, Inc. ("Straphangers") is a domestic not-for-profit corporation authorized to do business in the State of New York with its principal place of business in this County located at 9 Murray Street, New York, New York 10007. Straphangers is an organization which advocates for quality, fully accessible public mass transportation services at reasonable fares for the residents of New York City.

2

SHANAHAN & ASSOCIATES, P.C. • 545 FIFTH AVENUE, SUITE 1205 • NEW YORK, NEW YORK 10017 • (212) 867-1100

7. Petitioner Gene Russianoff ("Russianoff") is the Staff Attorney of the Straphangers and an individual residing in Queens County and a commuter on transportation systems operated by Respondents. Further, Russianoff is a taxpayer in the City and State of New York.

8. Petitioner Tri-State Transportation Campaign, Inc., ("Tri-State") is a foreign not-for-profit corporation authorized to do business in the State of New York with its principal place of business located at 350 West 31st Street, #802, New York, New York 10001. Tri-State Transportation Campaign is an organization which advocates for quality, fully accessible public mass transportation services at reasonable fares for the residents of New York City. Tri-State is a coalition of groups which advocates for quality, fully accessible public mass transportation services at reasonable fares for the residents of the tri-state region.

9. Petitioner Jonathon Orcutt ("Orcutt") is the Executive Director of the Tri-State Transportation Campaign, Inc., an individual residing in Kings County and a commuter on transportation systems operated by Respondents. Further, Petitioner Orcutt is a taxpayer in the City and State of New York.

10. Petitioner Common Cause, Inc., ("Common Cause") is a foreign not-for-profit corporation authorized to do business in the State of New York with its principal place of business located at 155 Sixth Avenue, 4th Floor, New York, New York, 10013. Common Cause is a good-government group advocating for responsible, unbiased and fair governmental action in the public interest. Common Cause is a good government group which advocates for accountability in governmental action.

11. Petitioner Rachel Leon ("Leon") is the Executive Director of Common Cause, an individual residing in Westchester County and a commuter on transportation systems operated by Respondents. Further, Petitioner Leon is a taxpayer in Westchester

3

3

County and the State of New York.

12.   Petitioner Local 100 of the Transit Workers Union a/k/a TWU 100 ("Local 100") is a local labor union which represents, for purposes of collective bargaining, 36,000 operational, maintenance, and technical employees of the New York City Transit Authority. Local 100 is located at 80 West End Avenue, New York, New York 10023, and its membership includes persons who are citizens, residents, straphangers and taxpayers of New York State.

13.   Petitioner Roger Toussaint is the President of Local 100 of the Transport Workers Union of America and sues in that capacity, as a straphanger on transportation systems operated by the Respondents and as a taxpayer of the City and State of New York.

14.   Respondent Metropolitan Transportation Authority ("MTA") is a domestic government corporation registered with the New York Secretary of State on June 1, 1965 with its principal place of business in this County at 347 Madison Avenue, New York, New York, 10017.

15.   Respondent Peter S. Kalikow ("Kalikow") is Chair and Commissioner of the Metropolitan Transportation Authority and is sued in his official capacity.

## JURISDICTION, VENUE AND STANDING

16.   Certain governmental actions are subject to review if they are irrational, arbitrary and capricious or otherwise unlawful.   Said actions are null and void and properly set aside through an Article 78 proceeding. CPLR § 7803; *see also*, State Finance Law § 123; *see also*, Stein v. Metropolitan Transportation Authority et al., 110 Misc.2d 1027; 443 N.Y.S.2d 340 (Sup.Ct. 1981) (State Finance Law authorizes "citizen taxpayers to challenge alleged wrongful expenditures of State funds whether or not they

4

4

are specially aggrieved."). Public contracting and procurement procedures and decisions that lack a rational basis, or fail to treat all interested bidders fairly, if challenged, must be vitiated. *See, e.g.,* Tri-State Aggregates Corp. v. Metropolitan Transportation Authority, 108 A.D.2d 645, 485 N.Y.S.2d 754 (1st Dep't 1985).

17.  "One who is a citizen, resident and taxpayer has standing to bring an [A]rticle 78 proceeding . . . , even though he does not show a personal grievance or personal interest in the outcome." Policemen's Benevolent Ass'n of Westchester Cty. v. Board of Trustees of the Village of Croton-on-Hudson, 21 A.D.2d 693, 694, 250 N.Y.S.2d 523, 526 (2nd Dep't 1964).

18.  This is particularly true in cases involving questions of broad public concern or importance, including the "preparation of specifications, advertising of bids and awarding of contracts for a public project." Albert Elia Building Company, Inc. v. New York State Urban Development Corporation, 54 A.D.2d 337, 342, 388 N.Y.S.2d 462, 466 (4th Dep't 1976); *see also, generally,* Chester Civic Improvement Ass'n v. New York City Transit Authority, 122 A.D.2d 715, 505 N.Y.S.2d 638 (1st Dep't 1986) (civic association and its president, who was a citizen-taxpayer, had standing to challenge the disposition of government property); Bergerman v. Murphy, 199 Misc. 1008, 1015, 102 N.Y.S.2d 622, 629 (Sup. Ct., N.Y. County 1951); Terrell v. Moses, 4 A.D.2d 171, 173, 163 N.Y.S.2d 770, 771 (1st Dep't 1957) (both holding that citizens, residents and taxpayers may bring an Article 78 proceeding where a "broad public question is posed").

19.  Petitioners Straphangers, Russianoff, Local 100 and Toussaint were specifically granted standing in Supreme Court, New York County by the Honorable Justice Lewis York in prior litigation against Respondents captioned Straphanger Campaign, et al. v. MTA, et al., Index: 107871/03.

20.  Pursuant to well-established precedent, Petitioners have standing to bring

5

this Article 78 proceeding to enjoin Respondents from going forward with their

agreement to transfer development rights at the Rail Yards to the Jets.

21. Venue is proper as New York County is the county in which the cause of

action arose and the county where the principal places of business of Respondents are

located.

## RELEVANT LEGAL AUTHORITIES

22. The New York State Public Authorities Law, Title 11, Art. 5, chp. 43-A,

governs the powers and operations of the MTA.

23. In enacting the Public Authorities Law, the legislature of New York State

stated in pertinent part:

> "The urgent and immediate need for the stabilization, strengthening and
> improvement of commuter services for the transportation of person in the
> metropolitan area can be met by the creation of a public authority to serve
> as the state's instrument for the carrying out of programs designed to
> continue and improve commuter services". See Id., §1261 (emphasis
> added).

24. Public Authorities Law §1264, states as relevant herein:

> "1. The purposes of the authority shall be the continuance, further
> development and improvement of commuter transportation and other
> services related thereto. . .
>
> 2. It is hereby found and declared that such purposes are in all respects
> *for the benefit of the people of the state of New York* and the authority shall
> be regarded as performing an essential governmental function in carrying
> out its purposes and in exercising the powers granted by this title". Id.
> §1264 (emphasis added).

25. Although the Public Authorities Law authorizes the MTA to "acquire,

hold and dispose of real or personal property in the exercise of its powers," N.Y. Pub.

Auth. Law § 1265(7), the MTA must first determine that any disposition is "in the

interest of the authority." *Id.* § 1267(5)-(6). In disposing of its property, the MTA must

use a process "that fosters fair and open competition, is conducted under the highest

ethical standards, and enjoys the complete confidence of the public." *See* MTA "Vendor

6

Code of Ethics." See MSG Exhibit 2.

26.   State Finance Law §123-b states in pertinent part:

> "Notwithstanding any inconsistent provision of law, any person who is a
> citizen taxpayer, whether or not such person is or may be affected or
> specially aggrieved by the activity herein referred to, may maintain an
> action for equitable or declaratory relief, or both, against an officer or
> employee of the state who in the course of his or her duties has caused, is
> now causing, or is about to cause a wrongful expenditure,
> misappropriation, misapplication, or any other illegal or unconstitutional
> disbursement of state funds or state property. . ."

27.   The New York State Attorney General and the New York State Inspector

General recently opined that public authorities such as the MTA may not simply use

"technical and superficial compliance" with the principles of competitiveness to mask a

process that, in essence, still guarantees the contract to one potential partner. N.Y. State

Attorney General & N.Y. State Inspector General, *A Joint Investigation Into the Contract*

*Between the New York State Canal Corporation and Richard A. Hutchens, CC, LLC*

(November 2004) at 7. See MSG order to show cause, Mastro Affidavit, Exhibit 4. They

also opined that public authorities are required to avoid creating the appearance of

favoritism. *Id.* at 70.

28.   Under the common law of the State of New York, the MTA is required to

"obtain the terms most beneficial to the public" in its disposition of public assets." Square

Parking v. MTA 92 A.D.2d 782, 485 N.Y.S.2d 754 (1st Dept. 1985).

29. Under the common law of the State of New York, Public officials, including

the boards of public authorities, are "temporary trustees of public property," and "it is

mandatory upon trustees with discretionary power of sale to dispose of trust property

upon the most beneficial terms which it is possible for them to secure." Ross v. Wilson

308 N.Y. 605 (1955).

30.   While public authorities such as the MTA have substantial discretion in the

disposition of public assets, they cannot act in an "arbitrary and capricious" manner. The

selection of a bid for public property must be set aside "upon a showing of actual

7

impropriety or unfair dealing – i.e., favoritism, improvidence, extravagance, fraud and corruption." Conduit and Foundation v. MTA 66 N.Y.2d 144, 495 N.Y.S.2d 340 (1985).

32.  Once the MTA decides to solicit bids for a project, "it is required to act fairly towards all bidders." Tri-State Aggregates Corp. V. MTA 108 A.D. 2nd 645, 646, 485 N.Y.S.2d 754 (1st Dept. 1985).

## FACTUAL BACKGROUND

### The MTA Attempts to Sell the Rail Yards
### to the Jets for Less Than Fair Value

33.  The MTA initiated its effort to sell the Rail Yards to the Jets on March 25, 2004 by entering into a Memorandum of Understanding ("MOU") to develop a stadium on the site[1].  The MOU, executed by the Empire State Development Corporation ("ESDC"), the Jets and the MTA, did not indicate how much was to be paid to the MTA for the Rail Yards.

34.  After the MOU was announced, public pressure led the MTA to hire outside appraisers to assess the value of the rail yards[2].

35.  An appraisal produced for the MTA by Jerome Haims Realty, Inc. (the "MTA appraisal") valued the rail yards at $923,400,000[3].  This appraisal was kept secret until it was subpoenaed by a Committee of the New York State Assembly in February 2005.

36.  A second appraisal, commissioned by Madison Square Garden, L.P. ("MSG"), was produced on November 22, 2004 by the Albert Valuation Group New York (the "MSG appraisal").  This appraisal valued the rail yards at $1 billion[4].

---

[1]MSG Exhibit 7.
[2]See Errol Cockfield & Joshua Robin, "Development Projects- the rail yards to be appraised," Newsday, July 1, 2004, MSG Exhibit 10.
[3]See MTA appraisal letter, MSG Exhibit 15.
[4]See MSG appraisal letter, MSG Exhibit 12.

8

8

37. In spite of these appraisals, the MTA and the Jets continued to negotiate the sale of the rail yards to the Jets at a far lower price. In January 2005, the Jets offered $100 million for the rights to the Rail Yards and the MTA proposed a $300 million[5]. The matter was to submitted for arbitration. However, that arbitration never took place.

38. On February 4, 2005 MSG entered the bidding with an unsolicited offer to pay $600 million for the rights to develop the rail yards[6]. Finally, on February 22, 2005, the MTA succumbed to widespread public pressure and agreed to issue a formal RFP for the sale or lease of the Rail Yards[7]. The process set up by the MTA for this RFP was clearly designed to discourage open bidding, and to favor the Jets.

### The MTA's Defective RFP Process

39. The MTA's RFP process was legally defective in several respects. First and foremost, it required that detailed proposals for the development of the Rail Yards be submitted within 27 days. The imposition of such an absurd deadline clearly violated the MTA's duty to seek the maximum benefit for the public in the sale of the Rail Yards. Any legitimate proposal for building over the rail yards-- which requires the design and construction of a raised platform to accommodate the MTA's rail operations -- would take far more than 27 days. Upon information and belief, the MTA has never in its history imposed such a short deadline for the sale of any other major real estate asset.

40. The MTA's 27-day deadline also violated its duty to treat all bidders fairly. Indeed, the only two bids the MTA ended up considering were submitted by parties that had begun work on their proposals well in advance of the February 22, 2005 RFP. The Jet's own bid asserts that " the Jets development team has invested upwards of 61,000 billable hours meeting with the LIRR and MTA representatives on a bi-weekly basis,

---

[5] See Charles Bagli, "Stadium Land Could Cost Jets $300 Million," New York Times, January 31, 2005, MSG Exhibit 14.
[6] See February 4, 2005 letter from MSG to MTA, MSG Exhibit 19.
[7] See February 22, 2005 RFP, MSG Exhibit 27.

9

9

performing site investigations, programming, engineering, designing and documenting the platform. Jets Bid at 5.1-1, see MSG Petition, Note 18. Cablevision had prepared and submitted a proposal to purchase the rail yards six weeks prior to the RFP's deadline of March 21, 2005. The fact that no credible developer or business in America was able to respond to the RFP by the 27-day deadline demonstrates both the unsoundness and unfairness of the MTA's RFP process.

41. In addition to its truncated time frame, the February 22, 2005 RFP was defective in several other respects. As noted by the Regional Plan Association ("RPA"), a highly regarded non-partisan civic group:

> "By requiring bidders to assume that the current low-density zoning remains in place, the process undermines proposals for the site to achieve its 'highest and best' use or for the MTA to receive fair market value for the site. The MTA's own appraisal of the site assumes an override of the low-density manufacturing use to allow for valuable high-density, mixed used development. By not assuming the necessary zoning override, the [MTA] is artificially deflating the site's value."
> Statement of Regional Plan Association, Feb. 23, 2005.

42. The February 22, 2005 RFP failed to provide critical information regarding environmental liabilities it required bidders to assume. MSG requested this information but, upon information and belief, it was never provided. See March 1, 2005 letter from A. Lance to R. Krsulic, MSG Petition page 17.

43. The RFP also required that proposals address a variety of construction requirements imposed by the MTA's Long Island Railroad subsidiary ("LIRR") which controls the rail operations on the site. Essential information regarding these requirements was not included in the RFP.

44. Unsurprisingly, only three proposals were submitted in response to the February 22, 2005 RFP. The MTA rejected one extremely tenuous proposal because it was dependent on contingencies far beyond the control of the parties. See Petitioners Exhibit H, annexed to Russianoff Affidavit. That left the proposals by the Jets and MSG,

10

10

the only two bidders capable of submitting proposals, within the MTA's absurdly truncated time frame. Neither of these proposals offered anything close to the $923,400,000 valuation of the Rail Yards set by the MTA appraisal or the $1 billion set by the MSG appraisal.

45.   On March 31, 2005, only 10 days after receiving the responses to its RFP, the MTA selected the Jet's bid for the Rail Yards. This bid was worth a present value of approximately $210 million.[1]

### The MTA's Fiscal Crisis

46.   During the same period discussed above – while the MTA was engaged in the bizarre and unlawful process that resulted in the sale of its most valuable asset for a fraction of its assessed value – the Authority was also petitioning the New York State Government for an unprecedented infusion of capital and operating funds.

47.   On July 29, 2004, the MTA Board of Directors met and issued the "MTA 2005 Preliminary Budget" ("Operating Budget"). The Board also issued the "Proposed MTA Capital Plan 2005-2009" (the "Capital Plan"). Copies of the 2005 operating budget and the 2005-2009 MTA Capital Plan are attached to the Affidavit of Gene Russianoff as Exhibits A and B. Both the MTA's Operating Budget and its Capital Plan acknowledged massive budget gaps.

48.   According to a report on the MTA Operating Budget by the New York City Independent Budget Office, "Even after fare and toll hikes and service reductions, the Authority faces a shortfall of $695 million in 2006 (9 percent of revenues). This shortfall grows to $1.2 billion in 2008 (15 percent of revenues)." See Russianoff Affidavit, Exhibit D.

---

[1] Upon information and belief, the Jets have proposed a $40 million dollar supplement to their RFP Bid. See Charles V. Bagli, Jets' Offer of Additional $40 Million to Save West Side Stadium Plan, at Least for Now, New York Times, April 14, 2005.

11

11

49.   The shortfall in the MTA's Capital Plan was even more severe. The MTA's plan documented the need for $17.2 billion over 5 years just to maintain the Authority's "Core" Capital Program. Another $9.9 billion was proposed for expansion projects such as the Second Avenue Subway, bringing the total for the 2005-2009 Capital Plan to $27.1 billion.

50.   On January 19, 2005, Governor George Pataki issued his proposed budget for 2005-2006. As discussed in detail in the Russianoff Affidavit, the Governor's proposal included a total of $19.2 billion for both the MTA's core and expansion projects -- $8 billion short of the MTA's request. Mass transit advocates, including the Petitioners, immediately joined with the MTA in a lobbying effort to force the Governor and Legislature to provide the MTA with more funds.

51.   On March 8, 2005, Petitioner Russianoff on behalf of NYPIRG/Straphanger Campaign wrote to Governor Pataki, stating:

> "[We] express our grave concerns about the impact that the proposed State budget will have on the transportation system that is the lifeblood of the state's economy. We wholeheartedly support the five-year capital plan that the MTA has proposed and recognize that both the core program and expansion projects are critical to the health of the system and the continued growth of the region's economy." See Russianoff Affidavit, Exhibit G.

52.   Petitioner Russianoff further noted:

> "The $2 billion that has been cut from vital maintenance and normal replacement will compromise the safety, reliability and service of the system. The $6 billion shortfall for expansion projects will all but eliminate the possibility that Second Avenue Subway or East Side Access will be completed in our lifetimes." Id.

53.   On March 31, 2005, the State Legislature responded to the lobbying of the MTA and the coalition of civic groups by passing a budget that met most of the Authority's need for its core programs. Although the MTA's expansion program fared less well the 2005-2006 New York State budget enacted several new taxes and fees and dedicated them to the MTA, including retention of additional sales tax on the taxpayers in

12

12

the MTA region, an increase in the mortgage recording tax and increased motor vehicle fees. These dedicated funds totaled $315 million per year for the MTA.

54.  The Capital Plan submitted by the MTA to the Governor also stated the Authority would seek to close its budget gaps by selling MTA assets, including the Rail Yards.

55.  Yet, within hours of the finalization of the New York State budget, on March 31, 2005, the MTA voted to sell the Rail Yards to the Jets for a fraction of its appraised value.

### Members of the MTA Board Voice Unprecedented Concern Over the Sale of the Rail Yards

56.  At the March 31, 2005, MTA Board Hearing before the Board approved the sale of the Rail Yards to the Jets, all of the non-voting members on the MTA Board present voiced strenuous objections to the MTA's RFP process.  See MSG Exhibit 1 at 44-46.

57.  Non-voting Board member James F. Blair, Chairperson of the Permanent Citizens Advisory Committee to the MTA, stated:

> [T]he board has a fiduciary duty to maximize the current value of its assets to better serve the riding public. We're not land developers, we're not sports promoters and we are not out for political gain. We are, however, the stewards of this region's transportation assets, a system that's in trouble, it's in danger of returning to a state of disrepair. And we have, therefore, a duty to protect our customers from avoidable fare increases or service cutbacks. This means that we really have to fearlessly maximize the asset values and select a proposal, which, under reasonable analysis, will yield the highest present value to our customers.
>
> Today, a $200 million value gap, as has been stated, appears to exist between these two bids. And this is a gap which frankly, from my perspective, is too wide to bridge.
>
> [I]f I had a vote, I would not be able to support the current motion. See MSG Exhibit 1 at 44.

13

13

58.    Non-voting Board member Andrew Albert objected to the bid process and

stated:

"I have come to the conclusion that if I could vote here today,
I would vote 'none of the above.' . . .
I say that because I don't believe either of the proposals offers
MTA a fair price for this very valuable piece of Manhattan
real estate. . . . [I]t is the last remaining piece of this size in
Manhattan, and it's right on the doorstep of the Central
Business District. And, not to mention, it even has waterfront
access.

So why should we be giving this valuable asset away?
What's the rush? Why not--why not, as is our option, say,
'None of these bids met our appraised value,' and ask for best
and final offers? What is driving this frenzy to approve
something today?

And while we're at it, our customers deserve to know
why some of the biggest names in development in New York
are not bidding on this property. What is keeping them away?
Is it the fact the playing field is anything but level?

Consider this: in the Jets proposal, the city and state
pick up the cost of the platform, but not in any of the other
proposals. Why should that be? Doesn't sound like a level
playing field to me. In the Jets proposal, the city picks up the
cost of the extension of the 7 Line. Again, not in any of the
other proposals. Level playing field?

Certainly, the density of the MSG proposal is enough
so that tax-incentive financing would allow the extension of
the No. 7 Line. So why does the city say that only with the
Jets proposal do the numbers work? Could the fact that the
development community knows the mayor's strong feelings
on the stadium be driving the lack of bids on this incredibly
valuable site?

Let's talk about jobs for a minute. No matter who
builds here, there's going to be thousands and thousands of
construction jobs. That's a fact. I believe we should take a
deep breath, tell the bidders, 'Thanks, but when you've got a
realistic bid for this incredible piece of property, come back
to us.'

Our riders—our riders deserve—our riders deserve to
know that we are guardians of this treasure of a
transportation—our riders deserve to know that we are
guardians of this treasure of a transportation system, and we
won't give away their future by either accepting bids that are

14

14

> too low, or bids that are stymied by pressure of any kind. Our
> customers deserve no less from us." See MSG Exhibit 1 at
> 44-45.

59. Non-voting MTA Board Member Edward Watt, who serves as the secretary-

treasurer of Transport Workers Union Local 100, simply stated:

> "I cannot match the eloquence of Mr. Blair, nor the clarity of Mr. Albert.
> However, the Transport Workers Union's position is with them, that it is
> not clear at all that the MTA is getting fair value for this land. . . .
>
> . . . [T]he straphangers will subsidize the skyboxes. And
> that cannot happen.
>
> So it looks like it's unanimous that the non-voters are
> voting no." See MSG Exhibit 1 at 46.

60. No prior application for the relief sought herein has been made to this or any

other Court.

15

15

## FIRST CAUSE OF ACTION
### THE MTA HAS BREACHED ITS FIDUCIARY DUTY TO OBTAIN THE TERMS MOST BENEFICIAL TO THE PUBLIC THROUGH THE SALE OF THE RAIL YARDS

61.   All prior allegations are incorporated herein fully by reference.

62.   The flawed RFP process initiated by the MTA on February 22, 2005 violated the Respondent's fiduciary duty to obtain the best possible terms for the sale of the Rail Yards.

63.   The selection of the Jet's bid for the Rail Yards on March 31, 2005, after a bidding period of only twenty-seven days and an evaluation period of only ten days, violated the Respondents' fiduciary duty to obtain the best possible terms for the sale of the Rail Yards.

64.   The selection of a proposal with a present value of $210 million for an asset with an appraised value of $923 million violated the Respondents fiduciary duty to obtain the best possible terms for the sale of the Rail Yards.

65.   The Petitioners and all similarly aggrieved will continue to be irreparably harmed absent the relief requested herein.

## SECOND CAUSE OF ACTION
### THE MTA HAS ACTED IN AN ARBITRARY AND CAPRICIOUS MANNER BY CONDUCTING AN RFP PROCESS THAT DID NOT TREAT ALL BIDDERS FAIRLY AND BY ACTING WITH FAVORITISM, IMPROVIDENCE AND EXTRAVAGANCE IN AWARDING THE RAIL YARD TO ANY BIDDER SOLICITED THROUGH THE FEBRUARY 22, 2005 RFP

66.   All prior allegations are incorporated herein fully by reference.

67.   The bidding process initiated by the Respondents February 22, 2005 RFP failed to treat all bidders fairly.

68.   The conduct of the MTA, and its entire RFP process, was permeated with

favoritism, improvidence and extravagance, in violation of the Respondents' legal duties and obligations.

69.   The Petitioners and all similarly aggrieved will continue to be irreparably harmed absent the relief requested herein.

### THIRD CAUSE OF ACTION
### THE MTA HAS VIOLATED NEW YORK STATE FINANCE LAW §123 BY ATTEMPTING TO SELL THE RAIL YARDS TO A BIDDER WHO PARTICIPATED IN THE FEBRUARY 22, 2005 RFP

70.   All prior allegations are incorporated herein fully by reference.

71.   Respondents, as agents of New York State, through the February 22, 2005 RFP and the MTA Board vote on March 31, 2005 to accept the Jet's bid, have caused a wrongful dissipation of funds appropriately belonging to the State of New York.

72.   Respondents, as agents of New York State, through the February 22, 2005 RFP and the MTA Board vote on March 31, 2005 to accept the Jets bid , have caused a wrongful transfer of title to property owned by the State of New York.

73.   The Petitioners and all similarly aggrieved will continue to be damaged absent the relief requested herein.

### RELIEF REQUESTED

**WHEREFORE**, Petitioners, on their own behalf and for all similarly aggrieved, request that this Court enter an Order providing for the following relief against Respondents:

(a)   Declaring that the Respondents acted arbitrarily and capriciously by and through the Request for Proposals process initiated on February 22, 2005 to select a bidder for the Rail Yard;

(b)   Declaring that all of the bids submitted pursuant to the Request for Proposal initiated on February 22, 2005 should have been rejected by the

MTA as they substantially undervalued the Rail Yard;

(c )      Annulling the vote of the MTA Board of March 31, 2005;

(d)      Permanently enjoining Respondents from proceeding to contract with <u>any</u> bidder or accepting <u>any</u> bid which resulted from the Request for Proposals dated February 22, 2005 or the MTA Board vote of March 31, 2005;

(e)      Ordering the Respondents to reissue a Request for Proposal for the Rail Yard which conforms with the statutory and common law of the State of New York;

(f)      Retaining jurisdiction over the Respondents in future Requests for Proposals pertaining to the Rail Yard to ensure the process conforms with the Public Authorities Law and common law;

(g)      Declaring that the Respondents violated the State Finance Law §123;

(h)      Awarding Petitioners the costs and disbursements of this proceeding; and

(i)      Granting such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         April 15, 2005

_____
Eric Schneiderman
Thomas D. Shanahan
Shanahan & Associates, P.C.
545 Fifth Avenue, Suite 1205
New York, New York 10017
(212) 867-1100
Fax (212) 972-1787

_____
Thomas Kennedy
Daniel R. Bright
Kennedy Schwartz & Cure, P.C.
113 University Place
New York, New York 10003
(212) 358-1500
Fax (212) 358-0207

_____
Nancy Christensen
Tri-State Transportation Campaign
350 West 31st Street, #802
New York, New York 10001
(212) 268-7474
Fax (212) 268-7333

## VERIFICATION OF PETITIONERS

Gene Russianoff, a Petitioner in this action on my own behalf and that of the other organizational and individual Petitioners hereby verifies that I have read the annexed Petition and the allegations contained therein are true to the best of my knowledge except for those allegations which begin with upon information and as to those allegations I believe them to be true.

Dated: April 15, 2005

Gene Russianoff

SWORN TO BEFORE ME THIS 15th DAY
OF APRIL, 2005

Thomas D. Shanahan

THOMAS D. SHANAHAN
Notary Public, State of New York
No. 02SH5083105
Qualified in Richmond County
Commission Expires August 4, _____