SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

In re the application of:
NEW YORK PUBLIC INTEREST RESEARCH
GROUP/STRAPHANGERS CAMPAIGN, INC.,
GENE RUSSIANOFF, COMMON CAUSE, INC.,
RACHEL LEON, TRI-STATE TRANSPORTATION          **BRIEF OF AMICI CURIAE**
CAMPAIGN, INC., JON ORCUTT, LOCAL 100
OF THE TRANSIT WORKERS UNION a/k/a
TWU LOCAL 100, ROGER TOUSSAINT, et al.,
on their own behalf and on behalf of all straphangers
and taxpayers in the City and State of New York
similarly aggrieved,                                        Index: 105292/05

                            Petitioners,

For an order pursuant to Article 78 of the C.P.L.R.,

                        - against -

NEW YORK METROPOLITAN TRANSPORTATION
AUTHORITY, PETER S. KALIKOW in his capacity of
Chair/Commissioner of the Metropolitan Transportation
Authority,

                            Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


**BRIEF OF AMICI CURIAE,
CITY COUNCIL SPEAKER A. GIFFORD MILLER,
CITY COUNCIL MEMBERS CHRISTINE C. QUINN, GALE A. BREWER, PHILIP
REED, BILL PERKINS, EVA MOSKOWITZ, CHARLES BARRON, DAVID
YASSKY, JOHN LIU AND LETITIA JAMES AND STATE SENATORS THOMAS K.
DUANE AND LIZ KRUEGER
<u>IN SUPPORT OF PETITIONERS</u>**

## TABLE OF CONTENTS

Page

INTEREST OF *AMICI CURIAE*………………………………………………………1

ARGUMENT………………………………………………………………………...3

I.    UNDER PRESSURE FROM MAYOR BLOOMBERG, THE
      MTA IMPERMISSIBLY STRUCTURED AN UNFAIR, NON-
      COMPETITIVE BIDDING PROCESS AND ACTED ARBITRARILY
      AND CAPRICIOUSLY IN SELECTING A CONTINGENT BID
      FAR BELOW FAIR MARKET VALUE ……………………………………6

      A.    The MTA, a Public Benefit Corporation in the Midst of a
            Fiscal Crisis, Must Obtain a Reasonable Return in Disposing
            of Its Valuable Assets Despite the Mayor's Opposition………………6

      B.    The MTA Violated its Fiduciary Duty to Secure Terms of
            Sale Most Beneficial to the Public without Favoritism,
            Partiality or Arbitrariness by Conducting an Inequitable,
            Non-Competitive Bidding Process……………………………………8

      C.    The MTA Acted Arbitrarily and Capriciously in Selecting
            a Contingent, Rule-Violating Bid Worth Hundreds of Millions
            of Dollars Less than Fair Market Value for the Development
            Rights over the Rail Yards…..………………………………………14

II.   THE MTA ACTED ARBITRARILY AND CAPRICIOUSLY IN
      SELECTING A BID THAT RELIES ON AN ILLEGAL SUBSIDY
      TO BE OBTAINED IN VIOLATION OF THE COUNCIL'S
      AUTHORITY UNDER THE CITY CHARTER…….……………………18

III.  THE MTA ACTED ARBITRARILY AND CAPRICIOUSLY IN
      BASING ITS SELECTION OF AN INFERIOR BID FAR BELOW
      MARKET VALUE ON NON-EXISTENT TRANSFERABLE
      DEVELOPMENT RIGHTS……………………………………………..23

IV.   THE MTA ACTED ARBITRARILY AND CAPRICIOUSLY IN
      PREMISING ITS DECISION ON FALSE INFORMATION
      REGARDING THE EFFECTS OF THE JETS' BID ON THE
      EXTENSION OF THE NUMBER SEVEN TRAIN…………………….....25

CONCLUSION………………………………………………………………….30

## TABLE OF AUTHORITIES

<u>CASES</u>

<u>Page</u>

<u>Conduit and Foundation Corp. v. MTA</u>, 66 N.Y. 2d 144 (1985).........................14-15

<u>Jered Contracting v. NYC Transit Authority,</u> 22 N.Y.2d 187 (1968).......................15

<u>McArdle v. Board of Estimate of the City of Mt. Vernon</u>, 74 Misc.2d 1014,
347 N.Y.S.2d 349 (Sup. Ct. 1973), <u>aff'd</u>, 45 A.D.2d 822, 357 N.Y.S.2d 1009
(2d Dept. 1974)....................................................................................11-13

<u>Ross v. Wilson</u>, 308 N.Y. 605 (1955).............................................................14

<u>Square Parking Systems, Inc. v. Metropolitan Transportation Authority,</u>
92 A.D.2d 782, 459 N.Y.S.2d 774(1st Dept. 1983)...............................11, 14, 29

<u>Tri-State Aggregates Corp. v. Metropolitan Transportation Authority,</u>
108 A.D.2d 645, 485 N.Y.S.2d 754 (1st Dept. 1985)..............................11, 13, 17

<u>Jo & Wo Realty Corp. v. City of New York</u>, 157 A.D.2d 205,
555 N.Y.S.2d 271 (1st Dept. 1990)................................................................11

## <u>CONSTITUTION AND LAWS OF NEW YORK STATE</u>

N.Y. Const. art. VII, § 7.............................................................................18

N.Y. Gen. Constr. Law § 66.........................................................................6

N.Y. Gen. Mun. Law § 854.......................................................................20-21

N.Y. Gen. Mun. Law § 858.........................................................................20

N.Y. Gen. Mun. Law § 874.........................................................................20

N.Y. Pub. Auth. Law §1260 <u>et seq</u>..................................................................6

N.Y. Pub. Auth. Law §1262.........................................................................6

N.Y. Pub. Auth. Law §1263.........................................................................6

N.Y. Pub. Auth. Law §1264......................................................................6, 8

N.Y. Pub. Auth. Law §1266.........................................................................23

ii

## LAWS OF NEW YORK CITY

Page

N.Y. City Charter § 197……………………………………………………......4, 24

N.Y. City Charter § 200……………………………………………………….4, 24

N.Y. City Charter § 227……………………………………………………….4, 18-20

N.Y. City Charter § 247…………………………………………………...…19

N.Y. City Charter § 253…………………………………………………...…19

N.Y. City Charter § 254……………………………………………………...19

N.Y. City Charter § 255……………………………………………………...19

N.Y. City Council Int. No. 584-A (proposed)……………………………….21

N.Y. City Council Resolution 760 (January 19, 2005)…………………….5, 28-29

N.Y. City Council Resolution 782, ULURP No. 040499(A)ZMM
(January 19, 2005)…………………………………………………….…...24

N.Y. City Council Resolution 783, ULURP No. 040500(A)ZRM
(January 19, 2005)…………………………………………………………..28

N.Y. City Zoning Resolution Art. IX, Chpt. 3, available at
http://www.nyc.gov/html/dcp/pdf/zone/art09c03.pdf…………………….4, 27-28

N.Y. City Zoning Resolution § 12-10……………………………………….24

N.Y. City Zoning Resolution § 43-12……………………………………….23

N.Y. City Zoning Resolution § 81-00 et seq…………………………………24

N.Y. City Zoning Resolution § 93-00 et seq………………………………...24

## HEARINGS

Joint Oversight Hearing of the City Council's Committees on Finance,
Transportation and Economic Development (February 7, 2005)………………4, 18-20

City Council Preliminary Budget Hearing for FY 2006 (March 18, 2005)……….6

## OTHER AUTHORITIES

Page

Affidavit of Richard Ravitch.................................................................13

Jets Bid................................................................................passim

Letter from Jerome Haims to Roco Krsulic, January 31, 2005.............................8

Letter from Katherine Lapp, April 5, 2005...........................................25

Madison Square Garden, L.P. Verified Petition & Complaint....................passim

Memorandum of Understanding, Empire State Development
Corporation, Jets Development LLC, and Metropolitan Transit
Authority (March 25, 2004)...............................................................8

Memorandum of Understanding between the City of New York and
the State of New York respecting the Javits Convention Center and
the New York Sports and Convention Center (March 25, 2004)..............3, 8, 16, 18

Metropolitan Transit Authority Vendor Code of Ethics, available at
http://www.mta.info/mta/procurement/vendor-code.htm.............................11

Number 7 Subway Extension -- Hudson Yards Rezoning and Development
Program Final Generic Environmental Impact Statement, CEQR#03DCP031M,
available at http://www.nyc.gov/html/dcp/html/hyards/eis.html............................26-27

N.Y. State Comptroller Opinion No. 82-174 (1982)....................................21

NYPIRG/Straphangers Verified Petition..............................................passim

Request for Proposals for the Sale of Real Property Interests above
John D. Caemmerer West Side Yard ...................................................passim

State Budget for FY 2006, available at
http://www.budget.state.ny.us/pubs/press/2005/pr0412005.html..................................7

U.S. Const. art I, § 9....................................................................18

Website of the City Planning Department,
http://www.nyc.gov/html/dcp/html/hyards/hymain.html......................................26-27

iv

## INTERESTS OF AMICI CURIAE

Speaker A. Gifford Miller currently serves on the City Council as the elected representative of the Fifth Councilmanic district of the City of New York. In addition, Miller serves as the Speaker of the New York City Council, as the result of unanimous votes of the New York City Council on January 9, 2002 and January 7, 2004. As Speaker of the City Council, Miller is the leader of the legislative branch of New York City's municipal government, the highest ranking Democrat in city office.

Council Members Christine C. Quinn, Gale A. Brewer, Philip Reed, Bill Perkins, Eva Moskowitz, Charles Barron and Letitia James serve as elected representatives of New York City residents across Manhattan and Brooklyn in the New York City Council. State Senators Thomas K. Duane and Liz Krueger serve as elected representatives of New York City residents in the New York State Senate.

In particular, Council Member Quinn and State Senator Duane represent the Third Councilmanic District and Twenty-Ninth Senate District, respectively, in which the John D. Caemerrer West Side Yards (hereinafter the "Rail Yards") are located. Council Member Brewer represents the Sixth Councilmanic District, which borders the Hudson Yards redevelopment area abutting the Rail Yards. Council Members Quinn and Brewer and Senator Duane are thus the elected representatives of the city residents whose daily lives will be most affected by construction of the proposed New York Sports and Convention Center.

Central to the duties of Speaker Miller and Council Members Quinn, Brewer, Reed, Perkins, Moskowitz, Barron and James as legislators are the responsibilities of

1

passing a responsible and balanced annual City budget, making appropriate land use decisions, and adopting effective zoning plans to ensure that the public is properly served by its governmental agencies. Bowing to pressure from the Bloomberg Administration, the New York Metropolitan Transportation Authority (hereinafter the "MTA" or the "Authority") conducted an unfair and non-competitive bidding process for the development and related property rights over the Rail Yards and selected an inferior bid far below fair market value. In so doing, the MTA not only breached its fiduciary duty to the public, but did great harm to the future of our mass transportation system and the people of the City of New York.

As the chosen representatives of hundreds of thousands of constituents that pay for and rely upon the bus and subway systems operated by the MTA, Speaker Miller, Council Members Quinn, Brewer, Reed, Perkins, Moskowitz, Barron and James and Senators Duane and Krueger have an interest, on behalf of their constituents, in any disposition of valuable MTA assets. Moreover, the disposition of MTA assets has a direct impact upon their function and duties as Council Members and State Senators, as the New York City and New York State budgets include substantial annual funding for the MTA.

Furthermore, the bid submitted by Jets Development, LLC (hereinafter the "Jets") and the MTA's arbitrary and capricious decision to select that bid rests on fundamental misconceptions of city budget, land use, zoning and public transportation laws – misconceptions that undermine the rightful authority of the City Council, as designated by the New York City Charter, and, consequently, the authority of Speaker Miller,

2

Council Members Quinn, Brewer, Reed, Perkins, Moskowitz, Barron and James, and the rights of their constituents.

## ARGUMENT

## PRELIMINARY STATEMENT

In awarding the immensely valuable development and related property rights over the John D. Caemerrer West Side Yards – the most prized piece of real estate currently available for development in New York City – the MTA succumbed to political pressure from Mayor Michael Bloomberg and members of the Bloomberg Administration and conducted an inequitable, non-competitive bidding process that violated the Authority's fiduciary duty to secure terms of sale most beneficial to the public without favoritism, partiality or arbitrariness. The MTA further acted arbitrarily and capriciously in ultimately selecting the Mayor's preferred bid, a contingent, rule-violating bid worth hundreds of millions of dollars less than fair market value for the property.

Moreover, in selecting the Jets' bid, the MTA arbitrarily and capriciously relied on fundamental misconceptions of city budget, land use, zoning and public transportation laws. First, the Jets' allegedly non-contingent bid relies on Mayor Bloomberg's 'commitment' to invest $300 million to pay for the stadium's platform and roof. See Jets Bid, 1.1-1; Memorandum of Understanding between the City of New York and the State of New York respecting the Javits Convention Center and the New York Sports and Convention Center, ¶ 3(b) (March 25, 2004) (hereinafter "City/State MOU"). However, no such budgetary appropriation has been made by the City Council nor has the Mayor so

3

requested.[1]  Instead, according to testimony at City Council hearings, the bid relies on an

illegal scheme to divert City revenues known as Payments in Lieu of Taxes (hereinafter

"PILOTs") without authorization from the City Council, see Testimony of Mark Page,

Joint Oversight Hearing of the City Council's Committees on Finance, Transportation

and Economic Development, at 40-43 (February 7, 2005) (hereinafter the "Council

Hearing on Financing"), in direct violation of the New York City Charter.  N.Y City

Charter § 227.

        The Jets' bid and the MTA's arbitrary and capricious decision to accept that bid

further rests on a misconception of land use law and the City Council's recent zoning

actions.  The Jets' allegedly non-contingent bid includes an illusory, future $440 million

payment from developers for Transferable Development Rights (hereinafter "TDRs").

See Jets Bid, 1.1-1, 1.1-3.  While claiming not to have considered the far-fetched $440

million future payment in making its decision, the MTA falsely asserted that the value of

the Jets' bid is enhanced by the MTA's retention of these hypothetical TDRs.  See

Madison Square Garden, L.P. (hereinafter "MSG") Verified Petition & Complaint, ¶¶

119-124 (quoting Transcript of MTA Board Meeting, March 31, 2005, at 35, 37).

However, the TDRs invented by the Jets and relied upon by the MTA simply do not exist.

As discussed in detail below, creating such TDRs would require future City Council

authorization.  N.Y. City Charter §§ 197-d and 200.  At best, the future existence of any

TDRs is highly speculative and exceedingly unlikely.  Having just passed a

comprehensive, carefully balanced and long-considered rezoning for the neighboring

Hudson Yards redevelopment area, see N.Y. City Zoning Resolutions, Art. IX, Chpt. 3,

---

[1] Similarly, in its FY 2006 budget, the State made no appropriation for the $300 million state subsidy on
which the Jets' bid rests.

4

the City Council has <u>no</u> intention of authorizing the TDRs invented by the Jets and relied upon by the MTA.

Finally, in attempting to justify its arbitrary and capricious decision to bend to the Mayor's will, the MTA exhibited a seemingly willful disregard of the City Council's recent approval of the Administration's plan to finance the westward extension of the Number Seven train. The MTA's claim that acceptance of the Jets' bid was necessary to "assure the financing of the number seven train" extension, MSG Verified Petition & Complaint, ¶ 106 (quoting Transcript of MTA Board Meeting, March 31, 2005, at 39) is demonstrably false and misleading. On January 19, 2005, the City Council endorsed a financing plan for the extension that does not rely in any way upon construction of any development over the Rail Yards. <u>See</u> N.Y. City Council Resolution 760 (January 19, 2005).[2] Indeed, many Council Members voted for Resolution 760, despite their opposition to the New York Sports and Convention Center plan (hereinafter the "NYSCC plan"), because the Resolution explicitly disavowed any connection between the Number Seven extension and the NYSCC plan. <u>Id.</u>

As a result, Speaker Miller, Council Members Quinn, Brewer, Reed, Perkins, Moskowitz, Barron and James and Senators Duane and Krueger join in the Petitioners' request that the Court: (a) declare that the MTA should have rejected all of the submitted bids, (b) annul the vote of the MTA board, (c) enjoin the MTA from proceeding to contract with any bidder, and (d) order the MTA to reissue a Request for Proposals for the Rail Yards that will conform with New York law and basic principles of equity.

---

[2] Resolution 760 is available at: http://webdocs.nyccouncil.info/textfiles/Res%200760-2005.htm?CFID=47498&CFTOKEN=75698668

**POINT I**

UNDER PRESSURE FROM MAYOR BLOOMBERG, THE MTA IMPERMISSIBLY
STRUCTURED AN UNFAIR, NON-COMPETITIVE BIDDING PROCESS AND
ACTED ARBITRARILY AND CAPRICIOUSLY IN SELECTING A CONTINGENT
BID FAR BELOW FAIR MARKET VALUE

A.    The MTA, a Public Benefit Corporation in the Midst of a Fiscal Crisis, Must
      Obtain a Reasonable Return in Disposing of Its Valuable Assets Despite the
      Mayor's Opposition

Chartered by New York State in 1965, the MTA is responsible for operating,
maintaining and improving public transportation in the Metropolitan Commuter
Transportation District, which includes New York City. N.Y. Pub. Auth. Law § 1262;
see generally id. at §§ 1260 et seq. (identifying MTA's powers and operations).  The
MTA is a public benefit corporation, id. at § 1263(1)(a), defined under New York law as
"a corporation organized to construct or operate a public improvement wholly or partly
within the state, the profits from which inure to the benefit of this or other states, or to
the people thereof." N.Y. Gen. Constr. Law § 66.   In creating the MTA, the New York
State legislature intended the MTA to "continu[e], further develop[] and improve[] . . .
commuter transportation" and "to develop and implement a unified mass transit policy . .
. for the benefit of the people of the state of New York." N.Y. Pub. Auth. Law § 1264.

The MTA is in the midst of a fiscal crisis.  Despite having imposed two
substantial fare and toll hikes over the past three years, closed token booths in the New
York city subways and eliminated thousands of jobs, the MTA admits that it faces
"daunting" operating deficits of $607 million in 2006, $689 million in 2007 and $991
million in 2008.  Prepared Remarks of Gary Lanigan, MTA Director of Budgets and
Financial Management, City Council Preliminary Budget Hearing for FY 2006, at 2
(March 18, 2005) (hereinafter "Lanigan Remarks").  The Independent Budget Office

6

(hereinafter the "IBO") of New York City has predicted even higher MTA budget shortfalls. NYPIRG/Straphangers Verified Petition, ¶ 47 (quoting the IBO as predicting annual deficits rising from $695 million in 2006 to $1.2 billion in 2009). Moreover, the MTA has not explained how it intends to fund its $27.6 billion Capital Plan over the next five years, Lanigan Remarks, at 4-6, since the State of New York's recent budget provides over $9 billion less than the MTA requested. State Budget for FY 2006, available at http://www.budget.state.ny.us/pubs/press/2005/pr0412005.html (indicating allocation of approximately $18.2 billion to MTA capital plan).

The Rail Yards represent undoubtedly the MTA's most valuable real estate asset, a little over 13 acres of developable property just off the waterfront in the heart of Midtown Manhattan. Request for Proposals for the Sale of Real Property Interests above John D. Caemmerer West Side Yard § III(A) (Feb. 22, 2005) (hereinafter "RFP").[3] The City Council's recent approval of the development plan for the surrounding Hudson Yards area, including the financing of the extension of the Number Seven train, have increased the Rail Yards' value significantly. Through disposition of the development and related property rights above the Rail Yards at or near market value, the MTA has a unique opportunity to ease its fiscal crisis and/or help fund its capital plan without slashing services, issuing bonds or requesting tax money. By contrast, the decision to award rights to the Rail Yards at a fraction of their market value, in spite of the Mayor's support, would have a direct and devastating impact upon train, subway and bus services in New York City and New York State – causing straphangers to suffer additional fare hikes, service disruptions and, ultimately, tax increases. In order to fulfill its mandate to

---

[3] The Request for Proposals is available for review on the internet at the following web site: http://www.newyorkgames.org/files/lawsuits/RFP/RFP_West%20Side%20Yard_1.pdf;

7

implement an effective mass transit policy and maximize benefit to the people of the state of New York, N.Y. Pub. Auth. Law § 1264, the MTA must overcome pressure from the Mayor and obtain a reasonable return for the development and related property rights over the Rail Yards.

B.    The MTA Violated its Fiduciary Duty to Secure Terms of Sale Most Beneficial to the Public without Favoritism, Partiality or Arbitrariness by Conducting an Inequitable, Non-Competitive Bidding Process

On November 2, 2004, after more than seven months of exclusive, closed-door negotiations among the MTA, the Jets and the Pataki and Bloomberg Administrations regarding construction of a stadium over the Rail Yards,[4] the MTA commissioned and received an independent appraisal setting the fair market value of the development and related property rights over the Rail Yards at $923,400,000. NYPIRG/Straphangers Verified Petition, ¶ 35; MSG Verified Petition & Complaint, ¶ 26 & Exhibit 15; see also Letter from Jerome Haims to Roco Krsulic, January 31, 2005, at 3 (reaffirming appraisal). Nevertheless, two months later, in response to the Jets' embarrassingly low offer of $100 million, the MTA indicated its willingness to accept the offer if it were increased to $300 million, less than a third of the MTA's own appraisal of fair market value. NYPIRG/Straphangers Verified Petition, ¶ 37. The MTA's willingness to accept such a low offer, in spite of its fiscal crisis, is strong evidence of the MTA's lack of concern for its fiduciary duty to the public and inability to withstand political pressure from the Mayor.

---

[4] The MTA, the Jets and the New York State Empire State Development Corporation entered into a Memorandum of Understanding regarding the construction of a stadium over the Rail Yards on March 25, 2004. See Memorandum of Understanding, Empire State Development Corporation, Jets Development LLC, and Metropolitan Transit Authority (March 25, 2004), available at http://www.newyorkgames.org/files/Jets/MOU_ESDC_Jets_MTA.pdf. On the same day, the Bloomberg and Pataki Administrations entered into a Memorandum of Understanding expressing support for subsidizing the Jets' plan with $600 million. See City/State Memorandum of Understanding (March 25, 2004), available at http://www.newyorkgames.org/files/Jets/MOU_NYC_NYS.pdf.

Over the last year, the disposition of the Rail Yards became the subject of an intense political battle. On one side, good government groups, editorial boards and advocates for straphangers and ordinary New Yorkers applied pressure on the MTA to create an open, public bidding process to yield the most beneficial terms possible. See, e.g., Winnie Hu & Charles Bagli, Obstacle Rises for Bloomberg on West Side Stadium, N.Y. Times, March 3, 2005, at B1; Juan Gonzalez, Jets' Sweet Deal Souring, N.Y. Daily News, March 1, 2005, at 18; Editorial, Eyes Wide Open on the Stadium, N.Y. Times, Feb. 14, 2005, at A22. Meanwhile, the Mayor and members of his Administration used hardball tactics, such as denigrating the patriotism and motives of opponents, to pressure the MTA to negotiate solely with their favored bidder, the Jets. See, e.g., Bryan Virasami, Olympic Gamesmanship: Bloomberg Says Cablevision's Offer for West Side Property Is Meant to Thwart the City's Bid for 2012, N.Y. Newsday, Feb. 11, 2005, at A26 (criticizing higher bid as effort to "take away the future of this city"); Brian Heyman, Progress Slower than Hoped: NYC2012 Continues to Push Its Message, Journal News, Feb. 15, 2005, at 5C.

On February 22, 2005, in response to mounting grassroots opposition as well as an unsolicited bid from MSG,[5] the MTA opened a bidding process by issuing a Request for Proposals (hereinafter "RFP") for the development and related property rights over the Rail Yards. See RFP; NYPIRG/Straphangers Verified Petition, ¶ 38. However, under intense pressure from the Bloomberg Administration to sell its most valuable asset as quickly as possible, see, e.g., Charles V. Bagli, Transit Agency Seeks Other Bids on

---

[5] Rather than welcoming MSG's substantially higher bid as an opportunity to obtain greater value for the public transportation system, the Mayor launched a highly personal attack on MSG and its proposal. See Winnie Hu, Mayor Calls Railyard Bid a 'Stunt', N.Y. Times, Feb. 6, 2005, § 1, at 29 (describing higher offer as "P.R. stunt cooked up by some people that have no interest in this city…").

9

West Side Site, N.Y. Times, Feb. 16, 2005, at A1 (describing "steely" response of Deputy Mayor to announcement of forthcoming RFP as threatening loss of Olympics), the MTA fashioned a bidding process that was flawed from the outset: bidders were given a mere twenty-seven days to submit "where is/as is," unconditional, full and final proposals. RFP §§ IV(C), V(A) and V(B)(1) (setting deadline and specifying that "[n]o proposal that is contingent upon a change in existing zoning requirements will be considered" and that offers must be "based on the 'Where Is/As Is' condition of the Site"). This unduly abbreviated time-period served to negate the ability of many potential bidders to even appraise the property – a complicated task since development will require construction of a platform costing hundreds of millions of dollars – let alone formulate a detailed, thorough and well-financed bid proposal.

In addition, the MTA chose not to share with all parties vitally important site information necessary to compile a bid. For example, the RFP required bidders to comply with a complex web of construction requirements, but the MTA apparently failed to explain the contents of these requirements to anyone but the Jets. See RFP § III(B); MSG Verified Petition & Complaint, ¶ 49. The RFP required bidders to assume responsibility for extensive environmental liabilities, but the MTA failed to provide information about risks and conditions to anyone but the Jets. See RFP § IV(F); MSG Verified Petition & Complaint, ¶ 50.

Meanwhile, according to media reports, the Bloomberg Administration engaged in an intimidation campaign to ward off prospective bidders. See Charles V. Bagli, Builders Wary of Pursuing Site Sought by Jets for a Stadium, N.Y. Times, Feb. 17, 2005, at B1 (quoting several developers as admitting reluctance to bid due to "fear of

10

retaliation"). The result of such a flawed process was predictable: the submission of only two serious bids,[6] neither one of which even approached the fair market value of the Rail Yards.

While the MTA is not under an obligation to solicit bids for all property dispositions, nevertheless, whenever the MTA does solicit bids, it must conduct a fair process: "[O]nce the MTA does solicit bids, it is required to act fairly towards all bidders." Tri-State Aggregates Corp. v. Metropolitan Transit Authority, 108 A.D.2d 645, 646, 485 N.Y.S.2d 754 (1st Dept. 1985); Square Parking Systems, Inc. v. Metropolitan Transportation Authority, 92 A.D.2d 782, 785, 459 N.Y.S.2d 774 (1st Dept. 1983). The MTA clearly recognizes this obligation, having committed itself to disposition of all property through a "procurement process that fosters fair and open competition, is conducted under the highest ethical standards, and enjoys the complete confidence of the public." MTA Vendor Code of Ethics § A, available at http://www.mta.info/mta/procurement/vendor-code.htm.

Failure to provide a reasonable timeframe for bid submissions undermines the primary purpose of conducting an open contracting process – to attract competition in order to obtain the best possible terms for the public. See Jo & Wo Realty Corp. v. City of New York, 157 A.D.2d 205, 212, 555 N.Y.S.2d 271 (1st Dept. 1990) ("the RFP method . . . affords the government the flexibility . . . to achieve the greatest economic benefit in dealing with prospective contractors, developers and franchisees"). The provision of an insufficient timeframe for bid submission and the creation of a non-competitive bidding environment render an award "invalid as against public policy..."

---

[6] A third offer from TransGas did not receive consideration, as it was contingent on various factors outside the control of the parties. See NYPIRG/Straphangers Verified Petition, ¶ 44.

11

McArdle v. Board of Estimate of the City of Mt. Vernon, 74 Misc.2d 1014, 1019, 347 N.Y.S.2d 349 (Sup. Ct. 1973), aff'd, 45 A.D.2d 822, 357 N.Y.S.2d 1009 (2d Dept. 1974).

Moreover, New York law requires that a public entity provide all bidders with sufficient information, as well as sufficient time, to formulate bids. "A minimum requirement in the public interest should be that ... the background information necessary to make an intelligent bid [] should be placed in the hands of all bidders, and not just one..." Id. (citing 10 McQuillin, Municipal Corporations § 29.60 (3d ed.)).

In McCardle, the City of Mount Vernon worked with computer consultants for months on recommendations regarding the computerization of its administrative activities, resulting in numerous recommendations and a detailed feasibility study. Id. at 1016-17. The City then formally requested proposals for a computerization contract, giving prospective bidders ten days to digest reams of information and submit bids; moreover, the City did not make the feasibility studies available to bidders, with the sole exception of the original computer consultants. Id. at 1017. Not surprisingly, the original consultants submitted the only bid and "won" the contract. Id. In an Article 78 proceeding, the Supreme Court held that the bidding process unfairly favored the consultants through the withholding of information and the unreasonably short bidding period. Id. at 1018-19. As a result, the Court set aside the award and "require[d], in the public interest, that the contract once again be advertised for bids; that the information in the feasibility study be made available to potential bidders and that a reasonable time be allotted for the submission of bids." Id. at 1019. The Appellate Division upheld this common-sense decision on appeal. 45 A.D.2d 822, 357 N.Y.S.2d 1009 (2d Dept. 1974)

12

The similarities between the material facts of <u>McCardle</u> and the instant case are inescapable. Like the City of Mount Vernon in <u>McCardle</u>, under pressure from the Bloomberg Administration, the MTA has: (1) favored a single bidder, the Jets, with whom it has a close, long-term relationship, by providing the Jets with a disproportionate share of information; (2) denied that information to other less favored bidders; and (3) provided a patently insufficient time period, 27 days, to prepare a complicated bid requiring the analysis of huge quantities of information. Under <u>McCardle</u>, an award following such a bidding process, where a public agency provides insufficient information to bidders, favors a particular bidder and provides insufficient time to formulate a bid, must be set aside. <u>Id.</u> at 1018-19; <u>see also</u> <u>Tri-State Aggregates</u>, 108 A.D.2d at 646 (where a bidding process involves oddities creating appearance of impropriety, MTA was right to rebid contract).

In sum, in the instant case, the MTA's unfairly brief bidding timeframe, its unwillingness to share information with prospective bidders equally, and the Jets' advantage over rival bidders through the many months of close collaboration with the Bloomberg Administration and the MTA in preparing its bid rendered the bidding process virtually prohibitive to other competitive bids. As former MTA Chairman Richard Ravitch stated succinctly, "this process did not produce the highest price obtainable by the Authority." Affidavit of Richard Ravitch, ¶ 3. Any bidding process that effectively eliminates the possibility of competition and fails to produce the highest obtainable bid must be deemed arbitrary and capricious. The Court should, therefore, annul the MTA's selection of the Jets' bid and require the MTA to engage in a new RFP process that will comply with New York law.

13

C.   The MTA Acted Arbitrarily and Capriciously in Selecting a Contingent, Rule-Violating Bid Worth Hundreds of Millions of Dollars Less than Fair Market Value for Development Rights over the Rail Yards

Through public statements, the Mayor and members of his Administration sent a clear and strong political message to the MTA Board, including the Mayor's own appointees, as to which bid the Mayor supported. See, e.g., Michael Saul, No Stadium, No Olympics, Swears an Angry Mike, N.Y. Daily News, March 2, 2005, at 12; Editorial, Bloomberg's Wasteland, N.Y. Sun, Feb. 24, 2005, at 10 (quoting Deputy Mayor as rejecting notion of rezoning property for any buyer other than Jets). In arbitrarily and capriciously selecting the Jets' inferior, contingent and rule-violating bid, the MTA confirmed what was obvious from the structure and backdrop of the bidding process: that the MTA, under pressure from the Bloomberg Administration, was unfairly committed to favoring the Jets rather than to maximizing benefit to the transportation system and the people of the state of New York.

As "temporary trustees of public property," public officials must "dispose of trust property upon the most beneficial terms which it is possible for them to secure." Ross v. Wilson, 308 N.Y. 605, 612 (1955). This duty applies equally to public agencies, including the MTA. Square Parking Systems, Inc. v. Metropolitan Transportation Authority, 92 A.D.2d 782, 785, 459 N.Y.S.2d 774 (1st Dept. 1983). In Square Parking Systems, the Appellate Division required the MTA, in selling a leasehold on a parking garage, to "obtain the terms most beneficial to the public." Id. (upholding MTA's decision to reject all bids for a five-year lease as insufficiently beneficial to public).

While the MTA has broad discretion in assessing bids in property sales, such discretion must not be exercised in an "arbitrary and capricious" fashion. Conduit and

14

Foundation Corp. v. Metropolitan Transit Authority, 66 N.Y. 2d 144 (1985). The Court of Appeals has held that that the MTA's award of a bid should be set aside "upon a showing of actual impropriety or unfair dealing -- i.e. 'favoritism, improvidence, extravagance, fraud and corruption.'" Id. at 149 (quoting Jered Contracting Corp. v. New York City Transit Authority, 22 N.Y.2d 187, 193 (1968)).

The MTA acted arbitrarily and capriciously in selecting a bid for the development rights over the Rail Yards that offered a fraction of market value and substantially less than a competing bid, violated the rules of the RFP, and is contingent on public funding that will not materialize. First, the Jets' bid of $210 million[7] constitutes less than 23 percent of the site's fair market value as determined by the MTA's appraiser. By contrast, MSG has bid $400 million, not including MSG's proposed payment of $360 million for construction of the platform, or 43 percent of fair market value. Though accepting a substantially inferior bid that adds up to less than one-quarter of fair market value would prove devastating to our subway system, the Bloomberg Administration praised the MTA's decision. See Winnie Hu, Mayor Denies Politics Had Role in M.T.A.'s Stadium Decision, N.Y. Times, Sat, April 2, 2005, at B1.

Second, the MTA selected the Jets' bid though it violated the express terms of the MTA's own RFP. In Section IV(C), the RFP clearly mandates that "[n]o proposal that is contingent upon a change in existing zoning requirements will be considered." RFP § IV(C). A key component of the Jets' bid was a proposed $440 million future payment by third-party developers for Transferable Development Rights ("TDRs"), apparently

---

[7] The Jets' bid lists a payment of $250 million for the "Site and on-site development rights." See Jets' Bid 1.1-1. However, since the $250 million will be paid over the course of five years, the payment is only worth $210 million today. Id. at 1.1-2 The $210 million bid was submitted along with a sketchy proposal for an additional future payment by third parties of $440 million. This third-party payment, discussed infra, was ignored by the MTA because of its highly conditional nature.

15

arranged by the Bloomberg Administration itself. See Charles V. Bagli, <u>Jets' Final Bid</u> <u>Needed Help from Group of Developers</u>, N.Y. Times, Mar. 26, 2005, at B1 (quoting third-party developer as admitting that "[b]asically the city came up with the idea"). However, as the Jets recognize, the payment for these TDRs depend entirely on the "result of future rezoning." Jets' Bid, 1.1-3. Thus, the Jets' bid violated the MTA's rule requiring "Where Is/As Is" bids and bids not contingent on zoning changes. See RFP §§ IV(C) and V(B)(1).

Third, a critical, necessary element of the Jets' bid is $600 million in subsidies from the Pataki and Bloomberg Administration. Jets' Bid, 1.1-3; City/State MOU. Without these subsidies, the Jets have no financial plan to construct the required platform over the Rail Yards. <u>Id.</u> Despite Mayor Bloomberg's unquenchable desire to funnel city money to a stadium, these subsidies are unlikely to ever materialize. At this time, neither the City Council nor the State Legislature has appropriated any money for these subsidies; in fact, since no one, including the Governor and Mayor, has proposed appropriation legislation, the City Council and State Legislature have not even begun any review process. With the State budget for 2006 already finalized and the City budget well on its way to completion, there is no chance of the subsidies materializing in the near future. Given the concerns of key legislators at the City and State level, see Brian McGuire, <u>Jets Stadium Hits Trouble in Albany</u>, N.Y. Sun, April 21, 2005, at 1; Michael Saul, <u>Stadium Far From a Done Deal, Silver Tells Mike</u>, N.Y. Daily News, April 7, 2005, at 4, as well as public opinion opposing subsidies for the NYSCC stadium, see Quinnipiac Poll, <u>http://www.quinnipiac.edu/x11370.xml?ReleaseID=668</u> (March 31, 2005), approval of appropriation legislation at any point is a highly unlikely proposition.

16

Moreover, as set forth below in detail, the Bloomberg Administration's scheme to finance the City's subsidy through an off-budget slush fund is illegal, as it directly violates the mandates of the City Charter. See infra Point Two.

Given all of these contingencies, were it operating in good faith in an arm's length transaction rather than simply rubber-stamping the Mayor's agenda, the MTA would have either disqualified the Jets' conditional bid as it did with the TransGas bid, see supra note 5, or asked the Jets to resubmit a bid that conformed to the RFP's rules. Cf. Tri-State Aggregates, 108 A.D.2d at 646 (approving MTA decision to rebid contract where bidding process involved oddities). The MTA's decision to accept the Jets' bid, unilaterally excise the contingent TDR proposal and ignore the contingent nature of the bid's massive public subsidies further demonstrates the MTA's clear favoritism towards the Jets.

Finally, as set forth in more detail below, in making its selection, the MTA willfully or negligently overlooked or misunderstood key aspects of New York City budget, land use, zoning and transportation law that further undermine the viability of the Jets' bid.

In sum, bowing to political pressure from a Mayor by exercising favoritism towards his pet project, the MTA acted arbitrarily and capriciously in structuring an unfair bidding process that discouraged competition and favored the Jets, and in selecting a contingent, inferior bid worth less than 25 percent of the fair market value of the development rights over the Rail Yards.

**POINT II**

THE MTA ACTED ARBITRARILY AND CAPRICIOUSLY IN SELECTING A BID
THAT RELIES ON AN ILLEGAL SUBSIDY TO BE OBTAINED IN VIOLATION OF
THE COUNCIL'S AUTHORITY UNDER THE CITY CHARTER

In its RFP, the MTA explicitly required that each bid include the construction of
a platform over the Rail Yards to assure the Long Island Rail Road's continued use of
the yards. RFP §§ III(A), III(B). To pay for the platform, as well as the stadium roof,
the Jets' bid relies on a City 'commitment' to invest $300 million. See Jets Bid, 1.1-1;
City/State MOU, ¶ 3(b). However, no budgetary appropriation has been made by the
City Council nor has such an appropriation even been requested. Instead, according to
testimony at City Council hearings, the Jets' bid and the Bloomberg Administration
intend to rely on an illegal plan to divert city revenues known as PILOTs through an off-
budget slush fund without authorization from the City Council, Testimony of Mark Page,
Council Hearing on Financing, at 40-43, in direct violation of democratic principles and
the New York City Charter. N.Y. City Charter § 227. In selecting a bid premised on this
illegal funding stream, the MTA acted arbitrarily and capriciously.

The commitment of the "power of the purse" to the legislative branch is a
bedrock principle of American democracy, enshrined in federal and state constitutions.
See, e.g., U.S. Const. art. I, § 9 ("No Money shall be drawn from the Treasury, but in
Consequence of Appropriations made by Law"); N.Y. Const. art. VII, § 7 ("no money
shall ever be paid out of the state treasury ... except in pursuance of an appropriation by
law). Similarly, the Charter of the City of New York commits the power to appropriate
funds to the City Council:

> "No money ... shall be paid from any fund under the management of the
> city, or any fund under the management of any agency or officer of the

18

city, or any other entity the majority of the members of whose board are city officials or are appointed directly or indirectly by city officials, <u>except in pursuance of an appropriation by the council</u> or other specific legal authorization...”[8]

N.Y. City Charter § 227 (emphasis added).

The budget process, set forth in great detail in the City Charter, further underscores the Council's primary role in the appropriation of the City's expenditures. Under the Charter, the Council must conduct Preliminary Executive Budget Hearings and communicate recommendations and findings to the Mayor. <u>Id.</u> at § 247. Upon presentation of the Mayor's proposed budget, the Charter requires the Council to hold Executive Budget Hearings, then adopt a budget by early June. <u>Id.</u> at §§ 253-254. Significantly, "[t]he budget when adopted by the council shall become effective immediately without further action by the mayor." <u>Id.</u> at § 254. While the Mayor retains veto power over provisions of the budget, the "council, by a two-thirds vote of all the council members, may override any disapproval by the mayor." <u>Id.</u> at § 255. The Charter thus commits the 'final say' over all budget appropriations to the City Council. <u>Id.</u>

The Bloomberg Administration's stated scheme for financing the $300 million public subsidy of the Jets' bid through an off-budget slush fund directly violates the Council's appropriation authority and thus upsets the carefully balanced separation of powers in City government. According to the testimony of New York City Budget Director Mark Page at a City Council hearing on February 7, 2005, the Administration's plan to finance the $300 million subsidy relies exclusively upon revenues derived from PILOT payments collected from tax-exempt development projects in New York City.

---

[8] Section 227 does include an exception from the council appropriation requirement for "grants or gifts from private entities," an exception limited to private donations, inapplicable to the case at hand.

19

Testimony of Mark Page, <u>Council Hearing on Financing</u>, at 40-43, 61-63, 90-92. According to Page, the Bloomberg Administration would create a local development corporation (the "LDC"), which will issue bonds to raise the $300 million subsidy; for the next 20 to 30 years, the Administration plans to hand over to the LDC all City PILOT revenues, valued at $71 million per year, to pay the debt service on the bonds. <u>Id.</u> The Administration has no intention of including the receipt or the transfer of these PILOT payments in the City budget, nor of requesting Council consent or authorization for the transfer. <u>Id.</u> at 88-92. Rather, though the Administration ultimately plans to transfer <u>over a billion dollars</u> during the next two to three decades,[9] the Administration contends that it needs no City Council approval whatsoever. <u>Id.</u>

This unilateral appropriation of over a billion dollars in PILOT money would clearly violate the Council's authority to appropriate funds under the New York City Charter. N.Y. City Charter § 227. Moreover, the Administration's plan to divert PILOT revenues to subsidize a Jets stadium also runs afoul of state law. New York State law authorizes municipal agencies, such as the New York City Industrial Development Agency, to "enter into agreements requiring payments in lieu of taxes," N.Y. Gen. Mun. Law § 858(15), equal to "the amount, or a portion of, real property taxes." <u>Id.</u> at § 854(17). However, such "[p]ayments in lieu of taxes received by the agency <u>shall be remitted</u> to each affected tax jurisdiction within thirty days of receipt." <u>Id.</u> at § 874. The term "affected tax jurisdiction" is defined as "any municipality ... , in which a project is

---

[9] According to Budget Director Page, the Administration intends to turn over approximately $71 million per year in PILOT payments to the LDC for the next 20 to 30 years. Testimony of Mark Page, <u>Council Hearing on Financing</u>, at 91-92. If the City remits $70 million for the next 20 to 30 years to the LDC, that adds up to a total of $1.4 to $2.1 <u>billion</u> dollars. It should be noted that the City expects to get some of that money back from the LDC. <u>Id.</u> (predicting that the LDC will return approximately $40 million per year). Even factoring in the potential returned money, the net City investment would be $600 to $900 million.

located, which will fail to receive real property tax payments…" Id. at § 854(16). The law thus clearly requires that the funds be transferred to the relevant municipality within 30 days; nothing in the law explicitly or implicitly authorizes the executive branch of that municipality to usurp the regular appropriations process mandated by law.

In interpreting the law governing PILOTs, the New York State Comptroller has explicitly designated PILOT payments as general revenues of a town or municipality. N.Y. State Comptroller Opinion No. 82-174 (1982). According to the Comptroller, "municipal recipients of in lieu of tax payments must include the same as estimated revenues in the annual preparation of their budgets." Id. (emphasis added). The Comptroller's opinion clearly indicates that PILOT revenues must be remitted to New York City's general fund and disbursed pursuant to the normal budget process, through an appropriation adopted by the Council. Moreover, the Comptroller's straightforward interpretation of PILOT law directly undercuts the Bloomberg Administration's extreme and unsupported position that the executive branch has unchecked authority over the receipt and disbursement of PILOT money. Speaker Miller recently introduced legislation, cosponsored by 34 Council Members and the Public Advocate, confirming that the Charter requires Council authorization for the disbursement of PILOT payments. See N.Y. City Council Int. No. 584-A (proposed).[10]

The Bloomberg Administration's illegal effort to circumvent the City Council's appropriation authority undoubtedly adversely affects Speaker Miller, Council Members Quinn, Brewer, Reed, Perkins, Moskowitz, Barron and James and the public in New

---

[10] Int. No. 584-A is available at http://webdocs.nyccouncil.info/textfiles/Int%200584-2005.htm?CFID=47498&CFTOKEN=75698668

21

York City, as well as inflicts great harm upon deep-seated principles of democracy.[11] Moreover, the lost revenue resulting from the MTA's selection of the Jets' inferior bid will undoubtedly require the Speaker Miller, Council Members Quinn, Brewer, Reed, Perkins, Moskowitz, Barron and James and the City Council to increase the City's contributions to the MTA in order to maintain the vibrancy and health of our aging mass transit system.

But even more pertinently to the case at hand, the patently illegal nature of the Administration's subsidy plan provides yet another severely damaging blow to the viability of the Jets' bid.  Without the City subsidy, the Jets' bid, even factoring in the suspect state subsidy,[12] is substantially reduced and will barely cover construction of the required platform.

As part of the bidding process, the MTA required the submission of a "satisfactory" financing plan.  RFP § V(B)(4).  A financing plan that relies so heavily on the Bloomberg Administration's illegal and undemocratic City subsidy cannot be deemed "satisfactory" to any neutral evaluator acting rationally.  The MTA thus acted arbitrarily and capriciously in selecting the Jets' bid, given its reliance on the illegal PILOT scheme.

---

[11] The long-term implications of such a loophole to the Charter's carefully balanced separation of powers are obvious and disturbing: today, the Administration seeks to transfer over a billion dollars without oversight to an unelected, unsupervised LDC. Under the Administration's theory, should a future administration garner additional PILOT revenues – and the stadium plan is supposed to generate more PILOT revenues – nothing could stop that administration from spending tens or even hundreds of billions of dollars in city revenue without any legislative appropriation or oversight.

[12] As set forth above, the State subsidy is also subject to substantial uncertainty. After all, the recently enacted state budget does not provide any authorization for the $300 million subsidy. MSG Verified Petition & Complaint, ¶ 68.

22

**POINT THREE**

THE MTA ACTED ARBITRARILY AND CAPRICIOUSLY IN BASING ITS
SELECTION OF AN INFERIOR BID FAR BELOW MARKET VALUE ON NON-
EXISTENT TRANSFERABLE DEVELOPMENT RIGHTS

The Jets' inferior, contingent bid and the MTA's arbitrary and capricious decision
to accept that bid further rest on a misconception of land use law and the City Council's
recent zoning actions. The Jets' bid includes an illusory, future $440 million payment
from developers for non-existent Transferable Development Rights (hereinafter "TDRs").
See Jets Bid, 1.1-1, 1.1-3. While claiming not to have considered this highly contingent
$440 million future payment in making its decision, the MTA incorrectly asserted that the
value of the Jets' bid is enhanced by the MTA's retention of these hypothetical TDRs.
MSG Verified Petition & Complaint, ¶¶ 119-124 (quoting Transcript of MTA Board
Meeting, March 31, 2005, at 35, 37). However, the TDRs invented by the Jets and relied
upon by the MTA do not currently exist and would require future authorization by the
City Council and the City Planning Commission. As set forth below, the future existence
of any TDRs from this property is inconceivable.

The Rail Yards consist of a lot totaling just over 13 acres, or 570,000 square feet.
RFP, § III(A). The property's current zoning law would allow the construction of
approximately 1.14 million square feet of buildings or other structures for manufacturing
uses.[13] N.Y. City Zoning Resolution § 43-12. Since the MTA has the power to override
zoning resolutions, the MTA can build larger buildings and permit other uses on the
property than those otherwise allowed. N.Y. Pub. Auth. Law § 1266. However, the

---

[13] The current zoning regulation governing the Rail Yards is M2-3. To compute the amount of "buildable"
square feet on the lot, one multiplies the area of the lot by a factor called "Floor Area Ratio" or "FAR."
Since the FAR for an M2-3 district is 2 and the lot contains 570,000 square feet, the limit on authorized
construction is 1.14 million square feet. New York City Zoning Resolution § 43-12, available at
http://www.nyc.gov/html/dcp/pdf/zone/art04c03.pdf.

23

MTA's authority to override municipal zoning law does not extend beyond its own property and does not allow for the transfer of unused development rights to entities other than the state.

New York City zoning resolutions carefully limit the transfer of unused development rights from one zoning lot to another. N.Y. City Zoning Resolution § 12-10 (defining "zoning lot" to allow limited transfers). Generally, for example, a property owner can only transfer such rights to an immediately adjacent zoning lot or to another lot on the same block where there is common ownership between the granting and receiving sites. Id. In some areas of the city, a more liberal mechanism exists for the transfer of such rights. See, e.g., N.Y. City Zoning Resolution §§ 81-00 et seq. (creating Special Midtown District); id. at §§ 93-00 et seq. (creating Special Hudson Yards District). However, the Rail Yards are not located in any such special district. As a result, the MTA has no authority to sell or otherwise transfer unused development rights to other property owners, absent a rezoning of the property. Such a rezoning would require the approval of both the City Council and the City Planning Commission. N.Y. City Charter §§ 197-c, 197-d and 200.

On January 19, 2005, the City Council completed a comprehensive and carefully balanced rezoning plan for the Hudson Yards redevelopment area, a historic revision years in the making. N.Y. City Zoning Resolution §§ 93-00 et seq. Responding to complaints that the plan would allow excessive density, the Council reduced the authorized development area by more than one million square feet. See N.Y. City Council Resolution 782, ULURP No. 040499(A)ZMM (January 19, 2005). The idea that the City Planning Department, the City Planning Commission and the City Council

24

would now revisit the rezoning plan in order to add 4.4 million square feet of Transferable Development Rights, potentially throwing off the careful balance achieved through years of planning and negotiation, is ludicrous.

At best, the future existence of any TDRs is highly speculative and exceedingly unlikely. Because the City Council has <u>no</u> current intention of authorizing the TDRs invented by the Jets and relied upon by the MTA, these hypothetical TDRs have no value, or, at most, a value so minimal that it approaches zero. The MTA thus acted arbitrarily and capriciously in relying on non-existent TDRs as a basis to throw away hundreds of millions of dollars by selecting an inferior bid so far below the property's market value.

## POINT FOUR

### THE MTA ACTED ARBITRARILY AND CAPRICIOUSLY IN PREMISING ITS DECISION ON FALSE INFORMATION REGARDING THE EFFECTS OF THE JETS' BID ON THE EXTENSION OF THE NUMBER SEVEN TRAIN

In an effort to explain its arbitrary and capricious decision to accept a contingent bid so far below market value that relies on an illegal subsidy, the MTA asserts that it chose the Jets' bid to "assure the financing of the number seven train." MSG Petition and Complaint, ¶ 106 (quoting Transcript of MTA Board Meeting, March 31, 2005, at 39). In a letter to Speaker Miller and Council Members Quinn and John Liu, MTA Executive Director Katherine Lapp further claimed that the Jets' bid was "more likely to achieve the objective of extending the Number 7 train to the far west side of Manhattan. . . ." Letter from Katherine Lapp, April 5, 2005, at 2. This post-hoc justification relies on a fundamental misunderstanding of the framework and status of the City Council's recent

25

comprehensive pan for the Hudson Yards redevelopment area.  Because, in enacting that plan, the City Council already approved a financing plan for the Number Seven train that does not rely upon construction of any development project over the Rail Yards, the MTA's claim regarding the Number Seven train is merely a smokescreen to obscure its arbitrary and capricious selection of the inferior, sub-market bid preferred by the Mayor.

Development of the Hudson Yards area, located generally between West 28th and West 43rd Streets, from Seventh Avenue to the Hudson River – but not including the Rail Yards – has been a long-term City goal.  The process of securing a comprehensive redevelopment plan, including rezoning and improvement of public transportation access "to transform Hudson Yards into a dynamic, transit-oriented urban center" began in earnest over four years ago.    Website  of  the  City  Planning  Dept., http://www.nyc.gov/html/dcp/html/hyards/hymain.html.    According to the Bloomberg Administration, the redevelopment plan involves "four key public sector actions that would be necessary to attract private development to the area: [1] Extending subway service, [2] Establishing a new open space network, [3] Zoning for appropriate densities and uses, [and 4] Creating a Convention Corridor."    Id. (emphasis added). The Administration's commitment to the plan could not be clearer: "There is an unacceptable alternative [to redeveloping Hudson Yards]: to abdicate and do nothing."  Id.

That the Number Seven train extension is critical to the concept of the Hudson Yards redevelopment plan, not to mention its success, is beyond dispute.  The title of the Environmental Impact Statement speaks for itself: the Administration chose the title "Number 7 Subway Extension -- Hudson Yards Rezoning and Development Program." See Number 7 Subway Extension -- Hudson Yards Rezoning and Development Program

26

Final Generic Environmental Impact Statement, CEQR#03DCP031M (hereinafter "EIS").[14] The City Planning Department has described the redevelopment plan as "the transit-oriented redevelopment of the Hudson Yards area." Website of the City Planning Dept., http://www.nyc.gov/html/dcp/html/hyards/eis.html. The Administration has identified "extending subway service" as one of the four critical areas of the plan. Id. at http://www.nyc.gov/html/dcp/html/hyards/hymain.html. Moreover, in discussing the need for a Number Seven train extension, the EIS admits that "[r]apid transit access is essential if the development potential of the Hudson Yards is to be fully realized." EIS, ES-15.

In addition, in preparing the EIS, the City Planning Department and the MTA relied upon the extension of the Number Seven line as an integral feature. See, e.g., id. at ES-5, ES-14, ES-15. As the EIS admits, "[e]xisting transit facilities and service are not adequate to support medium- to high-density redevelopment of the Hudson Yards area [as proposed by the redevelopment plan]... Extension of the No. 7 Subway line offers the best opportunity to meet the transportation needs of the Proposed Action." Id. at ES-15. The primacy of the Number Seven train extension in the EIS underscores its importance to the success of the Hudson Yards rezoning and development plan. Moreover, were the extension not to happen, the absence of subway service in proximity to the planned commercial development west of Tenth Avenue would fundamentally alter the environmental analysis, calling into question the viability of the entire redevelopment plan.

After years of planning, as well as review by community boards and the City Planning Commission, the City Council took up the plan, beginning in late 2004. On

---

[14] The EIS is available at http://www.nyc.gov/html/dcp/html/hyards/eis.html

January 19, 2005, the Council approved the plan, passing various pieces of implementing legislation, including a zoning resolution creating the Special Hudson Yards District. See N.Y. City Zoning Resolution Art. IX, Chpt. 3.[15] Significantly, the Special Hudson Yards District does not include the Rail Yards, and the City Council made abundantly clear that approval of the redevelopment plan bore no relationship to the success or failure of the NYSCC stadium. N.Y. City Council Resolution 783, ULURP No. 040500(A)ZRM (January 19, 2005) (amending zoning map to exclude proposed stadium location).

On the same day, by an overwhelming vote of 45 to 2, the City Council passed Resolution 760, endorsing the Administration's financing plan for the extension of the Number Seven train through a bond issue – a plan that also does not rely in any way upon construction of the NYSCC stadium. N.Y. City Council Resolution 760 (January 19, 2005). [16] Council leadership deliberately added explicit language emphasizing that the Hudson Yards infrastructure projects, including the Number Seven extension and its financing plan, were wholly independent from the NYSCC stadium plan. Id. ("Whereas, For purposes of this resolution, the Hudson Yards infrastructure projects do not include any components of the New York Sports and Convention Center…"). Passage of Resolution 760 cleared away the last governmental hurdle standing in the way of the Number Seven train extension.

The idea that the City would now reverse course and refuse or fail to finance the extension if the MTA failed to approve the Jets' bid is preposterous and flies in the face of recent history. As set forth above, according to the Bloomberg Administration itself,

---

[15] N.Y. City Zoning Resolution Art. IX, Chpt. 3 is available on the web site of the City Planning Department: http://www.nyc.gov/html/dcp/pdf/zone/art09c03.pdf.
[16] Resolution 760 is available at: http://webdocs.nyccouncil.info/textfiles/Res%200760-2005.htm?CFID=47498&CFTOKEN=75698668

the very economic viability of the Hudson Yards development plan depends on the extension; the EIS for the Hudson Yards development plan relies on the extension; and the City Council has overwhelmingly endorsed the extension and its financing plan with or without the NYSCC stadium. It comes as no surprise then that the Bloomberg Administration and even the MTA itself have confirmed that the extension will take place even if no stadium is built. See MSG Petition and Complaint, ¶¶ 109-110 (citing media reports quoting MTA counsel and spokeswoman for City Planning Department admitting that Number 7 train extension will go forward "regardless of the fate of the proposed stadium").

As set forth above, in disposing of an asset, the MTA has a fiduciary duty to obtain the "terms most beneficial to the public." Square Parking Systems, Inc. v. Metropolitan Transportation Authority, 92 A.D.2d 782, 785, 459 N.Y.S.2d 774 (1st Dept. 1983). The MTA's fiduciary duty extends generally to the people of the State of New York and, more specifically, to the riders of its subways and buses; the MTA is not a shadow city government. In exercising its fiduciary duty, the MTA has no business considering ancillary, future benefits that might (or might not) accrue[17] from the sale or lease of the property at hand for any other entity, including the City of New York.

Through elected representatives at the executive and legislative level, the city government has committed itself to the Hudson Yards redevelopment plan, including financing the Number Seven train extension. As clearly expressed in City Council

---

[17] The positive and negative effects of developing a stadium over the Rail Yards versus mixed commercial and residential space on the financing plan the Number Seven train extension are highly debatable. Two things are entirely clear: First, these effects will not impact the city's approved plan to develop the Hudson Yards area and finance the extension. Second, what would cause devastating damage to the Hudson Yards development plan is the TDR portion of the Jets' bid. The transfer of over 4 million square feet of additional development rights into the Hudson Yards area would throw off the carefully balanced development plan, causing an overabundance of available space, forcing excessive density and undermining the quality of life in the neighborhood.

29

Resolution 760, the city is committed to redeveloping the Hudson Yards area and financing the Number Seven train extension no matter what is ultimately built over the Rail Yards. The highly debatable question of whether the Jets' plan might prove beneficial to the City's future bond issue for the Number Seven train should have played no role in the MTA's deliberations. As a result, the MTA acted arbitrarily and capriciously in relying on this issue in selecting an inferior, contingent bid so far below market value.

## CONCLUSION

After conducting an inequitable, non-competitive bidding process in violation of its fiduciary duty, the MTA then succumbed to political pressure from Mayor Bloomberg and gave away the most prized piece of real estate currently available for development in New York City for a fraction of market value. Furthermore, in selecting the Jets' unacceptable bid, the MTA arbitrarily and capriciously relied on fundamental misconceptions of city budget, land use, zoning and public transportation laws – misconceptions that further undermine the viability of the Jets' bid, as well as run counter to New York City law and the New York City Charter. As a result, Amici Curiae urge that the Court: (a) declare that the MTA should have rejected all of the submitted bids, (b) annul the vote of the MTA board, (c) enjoin the MTA from proceeding to contract

30

with any bidder, and (d) order the MTA to reissue a Request for Proposals for the Rail

Yards that will conform with New York law and basic principles of equity.


Dated: April 27, 2005
      New York, New York

                                      Respectfully Submitted,

                       By:     _____

                                    John Balestriere, Esq.
                                    BALESTRIERE PLLC
                                    Attorney for Amici Curiae
                                    225 Broadway, Suite 2700
                                    New York, New York 10007
                                    (212) 374-5401