UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------------x
NEW YORK JETS LLC and JETS DEVELOPMENT LLC,      :
                                                 :
                                    Plaintiffs,  :
                                                 :
        -against-                                :        05 Civ. 2875 (HB)
                                                 :        <u>OPINION & ORDER</u>
                                                 :
CABLEVISION SYSTEMS CORPORATION,                 :
CSC HOLDINGS, INC., and                          :
MADISON SQUARE GARDEN LP,                         :
                                                 :
                                    Defendants.  :
----------------------------------------------------------------------------x

Hon. HAROLD BAER, JR., District Judge[*]:

On March 16, 2005, Plaintiffs, New York Jets LLC and Jets Development LLC
(collectively, the "Jets"), filed the instant action against Defendants Cablevision Systems
Corporation, CSC Holdings, Inc., and Madison Square Garden, LP, (collectively, "Cablevision").
The Jets allege that Cablevision, the owner of Madison Square Garden and Radio City Music
Hall, violated Section 2 of the Sherman Act, committed tortious interference and engaged in
deceptive acts and practices.  On April 5, 2005, Cablevision moved to dismiss the Complaint
pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Oral argument was held on
June 15, 2005.  Subsequent to the initial argument on the motion, this Court ordered the parties
to proceed with limited discovery with respect to the application of the <u>Noerr-Pennington</u>
doctrine to Cablevision's alleged conduct.  The parties submitted simultaneous supplemental
briefs on September 20, 2005 and a second oral argument directed to this facet of the motion was
held on September 27, 2005.  For the foregoing reasons, Defendants' motion is GRANTED in
part and DENIED in part.


<u>BACKGROUND</u>

*A.  The Parties*

The Jets own and operate the New York Jets professional football franchise.  (Compl. ¶
10).  Since the franchise was founded in 1959, the Jets (and its predecessor, the Titans) have

---

[*] Margaret Johnson, a summer 2005 intern in my Chambers, and currently a second year law student at New York
University School of Law, provided assistance in the research of this Opinion.

Dockets.Justia.com

never owned a stadium of its own and currently play home games at Giants Stadium, in East Rutherford, New Jersey.  (Compl. ¶ 37).

Cablevision owns Madison Square Garden Arena ("Madison Square Garden" or "The Garden") (seating capacity: 19,500), as well as the Theatre at Madison Square Garden (seating capacity: 5600) and Radio City Music Hall (seating capacity: 6000).  (Compl. ¶ 20).  The Garden is the home of, amongst others, the New York Knicks basketball team and the New York Rangers ice hockey team.  Other events, such as concerts, circuses and political conventions are also held at The Garden.  (Compl. ¶ 20).  Included amongst the 19,500 seats are 89 luxury suites used for business entertainment.  (Compl. ¶¶ 23, 24).  Cablevision's Radio City property is a popular music and performance venue.  (Compl. ¶ 20).  Cablevision both produces and promotes events and rents its venues to others for the same purposes.  (Compl. ¶ 18).  These spaces are unique in that they provide the only enclosed facilities in Manhattan that have a seating capacity in excess of 5,000.  (Compl. ¶¶ 20).

In addition to owning these three sports and entertainment venues, Cablevision is one of the nation's largest cable operators in terms of number of subscribers, serving over 3 million people in the New York City area.  (Compl. ¶ 13).

**B.  The Sports and Convention Center**

For several years, plaintiffs were at work to develop a proposal for a Sports and Convention Center to be constructed on the "West Side Rail Yard," a 30 acre site on the far west side of midtown Manhattan, owned by the Metropolitan Transportation Authority ("MTA").  (Compl. ¶¶ 2, 34, 35).  The proposal called for construction of a 75,000-seat stadium where the Jets would play ten home games per year, and that would also serve as a "multi-purpose, entertainment, and convention facility."  (Compl. ¶¶ 2, 3).  Once built, the Sports and Convention center would, according to the Jets, "create thousands of jobs, hundreds of millions of dollars of tax revenues, and hundreds of millions of dollars of economic activity and development."  (Compl. ¶ 2).  It was to serve as an "essential cornerstone" of New York City's bid to host the 2012 Olympics, as well as the new home of the Jets.  (Compl. ¶ 3).

1. Pre-2004 Negotiations

When Robert Wood Johnson IV became the owner of the New York Jets football franchise in 2000, the team began to search for a way to build a stadium in Manhattan.  (Compl. ¶ 4).  To date, at a cost of over $50 million, the Jets have engaged in "extensive and expensive efforts" in pursuit of a stadium.  (Compl. ¶¶ 4, 38).  Those efforts have included "intensive negotiations" with the MTA and the Empire State Development Corporation, New York State's economic development agency, as well as "the development of a plan, encompassing, among other things, architectural and environmental considerations."  (Compl. ¶ 38).

The Jets and Cablevision have not always been at odds.  In 2002, the Jets and Cablevision contemplated constructing the "Trisport" facility which would have housed the Jets, Knicks, and Rangers, and also provided entertainment and convention space.  (Compl. ¶ 35).  However, according to the Jets, Cablevision "abandoned" that project in early 2003.  (Id.)

2. Jets' Proposal

On March 25, 2004, the Jets entered into a Memorandum of Understanding ("MOU") with the MTA and the Empire State Development Corporation.  The MOU required "the parties to work cooperatively and to use their 'best efforts' to obtain written agreements and the approvals necessary to develop the Sports and Convention Center and to begin construction" by July 2005.  (Compl. ¶¶ 4, 53).  The MOU contained "nine milestones" to be achieved before construction could begin and, as of February 2005, four of the nine milestones had been completed and three more were nearly complete.  (Compl. ¶ 54, 55).

Pursuant to the terms of the MOU, the Jets agreed to finance all of the MTA's costs associated with the project, including "fees for consultants and outside counsel, costs for surveys, assessments, environmental review, and other things."  (Compl. ¶ 53).  By early 2005, the Jets had spent more than $2.6 million on such expenses.  (Id.)  The Jets and the MTA also agreed to participate in an arbitration to determine the fair market value of the site that was set to commence on February 23, 2005.  (Compl. ¶¶ 4, 55).  Following the arbitration, a comprehensive agreement to develop the Sports and Convention Center would have been entered into.  (Compl. ¶ 55).

3.  Cablevision's Bid

Thus, things were moving along swimmingly until February 4, 2005, when Cablevision filed an unsolicited bid to purchase the West Side Rail Yard for $600 million in order to build a "mixed-use residential real estate development."  (Compl. ¶ 56).  The bid consisted of a two-page letter which the Jets characterize as having "contradicted all the relevant zoning provisions governing the site, had no provisions for financing, was not associated with a professional real estate developer, and lacked specificity for the development itself."  (Compl. ¶ 57).

Cablevision's bid was not well received by the market.  On March 9, 2005 Standard & Poor's ("S&P"), a credit rating agency, lowered Cablevision's credit rating and stated that "real estate development [was] clearly outside Cablevision's purview as a cable TV, media, and entertainment operator" and that therefore the bid "could represent a substantial change in the company's risk profile."  (Compl. ¶ 59).

C.  **Stadium Delay**

1.  Advertising & Lobbying Efforts

Cablevision lobbied state officials to reject the proposed Sports and Convention Center. (See Pl.'s Letter dated September 15, 2005, Ex. H, D'Amato Dep., 7-10).  In addition to its lobbying efforts, Cablevision is alleged to have funded a multi-million dollar advertising blitz "designed to malign and denigrate" the Jets and the proposed Sports and Convention Center. (Compl. ¶¶ 6, 41).  Some of the advertisements were disseminated by the New York Association for Better Choices, a "front group" funded by Cablevision.  (Compl. ¶ 7).  According to the Jets, these advertisements falsely represented the economic benefits, financing, and environmental impact of the Sports and Convention Center.  (Compl. ¶ 41, 42) (quoting news reports criticizing Cablevision's media campaign).

Cablevision refused to allow the Jets to purchase airtime for local commercials on any of the non-broadcast networks carried on its cable system, and also allegedly coerced other television stations into refusing to air the Jets' ads.  (Compl. ¶¶ 7, 45).  As a result, the Jets allege that public support for the proposed Sports and Convention Center was reduced.  (Compl. ¶ 47).

4

### 2. Litigation

Cablevision filed two actions in New York State Supreme Court to halt the Jets'
proposal.  First, in September 2004, Cablevision filed suit "to prevent the MTA and New York
Planning Commission from . . . holding scheduled public hearings .  .  . based on supposed flaws
in a draft environmental impact statement" for the site.  (Compl. ¶ 51).  The case was dismissed
on September 21, 2004.  (Id.).  Then, in December 2004, Cablevision filed a second lawsuit,
alleging that the Jets had "improperly manipulated data" submitted in connection with the
environmental impact review for the Jets' proposed development.  (Compl. ¶ 52).  This action
was consolidated with other related cases and ultimately dismissed.  See Madison Square
Garden, L.P. v. N.Y. Metro. Transp. Auth., 2005 WL 1310274 (N.Y. Sup. Jun. 2, 2005), aff'd,
19 A.D.3d 284, 799 N.Y.S.2d 186 (N.Y. App. Div. 1st Dep't 2005).  In addition, the Jets contend
that Cablevision funded other litigations brought by third parties to defeat the Jets' proposal,
some of which are still pending.  (Pl.'s Supp. Brief at 12).

### D. The Public Authorities Control Board

On June 6, 2005 the Public Authorities Control Board ("PACB"), a governmental body
consisting of representatives of Governor George Pataki,  State Senate Majority Leader Joseph
Bruno, and Assembly Speaker Sheldon Silver, declined to approve funding and zoning for the
Sports and Convention Center, effectively killing the Jets' proposal.  (See Def.'s Supp. Brief at
2).

## I.  STANDARD OF REVIEW

When ruling on a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of
Civil Procedure, the Court must construe all factual allegations in the complaint in favor of the
non-moving party.  See Krimstock v. Kelly, 306 F.3d 40, 47 - 48 (2d Cir. 2002).  The Court's
consideration is normally limited to facts alleged in the complaint, documents appended to the
complaint or incorporated in the complaint by reference, and to matters of which judicial notice
may be taken.  See Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991).  A motion
to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no
set of facts in support of his claim which would entitle him to relief."  Shakur v. Selsky, 391 F.3d
106, 112 (2d Cir. 2004) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

Where, as here, "matters outside the pleadings are presented" with a motion to dismiss, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed. R. Civ. P. 12(b). "When matters outside of the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment. . ." Freidl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000). However, "[a] district court may not convert a motion under [Rule 12(b)(6)] into a Rule 56 motion . . . without sufficient notice to an opposing party and an opportunity for that party to respond." Groden v. Random House, Inc., 61 F.3d 1045, 1052 (2d Cir. 1995). Here, both parties have submitted extrinsic materials relevant to the application of the Noerr-Pennington defense. Thus, this Court will convert this motion to one for summary judgment with regard only to the application of Noerr-Pennington.

A court will not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 250 (1986). In determining whether there is a genuine issue of material fact, the Court must resolve all ambiguities, and draw all inferences, against the moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987). This is especially so here since only limited discovery has been permitted and additional discovery might further substantiate plaintiffs' allegations.

## II.  DISCUSSION

Cablevision argues in its motion to dismiss that the Jets' antitrust claim is deficient because the Jets fail to allege that Cablevision engaged in anticompetitive conduct or that Cablevision enjoys a monopoly in a relevant market. Cablevision also asserts that the doctrines of justiciability and comity require the dismissal of the action. Further, Cablevision contends that the Jets fail to allege the elements necessary to sustain either of the Jets' state law claims.

**A. Section 2 of the Sherman Act**

To state a claim for monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2 (2004) ("Section 2"), a plaintiff must demonstrate "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." <u>Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP.</u> <u>("Trinko")</u>, 540 U.S. 398, 407 (2004) (internal citation omitted). Possession of monopoly power is not a *per se* violation of Section 2; instead, an entity must monopolize a "relevant market" through "anticompetitive conduct," rather than by "a superior product, business acumen, or historic accident." <u>Creative Copier Serv. v. Xerox Corp.</u>, 344 F. Supp. 2d 858, 865 (D. Conn. 2004) (<u>citing</u> <u>United States v. Grinnell Corp.</u>, 384 U.S. 563, 570 - 71 (1966)). "The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." <u>Spectrum Sports, Inc. v. McQuillan</u>, 506 U.S. 447, 458 (1993).

The Jets allege that Cablevision violated Section 2 by monopolizing the market for large indoor entertainment venues in Manhattan. Conversely, Cablevision contends that the Jets fail to allege that Cablevision posesses monopoly power in a properly defined market, and that the conduct complained of does not constitute anticompetitive behavior. In particular, Cablevision contends that its actions were directed at securing government action and are therefore immune from antitrust liability. Cablevision also asserts that the Jets failed to allege any injury stemming from defendants' purportedly anticompetitive conduct.

*1. Relevant Market*

The threshold issue to be considered in an antitrust claim is the determination of a relevant market, and in this motion to dismiss plaintiff has adequately plead that requirement. <u>See</u> <u>Berkey Photo, Inc. v. Eastman Kodak Co.</u>, 603 F.2d 263, 268 (2d Cir. 1979) ("[T]he first step in a court's analysis must be a definition of the relevant market.") (citation omitted). As defined by the Second Circuit, a "relevant market" consists of "all products reasonably interchangeable by consumers for the same purposes." <u>Geneva Pharm. Tech. Corp. v. Barr Lab.</u>

Inc., 386 F.3d 485, 496 (2d Cir. 2004) (citation omitted).  Such a determination involves a "deeply fact-intensive" inquiry and "courts are hesitant to grant motions to dismiss for failure to plead the relevant product market."  Creative Copier, 344 F. Supp. 2d at 863 (citing Todd v. Exxon Corp., 275 F.3d 191, 199 - 200 (2d Cir. 2001).  Therefore, to survive a motion to dismiss, a plaintiff need only allege a "plausible" market.  Hack v. President and Fellows of Yale Coll., 237 F.3d 81, 86 (2d Cir. 2000) (quoting Brown Shoe Co. v. United States, 370 U.S. 294 (1962)).

Here, the Jets maintain that Cablevision is in control of all enclosed spectator facilities with capacities of greater than 5,000 that are appropriate for large-scale sports and entertainment events.  (Compl. ¶18(a)).  According to the Jets, the control over these venues has enabled Cablevision to monopolize three relevant markets: (1) the facilities market, (2) the ticket market, and (3) the suites market.  The Jets define the facilities market as "the market for the rental of enclosed facilities with seating capacity greater than 5,000 for enclosed large scale spectator events in Manhattan."  (Compl. ¶18(a)).  The "ticket market" is "the market for sales of tickets for enclosed large-scale spectator events held in enclosed facilities with seating capacity of greater than 5,000 in Manhattan."  (Compl. ¶18(b)).  The "suites market" is "the market for the rental of suites .  .  .  in enclosed facilities with seating capacity of greater than 5,000 in Manhattan."  (Compl. ¶18(c)).

Cablevision argues that the Jets' definition of the relevant market is too geographically narrow and arbitrarily disregards venues that hold fewer than 5,000 spectators.  For purposes of the Sherman Act, "[t]he relevant geographic market is defined simply as the geographic area where competition occurs."  N.Y. Citizens Comm. on Cable TV v. Manhattan Cable TV, 651 F. Supp. 802, 807 (S.D.N.Y. 1986).  Geographic constraints are reasonable when they reflect actual barriers on the flow of goods or services into or out of the market.  Id.  Similarly, a relevant product market consists of goods that are "reasonably interchangeable."  Id. at 808.  See also Tic-X-Press, Inc. v. Omni Promotions Co., 815 F.2d 1407, 1420 (11th Cir. 1987) (finding that relevant market consists of  venues in Atlanta with capacities greater than 4,000).  Here, the Jets plausibly allege that large venues within Manhattan are not interchangeable with larger venues outside of Manhattan, or with smaller venues within Manhattan.  The interchangeability of alternative venues is too fact-intensive an inquiry to appropriately resolve at this stage of the proceedings.  Further discovery is necessary before this Court can determine whether Cablevision possesses monopoly power in a relevant market.

2. *Anticompetitive Behavior*

The Jets allege that Cablevision engaged in four types of anticompetitive behavior: (1) "public misrepresentations;" (2) "attempts to silence plaintiffs;" (3) "misuse of the litigation process;" and (4) a "sham bid for the West Side Rail Yard." (Compl. ¶¶ 41 – 60). Cablevision argues, *inter alia*, that its conduct was aimed at securing government action and is therefore immune from antitrust liability.

In evaluating allegedly anticompetitive conduct, a court must determine whether "the challenged conduct is 'exclusionary' or 'predatory.'" Creative Copier, 344 F. Supp. 2d 858, 865 (D. Conn. 2004) (quoting Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 602 (1985)). However, certain conduct, albeit anticompetitive, is nonetheless exempt from antitrust liability. See City of Colum. v. Omni Outdoor Adver., Inc., 499 U.S. 365, 379 - 380 (1991). Beginning with E. R.R. Pres. Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961) and Mine Workers v. Pennington, 381 U.S. 657 (1965), the Supreme Court determined that attempts by private entities to "influence legislative, executive, administrative or judicial action are immune from federal antitrust liability." Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag, 207 F. Supp. 2d 221, 223 (S.D.N.Y. 2002) (citing to Noerr, 365 U.S. at 136; Pennington, 381 U.S. at 670). Put another way, if Cablevision's conduct was anticompetitive, but aimed at securing government action, Cablevision is immune from antitrust liability. See U.S. Football League v. Nat'l Football League, 634 F. Supp. 1155, 1178 (S.D.N.Y. 1986) ("mere solicitation of governmental action through legislative [administrative, or judicial] processes, even though the sole purpose of the defendants is to restrain competition, is an activity which is fully protected by the First Amendment") (internal quotation omitted).

The Supreme Court has limited Noerr-Pennington immunity to those circumstances where a monopolist truly seeks to secure government action. See Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 499-500 (1988). "The validity of such efforts, and thus the applicability of Noerr immunity, varies with the context and nature of the activity." Id. at 499. The Court explained that, "[j]ust as the antitrust laws should not regulate political activities simply because those activities have a commercial impact, so the antitrust laws should not necessarily immunize what are in essence commercial activities simply because they have a political impact. Id. at 507 (internal quotation omitted).

The Supreme Court has articulated an exception to <u>Noerr-Pennington</u> when a defendant's attempt at "'influencing governmental action[] is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor.'" <u>Omni Outdoor</u>, 499 U.S. at 380 (<u>quoting</u> <u>Noerr</u>, 365 U.S. at 144). "The 'sham' exception to <u>Noerr</u> encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." <u>Id.</u> (emphasis in original). "A 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all," but rather seek to harass a competitor by "impos[ing] expense and delay." <u>Id.</u> (internal quotation omitted). To come within this exception, a competitor must demonstrate that the conduct in question was both "objectively baseless," and was initiated "without regard for the merits [but rather] for the purpose of injuring a market rival." <u>Primetime 24 Joint Venture v. National Broadcasting Co.</u>, 219 F.3d 92, 100-101 (2d Cir. 2000) (internal quotations omitted). However, "[t]hat a private party's political motives are selfish is irrelevant . . . . an intent to restrain trade as a *result* of the government action sought does not foreclose protection." <u>Omni Outdoor</u>, 499 U.S. 380-81 (internal quotation omitted). Thus, a valid attempt to procure government action, even when initiated to attain a competitive advantage, is protected by <u>Noerr-Pennington</u>. However, a meritless petition, submitted to impose undue delay and expense on a rival, will subject a defendant to antitrust liability.

    a.   "<u>Public Misrepresentations</u>"

According to the Jets, Cablevision has engaged in a massive media campaign "through their cable monopoly and other outlets designed to malign and denigrate the Sports and Convention Center project and [the Jets]." (Compl. ¶ 41). The Jets also allege that Cablevision's advertisements and public statements contained numerous misrepresentations. (<u>Id.</u> ¶¶ 5-7, 36, 41-42). Cablevision argues that the advertisements were directed at influencing public opinion and toward securing governmental action (in the form of a rejection of the Jets' stadium proposal), and are therefore protected under <u>Noerr-Pennington</u>.

In <u>Allied Tube</u>, the Supreme Court stated that "[a] publicity campaign directed at the general public, seeking legislative or executive action, enjoys antitrust immunity even when the campaign employs unethical and deceptive methods." 486 U.S. at 499-500. <u>See also</u> <u>Noerr</u>, 365 U.S. at 140-41 ("a publicity campaign to influence governmental action falls clearly into the

10

category of political activity"). Here, the Jets allege that Cablevision employed a "multi-million dollar . . . campaign designed to delay and derail the Sports and Convention Center." (Compl. ¶ 5). In the course of this campaign, the Jets allege that Cablevision misrepresented the "economic benefits," "financing," and "environmental impact" of the proposed stadium, as well as the Jets' "truthfulness and integrity . . . in preparing and submitting regulatory filings" for the project. (Compl. ¶ 41).

These alleged misrepresentations fall squarely within the confines of <u>Noerr-Pennington</u>. Cablevision's advertisements and public statements were aimed at influencing public opinion as well as the government decisionmakers who possessed the power to block the Jets' proposal. Cablevision did not undertake this advertising campaign to detract from the Jets' appeal as a sports franchise. Indeed, Cablevision's only interest in discrediting the Jets was in conjunction with the Jets' efforts to construct a stadium next door to Madison Square Garden. While "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor," <u>Noerr</u>, 365 U.S. at 144, the facts alleged here fail to pass that test. The complaint alleges that Cablevision disseminated misleading information regarding the merits of the Jets' stadium proposal. To constitute a "sham," Cablevision's public statements must have been directed at harming the Jets' interests in some manner distinct from securing defeat of the Sports and Convention Center. The Jets fail to allege any purpose for the advertisements separate from achieving defeat of the stadium. Since this outcome necessarily depended on government intervention, Cablevision's alleged public misrepresentations are immune from antitrust liability.

b.  "Attempts to Silence Plaintiffs"

The Jets allege that Cablevision refused to air the Jets' advertisements in support of the Sports and Convention Center, and that Cablevision coerced other television stations into refusing to air the Jets' ads.  (Compl. ¶ 43).  Cablevision contends that it has no legal duty to run advertisements distributed by a competitor and that the Jets were able to adequately disseminate their message without Cablevision's cooperation.[1]

In general, a business "has a right to deal, or refuse to deal, with whomever it likes. . ." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984).[2]  However, the right to "refuse to deal" is not unrestrained.  See Eastman Kodak Co. v. Image Tech. Serv., 504 U.S. 451, 483 n.12 (1992) ("as a general matter a firm can refuse to deal with its competitors  . . . [however] such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal").  The Supreme Court articulated the scope of a business's right to "refuse to deal" with competitors in Aspen Skiing, 472 U.S. at 601.  There, the Court found that a firm that "attempt[s] to exclude rivals on some basis other than efficiency" is engaged in an anticompetitive practice.  Aspen Skiing, 472 U.S. at 605.  Thus, monopolists are permitted to choose with whom they conduct business so long as the purpose of their refusal to deal is not to create or maintain a monopoly.  Id. at 602.  In Aspen Skiing, the Court affirmed a finding of antitrust liability where the defendant had failed to articulate any normal business purpose or efficiency justification for its decision not to deal with its competitor.  Id. at 610-11.

The Supreme Court revisited the right to "refuse to deal" in Trinko.  There, the Court cautioned that the Aspen Skiing exception is to be narrowly construed.  Trinko, 540 U.S. at 408-09.  In Trinko, the Court found that defendant Verizon was not liable under the Sherman Act for allegedly failing to process rival communications companies' service orders in a timely fashion. Id. at 416.  The Court distinguished the allegations in Trinko from instances in which a firm that was "in the business of providing a service to certain customers . . . refused to provide the same service to certain other customers."  Id. at 410.

---

[1] In addition, at oral argument Cablevision asserted that its refusal to air the Jets' ads was protected by Noerr-Pennington.  This argument is far fetched.  A refusal to engage in business with a competitor, i.e., a refusal to sell a competitor advertising time, is too attenuated to constitute an attempt to secure governmental action, even when those advertisements involve an issue of public concern.

[2] See also Trinko, 540 U.S. at 408 ("As a general matter, the Sherman Act does not restrict the long recognized right of a [firm] engaged in an entirely private business . . . to exercise his own independent discretion as to parties with whom he will deal.") (internal citation omitted).

Here, the Jets allege that "[t]here is no rational business justification for [Cablevision's] refusal to accept profitable advertising" from the Jets.  (Compl. ¶ 44).  Cablevision responds that they are not obligated to do business with any competitor, including the Jets.  However, plaintiffs contend that Cablevision refused to sell airtime, a commodity which it made available to other consumers, to the Jets, in order to prevent the Jets from encroaching on Cablevision's stadium monopoly.  While Cablevision is generally free to engage in business or refuse to engage in business with whomever it chooses, it may not do so when the purpose of such refusal is to maintain a monopoly.  As alleged, defendants' "refusal to deal" was predicated on an impermissible purpose, and thus if proven would subject Cablevision to antitrust liability.[3]

       c.   "<u>Misuse of the Litigation Process</u>"

The Jets allege that Cablevision "funded, supported, and promoted baseless litigation designed solely to delay, increase the cost of, and prevent the development of the Sports and Convention Center project."  (Compl. ¶ 50).  The complaint references two lawsuits brought by Cablevision to prevent approval of the Sports and Convention Center.  (Compl. ¶ 51-52).[4] Relying again on <u>Noerr-Pennington</u>, Cablevision argues its attempts to block the Jets' stadium through litigation are protected.

As set forth above, <u>Noerr-Pennington</u> immunity is not absolute, for instance, it does not protect the filing of  "sham litigation."  <u>Cal. Motor Transp. Co. v. Trucking Unlimited</u>, 404 U.S. 508, 516 (1972).  In <u>Prof'l Real Estate Inv., Inc v. Colum. Pictures Indus., Inc.</u>, 508 U.S. 49 (1993), the Supreme Court established a two-part test for determining whether  litigation could be characterized as a "sham:"

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. . . . [Second,] a court should focus on whether the baseless suit conceals an attempt to interfere directly with a competitor's business relationships through the use of the governmental process -- as opposed to the outcome of that process -- as an anticompetitive weapon.  . . . [Thus, to disprove <u>Noerr</u> immunity,

---

[3] Cablevision also contends that it cannot be liable for refusing to air Cablevision's advertisements because it does not enjoy a monopoly with respect to its cable television network.  Nevertheless, it is sufficient that Cablevision's refusal to air the Jets' ads constituted anticompetitive conduct intended to maintain Cablevision's stadium monopoly.  Whether Cablevision's refusal to air the Jets' ads actually inhibited the Jets in disseminating their message is an issue of fact upon which further discovery is necessary.

[4]  In addition, the Jets claim that Cablevision funded litigation brought by outside groups.  (<u>See</u> Pl.'s Supp. Br. at 12).

> a plaintiff must] demonstrat[e] both the objective and the
> subjective components of a sham. . .

Id. at 60 – 61 (internal citations and emphasis omitted).  As the Second Circuit explained in

PrimeTime 24:

> In cases in which the defendant is accused of bringing a whole
> series of legal proceedings, the test is not retrospective but
> prospective: Were the legal filings made, not out of a genuine
> interest in redressing grievances, but as part of a pattern or practice
> of successive filings undertaken essentially for purposes of
> harassment?  .  .  .  [I]t is immaterial that some of the claims might,
> as a matter of chance, have merit.  The relevant issue is whether
> the legal challenges are brought pursuant to a policy of starting
> legal proceedings without regard to the merits and for the purpose
> of injuring a market rival.

219 F.3d at 101 (internal quotations omitted).

The Jets allege that Cablevision brought and financed frivolous litigation in an attempt to delay the construction of the Sports and Convention Center.  (Compl. ¶ 36(c)).  The Jets contend that defendants had "no reasonable basis to believe that they could prevail on the merits" of the litigation.  (Compl. ¶ 51).  Cablevision responds that the Jets have not demonstrated that these litigations were objectively baseless, nor that the litigations were brought without regard to the merits.  Indeed, Cablevision contends that certain actions are still pending in state court, and that various entities joined in Cablevision's effort to halt the Jets' proposal.  Noerr-Pennington and its progeny establish a high bar for litigants seeking to recover for antitrust violations based on the filing of sham litigation.  For now, plaintiffs have adequately alleged that Cablevision's efforts to block the Jets in state court constituted a sham.  Further, on the record developed thus far I am unable to evaluate the merit, if any, of the state court actions, as well as the defendant's motivation in initiating those actions.  If Cablevision did indeed file successive suits without regard for their merit, but rather to impose additional expense and delay on the Jets, this conduct is not protected by Noerr-Pennington.  Drawing all inferences in favor of the Jets, it cannot be established that Cablevision is entitled to Noerr-Pennington immunity.

    d.  "Sham Bid for the West Side Rail Yard"

The Jets claim that Cablevision engaged in anticompetitive conduct by submitting a sham bid to develop the West Side Rail Yard.  In its motion to dismiss, Cablevision contends that its bid is protected by Noerr-Pennington.

Assuming that Noerr-Pennington applies when government decisionmakers act in a proprietary capacity,[5] the Jets have adequately alleged that Cablevision's bid constituted a sham.  The Jets allege that Cablevision "submitted a sham bid to acquire the planned Sports and Convention Center site for the sole purpose of impeding Plaintiffs' plans to construct the Sports and Convention Center" and  absent any "legitimate business rationale."  (Compl. ¶¶ 36, 36(d)).  The Jets assert that Cablevision "had no intention" of building on the West Side Rail Yard, but rather submitted the bid "solely for the purpose of delaying and derailing the Sports and Convention Center."  (Compl. ¶ 57).  Cablevision responds that its bid constituted a valid effort to acquire the West Side Rail Yard.  Cablevision contends that its bid, which was higher than the Jets' offer, was actively considered by the MTA.  The limited discovery produced thus far demonstrates that there are triable issues of fact concerning the viability of Cablevision's bid.  (Cf. Pl.'s Supp. Br. at 5; Def.'s Supp. Br. at 13).  Additional discovery may further illuminate the circumstances surrounding Cablevision's competing proposal.  If it becomes apparent that Cablevision indeed sought to acquire the West Side Rail Yard for its own development project, defendants will likely be entitled to protection under Noerr-Pennington.  However, if the Jets can establish that Cablevision never intended to acquire the property, but submitted a bid only to impede the Jets' progress, immunity will be unavailable.  Upon the record developed thus far, the Jets' claim is entitled to proceed.


    3.  Anticompetitive Injury

Cablevision also asserts that the Jets fail to allege any cognizable antitrust injury stemming from defendants' alleged anticompetitive conduct.  The Supreme Court has defined "antitrust injury" as:

> [I]njury of the type the antitrust laws were intended to prevent and
> that flows from that which makes the defendants' acts unlawful.
> The injury should reflect the anticompetitive effect either of the

---

[5]  See U.S. Football League, 634 F. Supp. at 1179 ("Noerr-Pennington may indeed be applied to immunize petitioning conduct directed at government agencies acting in a proprietary capacity").

> violations or of anticompetitive acts made possible by the
> violation. It should, in short, be the type of loss that the claimed
> violations . . . would likely cause.

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc. ("Pueblo"), 429 U.S. 477, 489 (1977); see also

Kasada, Inc. v. Access Capital, Inc., No. 01 Civ. 8893, 2004 WL 2903776, *11 (S.D.N.Y. Dec.

14, 2004) (same).

Here, the Jets maintain that Cablevision's anticompetitive conduct has, inter alia,

"limited, reduced, restrained, suppressed, and effectively foreclosed" competition, forced

"consumers and businesses who attend events, rent facilities or rent suites in these markets in

Manhattan [to pay] . . . artificially inflated prices," and has created a situation where "potential

competitors of Cablevision [including the Jets] . . . have been foreclosed from competing on

the merits with Cablevision and [thus, have been] injured in their business and property."

(Compl. ¶ 63-64). These allegations are sufficient to survive a motion to dismiss. See, e.g.,

Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 876 (3d Cir. 1995) ("[T]he existence of an

'antitrust injury' is not typically resolved through [a] motion[] to dismiss.").


**B. Tortious Interference & Deceptive Business Practices**

Plaintiffs' claims for tortious interference with prospective business relations and

deceptive business practices are substantively identical to their antitrust claim. (Compl. ¶¶ 67-

79).[6] To prove tortious interference, a plaintiff must show "(1) business relations with a third

party; (2) defendants' interference with those business relations; (3) [that] defendants acted with

the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4)

injury to the relationship." Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994). Plaintiffs'

allegations of anticompetitive conduct suffice to state a claim for tortious interference. See

Innomed Labs, L.L.C. v. Alza Corp., 01 Civ. 8095, 2002 WL 31521084, * 7 (S.D.N.Y. Nov. 13,

2002) (Baer, J.) (anticompetitive behavior may constitute "wrongful act" for purposes of tortious

intereference claim).

Plaintiffs also allege that Cablevision's conduct constituted deceptive business practices

in violation of New York General Business Law Section 349. To state a claim for deceptive

business practices, a plaintiff must allege "first, that the challenged act or practice was consumer-

---

[6] The Jets allege that Cablevision tortiously interfered both with plaintiffs' relations with the MTA and with the Jets'
attempts to place ads on non-Cablevision television stations.

oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." <u>Stutman v. Chemical Bank</u>, 95 N.Y.2d 24, 29 (2000). Plaintiffs here have alleged that Cablevision engaged in anticompetitive conduct including the submission of a sham bid and the initiation of frivolous litigation. This behavior is sufficient to state a claim for deceptive business practices. <u>See</u> <u>Leider v. Ralfe</u>, 01 Civ. 3137, 2005 WL 152025, * 9-10 (S.D.N.Y. Jan. 25, 2005) (Baer, J.) (anticompetitive conduct involving consumer deception may constitute deceptive business practices); <u>New York v. Feldman</u>, 210 F. Supp.2d 294, 301 (S.D.N.Y. 2002) (consumer oriented activity consists of any action causing "consumer injury or harm to the public interest") (internal quotation omitted).

## C. Justiciability and Comity

Cablevision argues that this Court is not the appropriate forum to resolve these issues. In particular, Cablevision argues that the <u>Younger</u> doctrine and the Anti Injunction Act prohibit this Court from interfering with ongoing state court proceedings.

Pursuant to the Supreme Court's decision in <u>Younger v. Harris</u>, 401 U.S. 37 (1971), federal courts must abstain from enjoining pending civil proceedings in state court. <u>Wash. v. County of Rockland</u>, 373 F.3d 310, 318 (2d Cir. 2004). The Anti-Injunction, 28 U.S.C. § 2283 (2005) also prohibits federal courts from enjoining state court proceedings in most circumstances.

Here, plaintiffs do not seek an injunction staying any pending state court litigation. Nor would a judgment in this action necessitate such an injunction. While it is true that plaintiffs' allegations relate, in part, to the merit of certain state court actions, the gravamen of plaintiffs' complaint is distinct from the subject matter of any action currently pending in state court.

Finally, Cablevision argues that this controversy is not ripe for adjudication. However, after Cablevision filed its moving brief, the Jets' stadium proposal was defeated by the PACB. Therefore, it does not appear that any subsequent events in the political arena will alter the relations of the parties to this action.

17

## III.  CONCLUSION

In accordance with the conclusions set forth above, Cablevision's motion to dismiss is GRANTED with respect to Cablevision's alleged "public misrepresentations" and DENIED in all other respects.  The Pretrial Scheduling Order is hereby modified as follows:  All discovery shall be completed by March 31, 2006; no dispositive motion shall be made returnable after May 15, 2006; the Joint Pretrial Order is due July 17, 2006; and this matter is added to the August, 2006 trailing trial calendar.

The Clerk of the Court is instructed to close this motion and remove it from my docket.

**IT IS SO ORDERED**
New York, New York
October     2005

_____
U.S.D.J.

18