UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK JETS LLC and JETS DEVELOPMENT LLC,<br><br>Plaintiffs,<br><br>v.<br><br>CABLEVISION SYSTEMS CORPORATION, CSC HOLDINGS, INC., and MADISON SQUARE GARDEN, L.P.,<br><br>Defendants. | Case No. 05-CV-2875 (HB)<br><br>**<u>Oral Argument Requested</u>** |

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO AMEND ORDER ON MOTION TO DISMISS, TO INCLUDE CERTIFICATION UNDER §1292(B) AND TO STAY PROCEEDINGS PENDING APPEAL

Miguel A. Estrada
Theodore B. Olson
Michael L. Denger
Joshua Lipton
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC  20036-5306
Tel:  (202) 955-8500
Fax:  (202) 467-0539

Randy M. Mastro(RM-9492)
Jack M. Weiss
Jennifer H. Rearden
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Tel:  (212) 351-4000
Fax:  (212) 351-4035

*Counsel for Defendants Cablevision Systems Corporation, CSC Holdings, Inc., and Madison Square Garden, L.P.*

**TABLE OF CONTENTS**

ARGUMENT ...................................................................................................................................1

    A.    There are substantial grounds for difference of opinion on the controlling questions of law raised by Cablevision's motion to dismiss. ...................................2

        1.    The Court's decision regarding Cablevision's supposed "sham" litigation is inconsistent with the Supreme Court's decision in *PRE*. ...........2

        2.    The Court's decision regarding Cablevision's supposed "sham" bid is inconsistent with the Supreme Court's decisions in *PRE* and *Omni Outdoor*. ...................................................................................................4

        3.    The Court's decision regarding Cablevision's alleged conduct relating to the Jets' advertisements is inconsistent with the Supreme Court's decisions in *Omni Outdoor*, *Noerr*, *Turner Broadcasting*, and *Trinko*. ........5

        4.    The Jets' claims are legally insufficient, because any defeat of the Jets' stadium depended on government intervention. ...........................................7

    B.    An immediate appeal may materially advance the ultimate termination of the litigation. ...................................................................................................................8

    C.    The Court should stay proceedings pending an appeal because the Court's decision threatens to chill Cablevision's First Amendment rights. ..........................8

CONCLUSION..............................................................................................................................10

## TABLE OF AUTHORITIES

### Cases

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ................................................................................................. 6, 7

*Bath Petroleum Storage v. Market Hub Partners*,
    129 F. Supp. 2d 578 (W.D.N.Y.), *aff'd*, 229 F.3d 1135 (2d Cir. 2000) ........................ 8, 9

*City of Columbia v. Omni Outdoor Advert.*,
    499 U.S. 365 (1992) ............................................................................................. 5, 7, 8

*Covad Comms. v. Bell Atl. Corp.*,
    398 F.3d 666 (D.C. Cir. 2005) ......................................................................................... 2

*Eastern R.R. Pres. Conf. v. Noerr Motor Freight*,
    365 U.S. 127 (1961) ........................................................................................................ 6

*FORSA v. Mullen*,
    313 F. Supp. 2d 339 (S.D.N.Y. 2004) ............................................................................. 8

*In re Asbestos School Litig.*,
    46 F.3d 1284 (3d Cir. 1994) ...................................................................................... 9, 10

*Juster Assocs. v. City of Rutland*,
    901 F.2d 266 (2d Cir. 1990) ............................................................................................ 8

*Omega Homes, Inc. v. City of Buffalo*,
    171 F.3d 755 (2d Cir. 1999) .......................................................................................... 10

*Professional Real Estate Inv. v. Columbia Pictures Indus. ("PRE")*,
    508 U.S. 49 (1993) ................................................................................................. passim

*Suburban Restoration Co. v. ACMAT Corp.*,
    700 F.2d 98 (2d Cir. 1983) .............................................................................................. 8

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994) ........................................................................................................ 6

*Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag*,
    207 F. Supp. 2d 221 (S.D.N.Y. 2002) ............................................................................. 8

*Verizon Comms. v. Law Offices of Curtis V. Trinko*,
    540 U.S. 398 (2004) ................................................................................................... 6, 7

Defendants Cablevision Systems Corporation, CSC Holdings, Inc., and Madison Square Garden, L.P. ("Defendants" or "Cablevision") respectfully request that the Court amend its Order of October 17, 2005, and include a certification under 28 U.S.C. § 1292(b) that the Order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." *See* 28 U.S.C. § 1292(b).

In addition, Cablevision requests that the Court stay proceedings in this Court pending an appeal in the Court of Appeals. In order to present these issues to the Court of Appeals as expeditiously as possible, Cablevision respectfully requests that the Court address this Motion on an expedited basis.

## ARGUMENT

Cablevision's motion to dismiss raised a number of potentially dispositive legal issues that are, at a minimum, questions "as to which there is substantial ground for a difference of opinion." *See* 28 U.S.C. § 1292(b). The district courts in this Circuit have repeatedly **granted** motions to dismiss under *Noerr-Pennington* in analogous circumstances, and the Second Circuit has repeatedly affirmed those dismissals. Without anything more, the disconnect between this Court's October 17 Order and the Supreme Court's holding in *Professional Real Estate Inv. v. Columbia Pictures Indus. ("PRE")*, 508 U.S. 49 (1993), justifies certification under Section 1292(b). There are clearly substantial grounds for a different opinion on these issues. In addition, because this Court's decision carries a significant risk of chilling conduct protected by the First Amendment—including conduct by Cablevision and by others—the Court should certify its decision for appeal to provide the Second Circuit with a timely opportunity to resolve these critical issues at this stage of the case.

A.  **There are substantial grounds for difference of opinion on the controlling questions of law raised by Cablevision's motion to dismiss.**

    1.  **The Court's decision regarding Cablevision's supposed "sham" litigation is inconsistent with the Supreme Court's decision in *PRE*.**

With respect to Cablevision's alleged sham litigation, the grounds for difference of opinion are clear from the Supreme Court's opinion in *Professional Real Estate Inv. v. Columbia Pictures Indus. ("PRE")*, 508 U.S. 49 (1993). As the Supreme Court emphasized in *PRE*, the test for sham litigation is a two-part test, the first prong of which is that "***the lawsuit must be objectively baseless*** in the sense that no reasonable litigant could realistically expect success on the merits." 508 U.S. at 60 (emphasis added). The objective prong of the sham test should be decided "as a matter of law," *id*. at 63, and discovery into a litigant's subjective motivations should not be permitted where there was an objective basis for bringing a supposedly sham lawsuit, *id.* at 65. Indeed, a district court "ha[s] no occasion to inquire whether [the alleged sham litigant] was indifferent to the outcome on the merits of [the underlying] suit" unless it has first concluded that the underlying litigation was objectively baseless. *Id.*; *see also Covad Comms. v. Bell Atl. Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005) (defendant's "subjective motivations for" bringing allegedly sham litigation "may be evaluated '[o]nly if [the] challenged litigation is objectively meritless'" (quoting *PRE*, 508 U.S. at 60)).

This Court has misinterpreted the clear holding of the Supreme Court in two respects. In its October 17 Order, this Court held—without regard to the objective merits of Cablevision's claims—that "if Cablevision . . . file[d] successive suits without regard for their merit, but rather to impose additional expense and delay on the Jets, this conduct is not protected by *Noerr-Pennington*." Oct. 17 Order at 14. This Court thus concluded that the analysis of the Jets' sham litigation claim for purposes of Cablevision's motion to dismiss turns entirely on the subjective prong of the test established by the Supreme Court in *PRE*. That is clear legal error. Contrary to this Court's holding, under *PRE*, "[i]f an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. ***Only if challenged litigation is***

2

*objectively meritless may a court examine the litigant's subjective motivation*." 508 U.S. at 60 (emphasis added).

Moreover, instead of analyzing and deciding the objective prong of the sham test "as a matter of law" and before "examin[ing] the litigant's subjective motivation" as required by the Supreme Court, (*PRE*, 508 U.S. at 60, 63), this Court effectively ignored that issue, stating only that "on the record developed thus far I am unable to evaluate the merit . . . of the state court actions." Oct. 17 Order at 14. In fact, the record not only permitted, but dictated as a matter of law, the conclusion that Cablevision's litigation regarding the stadium was not a "sham" as an objective matter.

First, Cablevision submitted all relevant pleadings to the Court, including those of independent parties that received no funding from Cablevision, such as the Public Advocate, Tri-State Transportation Campaign, Common Cause, the Transit Workers' Union, and the Straphangers' Campaign. On their face, these pleadings establish the legal and factual bases for Cablevision's claims. Indeed (as is apparent from the pleadings), neither the Jets nor any other party took the position that those claims were frivolous by seeking sanctions.

Second, the Court has the decisions of the state courts, which specifically credit a number of Cablevision's arguments and demonstrate that the underlying litigation, at a minimum, raised substantial questions. Indeed, Cablevision submitted the decision of the New York Court of Appeals granting Cablevision and a number of other petitioners discretionary leave to appeal the dismissal of one of the supposedly "sham" claims – establishing that at least two Justices deemed that claim worthy of review by the State's highest court. This Court did not mention the Court of Appeals' order granting discretionary review. The other supposedly "sham" claim has not, in fact, been dismissed—contrary to the statement in this Court's opinion—but remains pending following extensive briefing, court-ordered discovery, and argument.[1]

---

[1] The Court incorrectly asserts that the December 2004 action concerning the environmental impact statement prepared by the MTA and the New York Department of City Planning was dismissed. That

[Footnote continued on next page]

In short, the courts in the underlying cases have credited Cablevision's arguments, and independent parties (that have received no funding from Cablevision) have asserted the same arguments. On that record, there can be no doubt as to the objective merits of these claims, and an examination of Cablevision's subjective motivations for bringing the litigation should not be permitted.

> 2. **The Court's decision regarding Cablevision's supposed "sham" bid is inconsistent with the Supreme Court's decisions in *PRE* and *Omni Outdoor*.**

This Court's decision on Cablevision's supposed sham bid is similarly flawed. The Court concluded that, "if the Jets can establish that Cablevision never intended to acquire the property, but submitted a bid only to impede the Jets' progress, immunity will be unavailable." Oct. 17 Order at 15. Again, the Court has misconstrued the sham test by ignoring the objective element of the test. With respect to this objective element, the Supreme Court has held that successful petitioning, as a matter of law, cannot be the basis for a sham claim. *See PRE*, 508 U.S. at 60 n.5 (successful request for government action "is by definition a reasonable effort at petitioning for redress and therefore not a sham"). As Cablevision explained in its September 20 brief, Cablevision's February 4, 2005 letter requesting that the MTA open up a bidding process for the development rights, which the Jets claim was a sham, was *successful* in bringing about the government action requested on the face of the letter.[2] This Court has apparently determined that Cablevision's successful petitioning nevertheless could form the basis for an antitrust claim

---

[Footnote continued from previous page]
case, in which the Jets were not a party, remains pending in the Supreme Court, New York County. The June 2, 2005 decision referenced in this Court's October 17 Order was not related to the environmental case, but rather to the action challenging the MTA's award of the development rights over the West Side Rail Yards to the Jets. In that case, the New York Court of Appeals subsequently granted discretionary leave to appeal the Appellate Division's affirmance of the lower court's dismissal.

[2] The Jets appear to have backed away from any argument that the bid submitted by Cablevision in March 2005 in response to the MTA's request for bids was a "sham." That is not surprising, given both the objective merit that is obvious on the face of the bid documents (which have been submitted to the Court) and the fact that the MTA Staff deemed Cablevision's formal bid to be one of two qualified bids—out of five that were submitted—that were worthy of final consideration by the MTA.

4

if Cablevision had anticompetitive motives for engaging in that petitioning.  In so concluding, this Court directly contradicted Supreme Court precedent.

In addition, the Court erred in holding that Cablevision would be entitled to *Noerr-Pennington* immunity only "[i]f it becomes apparent that Cablevision indeed sought to acquire the West Side Rail Yard for its own development project."  Oct. 17 Order at 15.  This holding misconstrues the standard for evaluating a claim of sham petitioning.  Even if Cablevision did not subjectively intend to acquire the property (which it did), Cablevision's conduct is entitled to *Noerr-Pennington* protection as long as any harm to the Jets resulted from "the *outcome* of [the governmental] process" (or if Cablevision's petitioning was not objectively baseless).  *See City of Columbia v. Omni Outdoor Advert.*, 499 U.S. 365, 380 (1992).[3]  Indeed, it was the MTA that decided to open up a bidding process and end its sole source negotiations with the Jets; and it was the PACB that declined to approve the stadium.  In these circumstances, Cablevision's subjective motivations in seeking this action—including whether it truly "sought to acquire the West Side Rail Yard for its own development project"—cannot render its petitioning unlawful.

**3. The Court's decision regarding Cablevision's alleged conduct relating to the Jets' advertisements is inconsistent with the Supreme Court's decisions in *Omni Outdoor*, *Noerr*, *Turner Broadcasting*, and *Trinko*.**

With respect to Cablevision's alleged conduct relating to the Jets' advertisements, there is not a single case in which analogous conduct in the context of a political advertising campaign has been held to be a basis for an antitrust claim.  To the contrary, the Supreme Court has made clear that it "is not the role of the Sherman Act" to "polic[e] the boundaries" of conduct "in the context of a genuine attempt to influence governmental action"—including conduct that seeks "to get [an] opponent ignored."  *Omni Outdoor*, 499 U.S. at 382.  In its September 20, 2005

---

[3] The Jets' arguments on this point similarly missed the mark.  In particular, the Jets' counsel argued that "Cablevision was not trying to buy the rail yards.  Cablevision was trying to delay and derail the sale of the rail yards to the Jets and increase its rival's costs."  *See* Sept. 27, 2005 Tr. at 5.  Even if the Jets' characterization of Cablevision's subjective intent were correct, the Jets have ignored a fundamental issue:  if Cablevision succeeded in "delay[ing] and derail[ing]" the stadium as a ***result*** of governmental action, then Cablevision's subjective motivation is irrelevant.

brief, Cablevision cited no fewer than four Supreme Court cases and three Second Circuit cases that explain that efforts "to influence the passage and enforcement of laws" are immune from the antitrust laws. *See* Sept. 20, 2005 Br. at 2-3 (quoting *Eastern R.R. Pres. Conf. v. Noerr Motor Freight*, 365 U.S. 127, 137-38 (1961)). No case has ever carved out an exception for preventing a political opponent from airing political advertisements. In creating such a limitation on *Noerr-Pennington* immunity here, this Court's October 17 Order sharply departs from unbroken Supreme Court and Second Circuit authority.

This Court has also departed from a separate line of Supreme Court authority that makes clear that, under the First Amendment, a cable company cannot be forced to carry a political message that it finds unpalatable. *See Turner Broad. Sys. v. FCC*, 512 U.S. 622, 636, 641 (1994) ("[a]t the heart of the First Amendment lies the principle that each person should decide for him or herself the ideas and beliefs deserving of expression, consideration, and adherence"; "cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment"); *see also* April 5, 2005 Br. at 13. The Court provided no explanation for this departure.

Moreover, in its application of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), the Court misapplied the limitation on *Aspen Skiing* that the Supreme Court imposed in *Verizon Comms. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004). The holding in *Trinko* was not, as stated by this Court, that a duty to deal with a competitor arises whenever a defendant is "in the business of providing a service to certain customers" and "refused to provide the same service to certain other customers." Oct. 17 Order at 12. Rather, *Trinko* explained that (i) there is a "high value" placed on a company's "right to refuse to deal with other firms"; (ii) the "limited exception" to that right recognized in *Aspen Skiing* is "at or near the outer boundary of [Sherman Act Section] 2 liability"; (iii) there was "significance in the [*Aspen Skiing*] defendant's decision to cease participation in a cooperative venture"; and (iv) because there was no similar prior cooperative venture in *Trinko*, the Court held that the case "does not fit within the limited exception recognized in *Aspen Skiing*." *Id.* at 408-09. This

6

Court's holding that the right to refuse to deal with others applies only where a business does not actually sell the service in question cuts against *Trinko*'s strong support for the right to refuse to deal, and it represents a significant *expansion* of *Aspen Skiing*. This holding goes well beyond "the outer boundary of § 2 liability" as set forth in *Trinko*. *Id.* at 409.

### 4. The Jets' claims are legally insufficient, because any defeat of the Jets' stadium depended on government intervention.

In granting the motion to dismiss with respect to Cablevision's advertisements, the Court correctly recognized that any defeat of the Jets' stadium "necessarily depended on government intervention," which requires dismissal under *Noerr-Pennington*. *See* Oct. 17 Order at 11; *see also Omni Outdoor*, 499 U.S. at 380 ("The 'sham' exception to *Noerr* encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon."). Under that same analysis, the Court should have dismissed all of the Jets' claims. Despite having filed a complaint and two briefs, the Jets have provided no explanation as to how the *process* of Cablevision's petitioning conduct defeated the stadium. In particular, the Jets have never explained how the "process" of two litigation matters (including only one in which the Jets were a party, and in which the Jets *prevailed* at the trial court level prior to the PACB vote against the stadium) and Cablevision's participation in the MTA bid process (in which the Jets were awarded the development rights) stopped the stadium. Likewise, the Jets have offered no explanation as to how the alleged refusal to air their political advertisements (which were allegedly designed to "balance the record . . . in response to" Cablevision's political advertising, *see* Complaint ¶ 43) could possibly have stopped the stadium in the absence of "government intervention."

The *only* argument that the Jets have offered regarding any connection between Cablevision's alleged conduct and the defeat of the stadium was the following statement from the Jets' counsel at the September 27, 2005 oral argument: "we believe that the evidence will show that our allegation in delay and disruption caused by Cablevision's sham February bid was in turn a material cause of the June abstentions" by two members of the Public Authorities Control Board (PACB). *See* Sept. 27, 2005 Tr. at 18. However, as a matter of well-established

7

law, the extent to which Cablevision's alleged conduct caused this action by a governmental body is **not** a question that the *Noerr-Pennington* doctrine permits the Jets or this Court to pursue. *See, e.g., Omni Outdoor*, 499 U.S. at 379-80 (*Noerr-Pennington* protects the "conduct of private individuals in seeking anticompetitive action from the government"); *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 272 (2d Cir. 1990) (where "the claimed restraint is the consequence of government action," a defendant's efforts to seek such action are "within the ambit of protection afforded by *Noerr*").

B.  **An immediate appeal may materially advance the ultimate termination of the litigation.**

As the Court recognized in its July 27, 2005 Order, Cablevision's *Noerr-Pennington* arguments, if successful, would mean that an "analysis of the relevant market, anti-competitive behavior, anti-competitive injury, and the remaining State law claims might turn out to have been wasted effort." Cablevision's arguments as to the lawfulness of its conduct under *Noerr-Pennington* and the First Amendment are a complete defense to the Jets' claims—including the Jets' Sherman Act and state law claims. *See, e.g., Suburban Restoration Co. v. ACMAT Corp.*, 700 F.2d 98, 102 (2d Cir. 1983); *FORSA v. Mullen*, 313 F. Supp. 2d 339, 343 (S.D.N.Y. 2004). Moreover, the *Noerr-Pennington* questions here are pure legal issues that can—and should—be resolved in the context of a motion to dismiss without the need for further discovery, motion practice, or trial on these claims. *See, e.g., PRE*, 508 U.S. at 63 (objective prong of sham test should be decided "as a matter of law"). Indeed, the courts in this Circuit have emphasized that it is important to resolve the scope of *Noerr-Pennington* issues at an early stage to avoid chilling protected First Amendment conduct. *See, e.g., Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag*, 207 F. Supp. 2d 221, 223 (S.D.N.Y. 2002); *Bath Petroleum Storage v. Market Hub Partners*, 129 F. Supp. 2d 578, 594 (W.D.N.Y.), *aff'd*, 229 F.3d 1135 (2d Cir. 2000).

C.  **The Court should stay proceedings pending an appeal because the Court's decision threatens to chill Cablevision's First Amendment rights.**

As discussed above, lengthy and complicated litigation in this matter might be avoided if Cablevision's appeal on its legal arguments is decided prior to further litigation. A stay is

8

important in this case, however, not only to save the parties' and the Court's resources, but also to avoid chilling Cablevision's First Amendment petitioning activity. Significantly, the litigation that is the subject of the Jets' sham claims is ongoing, and continued litigation and discovery on the Jets' claims threatens to chill Cablevision's participation in this (and other) protected petitioning conduct.

Indeed, the Jets have already demonstrated—at their very first opportunity—that they will use this litigation as a platform to smear Cablevision and its political allies to any tabloid that is willing to print their distorted version of the facts. It is precisely that type of effect that the *Noerr-Pennington* doctrine was designed to avoid. As another court in this Circuit stated, "[t]o allow antitrust claims based solely on broad and indistinct allegations of misrepresentation and 'sham litigation' to reach discovery . . . would have the effect of encouraging antitrust 'strike suits,' and effectively chill the First Amendment rights which *Noerr* immunity was intended to protect." *Bath Petroleum*, 129 F. Supp. 2d at 594. Moreover, this Court's decision that Cablevision might be held liable under the antitrust laws for refusing to carry an unpalatable political message could have serious implications for Cablevision's First Amendment freedom of expression. Likewise, this Court's decision that a defendant could be subject to discovery and trial for engaging in objectively meritorious petitioning based solely on allegations of its subjective motivations could have a chilling effect on protected First Amendment conduct that goes far beyond the parties to this case. *See, e.g., In re Asbestos School Litig.*, 46 F.3d 1284, 1295-96 (3d Cir. 1994) (granting writ of mandamus following denial of motion for summary judgment where "requiring Pfizer to stand trial for [claims] predicated solely on its exercise of its First Amendment freedoms could generally chill the exercise of" those freedoms).

The importance of the First Amendment issues underlying the *Noerr-Pennington* doctrine cannot be disputed. The Supreme Court has issued at least six opinions defining the contours of *Noerr-Pennington*, which have repeatedly emphasized the breadth and importance of the doctrine. The Second Circuit has likewise emphasized the importance of these issues. For example, in an analogous case in which a district court granted a defendant's motion to dismiss

9

on *Noerr-Pennington* grounds, the Second Circuit affirmed and published an opinion for the express purpose of "underscor[ing] [its] rejection of" a proposed limitation on *Noerr-Pennington* immunity. *Omega Homes, Inc. v. City of Buffalo*, 171 F.3d 755, 757 (2d Cir. 1999). The Second Circuit should be given an opportunity to weigh in on these issues in this case, both because they are potentially dispositive of the Jets' claims and because delay until the conclusion of the litigation would create a serious risk of chilling protected petitioning conduct.[4]

There is nothing on the other side of the equation that weighs against a stay pending appeal. As the Jets have acknowledged, their stadium project is dead. The Jets are seeking only unspecified damages in this suit designed to harass Cablevision, and they will not suffer any prejudice from a brief stay pending resolution of Cablevision's appeal. Moreover, Cablevision is willing to agree with the Jets on an expedited schedule for Cablevision's appeal, so that the issues can be decided expeditiously.

## CONCLUSION

For the foregoing reasons, Cablevision respectfully requests that the Court amend its Order of October 17, 2005 to include a certification under 28 U.S.C. § 1292(b) and stay proceedings in this Court pending an appeal.

---

[4] Given the First Amendment underpinnings of *Noerr-Pennington* and its nature as an immunity doctrine, we believe that a review of this Court's decision by the Second Circuit could be secured by writ of mandamus or otherwise without certification under § 1292(b). *See, e.g., In re Asbestos School Litig.*, 46 F.3d at 1295-96. Nonetheless, for the reasons explained here, certification under § 1292(b) is appropriate.

Dated:  October 27, 2005

Respectfully submitted,

|  |  |
|---|---|
|  | /s/ Randy M. Mastro |
| Miguel A. Estrada | Randy M. Mastro (RM-9492) |
| Theodore B. Olson | Jack M. Weiss |
| Michael L. Denger | Jennifer H. Rearden |
| Joshua Lipton | GIBSON, DUNN & CRUTCHER LLP |
| GIBSON, DUNN & CRUTCHER LLP | 200 Park Avenue |
| 1050 Connecticut Avenue, NW | New York, NY  10166-0193 |
| Washington, DC  20036-5306 | Tel:  (212) 351-4000 |
| Tel:  (202) 955-8500 | Fax:  (212) 351-4035 |
| Fax:  (202) 467-0539 |  |

*Counsel for Defendants Cablevision Systems Corporation, CSC Holdings, Inc., and Madison Square Garden, L.P.*