UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NEW YORK JETS LLC and
JETS DEVELOPMENT LLC,

   Plaintiffs,

  v.

CABLEVISION SYSTEMS CORPORATION,
CSC HOLDINGS, INC., and MADISON
SQUARE GARDEN L.P.,

   Defendants.

: Case No. 05-CV-2875 (HB)

**DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO AMEND ORDER ON MOTION TO DISMISS TO INCLUDE CERTIFICATION UNDER § 1292(b) AND TO STAY PROCEEDINGS PENDING APPEAL**

Miguel A. Estrada
Theodore B. Olson
Michael L. Denger
Joshua Lipton
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC  20036-5306
Tel:  (202) 955-8500
Fax:  (202) 467-0539

Randy M. Mastro (RM-9492)
Jack M. Weiss
Jennifer H. Rearden
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Tel:  (212) 351-4000
Fax:  (212) 351-4035

*Counsel for Defendants Cablevision Systems Corporation, CSC Holdings, Inc., and Madison Square Garden L.P.*

## **ARGUMENT**

In its motion for certification under Section 1292(b), Cablevision raised a number of points that the Jets make no effort to oppose. Each of these points strongly supports certification in this case and a stay pending appeal.

First, Cablevision explained that an immediate appeal may materially advance the termination of this litigation because Cablevision's *Noerr-Pennington* arguments, if successful, would require dismissal of all of the Jets' claims as a matter of law. Cablevision Br. at 8. The Jets do not take issue with this point.

Second, Cablevision explained that a stay and an immediate appeal are appropriate in this case because the Court's decision threatens to chill Cablevision's exercise of its First Amendment rights. In addition, Cablevision explained that the Court's decision stands to have a broad chilling effect on protected petitioning conduct that extends beyond this case. Cablevision Br. at 9-10. The Jets offer no opposition to these points—which is not surprising, given that this litigation was brought solely to harass Cablevision and to stifle its petitioning in opposition to the proposed stadium.

Third, the Jets do not identify any equities that would weigh against a stay and an immediate appeal. The Jets do not contest that their stadium project is dead, and they fail to identify any prejudice that they would suffer from a stay pending resolution of Cablevision's appeal.

The Jets offer just three arguments in opposition to Cablevision's motion, each of which falls flat. First, the Jets repeatedly assert that Cablevision is "simply restating" its arguments and that this Court has already "considered and rejected" those arguments. Jets Br. at 1, 7, 9. These points do not in any way bear on the question of certification under Section 1292(b). The statute does not require this Court to agree with Cablevision's legal arguments, nor, of course, does it require Cablevision to advance new arguments. Rather, it simply requires a "substantial ground for difference of opinion" on the legal questions. *See* 28 U.S.C. § 1292(b). Indeed, a party would not have any need for relief under Section 1292(b) if the district court had already agreed

with its arguments—the statute (and the need for an appeal) only comes into play when the court disagrees with a party's arguments. Accordingly, the fact that this Court has "considered and rejected Cablevision's arguments" is entirely irrelevant to the analysis of Cablevision's motion.

Next, the Jets argue that, in general, interlocutory orders are not appealable, and that certification under Section 1292(b) is reserved for "exceptional circumstances." Jets Br. at 2-3. The argument that decisions on motions to dismiss are generally not appealable simply misses the point, because Section 1292(b) provides an express statutory exception to the general rule regarding non-final orders. Likewise, the Jets' argument that review under Section 1292(b) is limited to exceptional circumstances fails to address whether those circumstances are present in this case. Indeed, when an order such as this Court's October 17 Order cuts against decades of unbroken authority from the Supreme Court and the Second Circuit and threatens to chill First Amendment rights, immediate appellate review is appropriate. *See, e.g., In re Asbestos School Litigation*, 46 F.3d 1284, 1294 (3d Cir. 1994) (granting writ of mandamus where district court's decision erroneously limited First Amendment and *Noerr-Pennington* defenses, which "has implications that broadly threaten First Amendment rights"); *cf. Omega Homes, Inc. v. City of Buffalo*, 171 F.3d 755, 757 (2d Cir. 1999) ("[w]e write only to underscore our rejection of" a proposed limitation on *Noerr-Pennington* immunity). The Jets make no argument to the contrary.

The Jets' third argument is that a substantial ground for difference of opinion on controlling questions of law does not exist here. Significantly, however, the Jets fail to identify a single case in which any court has adopted the positions that this Court took in its October 17 Order. Nor do the Jets cite any authority to contradict the controlling Supreme Court and Second Circuit precedent that cuts directly against this Court's Order.

For example, the Jets cite no authority controverting Cablevision's arguments regarding the Court's legal errors with respect to the supposed sham bid or to Cablevision's alleged conduct relating to the Jets' advertisements. Specifically, Cablevision explained why the Court's decision is inconsistent with the Supreme Court's decisions in *PRE, Omni Outdoor, Turner*

*Broadcasting*, and *Trinko* (Cablevision Br. at 4-7), and the Jets fail to identify any authority to the contrary. Clearly, there is substantial ground to reach an opinion on these points that differs from that of this Court.

Likewise, the Jets have (yet again) failed to provide an explanation as to how the *process* of Cablevision's petitioning conduct defeated the stadium. The only way the stadium could have been defeated (and the way it was, in fact, defeated) was through government action. *See* Cablevision Br. at 7-8; Oct. 17 Order at 11. This Court held that one aspect of Cablevision's alleged conduct—its alleged "public misrepresentations"—is immune from antitrust liability because government decisionmakers had the power to block the Jets' proposal. *See* Oct. 17 Order at 11. This logically suggests that substantial grounds for difference of opinion do indeed exist with respect to, at a minimum, the Court's holding that the rest of Cablevision's conduct in connection with that same political campaign might be subject to liability.

With respect to Cablevision's supposed sham litigation, the Jets rely on *PrimeTime 24 Joint Venture v. NBC, Inc.*, 219 F.3d 92 (2d Cir. 2000), but the Jets grossly distort the holding of that case. The Jets argue that they need not demonstrate that Cablevision's litigation was objectively baseless—despite the Supreme Court's clear holdings to the contrary in *PRE*—because "the *PRE* test" of objective baselessness "only applies to the filing of a single action." Jets Br. at 4. That is not what the Second Circuit held in *PrimeTime 24*. Rather, the Second Circuit held that, where the defendants had filed "huge volumes" of cases "without regard to whether the challenges had merit" in order "to overwhelm PrimeTime 24" with the volume of cases, the fact that some of the challenges "might, as a matter of chance, have merit" did not support *Noerr-Pennington* immunity. 219 F.3d at 101. No case has ever held that two underlying litigation matters, which serve as the basis for the Jets' sham litigation claims here, constitute a "huge volume" or a "series" of cases such that the objective prong of the *PRE* test

3

should not apply.[1] In fact, another court in this Circuit recently reached a conclusion that was directly contrary to that of this Court, demonstrating that there is indeed a "substantial ground for difference of opinion" on this issue. In *Marchon Eyewear v. Tura LP*, 2002 WL 31253199 (E.D.N.Y. 2002), the court rejected application of *PrimeTime 24* in circumstances directly analogous to this case:

> Try as Defendants may, their attempt to classify Plaintiffs' acts, whatever the motivation behind them, as "a whole series of legal proceedings" or a "pattern of baseless, repetitive claims," does not stand up to scrutiny. ***In the sham litigation counterclaim, Defendants cite only two lawsuits . . . , not a "series" or "pattern" of them.*** Although this Court does not attempt to define here the number of legal proceedings needed to allege a "series" or "pattern" of litigation, it distinguishes this case from *PrimeTime 24* . . . , the seminal Second Circuit case in this arena, in which the Court refused to dismiss an antitrust claim in which the defendants had submitted "simultaneous and voluminous challenges . . . without regard to whether the challenges had merit," and where "appellees coordinated their efforts to submit huge volumes of challenges simultaneously." The conduct in the present case simply does not rise to the level deemed by the Second Circuit to be "automatic petitioning . . . without regard to and regardless of the merits of said petitions . . . that if proven, would be sufficient to overcome [*Noerr-Pennington*]."

*Id.* at *8 (emphasis added) (citations omitted). This Court's holding in its October 17 Order that *PrimeTime 24* applies in this case is (a) contrary to the holding in *Marchon*, (b) a novel extension of *PrimeTime 24*, and (c) flatly inconsistent with the Supreme Court's holding in *PRE*. Clearly there are substantial grounds for difference of opinion with respect to this Court's holding.

Under *PRE*, this Court was, in fact, required to rule on the objective prong of the sham test as a matter of law before permitting litigation into Cablevision's subjective intentions. *See* Cablevision Br. at 2. There is no dispute regarding the facts of the underlying litigation, and

---

[1] Indeed, the Jets were defendants in only *one* case, which could hardly be deemed to constitute a "huge volume" or a "series" of cases that were filed to "overwhelm" the Jets.

4

those facts permit only one conclusion: the Jets' sham litigation claim must be dismissed because Cablevision's underlying claims were not objectively baseless. The Jets' arguments to the contrary are disingenuous. For example, the Jets argue that "*five* of the relevant litigations . . . have been dismissed," but to reach this number they attribute to Cablevision claims that were brought by independent parties that received no funding from Cablevision (such as the Public Advocate and the Straphangers' Campaign). That these independent parties brought claims that were similar to those filed by Cablevision cannot possibly support an antitrust claim against Cablevision. To the contrary, that fact underscores that an objective litigant reasonably could have expected success in prosecuting these claims.

The Jets also fail to acknowledge that the New York Court of Appeals has granted discretionary leave to appeal the dismissal in the MTA bid case, which is the only claim filed by Cablevision that was dismissed on the merits. The Court of Appeals' grant of discretionary review (not to mention the careful consideration that the lower courts gave to this case) is utterly inconsistent with the notion that this claim was so frivolous as to constitute a sham. The Jets' misrepresentation of the indisputable facts relating to the underlying litigation should not have deterred this Court from addressing the objective prong of the sham test and dismissing the Jets' claims.[2]

---

[2] The Jets' brief is littered with misrepresentations of the facts. For example, the Jets distort the record in asserting that "Cablevision sought to invalidate the very Environmental Impact Statement ('EIS') on which its proposal to acquire the West Side Rail Yard depended." Jets Br. at 5. Contrary to this assertion, MSG's Vice President for Planning and Project Development, Andrew Lynn, testified that MSG "*hadn't reached a conclusion* about whether we could rely on that EIS," and, in addition, that MSG thought that a supplement to the EIS in connection with its project was a "distinct possibility." (Tr. of Sept. 15, 2005 Dep. of Andrew S. Lynn at 156 (emphasis added).) Moreover, the central arguments in the EIS litigation, which concerned the environmental impact of traffic to and from the Jets' stadium on game days, simply do not relate to the mixed-use residential development that Cablevision proposed.

The Jets also flatly misstate the evidence regarding MSG's interest in bidding for the development rights over the Rail Yards. The Jets argue that, in their September 20 supplemental brief, they "set forth factual support for their argument that Cablevision's only purpose in bidding was to hinder or stop the Jets from acquiring the land; Cablevision had no intention of buying the site and could not have been seeking government action." Jets Br. at 7. Not only did the Jets offer no such "factual support" in that

[Footnote continued on next page]

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in Cablevision's opening memorandum, Cablevision respectfully requests that the Court amend its Order of October 17, 2005 to include a certification under 28 U.S.C. § 1292(b) and to stay proceedings in this Court pending an appeal.

Dated: New York, New York  
       November 14, 2005

Respectfully submitted,

/s/ Randy M. Mastro

Miguel A. Estrada  
Theodore B. Olson  
Michael L. Denger  
Joshua Lipton  
GIBSON, DUNN & CRUTCHER LLP  
1050 Connecticut Avenue, NW  
Washington, DC 20036-5306  
Tel: (202) 955-8500  
Fax: (202) 467-0539

Randy M. Mastro (RM-9492)  
Jack M. Weiss  
Jennifer H. Rearden  
GIBSON, DUNN & CRUTCHER LLP  
200 Park Avenue  
New York, NY 10166-0193  
Tel: (212) 351-4000  
Fax: (212) 351-4035

*Counsel for Defendants Cablevision Systems Corporation, CSC Holdings, Inc., and Madison Square Garden L.P.*

80346576_2.DOC

---

[Footnote continued from previous page]  
brief, but none exists. In fact, as Mr. Lynn testified under oath, certain developments in January and February of this year prompted MSG to express its interest in acquiring the development rights in February 2005 and then to formally bid for the property in March 2005. (Lynn Dep. Tr. at 126-30, 134-35.) In January, the Jets offered $100 million for the rights and the MTA announced that it would accept $300 million for them, notwithstanding that its own appraiser had just valued the property at nearly $1 billion. Other developers did not come forward with bids because they feared that proposing an alternative to the stadium would "antagonize the mayor and the governor." Thus, MSG saw a great opportunity to acquire an extremely valuable piece of property for far less than market value. Mr. Lynn also explained that he had studied the Rail Yards and had reviewed appraisals and proposed developments for it for years before MSG sent its February 4 expression of interest. (*See id.* at 22-25.) Indeed, Mr. Lynn had long "been having discussions with people at the company" about "[his] opinion and the opinion of many others that the best use of the site would be a mixed use residential and other uses development of the site," which is what MSG proposed. (*Id.* at 84.)