UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                                             :
                                                             :
NEW YORK JETS LLC and JETS                                   :
DEVELOPMENT LLC,                                             :     Case No. 05CV2875
                                                             :
                              Plaintiffs,                    :
                                                             :
                                                             :     **ANSWER AND AMENDED**
           v.                                                :     **COUNTERCLAIMS**
                                                             :
CABLEVISION SYSTEMS CORPORATION,                             :
CSC HOLDINGS, INC., and MADISON                              :
SQUARE GARDEN, LP,                                           :
                                                             :
                              Defendants.                    :
------------------------------------------------------------ x

        Defendants and Counterclaim Plaintiffs, Cablevision Systems Corporation ("CSC"), CSC

Holdings, Inc., and Madison Square Garden, L.P. ("MSG") (collectively, "Cablevision,"

"Defendants," or "Counterclaim Plaintiffs") by their attorneys, Gibson, Dunn & Crutcher LLP,

for their Answer to the complaint (the "Complaint") filed by New York Jets LLC and Jets

Development LLC (collectively, the "Jets," "Plaintiffs," or "Counterclaim Defendants"), respond

as follows:

        1.      Defendants deny the allegations set forth by Plaintiffs in paragraph 1 of the

Complaint.

        2.      Defendants deny the allegations set forth by Plaintiffs in paragraph 2 of the

Complaint.

        3.      Defendants deny the allegations set forth by Plaintiffs in paragraph 3 of the

Complaint.

        4.      Defendants deny knowledge or information sufficient to form a belief as to the

truth of the allegations set forth by Plaintiffs in paragraph 4 of the Complaint, except admit that

1

Dockets.Justia.com

the Jets, the New York Metropolitan Transportation Authority (the "MTA"), and the New York

State Urban Development Corporation, d/b/a the Empire State Development Corporation (the

"ESDC"), entered into a memorandum of understanding (the "MOU") on March 25, 2004.

5.    Defendants deny the allegations set forth by Plaintiffs in paragraph 5 of the

Complaint.

6.    Defendants deny the allegations set forth by Plaintiffs in paragraph 6 of the

Complaint.

7.    Defendants deny the allegations set forth by Plaintiffs in paragraph 7 of the

Complaint, except admit that Cablevision has declined to sell airtime to the Jets for the Jets to

run advertisements advocating the stadium project, which Cablevision opposed.

8.    Defendants deny the allegations set forth by Plaintiffs in paragraph 8 of the

Complaint.

9.    Defendants deny the allegations set forth by Plaintiffs in paragraph 9 of the

Complaint.

10.    Defendants admit the allegations set forth by Plaintiffs in paragraph 10 of the

Complaint.

11.    Defendants deny knowledge or information sufficient to form a belief as to the

accuracy of the allegations set forth by Plaintiffs in paragraph 11 of the Complaint, except admit

that Jets Development LLC is an affiliate of New York Jets LLC and is a Delaware limited

liability company with its principal place of business in New York, New York.

12.    Defendants deny the allegations set forth by Plaintiffs in paragraph 12 of the

Complaint, except admit that Cablevision Systems Corporation and CSC Holdings, Inc. are

Delaware corporations with their principal places of business in Bethpage, New York.

13.    Defendants aver that the allegations set forth by Plaintiffs in paragraph 13 of the Complaint state conclusions of law as to which no response is required, except admit that CSC Holdings owns cable systems and owns or has investments in cable programming networks and the entertainment and telecommunications businesses.

14.    Defendants admit the allegations set forth by Plaintiffs in paragraph 14 of the Complaint.

15.    Defendants admit that Plaintiffs purport to bring this action under the provisions cited in paragraph 15 of the Complaint.

16.    Defendants admit that Plaintiffs assert that venue is proper under the provisions cited in paragraph 16 of the Complaint.

17.    Defendants deny that they have caused injury to Plaintiffs and otherwise aver that the allegations set forth by Plaintiffs in paragraph 17 of the Complaint state conclusions of law as to which no response is required.

18.    Defendants deny the allegations set forth by Plaintiffs in paragraph 18 of the Complaint, except admit that Defendants rent facilities to promoters and producers, promote or produce events themselves, and sell tickets to the public.

19.    Defendants deny the allegations set forth by Plaintiffs in paragraph 19 of the Complaint.

20.    Defendants deny the allegations set forth by Plaintiffs in paragraph 20 of the Complaint and aver that these facilities are not the only enclosed spectator facilities capable of existing in Manhattan with such a seating capacity, that Manhattan is not the relevant geographic market in any event, and that there are other such facilities existing and planned within New

York City and the New York metropolitan area, except admit the allegations set forth in the second, third, and fourth sentences of paragraph 20.

21.     Defendants deny the allegations set forth by Plaintiffs in paragraph 21 of the Complaint.

22.     Defendants aver that the allegations set forth by Plaintiffs in paragraph 22 of the Complaint state conclusions of law as to which no response is required, and otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 of the Complaint.

23.     Defendants deny the allegations set forth by Plaintiffs in paragraph 23 of the Complaint.

24.     Defendants deny the allegations set forth by Plaintiffs in paragraph 24 of the Complaint, except admit that licensees of suites include large corporations and local businesses.

25.     Defendants deny the allegations set forth by Plaintiffs in paragraph 25 of the Complaint, except aver that the allegations in the first sentence of paragraph 25 state conclusions of law as to which no response is required, and admit that Manhattan is an international center of business, art, media, entertainment, and culture.

26.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth by Plaintiffs in paragraph 26 of the Complaint, except deny that venues outside Manhattan are not reasonable substitutes for venues within Manhattan.

27.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 27 of the Complaint, except admit that millions of people live or work in Manhattan and that Manhattan is accessible by public transportation, deny that consumers would not consider a ticket to a performance elsewhere to be a reasonable substitute,

and deny that event promoters would not consider a venue elsewhere to be a reasonable substitute.

28.    Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth by Plaintiffs in paragraph 28 of the Complaint and otherwise aver that paragraph 28 states conclusions of law as to which no response is required.

29.    Defendants aver that the allegations set forth by Plaintiffs in paragraph 29 of the Complaint state conclusions of law as to which no response is required.

30.    Defendants deny the allegations set forth by Plaintiffs in paragraph 30 of the Complaint and otherwise aver that paragraph 30 states conclusions of law as to which no response is required.

31.    Defendants deny the allegations set forth by Plaintiffs in paragraph 31 of the Complaint.

32.    Defendants deny the allegations set forth by Plaintiffs in paragraph 32 of the Complaint.

33.    Defendants deny the allegations set forth by Plaintiffs in paragraph 33 of the Complaint.

34.    Defendants deny the allegations set forth by Plaintiffs in paragraph 34 of the Complaint, except deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 34.

35.    Defendants deny the allegations in paragraph 35 of the Complaint, except admit that MSG has previously contemplated building an enclosed facility at the site of the West Side Rail Yards and that the Jets and Defendants jointly explored the possibility of constructing a TriSport facility on that site to house the Jets, the Knicks, and the Rangers.

36.     Defendants deny the allegations set forth by Plaintiffs in paragraph 36 of the Complaint.

37.     Defendants deny knowledge or information sufficient to form a belief as to the accuracy of the allegations set forth by Plaintiffs in paragraph 37 of the Complaint, except admit that the Jets do not have their own stadium and have instead played home games at the other venues identified in paragraph 37.

38.     Defendants deny the allegations set forth by Plaintiffs in the first sentence of paragraph 38 of the Complaint and otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth by Plaintiffs in paragraph 38 of the Complaint.

39.     Defendants deny the allegations set forth by Plaintiffs in paragraph 39 of the Complaint, except aver that the allegations in the first sentence of paragraph 39 state conclusions of law as to which no response is required.

40.     Defendants deny the allegations set forth by Plaintiffs in paragraph 40 of the Complaint.

41.     Defendants deny the allegations set forth by Plaintiffs in paragraph 41 of the Complaint.

42.     Defendants deny the allegations set forth by Plaintiffs in paragraph 42 of the Complaint and refer the Court to the articles cited therein for their contents.

43.     Defendants deny the allegations set forth by Plaintiffs in paragraph 43 of the Complaint.

44.     Defendants deny the allegations set forth by Plaintiffs in paragraph 44 of the Complaint.

45.      Defendants deny the allegations set forth by Plaintiffs in paragraph 45 of the Complaint.

46.      Defendants deny the allegations set forth by Plaintiffs in paragraph 46 of the Complaint.

47.      Defendants deny the allegations set forth by Plaintiffs in paragraph 47 of the Complaint.

48.      Defendants deny the allegations set forth by Plaintiffs in paragraph 48 of the Complaint.

49.      Defendants deny the allegations set forth by Plaintiffs in paragraph 49 of the Complaint, except admit that Cablevision has declined to sell airtime to the Jets for advertisements advocating the stadium project, which Cablevision opposed.

50.      Defendants deny the allegations set forth by Plaintiffs in paragraph 50 of the Complaint.

51.      Defendants deny the allegations set forth by Plaintiffs in paragraph 51 of the Complaint, except admit that Defendants filed a lawsuit in September 2004 regarding deficiencies in the environmental review of the proposed project and that the suit eventually was dismissed on procedural grounds unrelated to the merits of the allegations.

52.      Defendants deny the allegations set forth by Plaintiffs in paragraph 52 of the Complaint, except admit that Defendants filed a lawsuit in December 2004 alleging additional and different deficiencies in the environmental review of the proposed project.

53.      As to the allegations set forth by Plaintiffs in paragraph 53 of the Complaint, Defendants refer the Court to the MOU for its contents.

54.     As to the allegations set forth by Plaintiffs in paragraph 54 of the Complaint, Defendants refer the Court to the MOU for its contents.

55.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth by Plaintiffs in the first sentence of paragraph 55 of the Complaint, and deny the allegations set forth by Plaintiffs in the second sentence of paragraph 55 of the Complaint.

56.     Defendants deny the allegations set forth by Plaintiffs in paragraph 56 of the Complaint, except admit that on February 4, 2004, Madison Square Garden expressed its interest in acquiring the development rights (the "Development Rights") over the West Side Rail Yards.

57.     Defendants deny the allegations set forth by Plaintiffs in paragraph 57 of the Complaint.

58.     Defendants deny the allegations set forth by Plaintiffs in paragraph 58 of the Complaint.

59.     Defendants deny the allegations set forth by Plaintiffs in paragraph 59 of the Complaint and refer the Court to the Standard and Poor rating cited therein for its contents.

60.     Defendants deny the allegations set forth by Plaintiffs in paragraph 60 of the Complaint.

61.     Defendants incorporate their responses to the allegations in paragraphs 1 through 60.

62.     Defendants deny the allegations set forth by Plaintiffs in paragraph 62 of the Complaint.

63.     Defendants deny the allegations set forth by Plaintiffs in paragraph 63 of the Complaint.

64.     Defendants deny the allegations set forth by Plaintiffs in paragraph 64 of the Complaint.

65.     Defendants deny the allegations set forth by Plaintiffs in paragraph 65 of the Complaint.

66.     Defendants deny the allegations set forth by Plaintiffs in paragraph 66 of the Complaint.

67.     Defendants incorporate their responses to the allegations in paragraphs 1 through 66.

68.     Defendants deny the allegations set forth by Plaintiffs in paragraph 68 of the Complaint.

69.     Defendants deny the allegations set forth by Plaintiffs in paragraph 69 of the Complaint.

70.     Defendants deny the allegations set forth by Plaintiffs in paragraph 70 of the Complaint.

71.     Defendants incorporate their responses to the allegations in paragraphs 1 through 70.

72.     Defendants deny the allegations set forth by Plaintiffs in paragraph 72 of the Complaint, except deny knowledge and information sufficient to state a belief as to the truth of the allegations in the first sentence of paragraph 72.

73.     Defendants deny the allegations set forth by Plaintiffs in paragraph 73 of the Complaint.

74.     Defendants deny the allegations set forth by Plaintiffs in paragraph 74 of the Complaint.

75.     Defendants deny the allegations set forth by Plaintiffs in paragraph 75 of the Complaint.

76.     Defendants incorporate their responses to the allegations in paragraphs 1 through 75.

77.     Defendants deny the allegations set forth by Plaintiffs in paragraph 77 of the Complaint.

78.     Defendants deny the allegations set forth by Plaintiffs in paragraph 78 of the Complaint.

79.     Defendants deny the allegations set forth by Plaintiffs in paragraph 79 of the Complaint.

80.     Defendants deny the allegations set forth by Plaintiffs in the Prayer for Relief.

## AFFIRMATIVE DEFENSES

The statement of any defense hereinafter does not assume the burden of proof for any issue as to which applicable law places the burden upon Plaintiffs.  In addition, Defendants expressly reserve the right to amend and/or supplement their affirmative and other defenses.

## FIRST AFFIRMATIVE DEFENSE

Plaintiffs' Complaint, including each and every purported cause of action contained therein, fails to state a claim or cause of action against Cablevision upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Cablevision's alleged conduct is immune from liability under the *Noerr-Pennington* doctrine.

## THIRD AFFIRMATIVE DEFENSE

Cablevision's alleged conduct is protected under the First Amendment, and Plaintiffs are therefore barred from recovery.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs have not alleged that Cablevision engaged in any conduct that legally constitutes anticompetitive, wrongful, or tortious conduct.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs have not alleged that Cablevision engaged in any consumer-oriented conduct that could violate section 349 of the New York General Business Law.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs have not alleged that Cablevision engaged in any misleading conduct that could violate section 349 of the New York General Business Law.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs have not alleged any legally cognizable injury from any misleading conduct by Cablevision.

## EIGHTH AFFIRMATIVE DEFENSE

To the extent they are entitled to any relief, Plaintiffs are not entitled to injunctive or other equitable relief because they have an adequate remedy at law.

## NINTH AFFIRMATIVE DEFENSE

To the extent they are entitled to any damages, Plaintiffs are not entitled to punitive damages.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' harm, if any, did not result from the direct or proximate actions of Cablevision but from the acts or omissions of third parties over whom Cablevision had no control.  The

actions of such third parties constitute independent, intervening and superseding causes of harm, if any, suffered by Plaintiffs.

### ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Cablevision acted for bona fide and legitimate business purposes.

### TWELFTH AFFIRMATIVE DEFENSE

The claims alleged in the Complaint are barred in whole or in part by the Jets' unclean hands.

### COUNTERCLAIMS

### PRELIMINARY STATEMENT

81.    These counterclaims are brought under longstanding New York common law as well as New York's "Anti-SLAPP" statute, which was designed to protect opponents of a project from retaliatory lawsuits exactly like this one.

82.    The Jets filed this case in an effort to chill Cablevision's opposition to their efforts to secure a number of necessary government approvals and hundreds of millions of dollars in public subsidies to build a football stadium on the West Side of Manhattan.

83.    The proposed stadium project, and, in particular, the sweetheart deal for the valuable West Side Rail Yards that the Jets thought they were getting, was the subject of heated public debate for well over a year.

84.    Indeed, numerous City elected officials and fiscal watchdogs voiced objections to the proposed financing of the project.[1]

85.    Community Board 4, the Shubert Organization, and countless others also raised concerns about the environmental consequences of the proposed stadium, including increased traffic congestion, air pollution, noise, sewage, and water-supply impacts, and disturbance of suspected hazardous waste sites.

86.    In the end, the Jets failed to obtain the requisite government approvals for the proposed stadium, and they now continue to press this lawsuit simply to harass and punish Cablevision because they blame Cablevision's opposition to the project for its defeat.

87.    This action is simply the latest underhanded tactic to which the Jets resorted while pursuing the proposed stadium project and have continued to resort since their efforts to ram it through the political approval process failed.

88.    For example, in an effort to prevail in the MTA bid litigation, the Jets misled the Supreme Court, New York County (Cahn, J.) and the Appellate Division, First Department, about the contingent nature of the Jets' proposal to acquire the Development Rights.  In upholding the MTA's determination to award the Development Rights to the Jets, Justice Cahn and the Appellate Division relied heavily on the Jets' repeated representations that the deal

---

[1] See, e.g., Letter from William C. Thompson, Jr., to Hon. Michael Bloomberg, Oct. 20, 2004, at 2; N.Y. City Council Speaker Gifford Miller, Remarks at Meeting of the New York Building Congress, Nov. 18, 2004, at 6; N.Y. City Public Advocate Betsy Gotbaum, Press Release, *Gotbaum: New Yorkers Risk Paying Big Price for the West Side Stadium,* Nov. 18, 2004; Michael Saul, *W. Side Plan Up in Smoke?  Critics Rip Funding Shortfall,* N.Y. Daily News, Oct. 22, 2004, at 3; Michael Powell, *On New York's Far West Side, Rebirth or a Waste of Money? Cost of Plan for New Jets Stadium and Skyscrapers Debated,* Wash. Post, Nov. 26, 2004, at A3; Regional Plan Association, *Urban Development for the Hudson Rail Yards*, Dec. 1, 2004, at 2.

between the MTA and the Jets had "no contingen[cies]," "no conditions," was ready to close immediately, and was "not conditioned on [approval by] the Public Authorities Control Board." (Tr. of May 5, 2005 Hearing before Justice Cahn at 31, 67.)

89.     The term sheet signed by the Jets and the MTA on April 11, 2005, which the Jets refused to produce, made clear that the MTA and the Jets' deal would not, in fact, "close" until after the "satisfaction" of certain "conditions," including that "[a]ll project approvals for the development of the NYSCC must be finalized as of the closing date," and that "[a]ll project financing for the NYSCC shall be committed and ready to fund." (Term Sheet at 3.)

90.     Based in part on the Jets' misrepresentations regarding the provisions of the term sheet, Justice Cahn ultimately decided, among other things, that any contingencies in the term sheet "would allow the *MTA* to refuse to close" and "*would not enable the Jets to choose not to proceed.*" (June 2, 2005 Decision at 20 n.1 (emphasis added).)

91.     Yet at the MTA's July 27, 2005 Board meeting, MTA Chairman Peter Kalikow "announced that Jets President L. Jay Cross had requested that the MTA *give the Jets until the end of August to decide whether to proceed* with a contract of sale for the West Side Yards," and the MTA consented. (Letter from C. Rinaldi of the MTA to R. Mastro dated Aug. 1, 2005) (emphasis added).) On August 31, 2005, despite their prior representations, the Jets announced that they were abandoning this transaction with the MTA. (Letter from L. Jay Cross to P. Kalikow dated Aug. 31, 2005.)

92.     In addition, as part of their pro-stadium advertising campaign, and later as part of this lawsuit, the Jets stooped so low as to splice together snippets of an interview with MSG's Chairman to give the false impression that MSG opposed the Jets' stadium project because MSG is afraid of competition. (Jets Br. at 1-2). To the contrary, in that interview, MSG's Chairman

14

actually said: "*We're not afraid of competition*. But this is government-subsidized competition." (Transcript of Interview on WFAN, Oct. 29, 2004) at 15 (emphasis added).)

93.    As part of this lawsuit, the Jets also brought a baseless cause of action concerning Cablevision's alleged "massive media campaign," which the Jets asserted was "designed to malign and denigrate the Sports and Convention Center project and Plaintiffs." (Compl. ¶ 41.) The Court dismissed that claim.

94.    In commencing and continuing to pursue this case, which was filed solely to harass, intimidate, punish, and stifle Cablevision's opposition to the Jets' project, the Jets violated New York's Civil Rights Law, which protects project opponents such as Cablevision from retaliation for reporting on, commenting on, ruling on, challenging, and/or opposing an application for or issuance of government entitlements.

95.    Indeed, the Jets' sole motivation for commencing this litigation—which lacked any substantial foundation in fact or law—was to punish Cablevision for its public opposition to the stadium and to discourage Cablevision from taking any further steps to speak out against the project or to petition for governmental action rejecting the stadium proposal. The fact that the Jets filed the instant case just three business days before the deadline for submitting bids in response to the RFP makes this abundantly clear.

96.    In an effort to punish Cablevision for its anti-stadium petitioning, the Jets also have intentionally interfered with Cablevision's business. For example, in 2004, the Jets funded a telemarketing campaign with satellite-TV provider DirecTV that targeted Cablevision's cable subscribers in and around New York City. As a result of this campaign, certain Cablevision subscribers switched from Cablevision to DirecTV service, and other Cablevision subscribers decided not to renew their subscriptions for Cablevision service. The Jets had no rational

business motive to engage in this conduct; instead, they engaged in this conduct solely out of malice toward Cablevision.

97.     The Jets also intentionally interfered with Cablevision's existing and prospective business relations with certain design, engineering, and construction professionals, warning them that they would be refused consideration for work on the proposed Jets stadium if they continued working for MSG or participated in MSG's renovation project.  The Jets had no rational business motive to engage in this conduct; instead, they engaged in this conduct solely out of malice toward Cablevision.

98.     As a result of the Jets' threats, MSG's principal mechanical, electrical, and plumbing engineer and one of the general contractors MSG intended to engage in connection with its renovation project terminated their longstanding relationships with MSG and refused to work on the Garden renovation project, forcing MSG to retain other design, engineering, and construction professionals who lacked the detailed knowledge of the Garden that MSG's mechanical engineer and contractor had developed over many years of working with MSG.

99.     In these and other respects alleged herein, the Jets have damaged Cablevision. Cablevision brings this action to enjoin the Jets' unlawful actions and to recover compensatory and punitive damages.

I.     **Parties and Jurisdiction**

100.     Defendant and Counterclaim Plaintiff Cablevision Systems Corporation is a Delaware corporation with its principal place of business in Bethpage, New York.

101.     Defendant and Counterclaim Plaintiff CSC Holdings, Inc. is a Delaware corporation with its principal place of business in Bethpage, New York.

102.    Defendant and Counterclaim Plaintiff Madison Square Garden, L.P. is a Delaware partnership, indirectly owned and controlled by CSC Holdings.  MSG owns and operates, among other things, the Madison Square Garden arena (the "Garden").

103.    Plaintiffs and Counterclaim Defendants New York Jets LLC and Jets Development LLC are Delaware corporations with their principal places of business in New York, New York.

104.    Jets Development LLC is an affiliate of New York Jets LLC, which holds a franchise in the National Football League.

105.    The MTA is a body corporate and politic constituting a public benefit corporation established pursuant to section 1263 of the New York Public Authorities Law.

106.    The ESDC is a corporate governmental agency of the State of New York constituting a political subdivision and public benefit corporation established pursuant to section 6254 of the Unconsolidated Laws of New York.

107.    The New York State Public Authorities Control Board (the "PACB") is a governmental board established pursuant to section 50 of the New York Public Authorities Law.

108.    The City of New York (the "City") is a municipal corporation organized under the laws of the State of New York.

109.    The City Council of the City of New York (the "City Council") is the legislative body of the City of New York established pursuant to section 21 of the New York City Charter.

110.    The New York City Department of City Planning (the "DCP") is an agency of the City of New York established pursuant to section 191 of the New York City Charter.

111.    The New York City Planning Commission (the "CPC") is an agency of the City of New York established pursuant to section 192 of the New York City Charter.

112.    This Court has jurisdiction over Defendants' counterclaims pursuant to 28 U.S.C. § 1367.

## II.    Relevant Factual Background

113.    The MTA, through one of its subsidiary agencies, owns one of the few remaining parcels of land available for large-scale development in Manhattan—the John D. Caemmerer West Side Rail Yards on the West Side of Manhattan.  This "super block" location is the final frontier for major development in midtown Manhattan.  The MTA's own appraiser has valued the Development Rights over the West Side Rail Yards at nearly $1 billion.

114.    In or around late March 2004, it came to the attention of Cablevision that the MTA, the ESDC, and the Jets had entered into the MOU with respect to the development of a stadium for the New York Jets over the West Side Rail Yards.

115.    The MOU provided that the ESDC, the Jets, and the MTA would "agree to work cooperatively to implement the development [of a stadium] described in their Memorandum of Understanding."  MOU ¶ 14.

116.    The MOU did not address the consideration to be paid by the Jets for the West Side Rail Yards.

117.    In April 2004, in response to pressure by former MTA Chairman Richard Ravitch, New York State Assemblyman Richard Brodsky (Chair of the New York State Assembly's Committee on Corporations, Authorities, and Commissions), and others not to give away this valuable property to the Jets, MTA Chairman Peter Kalikow announced that the MTA would hire outside appraisers to estimate the value of the Development Rights.

118.    On November 2, 2004, Jerome Haims Realty, Inc. (the "MTA's Appraiser"), a real estate appraiser and consultant retained by the MTA, rendered an opinion that the fair market value of the Development Rights is $923,400,000.  The MTA's Appraiser concluded that

"the highest and best use" of the property was not as a stadium, but rather as "a mixed-use development that is for the most part residential apartment buildings with ground-level retail use along the site's 11th avenue frontage"—exactly the type of development that MSG subsequently proposed.

        **A.**      <u>**The Jets' Initial Offer of $100 Million for the Development Rights**</u>

119.     On January 30, 2005, the *New York Times* reported that the MTA and the Jets had been negotiating for months over the value of the Development Rights, and that the Jets had made a "take-it-or-take-it" offer of $100 million for the Development Rights—less than one-ninth of the value estimated by the MTA's Appraiser.  The Jets' offer was purportedly based on an appraisal prepared for the Jets that valued the Development Rights at only $36.9 million.

120.     Kalikow said he "thought $100 million, frankly, was an insult."

121.     But under pressure by the Jets, Kalikow agreed to an "arbitration" process through which the MTA could receive as little as $100 million for the Development Rights and could not receive more than $300 million—still only a fraction of the actual value of the property.

122.     The arbitration could not have resulted in the MTA receiving fair market value for the Development Rights because it was designed to determine the value of the Development Rights only for use in constructing a stadium.  In a letter to Mr. Kalikow and Jay Cross dated January 28, 2005, the arbitrator (former United States Senator George Mitchell) noted that his mandate was merely to "determine the price to be paid by the Jets for acquisition of the air rights and other real property interests necessary to permit the construction of the proposed stadium." Despite the MTA's own $923 million appraisal, the MTA's $300 million "demand" and the Jets' $100 million "offer" were to be the upper and lower bounds for the arbitrator's determination.

**B.**    **MSG's Initial Expression of Interest and the Opening of the Bidding**

123.    On February 4, 2005, in contrast with the Jets' lowball offer of $100 million, MSG wrote to the MTA and expressed its interest in bidding for the Development Rights. Specifically, MSG stated that it was prepared to pay the MTA $600 million for the right to develop the West Side Rail Yards, including $250 million toward the cost of a platform.

124.    MSG proposed to develop a dynamic, mixed-use community that would improve public access to the Hudson River waterfront. MSG stated that it was prepared to make a substantial, non-refundable deposit in order to proceed with its proposal.

125.    MSG requested that the MTA open up a bidding or request-for-proposal process through which interested parties could submit bids for the Development Rights, instead of continuing its sole source negotiations with the Jets.

126.    On February 8, 2005, the Jets and the MTA announced their intention to proceed with what was then called a "non-binding" arbitration to determine a purchase price for the Development Rights.

127.    In response to a request for information from the MTA on February 8, 2005, MSG submitted a detailed response on February 11, 2005 confirming that its proposal was much more favorable to the MTA than the Jets' proposal with respect to every criterion identified in the MTA's request.

128.    Facing public outrage over the sweetheart deal that the Jets stood to get, the MTA put the Development Rights up for public bidding. On February 22, 2005, the MTA issued a formal request for proposals for the sale or lease of the Development Rights (the "RFP").

129.    The RFP provided that "[t]he goal is a Disposition of the air rights over the entire Site in a manner that will maximize the economic benefit to MTA for improvement of the public

transportation facilities and functions of the MTA at the least economic and environmental risk

to MTA."

### C. **The Jets' Supposed "$720 Million" Bid**

130.    On March 21, 2005, the Jets submitted a so-called "bid" that not only was

deceptive, but also was based on phantom numbers and overly-optimistic expectations.

131.    The Jets' bid was divided into two parts:  first, a $250 million payment (in 2005

dollars) by the Jets for the air rights necessary to allow construction of the stadium, and second, a

contingent $440 million payment by certain real estate developer partners of the Jets for

additional development rights to be "transferred" from the West Side Rail Yards to other, yet-to-

be-identified locations throughout the City.

132.    In an effort to protect their sweetheart deal, the Jets reportedly offered to pay the

first $50 million of the $250 million earmarked in the bid only upon approval of the project by

the PACB, with the remaining $200 million to be paid only upon closing.

133.    Significantly, because PACB approval was based in part on a review of the

ESDC's override of local zoning with respect to the West Side Rail Yards, conditioning the Jets'

initial $50 million payment to the MTA on PACB approval was tantamount to conditioning that

payment on approval of the zoning.  Thus, when the PACB ultimately rejected the ESDC's

project plan for the West Side stadium, the Jets effectively were released from their obligation to

purchase the Development Rights.

134.    This was directly contrary to the requirements of the RFP, which prohibited

bidders from conditioning any aspect of their proposals upon zoning contingencies.

135.    Likewise, the $440 million payment from the Jets' developer partners was entirely

speculative; the developers were in no way bound to go through with the proposal, and the

purported transfer of future development "rights" to those developers was both unlawful and dependent upon a confluence of highly speculative future events.

**D.    MSG's $760 Million Proposal**

136.    MSG submitted a proposal in response to the RFP that was far superior to that of the Jets.  Not only did MSG increase its proposal from the $600 million mentioned in its February 4 expression of interest; it also trumped even the phony, overstated amount offered by the Jets by at least $40 million.  As City Council Speaker Gifford Miller was reported to observe, "[i]n an apples-to-apples comparison, clearly the Cablevision bid reaps a great deal more money."

137.    MSG proposed a payment of $760 million, consisting of a $400 million, up-front and unconditional cash payment and a commitment to construct the necessary platform, which was estimated to cost $360 million.

138.    MSG's proposal not only satisfied the criteria for evaluating proposals that were set forth in the RFP, but it far exceeded the Jets' proposal with respect to each of those criteria.

139.    Indeed, several MTA Board members openly conceded that MSG's bid was worth at least $200 million more than the Jets' proposal.

**E.    The Selection of the Jets' Bid**

140.    On March 31, 2005, under intense pressure from the Jets, and after the Jets had smeared MSG and its bid and otherwise intentionally interfered with MSG's prospective business relations with the MTA, the MTA accepted the Jets' inferior proposal.

141.    At the March 31 meeting, James S. Simpson, Chair of the MTA's Real Estate/Planning Committee, observed that MSG's proposal was qualified for consideration under the RFP, and, even more importantly, that it was worth substantially more than that of the Jets.

142.    Specifically, Mr. Simpson acknowledged that "MSG's proposal is worth at least $200 million more than the Jets' proposal" to the MTA, and further stated: "if we said, 'OK, let's look at the cash on the table, what is the best deal for us today' . . . the MSG proposal is the correct choice." (Tr. of March 31 Hearing at 36.)

143.    Two other MTA Board members, Vice Chairman David S. Mack and Vice Chairman Edward B. Dunn, also conceded that MSG's proposal was higher. (*Id.* at 40.)

**F.      The PACB's Rejection of the Proposed Stadium Project**

144.    On June 6, 2005, the PACB rejected the Project Plan for the Jets stadium, including the proposed ESDC override of the zoning restrictions on the Rail Yards.

145.    In announcing his decision to withhold support for the stadium project, Assembly Speaker Sheldon Silver, a member of the PACB, observed: "With the promise of jobs and prosperity, too many New Yorkers have fallen for the relentless and hysterical warnings that we will lose out on our bid to host the 2012 Summer Olympics unless - blindly and wholeheartedly - we commit to building this stadium, and this particular stadium only!" (Remarks by Speaker Sheldon Silver, PACB Decision Press Conference, June 6, 2005.)

146.    Speaker Silver continued: "Ask the Governor, ask the Mayor, how they justify building 24 million square feet of commercial office space on the West Side; how they justify the extensive incentives they are providing in the attempt to attract businesses there in competition with Lower Manhattan." (*Id.*)

147.    Speaker Silver also stated: "Considering our constitutional obligation to provide each and every child with a sound, basic education, our moral obligation to rebuild and revitalize Lower Manhattan, and our public obligation to provide a safe, affordable and efficient mass transit system, I cannot in good conscience cast my vote in support of the proposal before us today."

148.    Similarly, in refusing to support the stadium project, Senate Majority Leader Joseph Bruno, another member of the PACB, stated:  "The stadium project is the largest in size, scope, and cost, that has ever come before the PACB with so many unresolved questions. We still need more answers regarding the finances of the stadium, there are serious questions about the business plan, the amount of taxpayers dollars involved has been a constantly moving target and the lack of public support for the project is troubling."  (Statement by Senate Majority Leader Joseph L. Bruno, June 6, 2005.)

**III.    The Jets Tortiously Interfere with MSG's Existing and Prospective Business Relations with Construction and Design Professionals**

149.    During or prior to 2002, MSG began planning for a potential renovation of the Garden.

150.    Very few design, engineering, and construction professionals have sufficient expertise to work on projects of the specialized nature and magnitude of the renovation of the Garden.

151.    In connection with these plans, MSG conducted a renovation study in 2002 to assess whether a renovation of the Garden was feasible and, if so, to evaluate how best to undertake such a renovation.

152.    MSG also intended to use the renovation study to develop its relationships with the design and construction professionals it intended to engage for the renovation project.

153.    Prior to developing its renovation plans for the Garden, MSG had maintained a decades-long business relationship with Flack + Kurtz Inc. ("Flack + Kurtz"), a mechanical, electrical, and plumbing design and consulting firm.

154.    Flack + Kurtz was the Garden's principal "mechanical, electrical, and plumbing engineer," and had particular knowledge of and experience with the design, structure, facilities, and inner workings of the Garden that could not be replicated.

155.    MSG had invested substantial amounts of time and money in educating Flack + Kurtz about the design, structure, facilities, and inner workings of the Garden.

156.    Indeed, Flack + Kurtz was the mechanical, electrical, and plumbing consultant for the Garden's prior renovation project, which took place in the early 1990s.

157.    MSG also retained Flack + Kurtz as the mechanical, electrical, and plumbing consultant for its 2002 renovation study.

158.    Over the course of its relationship with MSG, Flack + Kurtz developed a knowledge of and familiarity with the Garden structure itself that no other mechanical, electrical, and plumbing consultant possesses.  Flack + Kurtz developed a knowledge of the Garden structure even beyond that of most MSG employees.

159.    MSG intended to engage Flack + Kurtz as the mechanical, electrical, and plumbing consultant for its renovation project.

160.    After MSG conducted its 2002 renovation study, Flack + Kurtz expressed interest in working on MSG's Garden renovation project.

161.    The Jets knew of MSG's longstanding relationship with Flack + Kurtz.

162.    The Jets were aware of MSG's plan to retain Flack + Kurtz to work on the renovation of the Garden.

163.    In or about June 2004, the Jets willfully, wantonly, and intentionally interfered with MSG's existing and prospective business relations with Flack + Kurtz in conscious disregard of MSG's rights.

164.    In particular, the Jets willfully and wantonly threatened Flack + Kurtz, warning that the firm would be refused consideration for work on the proposed Jets stadium if it continued working for MSG or participated in MSG's renovation project.

165.    Because of the Jets' threats, Flack + Kurtz refused to work on the Garden renovation and terminated its relationship with MSG.

166.    One Flack + Kurtz executive informed MSG that Flack + Kurtz had even offered to implement a "Chinese wall" within the firm to ensure that none of the personnel involved in the Garden project would have any involvement in the Jets stadium project, but the Jets refused. The Flack + Kurtz executive informed MSG that the Jets had refused to work with Flack + Kurtz unless Flack + Kurtz severed its ties with MSG.

167.    By willfully and wantonly threatening to deny Flack + Kurtz the opportunity to work on the proposed Jets' stadium, the Jets denied MSG access to the services of the single most qualified mechanical, electrical, and plumbing consultant capable of serving MSG's needs. The Jets had no legitimate basis for this egregious, willful, and wanton conduct.

168.    The Jets only purpose in threatening Flack + Kurtz was to injure MSG.

169.    The Jets used dishonest, unfair and improper means in order to interfere with MSG's existing and prospective business relations with Flack + Kurtz.

170.    As a direct result of the Jets' wanton threats, Flack + Kurtz refused to work on the Garden renovation project, and MSG was forced to retain a replacement mechanical, electrical, and plumbing consultant that lacked the detailed knowledge of the Garden that Flack + Kurtz had developed over many years of working with MSG.

171.    But for the Jets' wrongful and malicious conduct in conscious disregard of MSG's rights, MSG would have continued and further expanded its business relations with Flack + Kurtz.

172.    MSG incurred considerable expense in attempting to bring a new mechanical, electrical, and plumbing consultant up to speed on the Garden structure and facilities.

173.    Moreover, because no other mechanical, electrical, and plumbing consultant possesses the level of knowledge and familiarity with the Garden that Flack + Kurtz possesses, the Garden renovation project now necessarily involves additional costs that MSG would not have borne if Flack + Kurtz were involved in the renovation.

174.    On account of the Jets' willful and wanton acts in conscious disregard of MSG's rights, Cablevision is also entitled to punitive damages in an amount to be determined at trial.

175.    In or about June 2004, the Jets willfully and wantonly made similar threats to certain other design and construction professionals, including Turner Construction Co. ("Turner").

176.    MSG had existing and/or prospective business relationships with these professionals, including Turner.

177.    For example, MSG had been working with Turner for several years before the Jets willfully and wantonly began to exert pressure on that firm.

178.    MSG previously had engaged Turner as a contractor in connection with a project to construct a sports practice facility for MSG.

179.    In addition, in or about the year 2000, MSG retained Turner to assess the constructability and cost of constructing a new Madison Square Garden arena.  In connection with that assignment, Turner developed—at MSG's expense—a detailed working knowledge of

MSG's business and operations, as well as MSG's desired programming for a new (or renovated) arena.

180.     MSG also engaged Turner as a consultant in connection with its 2002 Garden renovation study.

181.     As with Flack + Kurtz, MSG engaged Turner in connection with the 2002 renovation study partly to further develop its relationship with Turner because it anticipated soliciting Turner as contractor for the Garden renovation project itself.

182.     MSG determined that Turner was one of the only strong candidates for the Garden renovation construction contract because Turner offered the combination of a strong New York presence and expertise in large-scale construction projects in New York with a strong expertise in the construction of major sports facilities.  In MSG's view, this combination of attributes made Turner one of very few qualified candidates for the Garden renovation contract.

183.     MSG executives even met with Turner executives from both its New York office and its Sports construction division—which was not based in New York—to assure that MSG would be able to draw upon both areas of expertise offered by Turner.

184.     During and after the 2002 renovation study, MSG's discussions with Turner executives concerning Turner's involvement in the renovation project were very positive.  On numerous occasions, Turner executives expressed their interest in working as contractor for the Garden renovation project.

185.     The Jets were aware of MSG's longstanding relationship with Turner.

186.     MSG planned to retain Turner in connection with the Garden renovation project, and Turner had agreed to be retained in connection with that project.

187.     The Jets were aware of MSG's plan to retain Turner to work on that project.

188.    In or about November 2004, the Jets willfully, wantonly, and intentionally interfered with MSG's existing and prospective business relations with Turner in conscious disregard of MSG's rights.

189.    In particular, the Jets willfully and wantonly threatened that Turner would be excluded from work on the proposed Jets stadium if it continued working for MSG or participated in MSG's renovation project for the Garden.

190.    By willfully and wantonly threatening to deny Turner the opportunity to work on the proposed Jets' stadium, the Jets denied MSG access to the services of those few qualified professionals capable of serving MSG's needs.  The Jets had no legitimate basis for this egregious, willful, and wanton conduct.

191.    The Jets' only purpose in threatening Turner was to injure MSG.

192.    The Jets used dishonest, unfair and improper means in order to interfere with MSG's existing and prospective business relations with Turner.

193.    As a result of the Jets' willful and wanton threats, Turner terminated its relationship with MSG and refused to work on the Garden renovation.

194.    But for the Jets' wrongful and malicious conduct in conscious disregard of MSG's rights, MSG would have continued and further expanded its business relations with Turner.

195.    As a result of Turner's refusal to work on the Garden renovation project, MSG was forced to retain replacement contractors who lacked the detailed knowledge of the Garden that Turner had developed as described above.

196.    MSG incurred considerable expense bringing new contractors up to speed on the Garden.

197.    Moreover, because Turner was one of only a limited number of qualified candidates for the Garden renovation contract, Turner's refusal to work on the renovation project is irrevocably injuring MSG's bargaining position with the remaining candidate(s), which no longer are under the same pressure to provide MSG the most competitive assessment of the construction costs for this project.  Accordingly, MSG is greatly disadvantaged by Turner's refusal to work on the renovation project and will incur substantial additional costs in connection with the construction contract for the project.

198.    On account of the Jets' willful and wanton acts in conscious disregard of MSG's rights, Cablevision is also entitled to punitive damages in an amount to be determined at trial.

199.    The Jets also willfully and wantonly threatened other design, engineering, and construction professionals in order to stop them from working with MSG.

200.    For example, Code Consultants, Inc. ("Code Consultants"), a consulting firm specializing in fire safety and regulatory code compliance issues, also was retained to consult on the 2002 Garden renovation study.

201.    In connection with the Garden renovation project, MSG intended to engage Code Consultants, which MSG considered to be the single most qualified consulting firm in its field for the Garden renovation.

202.    In or about June 2004, the Jets willfully, wantonly, and intentionally interfered with MSG's existing and prospective business relations with Code Consultants, in conscious disregard of MSG's rights, by threatening that Code Consultants would be refused consideration for work on the proposed Jets stadium if it continued working for MSG or participated in MSG's renovation project.

203.    Because of the Jets' willful and wanton threats, Code Consultants refused to work on the Garden renovation and terminated its relationship with MSG.

204.    By threatening to deny Code Consultants the opportunity to work on the proposed Jets' stadium, the Jets denied MSG access to the services of the most qualified professionals capable of serving MSG's needs.  The Jets had no legitimate basis for this egregious, willful, and wanton conduct.

205.    The Jets only purpose in threatening Code Consultants was to injure MSG.

206.    The Jets used dishonest, unfair and improper means in order to interfere with MSG's existing and prospective business relations with Code Consultants.

207.    But for the Jets' wrongful and malicious conduct in conscious disregard of MSG's rights, MSG would have continued and further expanded its business relations with Code Consultants.

208.    MSG incurred considerable expense attempting to find a replacement for Code Consultants.

209.    On account of the Jets' willful and wanton acts in conscious disregard of MSG's rights, Cablevision is also entitled to punitive damages in an amount to be determined at trial.

## IV.    The Jets Tortiously Interfere with Cablevision's Existing and Prospective Relations with its Subscribers

210.    In or around January 2005, "in response to Cablevision's fierce opposition" to the Jets' stadium proposal, the Jets funded a telemarketing campaign targeted at Cablevision's cable subscribers in and around New York City.  Michael Saul, *Team Takes Direct Swipe at Cablevision*, N.Y. Daily News, Jan. 16, 2005, at 3.

211.    As the New York Daily News reported on January 16, 2005, the phone campaign was "a Jets initiative."  According to a spokesman for satellite-TV provider DirecTV, the Jets approached DirecTV about cooperating in the campaign.

212.    The sole purpose of this campaign was to harm Cablevision by convincing Cablevision's subscribers, in conscious disregard of Cablevision's rights, "to drop Cablevision" by criticizing Cablevision's position on the stadium proposal.

213.    As part of this campaign, telemarketers retained by DirecTV and the Jets called Cablevision subscribers on Long Island and in other areas.

214.    The Jets and DirecTV not only knew that a valid contract and business relations as well as the prospect of future business relations existed between Cablevision and these customers, but they also willfully and wantonly targeted these customers specifically *because* they had a valid contractual relationship and business relations with Cablevision and were likely to continue those business relations with Cablevision in the future.

215.    Because of the existing business relations between Cablevision and the Cablevision subscribers whom the Jets' and DirecTV's telemarketers targeted, Cablevision had a reasonable expectation that it would have an opportunity to deliver future services to these customers.

216.    Upon information and belief, the telemarketers retained by DirecTV and the Jets began each telephone call by discussing the proposed Jets' stadium and then moved quickly into a sharp criticism of Cablevision's opposition to the stadium project.

217.    Upon information and belief, during these calls, the telemarketers retained by DirecTV and the Jets made false statements about the proposed Jets' stadium and about Cablevision's opposition to the stadium project.

218.    The telemarketers advised subscribers that they could avoid supporting Cablevision's opposition to the stadium project by dropping Cablevision as a cable provider and switching to DirecTV.

219.    Upon information and belief, the telemarketers then connected to a DirecTV call center any subscribers who had been enticed into dropping Cablevision service.

220.    The Jets' only purpose in initiating and carrying out this telemarketing campaign was to injure Cablevision.

221.    The Jets used dishonest, unfair and improper means in order to interfere with Cablevision's existing and prospective business relations with its cable subscribers.

222.    As a result of the Jets' and DirecTV's telemarketing campaign, certain Cablevision subscribers switched from Cablevision to DirecTV service.

223.    But for the Jets' and DirecTV's wrongful and malicious conduct, these Cablevision subscribers would not have switched from Cablevision to DirecTV service.

224.    As a result of the Jets' and DirecTV's telemarketing campaign, certain former Cablevision subscribers decided not to renew their subscriptions for Cablevision service.

225.    But for the Jets' and DirecTV's wrongful and malicious conduct, these Cablevision subscribers would have renewed their subscriptions.

226.    As a result of the Jets' and DirecTV's telephone campaign, Cablevision has suffered compensatory damages, in an amount to be proven at trial, in the form of, *inter alia*, lost customer revenues.

227.    On account of the Jets' willful and wanton acts in conscious disregard of Cablevision's rights, Cablevision is also entitled to punitive damages in an amount to be determined at trial.

**V.  The Jets Commence Baseless, Retaliatory Litigation in an Attempt
to Stifle Cablevision's Right to Public Petition and Participation and to Punish
<u>Cablevision for its Opposition to the Stadium</u>**

228.    In connection with their proposal to construct a stadium on the West Side, the Jets applied for and/or received numerous permits, zoning changes, leases, licenses, certificates, or other entitlements for use or permission to act from government bodies, including but not limited to the MTA, the ESDC, the PACB, the City, the City Council, the DCP, and the CPC.

229.    In addition, the Jets had interests, connections, and affiliations with persons who applied for and/or received numerous permits, zoning changes, leases, licenses, certificates, or other entitlements for use or permission to act from government bodies, including, but not limited to, the MTA, the ESDC, the PACB, the City, the City Council, the DCP, and the CPC.

230.    For example, the Jets and/or parties with whom the Jets had interests, connections, and affiliations in connection with the stadium proposal applied for and/or received the following governmental entitlements:

(a)    environmental review and approval for the No. 7 Subway Extension—Hudson Yards Rezoning and Development Program by the MTA, the City, the City Council, the DCP, and the CPC pursuant to the New York State Environmental Quality Review Act;

(b)    the commitments set forth in the March 25, 2004 MOU among the Jets, the MTA, and the ESDC concerning the stadium proposal;

(c)    the right to purchase from the MTA the Development Rights over the West Side Rail Yards in order to construct the Jets' proposed stadium;

(d)    the approval of an ESDC general project plan for the Jets' stadium proposal which called for the ESDC to exercise its statutory powers—including the power to override local zoning—in furtherance of the Jets' stadium proposal;

(e)     statutorily-required PACB approval of the ESDC's general project plan for the Jets' stadium proposal; and

(f)     commitments from the Bloomberg Administration to use City revenues (in the form of payments in lieu of taxes administered by certain City agencies) in order to finance a portion of the costs of Jets' stadium proposal.

231.    Cablevision undertook to report on, comment on, rule on, challenge, and/or oppose the application for and issuance of permits, zoning changes, leases, licenses, certificates, or other entitlements for use or permission to act from government bodies sought by the Jets and/or parties with whom the Jets had an interest, connection or affiliation in connection with the Jets' proposal to construct a stadium on the West Side of Manhattan, including, but not limited to, the following:

(a)     commencing litigation challenging the adequacy of the environmental review process for the Jets' stadium proposal and opposing the approval of that environmental review by, among others, the MTA, City, City Council, DCP, and CPC;

(b)     requesting that the MTA initiate an open bidding process for the Development Rights over the West Side Rail Yards through a letter dated February 4, 2005;

(c)     submitting a response to the MTA's request for proposals (the "RFP") seeking proposals for the disposition of the Development Rights over the West Side Rail Yards;

(d)     commencing litigation challenging the MTA's decision to award the Development Rights over the West Side Rail Yards to the Jets despite Defendants' superior bid submitted in response to the RFP;

(e)     communicating with relevant governmental bodies, including, but not limited to, the MTA, the ESDC, the City, and the PACB in order to express Defendants' views concerning the Jets' stadium proposal and the government entitlements sought in connection therewith; and

(f)     attempting to influence public opinion and government decision-making by expressing Defendants' views concerning the Jets' stadium proposal and the government entitlements sought in furtherance thereof to members of the public and the media through advertising and other means.

232.    The instant litigation commenced by the Jets is materially related to Defendants' efforts to report on, comment on, rule on, challenge, and/or oppose the application for and issuance of permits, zoning changes, leases, licenses, certificates, or other entitlements for use or permission to act from government bodies sought by the Jets and/or by parties with whom the Jets had an interest, connection, or affiliation in connection with the Jets' stadium proposal.

233.    For example, the Jets allege that Defendants' submission of proposals to the MTA to purchase the Development Rights and Defendants' litigation challenging the environmental review of the stadium proposal and the MTA's selection of the Jets' bid for the Development Rights were a "sham."

234.    Similarly, the Jets asserted a claim, now dismissed by the Court, that Defendants' expressions of their views concerning the stadium proposal in advertising and the media contained "false" and "misleading" statements.

235.    These allegations by the Jets bear directly on Defendants' efforts to report on, comment on, rule on, challenge, and/or oppose the application for and issuance of governmental entitlements in connection with the Jets' stadium proposal.

236.     The Jets commenced and continue to litigate the instant litigation solely in retaliation for Defendants' efforts to report on, comment on, rule on, challenge, and/or oppose on the Jets' stadium proposal.

237.     The Jets' claims have no substantial basis in fact or law and cannot be supported by any substantial argument for the extension, modification, or reversal of existing law.

238.     For example, although the Jets allege that Defendants brought "sham" litigation challenging certain necessary approvals of the Jets' proposal, there is no support in the record for these allegations.

239.     In the case concerning the environmental review of the Hudson Yards rezoning— one of Defendants' alleged "sham" litigations—Justice Cahn recently granted the motion by Cablevision and the other petitioners for voluntary discontinuance, because "the removal of the stadium plan from the redevelopment plan vitiates the primary issues underlying this entire litigation."  Opinion at 6.

240.     The EIS litigation was never dismissed on the merits.

241.     In fact, in his opinion, Justice Cahn expressly noted that, because "no substantive denial of any of the petitions in these proceedings has ensued, *no credible claim of sham can reasonably arise from the mere grant of discontinuance herein*."  Opinion at 7 (emphasis added).

242.     The court made no suggestion that any claim by Cablevision or any of the other petitioners was frivolous or objectively baseless.

243.     In the other alleged "sham" litigation—challenging the MTA's selection of the Jets' bid for the stadium site—the New York Court of Appeals granted Defendants' request for discretionary permission to appeal an adverse ruling below, which clearly demonstrates that the case was not a "sham."

244.    While the Court of Appeals has since granted the MTA's motion to dismiss that appeal as moot because the MTA formally abandoned its plan to sell this property after the Jets terminated their stadium project, that in no way alters the fact that multiple judges on that court necessarily considered the issues raised on Cablevision's appeal so worthy of review that they took the extraordinary step of granting leave to appeal.  Hence, that case too could not possibly be characterized as sham litigation.

245.    Even the lower courts in that matter acknowledged that Defendants had presented a close case; the trial court found that Defendants' arguments had been "skillfully and persuasively made," and the Appellate Division concluded that the MTA's justifications for its selection of the Jets' bid included "improper post hoc rationalization."

246.    In addition, in both of these matters, independent third parties other than Defendants asserted claims essentially identical to those the Jets now allege to be "sham" claims.

247.

248.    Moreover, none of the respondents in any of these alleged "sham" proceedings— including the EIS litigation (to which the Jets were not a party) and the MTA litigation—ever moved the court for sanctions against Cablevision or any other petitioners, nor did the court award respondents any costs.

249.    Similarly, there is no support for the Jets' allegation that Defendants' bid to purchase the Development Rights was a "sham."

250.    The MTA itself determined that Defendants' response to the RFP—one of only two responses that survived the MTA's initial review—was a fully qualified bid that warranted serious consideration.

251.    Indeed, Defendants' proposal was superior to that submitted by the Jets, offering the MTA some $200 million in greater cash value.

252.    Defendants' initial expression of interest submitted to the MTA on February 4, 2005 likewise was not a "sham."

253.    In fact, that submission—which urged the MTA to solicit or entertain other offers for the site beyond that of the Jets—was successful in persuading the MTA to conduct an RFP process for the sale of the site rather than to continue its sole-source negotiations with the Jets.

254.    Moreover, the Jets had no basis in fact to allege that Cablevision did not subjectively seek the results that it requested from the MTA.

255.    The Jets asserted these baseless allegations against Defendants solely for the purpose of harassing Defendants and stifling Defendants' attempts to participate in the public and political debate surrounding the Jets' proposal.

256.    Indeed, this action was filed on March 16, 2005—just three business days before the deadline for submission of responses to the MTA's RFP for the sale of the Development Rights—in an attempt to derail Defendants' bid and participation in the RFP process.  The Jets obviously—albeit incorrectly—believed that the assertion of these baseless claims against Defendants would cause Defendants to abandon their efforts to acquire the Development Rights and their efforts to participate in the public and political debate surrounding the stadium proposal.

## AS AND FOR A FIRST COUNTERCLAIM
### (New York Civil Rights Law section 70-a)

257.    Defendants repeat and reallege the allegations contained in paragraphs 1 through 256 as if set forth fully herein.

258.    Each of the Plaintiffs constitutes a "public applicant or permittee" as that term is defined in section 76-a(1)(b) of the New York Civil Rights Law.

259.    The instant litigation brought by the Jets constitutes an "action involving public petition and participation" as that term is defined in section 76-a(1)(a) of the New York Civil Rights Law.

260.    Plaintiffs' claims in the instant litigation lack any substantial basis in fact and in law and cannot not be supported by a substantial argument for the extension, modification, or reversal of existing law.

261.    Plaintiffs commenced and continued the instant litigation for the sole purpose of harassing, intimidating, punishing, or otherwise maliciously inhibiting the free exercise of Defendants' speech, petition, or association rights, specifically, Defendants' efforts to express their views concerning Plaintiffs' stadium proposal and the government entitlements sought in connection therewith.

262.    As a result of Plaintiffs' commencement and continuation of the instant litigation, Defendants have incurred pecuniary damages including, but not limited to, costs and attorney fees incurred in connection with the defense of this action.

263.    Because Plaintiffs commenced and continued the instant litigation without any substantial basis in fact or law for their claims, and for the sole purpose of harassing, intimidating, punishing, or otherwise maliciously inhibiting the free exercise of Defendants' speech, petition, or association rights, Defendants are entitled to recover costs, attorney fees, compensatory damages, and punitive damages from Plaintiffs, in an amount to be determined at trial, pursuant to section 70-a(1) of the New York Civil Rights Law.

**AS AND FOR A SECOND COUNTERCLAIM**
**(Tortious Interference With Existing Contracts and With Prospective**
**Business Relations:**
**Interference with Cablevision's Contracts and Prospective Business**
**Relations with Cable Subscribers)**

264.    Defendants repeat and reallege the allegations contained in paragraphs 1 through 263 as set forth herein.

265.    At the time of the Jets' and DirecTV's willful and wanton phone campaign targeting existing Cablevision customers, Cablevision had existing contracts to deliver cable services to the targeted customers.

266.    The Jets and DirecTV not only knew that a valid contract and business relations as well as the prospect of future business relations existed between Cablevision and these customers, but they also willfully and wantonly targeted these customers specifically *because* they had a valid contractual relationship and business relations with Cablevision and were likely to continue those business relations with Cablevision in the future.

267.    Because of the existing business relations between Cablevision and the Cablevision subscribers whom the Jets' and DirecTV's telemarketers targeted, Cablevision had a reasonable expectation that it would have an opportunity to deliver future services to these customers.

268.    The goal of the Jets' and DirecTV's telephone campaign was to wrongfully and maliciously induce customers to breach their contracts and cease their business relations with Cablevision in favor of subscribing to DirecTV in conscious disregard of Cablevision's rights.

269.    The Jets willfully and wantonly engaged in this campaign for the sole purpose of injuring Cablevision and used dishonest, unfair, and improper means to conduct the campaign.

270.    As a result of the Jets' and DirecTV's telemarketing campaign, certain Cablevision subscribers switched from Cablevision to DirecTV service.

271.    But for the Jets' and DirecTV's wrongful and malicious conduct, these Cablevision subscribers would not have switched from Cablevision to DirecTV service.

272.    As a result of the Jets' and DirecTV's telemarketing campaign, certain former Cablevision subscribers decided not to renew their subscriptions for Cablevision service.

273.    But for the Jets' and DirecTV's wrongful and malicious conduct, these Cablevision subscribers would have renewed their subscriptions.

274.    As a result of the Jets' and DirecTV's telephone campaign, Cablevision has suffered damages, in an amount to be proven at trial, in the form of, *inter alia*, lost customer revenues.

275.    On account of the Jets' willful and wanton acts in conscious disregard of Cablevision's rights, Cablevision is also entitled to punitive damages in an amount to be determined at trial.

### AS AND FOR A THIRD COUNTERCLAIM
**(Tortious Interference With Existing Contracts and With Prospective Business Relations:
Interference with MSG's Contracts and Prospective Business Relations with
<u>Design and Construction Professionals</u>)**

276.    Defendants repeat and reallege the allegations contained in paragraphs 1 through 275 as set forth herein.

277.    During the period in which the Jets willfully and wantonly threatened Flack + Kurtz, Turner, Code Consultants, and certain other design and construction professionals that desired to work on the Jets Stadium, MSG had existing contracts and business relations with these design and construction professionals.

278.    Because of the existing business relations between MSG and these design and construction professionals, and for the other reasons explained above, MSG had a reasonable

expectation that it would have an opportunity to work with these construction professionals on the renovation of the Garden.

279.    The Jets knew of MSG's existing contracts and business relations with these design and construction professionals, and the Jets knew of MSG's renovation plans and desire to retain these design and construction professionals in connection with its renovation project.

280.    The Jets intended to procure a breach of the existing contracts and business relations between MSG and these design and construction professionals.

281.    The Jets willfully and wantonly threatened these design and construction professionals for the sole purpose of harming MSG, and they used dishonest, unfair, and improper means to interfere with MSG's business relations and prospective business relations with these professionals.

282.    But for the Jets' wrongful and malicious conduct in conscious disregard of MSG's rights, MSG would have continued and further expanded its business relations with these professionals.

283.    As a direct result of the termination of these contracts and business relations, MSG was forced to hire replacement design and construction professionals, to expend considerable additional resources to familiarize these replacement professionals with the design, structure, facilities, and inner workings of the Garden, and to incur additional construction costs in connection with the Garden renovation project.

284.    As a result of the Jets' wrongful and malicious conduct, MSG has suffered damages in an amount to be determined at trial.

285.    On account of the Jets' willful and wanton acts in conscious disregard of MSG's rights, Cablevision is also entitled to punitive damages in an amount to be determined at trial.

WHEREFORE, Defendants respectfully demand a judgment:

a) dismissing the Complaint with prejudice as against the Defendants;

b) on the First Counterclaim, for costs, attorneys' fees, and other compensatory damages according to proof, and for punitive damages in an amount to be determined at trial;

c) on the Second Counterclaim, for compensatory damages according to proof, punitive damages in an amount to be determined at trial, and for an order permanently enjoining and restraining the Plaintiffs from further interference with Defendants' contracts and existing or future business relations;

d) on the Third Counterclaim, for compensatory damages according to proof, punitive damages in an amount to be determined at trial, and for an order permanently enjoining and restraining the Plaintiffs from further interference with Defendants' contracts and existing or future business relations;

e) for the costs of defending this action and bringing these Counterclaims, including without limitation expenses and reasonable attorneys' fees; and

f) for such other and further relief as this Court deems just and proper.

Dated:        New York, New York
              December 2, 2005

                                   GIBSON, DUNN & CRUTCHER LLP


                              By:_____s/ Randy M. Mastro_____
Miguel A. Estrada (ME-4227)          Randy M. Mastro (RM-9492)
Michael L. Denger                    Jennifer H. Rearden (JR-2552)
Joshua Lipton
GIBSON, DUNN & CRUTCHER LLP          200 Park Avenue
1050 Connecticut Avenue, NW          New York, NY  10166-0193
Washington, DC  20036-5306           Tel:  (212) 351-4000
Tel:  (202) 955-8500                 Fax:  (212) 351-4035
Fax:  (202467-0539

                                     *Counsel for Defendants Cablevision Systems*
                                     *Corporation, CSC Holdings, Inc., and Madison*
                                     *Square Garden, L.P.*

80347413_3.DOC