UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

NEW YORK JETS LLC and                          :
JETS DEVELOPMENT LLC,                           :
                                                :
                 Plaintiffs-Counterclaim        :
                 Defendants,                    :
                                                :
         v.                                     :     Case No. 05-CV-2875 (HB)
                                                :
CABLEVISION SYSTEMS CORPORATION,                :
CSC HOLDINGS, INC., and MADISON                 :
SQUARE GARDEN L.P.,                             :
                                                :
                 Defendants-Counterclaim        :
                 Plaintiffs.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO DISMISS DEFENDANTS' AMENDED COUNTERCLAIMS

Miguel A. Estrada (ME-4227)          Randy M. Mastro (RM-9492)
Michael L. Denger                    Jack M. Weiss
Joshua Lipton                        Jennifer H. Rearden (JR-2552)
GIBSON, DUNN & CRUTCHER LLP          GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW          200 Park Avenue
Washington, DC  20036-5306           New York, NY  10166-0193
Tel:  (202) 955-8500                 Tel:  (212) 351-4000
Fax:  (202) 467-0539                 Fax:  (212) 351-4035

                                     Counsel for Defendants-Counterclaim Plaintiffs
                                     Cablevision Systems Corporation, CSC Holdings,
                                     Inc., and Madison Square Garden, L.P.

Dockets.Justia.com

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................ 1

RELEVANT BACKGROUND ......................................................................................... 3

ARGUMENT ................................................................................................................... 5

I.   CABLEVISION HAS STATED A VIABLE ANTI-SLAPP CLAIM ............................ 6

II.  CABLEVISION HAS STATED VIABLE  TORTIOUS INTERFERENCE
     CLAIMS ................................................................................................................. 11

     A.   Cablevision Has Sufficiently Alleged Tortious Interference with Its
          Contractual and Prospective Business Relations with Its Cable
          Subscribers ................................................................................................. 12

          1.   Cablevision Has Sufficiently Identified the Contracts with
               Which the Jets Tortiously Interfered ................................................. 12

          2.   Cablevision Has Sufficiently Alleged that the Jets Acted Solely
               to Harm Cablevision .......................................................................... 14

     B.   Cablevision Has Sufficiently Alleged Tortious Interference with Its
          Contractual and Prospective Business Relations with Design,
          Engineering, and Construction Professionals ............................................. 16

          1.   The Jets Acted Solely to Injure Cablevision ..................................... 16

          2.   The Jets Employed the Wrongful Means of Economic Pressure ......... 18

CONCLUSION ............................................................................................................. 21

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Auto. Elec. Serv. Corp. v. Ass'n of Auto. Aftermarket Distribs.*,
  747 F. Supp. 1483 (E.D.N.Y. 1990) .................................................................................... 13

*BIB Constr. Co. v. City of Poughkeepsie*,
  204 A.D.2d 947, 612 N.Y.S.2d 283 (3d Dep't 1994) ......................................................... 12

*Carvel Corp. v. Noonan*,
  3 N.Y.3d 182, 785 N.Y.S.2d 359 (2000) ...................................................................... 14, 15

*Chevron U.S.A., Inc. v. Roxen Serv., Inc.*,
  813 F.2d 26 (2d Cir. 1987) ................................................................................................. 13

*Concern, Inc. v. Pataki*,
  Index No. 2004-5014, 2005 WL 1310478 (Sup. Ct. Erie County May 25, 2005) ................ 11

*Drug Emporium, Inc. v. Blue Cross of W. N.Y., Inc.*,
  104 F. Supp. 2d 184 (W.D.N.Y. 2000) ................................................................... 18, 19, 20

*Friends of Rockland Shelter Animals, Inc. v. Mullen*,
  313 F. Supp. 2d 339 (S.D.N.Y. 2004) ................................................................................. 10

*Henneberry v. Sumitomo Corp. of Am.*,
  No. 04 Civ. 2128, 2005 U.S. Dist. LEXIS 7475 (S.D.N.Y. Apr. 27, 2005) ........................... 13

*Highland Capital Mgmt., L.P. v. Schneider*,
  No. 02 Civ. 9098, 2005 U.S. Dist. LEXIS 14912 (S.D.N.Y. July 26, 2005) .......................... 13

*Krimstock v. Kelly*,
  306 F.3d 40 (2d Cir. 2000) ................................................................................................... 5

*Miteva v. Third Point Mgmt. Co.*,
  323 F. Supp. 2d 573 (S.D.N.Y. 2004) ................................................................. 3, 16, 17, 18

*Moscato v. TIE Techs., Inc.*,
  04 Civ. 2487, 2005 U.S. Dist. LEXIS 867 (S.D.N.Y. Jan. 21, 2005) .................................... 13

*Paulemon v. Tobin*,
  30 F.3d 307 (2d Cir. 1994) ................................................................................................. 15

*PGC Prop., LLC v. Wainscott/Sagaponack Prop. Owners, Inc.*,
  250 F. Supp. 2d 136 (E.D.N.Y. 2003) ................................................................................... 9

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Scutti Enters., LLC v. Park Place Entm't Corp.*,
  322 F.3d 211 (2d Cir. 2003) ................................................................................... 5, 12, 18, 20

*Sedona Corp. v. Ladenburg Thalmann & Co.*,
  No. 03 Civ. 3120, 2005 U.S. Dist. LEXIS 16382 (S.D.N.Y. Aug. 9, 2005) ............................ 12

*T.S. Haulers, Inc. v. Kaplan*,
  Index No. 7313/01, slip op. (Sup. Ct. Suffolk County Sept. 5, 2001),
  *aff'd in part*, 295 A.D.2d 595, 744 N.Y.S.2d 193 (2d Dep't 2002) .......................................... 10

*Tasso v. Platinum Guild Int'l*,
  No. 94 Civ. 8288, 1997 U.S. Dist. LEXIS 252 (S.D.N.Y. Jan. 16,1997) ........................... 19, 20

*W. Branch Conservation Ass'n v. Planning Bd.*,
  222 A.D.2d 513, 636 N.Y.S.2d 61 (2d Dep't 1995) ........................................................ 10, 11

### Statutes

1992 N.Y. Laws ch. 767, § 1 ...................................................................................................... 11

N.Y. Civ. Rights Law § 70-a ................................................................................................ 6, 7, 11

N.Y. Civ. Rights Law § 76-a .................................................................................................... 6, 7

### Rules

Fed. R. Civ. P. 12(b)(6) ............................................................................................................ 5, 7

Fed. R. Civ. P. 8(a)(2) ................................................................................................................ 12

## PRELIMINARY STATEMENT

Defendants-Counterclaim Plaintiffs Cablevision Systems Corporation, CSC Holdings, Inc., and Madison Square Garden, L.P. (collectively, "Defendants" or "Cablevision") submit this memorandum of law in opposition to the motion of New York Jets LLC and Jets Development LLC (collectively, the "Jets") to dismiss Cablevision's amended counterclaims.

The Jets brought this case in March 2005 in an effort to chill Cablevision's opposition to their proposed stadium project. That project—and, in particular, the Jets' efforts to secure a sweetheart deal for the valuable West Side Rail Yards—was the subject of heated public debate for well over a year. In the end, a few months after having filed this action, the Jets failed to obtain the requisite government approvals for the proposed stadium. In continuing violation of New York's Civil Rights Law, which protects Cablevision in exercising its rights to petition the government and to speak out against a misguided use of scarce public resources and valuable public property, the Jets are still pressing this vexatious litigation as sore losers seeking to blame Cablevision alone for the defeat of their project, which most New Yorkers opposed and which New York's top lawmakers ultimately rejected.

For these reasons, Cablevision has asserted an "anti-SLAPP" counterclaim against the Jets, as authorized under New York's Civil Rights Law. The Jets now seek to dismiss Cablevision's anti-SLAPP counterclaim based entirely on an unsupportable reading of this Court's October 17, 2005 Order (the "Order"), which granted in part and denied in part Cablevision's motion to dismiss the Jets' claims. In essence, the Jets put the cart before the horse, arguing that this Court could not possibly find their claims to be baseless for anti-SLAPP purposes because the Court has denied Cablevision's dispositive motion. That argument fails because the Jets' SLAPP suit is premised on numerous assertions of fact that the Jets have not yet substantiated—and, indeed, cannot substantiate—and that the Court will scrutinize only after

discovery when Cablevision moves for summary judgment. In fact, even with respect to the narrow issue of *Noerr-Pennington* immunity, as to which the Jets submitted limited evidentiary material, the Court deferred to the Jets' factual allegations in denying Cablevision's motion, stating that a more complete record was necessary in order to assess those allegations. Specifically, the Court found that the "limited discovery produced thus far" was insufficient to permit the Court to rule on the Jets' claims. Order at 15. Thus, additional evidence must also be developed before deciding whether, as Cablevision has alleged, the Jets' claims lack a substantial basis and were filed solely "to punish Cablevision for its public opposition to the stadium." Answer & Am. Countercls. ¶ 95. Indeed, anti-SLAPP relief does not turn on whether a case is dismissed at the outset. If, as Cablevision alleges, the factual record in this case shows that the Jets lacked a substantial basis for their claims, then Cablevision is entitled to anti-SLAPP relief.

Cablevision also has asserted two separate counterclaims for tortious interference with contractual and prospective business relations arising from the Jets' further efforts to punish and deter Cablevision's anti-stadium petitioning. The Jets intentionally interfered with Cablevision's cable business by urging Cablevision subscribers to switch to DirecTV—an effort undertaken for no conceivable independent economic benefit to the Jets but, rather, out of pure malice toward Cablevision. *Id.* ¶ 96. The Jets also intentionally interfered with MSG's business relations with design, engineering, and construction professionals by threatening that the Jets would refuse to use them for work on the proposed Jets stadium if they continued working for MSG or participated in MSG's renovation project, which was also an act of pure malice. *Id.* ¶ 97. In these counterclaims, Cablevision alleges that the Jets acted solely to injure Cablevision and used wrongful means—either of which is sufficient to make out a claim of tortious interference with prospective business relations.

In response, the Jets do not deny their tortious conduct; they merely offer ludicrous alternative justifications for it. And even if the Jets' purported alternative explanations for their conduct were facially plausible—which they are not—their argument in this regard does nothing more than identify a material issue of fact that must be resolved at trial. Indeed, the Jets' purported justifications only highlight the well-settled principle that "whether the defendant acted with the 'sole purpose' of harming the plaintiff is a question of material fact" that cannot be decided on a motion to dismiss. *Miteva v. Third Point Mgmt. Co.*, 323 F. Supp. 2d 573, 587 (S.D.N.Y. 2004). Moreover, Cablevision has alleged tortious interference with contract as well, as to which the Jets' purported motivations for harming Cablevision are not at all relevant. Here, Cablevision alleges, for example, that it had contracts with its cable subscribers, that the Jets knew of those contracts, and that the Jets tortiously interfered with those contracts by inducing those subscribers to switch to DirecTV. That alone is sufficient to state a viable claim for tortious interference with contract.

For these reasons and the others explained herein, the Jets' motion to dismiss Cablevision's counterclaims must fail in its entirety.

## RELEVANT BACKGROUND

The Jets commenced this lawsuit in March 2005 in a flagrant effort to harass and punish Cablevision for its opposition to the Jets' West Side stadium project and to chill any further opposition from Cablevision.[1] *See, e.g.*, Answer & Am. Countercls. ¶¶ 82, 86, 236, 255. The Jets' Complaint alleged that Cablevision's efforts to oppose the stadium project—including its

---

[1] Indeed, this case was filed just three business days before the deadline for submission of responses to the MTA's request for proposals for the sale of the West Side Rail Yards. Answer & Am. Countercls. ¶ 256.

alleged anti-stadium litigation, its efforts to purchase the stadium site for its own purposes, its public-relations campaign opposing the stadium project and the public subsidies proposed for that project, and its refusals to air the Jets' pro-stadium advertisements—violated federal antitrust law, constituted tortious interference with the Jets' prospective business relations, and violated state trade-practices law. *See* Compl. ¶¶ 6, 61-79. The Jets' claims, however, "have no substantial basis in fact or law and cannot be supported by any substantial argument for the extension, modification, or reversal of existing law." Answer & Am. Countercls. ¶ 237; *see id.* ¶¶ 238-54. Indeed, the Jets' *sole* purpose for commencing this baseless litigation was to punish Cablevision for its government petitioning in opposition to the stadium and to stifle any further petitioning that Cablevision might attempt to undertake. *Id.* ¶¶ 236, 255.

The Jets' baseless suit against Cablevision is not the only example of their efforts to punish and harass Cablevision in retaliation for its opposition to the stadium. Even before commencing this litigation, the Jets went to great lengths to punish Cablevision by tortiously interfering with Cablevision's contractual and prospective business relations. For example, in approximately January 2005, the Jets (in cooperation with satellite-TV provider DirecTV) funded a telemarketing campaign targeting Cablevision's cable subscribers in and around New York City. *Id.* ¶ 210. The telemarketers began each call with a brief discussion of the proposed stadium and then "moved quickly into a sharp criticism of Cablevision's opposition to the stadium project." *Id.* ¶ 216. The Jets used wrongful means to induce Cablevision's customers to terminate Cablevision service; the telemarketers retained by the Jets and DirecTV made "false statements" about Cablevision's position. *Id.* ¶ 217. Moreover, the "sole purpose" of this campaign "was to harm Cablevision by convincing Cablevision's subscribers, in conscious disregard of Cablevision's rights, 'to drop Cablevision' by criticizing Cablevision's

position on the stadium proposal." *Id.* ¶ 212; *see id.* ¶ 220. The Jets had no rational business motive for engaging in this conduct; instead, they interfered with Cablevision's cable business solely out of malice toward Cablevision. *Id.* ¶ 96.

Similarly, the Jets interfered with MSG's relations with certain design, engineering, and construction professionals—including Flack + Kurtz Inc. ("Flack + Kurtz"), Turner Construction Co. ("Turner"), and Code Consultants, Inc. ("Code Consultants")—by refusing to do business with those professionals unless they agreed to terminate their relations with MSG. *Id.* ¶¶ 163-64, 188-89, 202. As with the DirecTV campaign, the Jets had no rational business motive for engaging in this conduct, and acted solely out of malice toward Cablevision. *Id.* ¶ 97. Indeed, the Jets' sole purpose in interfering with these relations was to injure Cablevision, *see id.* ¶¶ 168, 191, 205, and the Jets' used wrongful means—namely, improper threats of refusal to do business with these professionals—in order to accomplish this interference, *see id.* ¶¶ 164, 169, 189, 192, 202, 206. As a result of the Jets' and DirecTV's phone campaign, and of the Jets' tortious interference with MSG's relations with its design, engineering, and construction professionals, Cablevision has suffered damages. *See, e.g., id.* ¶¶ 171-73, 193-96, 224-26.

## ARGUMENT

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor." *Krimstock v. Kelly*, 306 F.3d 40, 47-48 (2d Cir. 2002) (internal quotation omitted). The court "may not dismiss a complaint unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 214 (2d Cir. 2003) (internal quotation omitted). Under this well-settled standard, the Jets' motion to dismiss must be denied.

## I.

## CABLEVISION HAS STATED A VIABLE ANTI-SLAPP CLAIM

As Governor Cuomo stated upon signing New York's anti-SLAPP legislation, "[t]he aim of SLAPP suits is simple and brutal: the individual is to regret ever having entered the public arena to tell government what she thinks about something directly affecting her."[2]  Cablevision's counterclaim against the Jets—a "public applicant or permittee" seeking government approvals for its stadium project—falls squarely within the anti-SLAPP statute. N.Y. Civ. Rights Law §§ 70-a(1), 76-a(1).  Cablevision alleges that it is a "defendant in an action involving public petition and participation"—namely, this action—that is "materially related" to Cablevision's efforts to "comment on" or "challenge or oppose" the stadium. *See id.*; Answer & Am. Countercls. ¶¶ 216-23.  In addition, Cablevision alleges that the Jets' lawsuit was brought without a substantial basis in fact and law and that the Jets brought the lawsuit for the sole purpose of harassing, intimidating, and punishing Cablevision's exercise of its speech and petitioning rights and "to discourage Cablevision from taking any further steps to speak out against the project or to petition for governmental action rejecting the stadium proposal." *See, e.g.*, Answer & Am. Countercls. ¶¶ 95, 228-38.  These allegations clearly state a claim for relief under New York's anti-SLAPP statute. *See* N.Y. Civ. Rights Law §§ 70-a(1), 76-a.

---

[2] Declaration of Randy M. Mastro in Support of Defendants' Opposition to Plaintiffs' Motion to Dismiss Defendants' Amended Counterclaims ("Mastro Decl.") Ex. 1 (Gary Spencer, *Cuomo Signs Bill To Deter SLAPP Lawsuits*, N.Y. L.J., Aug. 6, 1992, at 1). "SLAPP" stands for "Strategic Lawsuit Against Public Participation." *See id.* The paradigmatic SLAPP lawsuit is a claim filed by a project developer against a project opponent based on petitioning conduct by the defendant in connection with its opposition to a project. *See id.* New York has passed an anti-SLAPP statute that provides an independent cause of action to the target of a SLAPP suit in an effort to protect project opponents (such as Cablevision) from having their public participation stifled by the burdens of defending SLAPP lawsuits brought by project developers (such as the Jets).

Indeed, this Court has already determined that at least one of the Jets' claims lacked *any basis in law.* In its Order, the Court held that the Jets failed to state a claim with respect to Cablevision's allegedly misleading political advertisements because the conduct upon which the Jets' claim was premised "fall[s] *squarely* within the confines of *Noerr-Pennington*" immunity. Order at 11 (emphasis added). Neither in their opposition to Cablevision's motion to dismiss nor in their own motion to dismiss Cablevision's counterclaims have the Jets offered any argument supporting a modification or reversal of the *Noerr-Pennington* doctrine that would provide a substantial basis for their claim regarding Cablevision's alleged public misstatements. On this ground alone, Cablevision has stated a claim for anti-SLAPP relief. *See* N.Y. Civ. Rights Law §§ 70-a(1), 76-a(1). The Jets have offered no argument to the contrary.

While the Jets attempt to overlook the Court's dismissal of their claim relating to Cablevision's advertisements, they contend that the remainder of that Order requires dismissal of Cablevision's anti-SLAPP counterclaim. The Jets are wrong. To begin with, this Court's denial of Cablevision's motion to dismiss did not in any way resolve the question of whether a "substantial basis" for the Jets' claims exists as to all issues of fact and law. In evaluating the Jets' claims, the Court applied the standard applicable to Rule 12(b)(6) motions except as to a single narrow issue—the issue of *Noerr-Pennington* immunity—and therefore accepted all of the Jets' factual allegations as true. *See* Order at 5-6. For example, the Court refused to disturb the Jets' allegations concerning the relevant market,[3] *id.* at 8, or their allegations of antitrust injury,

---

[3] The Jets suggest that Cablevision could not in good faith have alleged its anti-SLAPP claim with respect to the Jets' refusal-to-deal allegations for two reasons. First, the Jets assert that the Court rejected Cablevision's argument that it had no duty to deal with the Jets. Second, the Jets cite Cablevision's alleged "concession" that its refusal to air the Jets' ads was based on its opposition to the stadium. *See* Plaintiffs' Memorandum of Law in Support of Motion

[Footnote continued on next page]

*id.* at 16. Thus, the Court has not yet subjected the vast majority of the Jets' allegations to any evidentiary scrutiny and, indeed, the Jets have never substantiated any of these allegations in any manner whatsoever.

Moreover, even on the limited issue of *Noerr-Pennington* immunity—to which the Court applied a summary judgment standard of review—the Court concluded that it could not resolve the relevant factual issues until a more complete factual record was developed after full discovery. For example, the Court declined to look beyond the Jets' allegation concerning the objective merits of Cablevision's anti-stadium litigation, finding that, "*[f]or now,* plaintiffs have adequately *alleged* that Cablevision's efforts to block the Jets in state court constituted a sham. Further, on the record developed thus far *I am unable to evaluate the merit, if any, of the state court actions . . . .*" *Id.* at 14 (emphasis added). Similarly, the Court found that it could not evaluate the truth of the Jets' allegations concerning Cablevision's alleged "sham" bid based on the "limited discovery produced thus far," and noted that "[a]dditional discovery may further illuminate the circumstances surrounding Cablevision's competing proposal." *Id.* at 15. Thus,

---

[Footnote continued from previous page]

to Dismiss Defendants' Amended Counterclaims ("Jets' Mem.") at 4-5. On these grounds alone, the Jets argue that the "legal and factual bases" for their refusal-to-deal claim have been firmly established. *Id.* at 5. Yet the Jets conveniently omit from their rendition of the "bases" of this cause of action any support for their assertions concerning the relevant market or the alleged antitrust injury underlying their refusal-to-deal claim, both of which are required elements of that claim, and neither of which is supported by any facts but only by the bare allegations of the Complaint. Thus, even if the Jets had a substantial basis for asserting that Cablevision breached a duty to deal, they would still be subject to anti-SLAPP liability unless they could show a substantial basis for alleging that Cablevision was a monopolist in the relevant market and that its conduct caused antitrust injury. Likewise, as this Court recognized, the Jets must demonstrate that any refusal to deal "actually inhibited the Jets in disseminating their message," which is "an issue of fact upon which further discovery is needed." Order at 13 n.3. The Jets have not substantiated—and, indeed, cannot substantiate—these allegations.

although the Court allowed the Jets' vexatious litigation against Cablevision to proceed, it still remains to be determined whether the Jets can offer any substantive support for their allegations—much less the required "substantial basis." Accordingly, the Order in no way undermines Cablevision's extensive factual allegations regarding the baselessness of the Jets' SLAPP lawsuit, *see, e.g.*, Answer & Am. Countercls. ¶¶ 228-38—nor does it support dismissal of Cablevision's counterclaim.

The recent decision in *PGC Property, LLC v. Wainscott/Sagaponack Property Owners, Inc.*, 250 F. Supp. 2d 136, 144-45 (E.D.N.Y. 2003), demonstrates that Cablevision is entitled to proceed with its anti-SLAPP claim. In that case, the court properly recognized that its denial of the defendants' motion for *summary judgment* on the SLAPP suit did not compel dismissal of the defendants' anti-SLAPP counterclaim. In denying the plaintiffs' motion to dismiss the anti-SLAPP counterclaim, the court noted that "[t]he factual record is limited[,] . . . no discovery has been conducted[, and] . . . there exist issues of material fact with respect to the plaintiffs' claims . . . ."[4] *Id.*

This Court should reach the same conclusion. Indeed, the circumstances are even more compelling here. Unlike in *PGC Property*, in which the court denied the defendants' entire summary judgment motion before denying the plaintiffs' motion to dismiss the defendants' anti-

---

[4] Indeed, the plaintiffs in *PGC Property* unsuccessfully attempted to advance the very same argument put forth by the Jets here. The plaintiffs in that case argued that the defendants' anti-SLAPP counterclaim should be dismissed because plaintiffs had demonstrated that defendants were not entitled to summary judgment dismissing the plaintiffs' claims and, therefore, that the plaintiffs had a substantial basis for asserting those claims. Mastro Decl. Ex. 2 at 10 (Plaintiff's Memorandum of Law in Support of Cross-Motion for Judgment on the Pleadings, *PGC Prop., LLC v. Wainscott/Sagaponack Prop. Owners, Inc.*, 250 F. Supp. 2d 136 (E.D.N.Y. 2003) (No. CV 02 2275)). The court rejected that argument, however, by refusing to dismiss the defendants' anti-SLAPP counterclaim even though it agreed with the plaintiffs that the defendants were not entitled to summary judgment on the plaintiffs' claims.

SLAPP claim, this Court *granted* part of Cablevision's motion to dismiss, holding that the Jets

failed to state a claim for alleged public misrepresentations. In addition, the Court has not yet

looked beyond the Jets' allegations concerning market definition, injury, or damages, and it

expressly declined to rule on the factual bases for the Jets' sham-petitioning allegations based

only on the limited factual record developed thus far. Thus, there is no reason why this Court's

Order should compel dismissal of Cablevision's anti-SLAPP counterclaim.[5]

  For these reasons, Cablevision has stated a viable anti-SLAPP counterclaim and is

entitled to pursue that claim.[6]

---

[5] The court's decision in *T.S. Haulers, Inc. v. Kaplan*, Index No. 7313/01, slip op. at 4 (Sup.
Ct. Suffolk County Sept. 5, 2001) (copy attached as Mastro Decl. Ex. 3), *aff'd in part*, 295
A.D.2d 595, 744 N.Y.S.2d 193 (2d Dep't 2002), further demonstrates that dismissal of
Cablevision's anti-SLAPP claim at this early stage would be premature. In that case, the
defendant prevailed on its anti-SLAPP claim at the summary-judgment stage by
demonstrating that, "[a]pplying the [relevant legal] standard to the evidence submitted, it
[was] clear that plaintiff failed to carry its burden" on the underlying claim. *Id.*, slip op. at 4.
Here, the Jets' underlying claims have never been subjected to any evidentiary scrutiny,
which necessitates denial of their motion. Moreover, the Jets' reliance on *Friends of
Rockland Shelter Animals, Inc. v. Mullen*, 313 F. Supp. 2d 339 (S.D.N.Y. 2004) ("*FORSA*"),
is misplaced. In *FORSA*, the court's ruling rested in part on facts presented by the plaintiff
"that tended to" substantiate its claim. *Id.* at 344-45. Here, despite their conclusory
arguments to the contrary, the Jets have made no such factual showing and, more
importantly, the Court essentially deferred resolution of even the one issue—*Noerr-
Pennington* immunity—upon which it entertained evidentiary submissions. *See* Order at 14-
15. Thus, it remains to be seen whether the Jets had any "substantial basis" for their
allegations. For these reasons, *FORSA* does not support dismissal of Cablevision's anti-
SLAPP claim.

[6] Just as they fail to justify their assertion that Cablevision's anti-SLAPP claim should be
dismissed as a matter of law, the Jets likewise fail to articulate any valid rationale supporting
their call for a discretionary dismissal of that claim—particularly given the fact that they
have been allowed to proceed with their own claims based on unsubstantiated allegations and
distortions of fact. As discussed above, the Jets' reliance on *FORSA* is misplaced. *See supra*
note 5. *FORSA* provides no more support for a discretionary dismissal than it does for
dismissal as a matter of law. The decision in *West Branch Conservation Ass'n v. Planning
Board*, 222 A.D.2d 513, 636 N.Y.S.2d 61 (2d Dep't 1995), *cited in* Jets' Mem. at 6 & n.3,

[Footnote continued on next page]

## II.

## CABLEVISION HAS STATED VIABLE
## TORTIOUS INTERFERENCE CLAIMS

In addition to its anti-SLAPP claim, Cablevision alleges two tortious interference claims, one in connection with its cable business, and the other with respect to its relationships with certain design, engineering, and construction professionals. The Jets do not deny their interference, but merely offer a single, meritless legal argument and a handful of dubious excuses for their conduct, which are inherently fact-based and therefore could not be resolved on a

---

[Footnote continued from previous page]

likewise does not support discretionary dismissal here because, unlike in this case, the alleged SLAPP victim seeking anti-SLAPP damages in that action was the party who had commenced the underlying litigation. *See id.* at 514-15, 636 N.Y.S.2d at 62-63; *Concern, Inc. v. Pataki*, Index No. 2004-5014, 2005 WL 1310478, at *29 (Sup. Ct. Erie County May 25, 2005) (declining to award anti-SLAPP damages in a case where "the alleged SLAPP suit is a counterclaim; in other words, [the party asserting the improper SLAPP claim] was not the initiator of the lawsuit"). The *West Branch* petitioners named the developer of a project they opposed as a respondent in a proceeding challenging that project, and the developer asserted a counterclaim against them. *See W. Branch*, 222 A.D.2d at 514-15, 636 N.Y.S.2d at 62-63. The petitioners moved to dismiss the counterclaim and for an award of costs, asserting that the counterclaim was an improper SLAPP suit. *See id.* at 514-15, 636 N.Y.S.2d at 62-63. Here, in contrast, Cablevision did not initiate this lawsuit.

Moreover, the Jets' suggestion that the New York anti-SLAPP statute was not intended to protect parties such as Cablevision—a corporate citizen seeking to exercise its right to public petition and participation by expressing its views on a matter of great public concern—is controverted by both the statutory text and the legislative history. *See* N.Y. Civ. Rights Law § 70-a(1) (establishing a cause of action for any "*defendant* in an action involving public petition and participation" (emphasis added)); 1992 N.Y. Laws ch. 767, § 1 (copy attached as Mastro Decl. Ex. 4) ("The laws of the state must provide the utmost protection for the free exercise of speech, petition and association rights, particularly where such rights are exercised in a public forum with respect to issues of public concern. . . . [T]he threat of personal damages and litigation costs can be and has been used as a means of harassing, intimidating or punishing individuals, unincorporated associations, not-for-profit corporations *and others who have involved themselves in public affairs*." (emphasis added)). The Jets' lawsuit, which asserts claims in excess of $100 million and has imposed costly and burdensome discovery obligations upon Cablevision, surely presents a threat of sufficient magnitude to harass and intimidate even corporate entities such as Cablevision.

motion to dismiss even if they were remotely credible. Cablevision has clearly satisfied the notice pleading standards of Rule 8. *See, e.g., Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003) ("Complaints alleging torts are held to the less stringent notice requirements of [Federal] Rule [of Civil Procedure] 8(a)(2), 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"). Accordingly, the Jets' motion to dismiss these claims must be denied.

A.    **Cablevision Has Sufficiently Alleged Tortious Interference with Its Contractual and Prospective Business Relations with Its Cable Subscribers**

   1.    **Cablevision Has Sufficiently Identified the Contracts with Which the Jets Tortiously Interfered**

   The Jets contend that Cablevision cannot state a claim for tortious interference with its contracts with cable subscribers because it did not specifically identify the particular subscribers who dropped Cablevision service as a result of the Jets/DirecTV phone campaign. Their argument lacks merit. Even on summary judgment, "when the facts essential to justify opposition to . . . [the] motion . . . might exist but cannot be stated because they are in the moving party's exclusive knowledge or control, summary judgment must be denied and the opposing party afforded an opportunity to engage in discovery." *BIB Constr. Co. v. City of Poughkeepsie*, 204 A.D.2d 947, 948, 612 N.Y.S.2d 283, 285 (3d Dep't 1994).[7] Here, the Jets

---

   [7] In addition, the Jets mischaracterize *Sedona Corp. v. Ladenburg Thalmann & Co.*, No. 03 Civ. 3120, 2005 U.S. Dist. LEXIS 16382, at *61-*62 (S.D.N.Y. Aug. 9, 2005), the principal case upon which they rely for the proposition that a tortious interference claim is insufficient as a matter of law if the pleadings fail to identify every contract at issue and each contract's specific terms. In fact, the court in *Sedona* dismissed the plaintiff's claim because the plaintiff failed to "address the most basic elements of the tortious interference with contract cause of action." *Id.* Specifically, the plaintiff failed to allege any breach of the contracts at issue, knowledge of those contracts on the part of the defendants, or intentional and improper procurement of the breach of any contract. *Id.* Simply put, the plaintiff failed to allege any facts in support of any of those elements. As a result, the court declined to decide whether

[Footnote continued on next page]

and their collaborator, DirecTV, selected and called some of the many thousands of Cablevision

customers in the tri-State area. Without discovery, Cablevision has no way of ascertaining the

identities of the specific subscribers whom the Jets and DirecTV contacted and co-opted. As a

matter of fundamental fairness, Cablevision should be afforded an opportunity to discover these

"essential" facts that are exclusively within the plaintiffs' (or DirecTV's) knowledge or control.

Accordingly, this Court should reject the Jets' motion to dismiss this counterclaim.[8]

---

[Footnote continued from previous page]

    the plaintiff had adequately alleged the existence of contracts. The other cases upon which
the Jets rely for this proposition are similarly inapplicable to this case. *See Highland Capital
Mgmt., L.P. v. Schneider*, No. 02 Civ. 9098, 2005 U.S. Dist. LEXIS 14912, at *75-*76
(S.D.N.Y. July 26, 2005) (dismissing claim for tortious interference with prospective
economic advantage on summary judgment because "defendants' alleged tortious action
directed toward the third party . . . did not convince [the third party] to avoid business
relationships with plaintiff"); *Henneberry v. Sumitomo Corp. of Am.*, No. 04 Civ. 2128, 2005
U.S. Dist. LEXIS 7475, at *75 (S.D.N.Y. Apr. 27, 2005) (dismissing claim for tortious
interference with prospective economic advantage because plaintiff "fail[ed] to sufficiently
allege a causal link between the tort and his injury giving rise to damages"); *Moscato v. TIE
Techs., Inc.*, 04 Civ. 2487, 2005 U.S. Dist. LEXIS 867, at *16 (S.D.N.Y. Jan. 21, 2005)
("[Plaintiff's] complaint fails to allege facts in support of the existence of *any* element of his
claim." (emphasis added)).

[8]  The Jets also speculate that Cablevision's contracts with its cable subscribers are "at will"
contracts and argue that the breach of such contracts does not support a claim for tortious
interference. As the Second Circuit recognized in the very case upon which the Jets purport
to rely, however, "[w]here contracts terminable at will have been involved, we have upheld
complaints and recoveries in actions seeking damages for interference when the alleged
means employed by the one interfering were wrongful." *Chevron U.S.A., Inc. v. Roxen Serv.,
Inc.*, 813 F.2d 26, 30 (2d Cir. 1987) (internal citation omitted). Other courts have taken that
approach as well. *See, e.g., Auto. Elec. Serv. Corp. v. Ass'n of Auto. Aftermarket Distribs.*,
747 F. Supp. 1483, 1507 (E.D.N.Y. 1990) ("A cause of action for tortious interference with
contractual relations does not lie . . . if the contract is terminable at will unless there is a
showing of fraud, misrepresentation, unfair conduct or other wrongful acts. . . . [T]he Court
finds here that as a result of the wrongful acts and bad faith of [the defendant], there was
attempt [sic] to intentionally interfere or procure the breach of the contract so as to bring
even an at-will contract within the ambit of this tort." (internal citation omitted)).

2.    **Cablevision Has Sufficiently Alleged that the Jets Acted Solely to Harm Cablevision**

The Jets do not deny their interference with Cablevision's cable business but contend, as a matter of fact, that they did not act solely for the purpose of harming Cablevision. Cablevision, however, has alleged that the Jets had no rational business motive for funding a campaign to convince Cablevision's customers to switch to DirecTV. *See* Answer & Am. Countercls. ¶ 97. Moreover, even if this Court were not required to accept Cablevision's factual allegations as true for purposes of this motion to dismiss, Cablevision's allegations are entirely plausible, given that the economic benefit from switching Cablevision customers to DirecTV would flow to DirecTV, not the Jets.

The Jets counter with a factual contention regarding their motivation for interfering with Cablevision's customers. In particular, the Jets argue that a defendant "can act solely for the purpose of harming the plaintiff only if it is acting without regard to its own economic interest." Jets' Mem. at 9 (citing *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 191, 785 N.Y.S.2d 359, 363 (2004)).[9] The Jets' explanation of their purported economic interest, however, strains credulity. The Jets now claim that, in funding this telephone campaign, they were "plainly acting to

---

[9] The Jets' reliance on *Carvel Corp. v. Noonan* for this proposition is misplaced. Among other things, the *Carvel* franchisee plaintiffs alleged only economic pressure imposed by Carvel directly upon them, rather than on the customers with whom the plaintiffs had prospective business relations. *Id.* at 192, 785 N.Y.S.2d at 363-64. The *Carvel* court made clear that only the latter scenario would support a tortious-interference claim. *See id.* Here, unlike in *Carvel*, Cablevision's allegations establish that the Jets' conduct was directed at Cablevision's customers. Moreover, the decision in *Carvel* was based on a factual record that had been fully developed at trial—not on a lower court's resolution of a motion to dismiss on the pleadings. In addition, the *Carvel* court expressly noted that the relations between the plaintiffs and the defendant were governed by the terms of their franchise agreements, not by tort-law principles. *See id.* at 193-94, 785 N.Y.S.2d at 364-65. In contrast, tort-law principles certainly apply here—Cablevision's relations with the Jets are not governed by any contracts.

advance their own economic interest in attempting to build the West Side Stadium." *Id.* at 10.
They even offer a twisted interpretation of Cablevision's pleading as supposedly alleging that
"the Jets funded the phone calls to communicate their position on the proposed Jets' stadium."
*Id.* at 10. In reality, Cablevision has pleaded no such thing. Indeed, Cablevision expressly
alleges that "[t]he sole purpose of [that] campaign was to harm Cablevision by convincing
Cablevision's subscribers, in conscious disregard of Cablevision's rights, 'to drop Cablevision'
by criticizing Cablevision's position on the stadium proposal." Answer & Am. Countercls.
¶ 212; *see id.* at ¶¶ 214, 266, 268-69.

Apart from underscoring that a defendant's motive for engaging in interfering conduct
raises questions of fact that cannot be decided on a motion to dismiss, the Jets' argument in this
regard simply makes no sense. The telemarketers retained by the Jets and DirecTV contacted
Cablevision's customers for one purpose and one purpose only: to induce them to drop
Cablevision's service. According to Cablevision's factual allegations (and as reported in the
press), the telemarketers told Cablevision's customers: "You know, you don't have to support a
monopoly that doesn't support New York City. You have another television choice besides
Cablevision. That choice is DirecTV."[10] That message was not designed to build support for
the stadium project or, indeed, to benefit the Jets' economic interests in any way. To the
contrary, it was an anti-Cablevision harangue intended only to injure Cablevision's business.

---

[10] Mastro Decl. Ex. 5 (Michael Saul, *Team Takes Direct Swipe at Cablevision,* N.Y. Daily
News, Jan. 16. 2005, at 3); *see also, e.g.,* Answer & Am. Countercls. ¶¶ 210-12. This Court
properly may consider the article quoted herein because Cablevision clearly incorporated that
article into its Amended Counterclaims by reference. *See, e.g., Paulemon v. Tobin,* 30 F.3d
307, 308-09 (2d Cir. 1994) ("Although a court considering a motion to dismiss . . . is limited
to the facts stated in the [pleading], the [pleading] includes any written instrument attached to
it as an exhibit and any statements or documents incorporated into it by reference.").

In any event, "whether the defendant acted with the 'sole purpose' of harming the plaintiff is a question of material fact." *Miteva v. Third Point Mgmt. Co.*, 323 F. Supp. 2d 573, 587 (S.D.N.Y. 2004). As such, factual questions regarding the Jets' motive for interfering in Cablevision's cable business simply cannot be resolved on this motion to dismiss. Indeed, the court in *Miteva* rejected a motion for *summary judgment* where the defendant, like the Jets here, claimed an alternative justification for his interference. The court reasoned that the plaintiff "create[d] an issue of fact by challenging [the defendant]'s alleged other motive." *Id.* Similarly here, Cablevision's well-pleaded allegations raise a question of fact that cannot be decided on a motion to dismiss.[11]

**B.    Cablevision Has Sufficiently Alleged Tortious Interference with Its Contractual and Prospective Business Relations with Design, Engineering, and Construction Professionals**

In seeking dismissal of Cablevision's claim for tortious interference with its relations with design, engineering, and construction professionals Flack + Kurtz, Turner, and Code Consultants, the Jets raise arguments similar to those advanced in opposition to Cablevision's claim of tortious interference with its cable business. The Jets' arguments fail in this context for the same reasons.

**1.    The Jets Acted Solely to Injure Cablevision**

Cablevision has adequately alleged that the Jets' sole motivation for tortiously interfering with MSG's prospective business relations with these design, engineering, and construction

---

[11]  The Jets also speciously argue that Cablevision fails to plead that the Jets used "wrongful means" to tortiously interfere with Cablevision's cable business, which would provide an independent basis for sustaining this claim regardless of the Jets' motives. *See, e.g., Miteva*, 323 F. Supp. 2d at 585-87. In fact, Cablevision expressly alleges that the Jets made "false statements" about the proposed Jets' stadium and about Cablevision's opposition to the stadium project. *See* Answer & Am. Countercls. ¶ 217.

professionals was to harm MSG.[12]  *See, e.g.*, Answer & Am. Countercls. ¶¶ 166, 168, 191, 205. In the face of Cablevision's well-pleaded allegations in this regard, the Jets argue that the threats they lodged against MSG's design, engineering, and construction professionals somehow involved the pursuit of the Jets' "own economic interest in seeing to it that critical vendors would not have a conflict of interest by working with the Jets to develop the stadium project while at the same time working for Cablevision." Jets' Mem. at 13. This excuse is entirely implausible. The Jets point to no support for the contention that these well-established contractors did not have the ability to provide services to the Jets and Madison Square Garden at the same time.[13]

In any event, the Jets' position is an inherently fact-based attack on the truth of Cablevision's allegations that the Jets acted solely to harm Cablevision—allegations that this Court must accept as true for purposes of the instant motion.  It is abundantly clear that "whether the defendant acted with the 'sole purpose' of harming the plaintiff is a question of material fact." *Miteva*, 323 F. Supp. 2d at 587.  As such, the Jets' purported justifications for their conduct cannot support dismissal of Cablevision's counterclaims.[14]

---

[12]  Although the Jets argue that Cablevision fails to allege the existence of any contracts with these firms, Cablevision does, in fact, expressly allege that it has had longstanding, ongoing contractual relationships with each of them. *See, e.g.*, Answer & Am. Countercls. ¶¶ 161, 176-77, 185.

[13]  The Jets also argue that they were pursuing "their own economic interest in seeking the services of these entities because . . . all of them were extremely qualified service providers in the field of facilities design and construction." Jets' Mem. at 13 n.4. The Jets further assert that they "needed" these services "to build a competing stadium." *Id.*  Even if these claims were true, however, the Jets fail to explain how coercing these professionals into refusing to work for Cablevision served that purported interest.

[14]  In any event, Cablevision's counterclaims include additional allegations that are sufficient to support a finding that the Jets' sole purpose was to injure Cablevision.  In particular, with respect to Flack + Kurtz, Cablevision alleges that a Flack + Kurtz executive "even offered to

[Footnote continued on next page]

### 2. The Jets Employed the Wrongful Means of Economic Pressure

Moreover, Cablevision's tortious interference claim with respect to these prospective business relations would necessarily survive the instant motion, regardless of the Jets' motives, because Cablevision also sufficiently alleges that the Jets used wrongful means to interfere with Cablevision's relations with its design, engineering, and construction professionals.[15]  *See, e.g.,* Answer & Am. Countercls. ¶¶ 169, 192, 206.  The Jets assert—again, without offering any substantive support—that Cablevision's allegations are insufficient to establish that the Jets used wrongful means.  To the contrary, courts have repeatedly held that allegations, such as those made by Cablevision here, of wrongful exertion of economic pressure on a third party with whom the plaintiff has prospective business relations are sufficient to state a claim for tortious interference.[16]  As these courts have recognized, "[w]hether [a] plaintiff's allegations of

---

[Footnote continued from previous page]
  implement a 'Chinese wall' within the firm to ensure that none of the personnel involved in the Garden project would have any involvement in the Jets stadium project, but the Jets refused" such an arrangement.  Answer & Am. Countercls. ¶ 166.  Thus, even if there were any merit to the Jets' absurd claim that they were acting in their own "economic interest" by refusing to work with vendors that also worked with Cablevision, that argument would still fail because Cablevision has alleged that the Jets refused to implement the very remedial measures that would have protected their alleged "economic interests."

[15]  As the Jets concede, Cablevision's claim for tortious interference can be supported *either* by an allegation that the Jets acted solely to harm Cablevision *or* by an allegation that the Jets used wrongful means.  *See, e.g., Miteva,* 323 F. Supp. 2d at 573; Jets' Mem. at 8-9.

[16]  *See, e.g., Scutti Enters.,* 322 F.3d at 217 (reversing lower court's dismissal of complaint where the defendant had induced a third party to impose limitations on a business venture with the plaintiff by offering to loan the third party $6 million for use in a similar, competing venture with the defendant; although the limitation on plaintiff's venture "appear[ed] to be related to the business in which [defendant] and [plaintiff] compete, . . . it [was] not beyond doubt that [plaintiff] could demonstrate that [defendant]'s loan offer, which induced the [third party]'s agreement to the limitation, was economic pressure unrelated to that business, and was wrongfully aimed at extinguishing [plaintiff]'s relationship with the [third party]"); *Drug Emporium, Inc. v. Blue Cross of W. N.Y., Inc.,* 104 F. Supp. 2d 184, 192 (W.D.N.Y.

[Footnote continued on next page]

economic pressure are of the degree necessary to sustain an action is a question of fact best

answered upon summary judgment or at trial." *Drug Emporium, Inc. v. Blue Cross of W. N.Y.,*

*Inc.*, 104 F. Supp. 2d 184, 192 (W.D.N.Y. 2000). Here, Cablevision alleges that the Jets

improperly exerted economic pressure on its design, engineering, and construction professionals

by refusing to work with those professionals if they continued to work with Cablevision. *See*

Answer & Am. Countercls. ¶¶ 161-69, 185-92, 203-06. Accordingly, Cablevision has

sufficiently alleged wrongful means through economic pressure.

The court's decision in *Tasso v. Platinum Guild International*, No. 94 Civ. 8288, 1997

U.S. Dist. LEXIS 252 (S.D.N.Y. Jan. 16, 1997), compels this conclusion. In *Tasso*, plaintiff

headed a public relations firm, and defendant PGI had been plaintiff's principal client until their

business relationship soured. *See id.*, 1997 U.S. Dist. LEXIS 252, at *3-*4. Plaintiff alleged

that, thereafter, defendants tortiously interfered with her prospective business relations with Gold

Corp., a potential new public-relations client. *See id.*, 1997 U.S. Dist. LEXIS 252, at *4-*6.

Specifically, the plaintiff alleged that defendants

> *threatened to withhold all of PGI's business from Gold Corp. if Gold Corp. became a client of plaintiff. . . .*
>
> . . . .
>
> . . . *[T]aking plaintiff's allegations as true, defendant clearly exercised a degree of economic pressure that went far beyond mere persuasion in inducing Gold Corp. not to become a*

[Footnote continued from previous page]

2000) (refusing to dismiss tortious interference claim premised on allegations that defendant pharmacies wrongfully exerted economic pressure on Blue Cross in order to induce Blue Cross to terminate relations with the plaintiff and deal exclusively with the defendant pharmacies because "plaintiff's allegations that [the defendant pharmacies] used economic pressure to force Blue Cross to terminate its relationship with plaintiff are sufficient to defeat defendants' motion to dismiss").

> *client of plaintiff.* . . . [D]efendant . . . informed Gold Corp. that if
> it retained plaintiff as its public relations agent, it would not
> receive any business from PGI. Plaintiff has therefore adequately
> pleaded that defendants disrupted her prospective relationship with
> Gold Corp. by dishonest, unfair, or improper means. Defendants'
> motion to dismiss the claim for intentional interference is therefore
> denied.

*Id.*, 1997 U.S. Dist. LEXIS 252, at *14-*18 (emphasis added) (internal citation omitted); *see also*

*Scutti Enters.*, 322 F.3d at 217 (reversing dismissal order below where, although it appeared

from the pleadings that defendant's interference was not wrongful economic pressure, it was "not

beyond doubt" that plaintiff could prove otherwise).

Cablevision likewise alleges that the Jets wrongfully interfered with its relations with

design, engineering, and construction professionals by refusing to do any business with those

professionals unless they agreed to terminate their business relations with Cablevision. These

allegations are sufficient to establish that the Jets "exercised a degree of economic pressure that

went far beyond mere persuasion" when they induced these professionals to terminate their

relations with Cablevision. *Tasso*, 1997 U.S. Dist. LEXIS 252, at *17. In any event, it is not

appropriate on this motion to dismiss for the Court to decide the factual issue of whether

Cablevision's allegations of economic pressure are "of the degree necessary to sustain an

action." *Drug Emporium*, 104 F. Supp. 2d at 192. Accordingly, the Jets' motion to dismiss must

be denied.

## CONCLUSION

For the foregoing reasons, Cablevision respectfully requests that the Court deny

Plaintiffs' motion to dismiss Cablevision's Amended Counterclaims.

Dated:    New York, New York
          January 17, 2006

                                    Respectfully submitted,

Miguel A. Estrada (ME-4227)          Randy M. Mastro (RM-9492)
Michael L. Denger                    Jack M. Weiss
Joshua Lipton                        Jennifer H. Rearden (JR-2552)
GIBSON, DUNN & CRUTCHER LLP          GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW          200 Park Avenue
Washington, DC  20036-5306           New York, NY  10166-0193
Tel:  (202) 955-8500                 Tel:  (212) 351-4000
Fax:  (202) 467-0539                 Fax:  (212) 351-4035

                                    Counsel for Defendants Cablevision Systems
                                    Corporation, CSC Holdings, Inc., and Madison
                                    Square Garden, L.P.

80351729_3.DOC